1               IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3    _____

4    UNITED STATES OF AMERICA,          Case No. 10-CR-329-7-F
                                        Volume V of XX
5              Plaintiffs,              (Pages 1 through 105)

6              vs.                      Cheyenne, Wyoming
                                        October 3, 2011
7    ROBERT VELASQUEZ, JR.,             2:32 p.m.
     MIGUEL ANGEL ORDAZ,
8    DANIEL GEORGE RENTERIA,
     ALEX GARCIA, JR.,
9
               Defendants.
10   _____

11

12             TRANSCRIPT OF TRIAL PROCEEDINGS

13       BEFORE THE HONORABLE NANCY D. FREUDENTHAL
            CHIEF UNITED STATES DISTRICT JUDGE
14
          and a jury of twelve and two alternates
15

16

17

18

19

20

21   Court Reporter:      MRS. MARGIE R. DAUSTER, RPR, CRR
                          1500 Longs Peak Drive
22                        Fort Collins, Colorado 80524
                          (970) 631-5925
23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

```
 1   APPEARANCES:

 2   For the Plaintiff:        MR. DARRELL FUN
                               Assistant U.S. Attorney
 3                             U.S. ATTORNEY'S OFFICE
                               100 East "B" Street, Suite 2211
 4                             P.O. Box 22211
                               Casper, Wyoming 82601
 5
                               MR. L. ROBERT MURRAY
 6                             Assistant U.S. Attorney
                               U.S. ATTORNEY'S OFFICE
 7                             P.O. Box 668
                               2120 Capitol Avenue, Suite 4000
 8                             Cheyenne, Wyoming 82003

 9   For Defendant             MR. VINCENT HORN, JR.
     Velasquez:                Attorney at Law
10                             9774 Chanteclaire Circle, Suite 100
                               Littleton, Colorado 80126
11
     For Defendant Ordaz:      MR. PETER TIMBERS
12                             Attorney at Law
                               SCHWARTZ, BON, WALKER & STUDER, LLC
13                             141 S. Center Street, Suite 500
                               Casper, Wyoming 82601
14
     For Defendant             MR. THOMAS A. FLEENER
15   Renteria:                 Attorney at Law
                               FLEENER & VANG, LLC
16                             2523 Garfield, Suite D
                               P.O. Box 1186
17                             Laramie, Wyoming 82073-1186

18   For Defendant Garcia:     MS. JILL A. HIGHAM
                               Attorney at Law
19                             THE HIGHAM LAW OFFICE
                               1001 E. Harmony Road, Suite A-366
20                             Fort Collins, Colorado 80525-3354

21

22

23

24

25
```

1                         INDEX TO WITNESSES

2    GOVERNMENT'S:                                      PAGE

3    ROBERT MacMASTER

4       Direct – Mr. Fun                                  9
        Cross– Mr. Horn                                  14
5
     LISA RIGGS
6
        Direct – Mr. Fun                                 24
7       Cross – Mr. Horn                                 77
        Cross – Mr. Timbers                              77
8       Cross – Mr. Fleener                              84
        Redirect – Mr. Fun                               96
9       Recross – Mr. Fleener                           101
        Recross – Mr. Timbers                           102
10

11

12                        INDEX TO EXHIBITS

13   GOVERNMENT'S                          IDENTIFIED/RECEIVED

14   1409-A                                    58        59
     1802                                      66        67
15   1804-A                                    64        65
     1804-B                                    64        65
16   1804-C                                    64        65
     1804-D                                    64        65
17   1804-E                                    64        65

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S

 2        (Trial proceedings reconvened

 3         2:32 p.m., October 3, 2011.)

 4        (Following out of the presence of the jury.)

 5        THE COURT:  We're here in the continuation of the

 6   jury trial in United States of America versus Robert

 7   Velasquez, et al., Docket 10-CR-329.

 8             I have received a copy of Defendants Velasquez and

 9   Garcia's motion for mistrial.  Either Mr. Horn or

10   Ms. Higham.

11        MR. HORN:  Your Honor, I guess I've been

12   designated.  After the court -- after 4:30, or thereabouts,

13   on Friday, Your Honor, I was heading south, and I got a call

14   from the marshal's office, Mr. Jason Griess, telling me that

15   my client wanted to talk to me.  And so I turned around and

16   came back, went to the marshal's office, and was advised

17   that -- from some of the deputies that my client and

18   Mr. Renteria were --

19        THE COURT:  Mr. --

20        MR. HORN:  I'm sorry.  I'm sorry.  Alex Garcia, I

21   apologize.  -- were handcuffed in the elevator, Judge, and

22   were facing the back of the elevator, hands cuffed behind

23   their back.  And my client advised me that there was some

24   problem with the opening and closing of the elevator doors.

25   One of the marshals was attempting to do that.
```

1    My client turned around, saw two or more jurors

2    walking down the hallway.  He believes that this is

3    prejudicial to him and to his co-defendant.  The motion for

4    the mistrial, Judge, was -- has been filed.  I'm not going

5    to rehash it all.

6    But, basically, the case law indicates that,

7    briefly, the visible restraints -- the use of visible

8    restraints is prejudicial in nature and almost inevitably

9    affects adversely the jury's perception of the character of

10   the defendant, citing Zant, Z-a-n-t, v. Stephens,

11   S-t-e-p-h-e-n-s.

12   THE COURT:  Was that an inadvertent view of the

13   defendants in restraints, or was that --

14   MR. HORN:  The *Zant* case, Judge?

15   THE COURT:  Beg your pardon?

16   MR. HORN:  The *Zant* case or this case?

17   THE COURT:  Well, the case you're citing to me.

18   MR. HORN:  Judge, I don't know.  I'm sorry.  I

19   don't know.

20   THE COURT:  Okay.

21   MR. HORN:  I just got -- our paralegal put this

22   stuff together, and I only had an opportunity to read it

23   this afternoon, Judge.  For that I apologize.

24   But, basically, my client -- and I'll let

25   Ms. Higham speak for Mr. Garcia.  But they feel that

1    they've -- that their case is prejudiced if, in fact, the

2    jurors did see them in handcuffs, given the case law that

3    I've seen, Judge.

4          And even looking at Mr. Murray's comments, he

5    does -- he does cite some cases which would indicate this

6    circuit is joining a number of other circuits, has upheld

7    the principle that in the absence of a showing of prejudice,

8    a fleeting glance by jurors of a defendant outside the

9    courtroom in handcuffs does not justify a new trial.

10         The case of *U.S. v. Simpson*, which is somewhat in

11   Mr. Murray's comments, that was after the case.  The trial

12   was over at that point, Judge.  And the point is that we

13   really can't let this go to the end of the trial and say,

14   well, you know, we should have told you, Judge, and we want

15   a motion for a mistrial because of this incident.

16         I'm not suggesting it was the fault of the

17   marshals.  We don't even know if the jurors saw the clients

18   with their handcuffs on.  I understand that one of the --

19   one of the marshals is available to testify as to what he

20   saw.  Perhaps we ought to get into that and see what

21   actually happened because I wasn't there.  Any questions,

22   Your Honor?

23         THE COURT:  No.  Thank you, Mr. Horn.

24         MS. HIGHAM:  Your Honor, if I may just make a few

25   remarks on behalf of Mr. Garcia.  I was not contacted by the

1    marshals.  I was contacted by Mr. Horn and then had a

2    subsequent conversations with Mr. Garcia.  The -- the

3    argument that it was an inadvertent glance, I think, loses a

4    lot of its weight in this issue.

5         THE COURT:  I don't think we even have evidence

6    that anyone besides Mr. Velasquez glanced.  Do we have any

7    evidence at all that a juror saw either Mr. Garcia or

8    Mr. Velasquez in restraints?

9         MS. HIGHAM:  I'll just tell you what Mr. Garcia

10   related to me.  That he did hear jurors talking in the

11   hallway.  Mr. Garcia heard -- looked over his shoulder,

12   because his back was facing the elevator doors, as they

13   opened, with his -- with his hands cuffed behind him.  And

14   he -- he was able to identify two of the jurors and describe

15   them to me that he saw as they walked past.

16        THE COURT:  I don't think that answers my question.

17   But I guess if we go to the facts of this, I suspect we can

18   either hear from the marshals or the defendants.

19        MS. HIGHAM:  Okay.  Thank you, Your Honor.

20        THE COURT:  Mr. Fun or Mr. Murray?

21        MR. FUN:  May it please the Court, good morning.

22   Good afternoon actually, Your Honor.  I think the real issue

23   in this case -- there are a couple issues, I think, that

24   need to be addressed.

25             One is whether or not there was an intentional

1    showing of the -- the defendants in handcuffs or whether it

2    was unintentional, if that were the case.

3            I think the cases that Mr. Horn cites relate to the

4    defendants appearing at trial in shackles versus being

5    transported or in the hallway type of situation.  I think in

6    this particular case, the controlling law is Tenth Circuit

7    cases, specifically *U.S. v. Jones* at 468 Federal 3rd 704, as

8    well as *United States v. Ware*, 897 Federal 2nd 1538, a 1990

9    Tenth Circuit case.

10           And, basically, what those cases stand for is the

11    general proposition that a juror's brief view of a defendant

12    in shackles does not automatically qualify as a due process

13    violation that would result in a mistrial.  The cases

14    clearly indicate that such an incident must be -- must

15    result in prejudice to violate due process, and the burden

16    is on the defendant to show such prejudice.

17           *United States v. Ware* goes on to talk about joining

18    other circuits in such a circumstance and has upheld the

19    principle that in the absence of a showing of prejudice, a

20    fleeting glance by jurors of a defendant outside the

21    courtroom in handcuffs does not justify a new trial.

22           Moreover, this court requires a defendant who

23    complains of a juror seeing him in restraints show actual

24    prejudice.

25           So I think the court is correct.  We don't have any

1   facts at this point.  I mean, what we know is some

2   allegations that -- that the defendants seem to raise,

3   perhaps self-serving, that they were in handcuffs and that

4   the elevator doors wouldn't close and jurors were walking

5   by.  But there's no evidence on the record at this point to

6   suggest that the jurors even saw them or even saw them in

7   handcuffs, as the case may be.

8          It's my understanding that Deputy U.S. Marshal

9   Robert MacMaster was present and probably can tell us a

10  little bit more in terms of the circumstances and facts to

11  help flesh this out.

12         THE COURT:  Thank you.  Did -- did you want to call

13  the marshal?  Did you want to call a member of the marshals?

14         MR. FUN:  Yes, Your Honor.

15         THE COURT:  All right.  Why don't you.  If you

16  could -- thank you.

17      (Witness sworn.)

18         THE CLERK:  Can you please state and spell your

19  name for the record.

20         THE WITNESS:  Robert MacMaster, M-a-c-M-a-s-t-e-r.

21                  ROBERT MacMASTER,

22  having been first duly sworn, was examined and testified as

23  follows:

24                  DIRECT EXAMINATION

25      Q.   (By Mr. Fun)  Sir, you're a Deputy U.S. Marshal

1    here in the Cheyenne courthouse?

2       A.    Correct.

3       Q.    And how long have you been with the U.S. Marshals?

4       A.    A little over three years.

5       Q.    Sir, you've been, obviously, hearing us talk about

6    this incident.  What can you tell us about it?

7       A.    As was stated before, when we recessed trial on

8    Friday, we were transporting or moving the prisoners from

9    the courtroom to our secure location downstairs, our

10   cellblock.  We used the elevator to -- to transport

11   prisoners.  And as we stepped on with two of them, the

12   elevator malfunctioned.  It didn't stay closed, and it

13   popped back open.

14           At that time jurors had been released and were

15   walking down the hallway that passes the opening of the

16   elevator.

17      Q.    Okay.  Now, there's, obviously, three elevators in

18   the hallway.  Which elevator was it?

19      A.    I think he might be referring to the main public

20   elevators.  What we do is take prisoners in a back hallway

21   that's behind the courtrooms, and there's a single elevator

22   there.

23      Q.    Okay.  Now, when you say that the -- there was a

24   malfunction and the doors popped open, how long were the

25   doors open?

1      A.     Seconds.  Less than four.  It was a series of

2    opening and closing though.  We hit a series of buttons

3    that, you know, the elevator is supposed to close.  It

4    popped back open.  We hit the button that would allow the

5    elevators to close, and it popped back open again.  So

6    altogether, I would say it was open for four to five seconds

7    at a period of time where it should have been closed.

8      Q.     I understand.  Now, you mentioned that some jurors

9    passed the opening.  Do you know which jurors passed that

10   opening?

11     A.     I could identify one if I saw him.

12     Q.     Okay.

13     A.     I mean, obviously, I don't know names or numbers.

14     Q.     Do you know how -- approximately how many jurors

15   had passed that opening?

16     A.     It was about three or four.

17     Q.     Do you recall if any jurors looked into the

18   elevators?

19     A.     I didn't see any of them turn their head.

20     Q.     Do you recall if any -- you heard any comments as

21   the jurors passed by?

22     A.     I don't.  I was more concerned with my job at that

23   point.

24     Q.     Okay.  Now, when prisoners are put in the elevator,

25   can you explain where people are standing and how they're

1    standing in the elevator?

2        A.    Sure.  Generally, you know, we make the prisoners

3    face the back wall.

4        Q.    Okay.

5        A.    Deputies or secur -- court personnel will be at the

6    front of the elevator closer to the door so they can

7    function the keypads and . . .

8        Q.    Okay.  And how many -- how many court security

9    personnel do you have in the elevator in this particular --

10   let me rephrase that question.

11           In this particular case, you had two prisoners in

12   the elevator.  How many marshals or court security were on

13   the elevator at the same time?

14       A.    There were two inside the elevator and one outside

15   of the elevator.

16       Q.    Okay.  Where was the person that was outside the

17   elevator standing?

18       A.    I'm not sure because my view was obstructed by the

19   elevator walls.

20       Q.    Okay.

21       A.    I'm not sure which side he was on.

22       Q.    And can you please tell us where the two court

23   security personnel were standing in the elevator?

24       A.    In opposite corners.  I mean, I was on one corner

25   near the keypad.

1    Q.    Okay.

2    A.    The other deputy was on the other side near the --

3    the buttons that function the elevator, as far as your floor

4    choice and your open and close buttons.

5    Q.    Okay.  Would there have been anyone standing

6    directly behind any of the prisoners as the doors were being

7    opened?

8    A.    It's a small enough elevator that you -- you could

9    say that both of us were standing directly behind the

10   defendants.

11   Q.    Other than that single occasion, were there any

12   other occasions where this has happened in this case?

13   A.    No, sir.

14   Q.    And where are the defendants handcuffed at the time

15   they were being transported?

16   A.    Behind their back.

17   Q.    Other than the handcuffs, are there any other

18   shackles or belly chains on them?

19   A.    No.

20   Q.    Okay.  So just merely handcuffs?

21   A.    Correct.

22   Q.    Do you recall seeing either Robert Velasquez or

23   Alex Garcia looking over their shoulders?

24   A.    I know that Mr. Velasquez for sure looked over his

25   shoulder.  I'm not sure about Mr. Garcia.  Mr. Velasquez was

1    closer to me in the elevator.  That's why I had a better

2    view of him.

3              MR. FUN:  Just a moment, Your Honor.

4              THE COURT:  Thank you.

5        (Discussion off the record.)

6        Q.    (By Mr. Fun)  Deputy MacMaster, can you please

7    describe for us, how wide is the opening to this elevator?

8        A.    4 to 5 feet.  5 feet.

9        Q.    And were there any court security or court

10   personnel directly in the line between the defendant and the

11   doorway as the jurors passed by?

12       A.    Yes.

13             MR. FUN:  Thank you.  I have nothing further, Your

14   Honor.

15                        CROSS-EXAMINATION

16       Q.    (By Mr. Horn)  Deputy MacMaster, assuming that a

17   person or a juror walking by the elevator during this

18   process, would they have the ability, while those doors were

19   open, to see either Mr. Garcia or Mr. Velasquez with the

20   handcuffs behind their back?

21       A.    Yes.

22       Q.    And you conceded that Mr. Velasquez looked over his

23   shoulder at the time that the jurors were walking by?

24       A.    At the time they walked by, I'm not sure.  At some

25   point during this event, Mr. Velasquez looked over his

1    shoulder.  He was able to identify jurors.

2        Q.    How long were the doors actually opened; do you

3    know?

4        A.    As I said earlier, four or five seconds.

5        Q.    Certainly enough time to turn around and look, see

6    someone walking by?

7        A.    Right.  But can I qualify that?

8        Q.    Sure.

9        A.    They were open for four to five seconds.  That's

10   not the amount of time it took those people to walk by.  I

11   mean, that was probably a mere second or two.

12       Q.    Do you remember how many jurors were actually

13   walking by?

14       A.    It was three to four.  I'm not sure.

15       Q.    Recognize the -- whether they were male or female?

16   I know we have a preponderance of female jurors.

17       A.    I definitely saw a female.  I don't know which one.

18   And definitely saw a male.  And that's the one I could

19   identify if I saw him.

20       Q.    Did you follow the same procedure that you do in

21   any jury case where there are defendants in custody?

22       A.    Yes.

23             MR. HORN:  Can I have a moment, Your Honor?

24       Q.    (By Mr. Horn)  Deputy MacMaster, is it your custody

25   in this building to make sure the jury is gone before they

1   transport the prisoners with handcuffs?

2       A.    Solely mine, no.  We work in conjunction with the

3   clerk's office --

4       Q.    Okay.

5       A.    -- to ensure that jurors are where we think they

6   are.

7       Q.    Okay.  Wouldn't it be a better practice to check

8   with the court clerk and find out if the jury room is in

9   fact empty before you start moving prisoners?

10      A.    That occurred.

11      Q.    I'm sorry?

12      A.    That occurred.

13      Q.    That occurred?

14      A.    Yes, sir.

15      Q.    You were told that they were all gone?

16      A.    Verbally, no.  The clerk made eye contact with the

17  deputy marshal.  I think a series of thumbs-up were given

18  which, you know, to us means the jury is gone, you can go

19  ahead and move the prisoners.

20            We did so.  The elevator malfunctioned.  We should

21  have been moving -- you know, the elevators should have been

22  closed and moving.  It didn't.  And here we are.

23      Q.    Were Mr. Velasquez and Mr. Garcia, were they the

24  first group to go or the second group; do you know?

25      A.    They were the second group.

1      Q.    Second group.  So there was a time lapse,

2   obviously, between the first group and the second group.

3      A.    Correct.

4      Q.    How long would it take -- how long did you have to

5   wait for the elevator?

6      A.    You know, that elevator is not the quickest, so it

7   was quite a few minutes.  For it to cycle, you know, to go

8   down to the first floor, unload prisoners and come back up,

9   it's probably a good four or five minutes.

10     Q.    And for that time frame, where were Mr. Garcia and

11  Mr. Velasquez?

12     A.    In what we call the man trap.  And it's a -- sort

13  of a hallway between our cell block and the public hallway.

14     Q.    So they were -- you and the two clients were not in

15  the hallway at that point?

16     A.    Correct.  We were not in the public hallway.

17           MR. HORN:  All right.  That's all I have, Your

18  Honor.

19           THE COURT:  Thank you.

20           MR. FUN:  I have nothing further, Your Honor.

21  Thank you.

22           THE COURT:  Thank you, Marshal.

23           MR. FLEENER:  Your Honor, for the record,

24  Mr. Renteria joins that motion for mistrial.

25           THE COURT:  On what basis?

1          MR. FLEENER:  On the basis that prejudice to two is

2     prejudice to four.  That if all four of these defendants are

3     in a room sitting at a table together, that even if -- that

4     if Mr. Garcia and Mr. -- Mr. Velasquez -- I apologize --

5     Mr. Velasquez are prejudiced, then jurors could reasonably

6     assume that these particular witnesses are also shackled and

7     together.

8          MR. TIMBERS:  Your Honor, Mr. Ordaz joins.

9          THE COURT:  For the same reasons or any others?

10         MR. TIMBERS:  For the same reasons articulated by

11    Mr. Fleener.  Thank you, Your Honor.

12         THE COURT:  Thank you.  Anything further on this

13    matter?

14         MR. FUN:  I don't believe so from the United

15    States, other than I think the obvious is that Mr. Fleener's

16    client and Mr. Timber's client, obviously, don't have

17    standing to raise the issue.  Nonetheless, even if they did,

18    I don't think it's an issue worthy of much note given the

19    facts.

20         THE COURT:  Thank you.  Based on the cases cited,

21    as well as *United States vs. Johnson*, which I'm not sure was

22    referenced by the prosecutor, that's at 911 F.2nd 1394, this

23    circuit has held consistent with other circuits, that a

24    juror's fleeting and inadvertent glance of a defendant in

25    handcuffs does not warrant a mistrial.

1          The court would suggest a curative jury

2     instruction.  We're in a bit of a difficult situation

3     because we don't know whether any jurors actually did see

4     the defendants in handcuffs.  I'll note one for your

5     consideration, and we can discuss it further at the

6     instruction conference.

7          If the defendants request a curative jury

8     instruction, I would suggest something along the lines of

9     the following:  The jury should not -- should make no

10    inferences from or speculate about the presence of the U.S.

11    marshals in this courtroom or any other visible security

12    measures in this case.  You must not consider this fact in

13    deciding the issues in this case.  It is not evidence in the

14    case and should not be discussed by you in your

15    deliberations.  It has no bearing on defendants' guilt or

16    innocence.

17         At the time of the instruction conference we can

18    discuss the basis for that curative jury instruction, which

19    has been revised given our lack of understanding about the

20    facts.  I believe it would be more prejudicial to inquire

21    about whether anyone saw anything than to leave the matter

22    lie.

23         I certainly believe that the presence of the

24    marshals in the courtroom, if no one saw anything, would be

25    an innocent enough and perhaps appropriate jury instruction

1    in this case nonetheless.

2          I'll, as I mentioned, let defense counsel

3    deliberate on that.  It will be the defense counsel's

4    responsibility to inform the court as to whether any of the

5    defense wants a curative jury instruction, and then we can

6    work on its actual text to arrive at something that's,

7    hopefully, suitable to everyone.

8          MR. HORN:  Your Honor, on behalf of Mr. Velasquez,

9    two things.  One, we just want to be sure that the motion

10   will be filed -- is going to be filed with the court.  We

11   gave it to the various persons.  I'm not sure that it's

12   actually on the docket right now, Judge.  If it's not, I'll

13   take care of getting it there.

14         Secondly, we just want a continuing objection, Your

15   Honor, to your ruling on this issue.

16         THE COURT:  So noted.

17         MR. HORN:  Thank you, Your Honor.

18         THE COURT:  Thank you.  And that's noted as to all

19   the defendants.

20         MR. FLEENER:  Your Honor, may I briefly address

21   another issue?

22         THE COURT:  Yes.

23         MR. FLEENER:  I was informed by my client yesterday

24   or Friday that the marshal service was taking photos of them

25   at the behest of the United States.  I don't know what the

1   photos are being used for.  We would object to the marshal

2   service taking photos at the request of the United States,

3   and I -- my client said he wasn't going to allow his photo

4   to be taken.  I think he has a right not to allow his photo

5   to be taken.

6          But I would ask the court to tell the United States

7   to please, if they have something like that, to -- I think

8   it needs to be -- to have an order from the court or the

9   consent of the defense counsel.  I don't think you can just

10  have the marshal service running around taking photos of our

11  guys.

12         I don't know what it's used for.  I don't know if

13  they're going to put them in the big book or if it's used

14  for something else, but it came up.

15         THE COURT:  In terms of the court's intention for

16  jury deliberations is that none of the defendants' photos

17  would need to be included in that book.  They're here.

18  They're not likely to be forgotten.

19         MR. FLEENER:  Well, that was our understanding too.

20  That's why we were caught off guard when the photos were

21  being taken.  I don't know what they were being taken for.

22         THE COURT:  Thank you, Mr. Fleener.

23         MR. HORN:  Your Honor, Mr. Velasquez was

24  photographed.

25         MR. TIMBERS:  As was Mr. Ordaz.  And I just don't

1    know the purpose of it.  I -- I -- thank you.

2            MR. FLEENER:  I'd ask the court to inquire of the

3    United States why they had the marshal service take our

4    clients' photos.

5            MS. HIGHAM:  Mr. Garcia as well, Your Honor.

6            THE COURT:  Thank you.  Mr. Fun?

7            MR. FUN:  Your Honor, well, a couple things.  One

8    is that the image of a person is not protected as a privacy

9    matter issue.  So I don't think that's much of an issue.

10   The only thing I did was I asked the U.S. marshals if they

11   had current photographs of the defendants.  They indicated

12   they did not.  I said, okay, it's not a problem.  I just was

13   curious if they did.

14           And then, apparently, they took current photographs

15   of the defendants.  And that's it.  The only thing I did

16   note was that at least in one particular case, Mr. Fleener's

17   client, he has altered his appearance between the time he

18   was arrested and, obviously, several months ago and today at

19   trial.  Primarily, he has now full facial hair as well as

20   hair on the top of his head now.

21           So it was mainly for purposes of if we need to

22   bring up those issues relative to trial and have comparing

23   photos, to some degree, of the defendant's appearance now

24   versus later or prior when the witnesses saw him.

25           But I don't think it's going to be an issue, Your

1    Honor.

2              THE COURT:  Thank you, Mr. Fun.

3              MR. FLEENER:  You don't compare photos, judge.  If

4    the witness looks different than --

5              MR. MURRAY:  Your Honor, if I can just

6    short-circuit this real quick.  It's my understanding, in

7    talking to the case agent, and Mr. Fun can correct me if I'm

8    wrong --

9              THE COURT:  I'm sorry.  I couldn't hear you when

10   you had your head turned.

11             MR. MURRAY:  It's my understanding, talking to the

12   case agent and Mr. Fun, that none of the potential witnesses

13   have seen these photos at all, and we're not going to be

14   showing them to them at all.  It won't be an issue.

15             THE COURT:  Thank you.  Thank you for bringing that

16   to the court's attention.  It's the court's understanding

17   that the government has no intent at this point to use the

18   photos.  And if that changes, I'd ask the government to

19   advise the court.  Anything else before we bring the jury

20   in?  No?  All right.  Thank you.  Please stand for the jury.

21             (Following in the presence of the jury.)

22             THE COURT:  Please be seated.  We're here in the

23   continuation of the jury trial in Docket Number 10-CR-329.

24   I have to admit, I'm not sure -- were we concluded with

25   Special Agent Herrmann?

1    MR. FUN:  May it please the court, yes, ma'am, we

2    were.

3          THE COURT:  And if I forgot or neglected to advise,

4    he's released from his subpoena, and you may call your next

5    witness.

6          MR. FUN:  Thank you, Your Honor.

7          THE COURT:  Thank you.

8          MR. FUN:  Counsel.

9          MR. FLEENER:  Counsel.

10         MR. FUN:  Good afternoon.

11         THE COURT:  Oh, before that, I would note the

12   presence of the jury with roll call waived.  Thank you.

13         MR. FUN:  The United States now calls Lisa Riggs to

14   the stand.

15      (Witness sworn.)

16         THE CLERK:  Please take a seat.  State and spell

17   your name for the record.

18         THE WITNESS:  Lisa Riggs, L-i-s-a R-i-g-g-s.

19                    LISA RIGGS,

20   having been first duly sworn, was examined and testified as

21   follows:

22                  DIRECT EXAMINATION

23   Q.    (By Mr. Fun)  Ms. Riggs, have you testified in

24   court before?

25   A.    No, sir.

1    Q.    Okay.  I know you're a little nervous, so try to

2    relax.  Let's just first tell the jury about your background

3    a little bit.  Where did you grow up at?

4    A.    Wyoming.

5    Q.    And what education level have you achieved?

6    A.    Some college.

7    Q.    Are you married?

8    A.    No, sir.

9    Q.    Do you have any children?

10   A.    No, sir.

11   Q.    How old are you?

12   A.    22.

13   Q.    Have you been convicted of any felony crimes?

14   A.    No, sir.

15   Q.    Have you been convicted of any crime, whether it be

16   felony or misdemeanor, involving false statements?

17   A.    No, sir.

18        MR. FLEENER:  Objection.  He's bolstering the

19   witness.

20        MR. FUN:  It's proper, Your Honor.

21        THE COURT:  Overruled.  Please proceed.

22   Q.    (By Mr. Fun)  For false statements?

23   A.    No, sir.

24   Q.    Perjury?

25   A.    No, sir.

```
 1      Q.     Check fraud?

 2      A.     No.

 3      Q.     Anything of that nature?

 4      A.     No.

 5      Q.     Now, madam, have you been promised anything for

 6   your testimony here today?

 7      A.     No, sir.

 8      Q.     Have you been paid anything for your testimony?

 9      A.     No, sir.

10      Q.     Have you been granted any type of immunity for your

11   testimony?

12      A.     No.

13      Q.     Are you pending any charges?

14      A.     No.

15      Q.     Okay.  Now, let's turn to a little bit about

16   your -- your drug use.  Have you used controlled substances

17   or illegal drugs in your life?

18      A.     Yes, sir.

19      Q.     What type of drugs have you used?

20      A.     Marijuana.

21      Q.     Anything else?

22      A.     Cocaine and ecstasy and mushrooms.

23      Q.     Have you ever used any methamphetamine?

24      A.     No, sir.

25      Q.     What was the first drug you used?
```

1    A.    Marijuana.

2    Q.    And how old were you?

3    A.    Maybe seventh or eighth grade.

4    Q.    Is there a drug that you prefer to use?

5    A.    In the past, marijuana.

6    Q.    How did you use marijuana?

7    A.    I would smoke it.

8    Q.    When was the last time you used marijuana?

9    A.    The fall of 2009.

10   Q.    How old were you then?

11   A.    19, I think.

12   Q.    Have you received any type of treatment for

13   controlled substances, drug treatment?

14   A.    No.

15   Q.    When you were using marijuana, did you ever suffer

16   any memory loss?

17   A.    I don't think so.  No.

18   Q.    How about any blackouts?

19   A.    No.

20   Q.    Hallucinations?

21   A.    No.

22   Q.    Ms. Riggs, were you, at a point in time, a

23   confidential informant?

24   A.    Yes.

25   Q.    How did you become a confidential informant?

1    A.    I was pulled over and ticketed.  And the officer

2  asked me if I wanted to meet with Officer Hall the following

3  day to talk to him about some stuff.

4    Q.    Did you meet with Officer Hall?

5    A.    Yes, sir.

6    Q.    Do you recall when that was?

7    A.    In the fall of '09.  Maybe October.

8    Q.    Now, had you ever been a CI before?

9    A.    No, sir.

10   Q.    Was this the only case where you were a

11  confidential informant?

12   A.    Yes, sir.

13   Q.    The time you became a confidential informant, did

14  you have any charges pending against you?

15   A.    Yes.

16   Q.    And what was that for?

17   A.    Possession of marijuana.

18   Q.    And how much marijuana?

19   A.    I don't remember the exact amount.

20   Q.    Do you remember if it was a felony amount or a

21  misdemeanor amount?

22   A.    A misdemeanor.

23   Q.    Why did you become a confidential informant?

24   A.    Because the decisions I was making weren't great,

25  and I needed to get away from that.

1    Q.    Tell me about the process that you went through to

2    become a confidential informant, in brief.

3    A.    What do you mean?

4    Q.    You met with Agent Hall?

5    A.    Yes.

6    Q.    Tell us what happened.

7    A.    I met with Officer Hall, and we discussed my

8    personal use.  We discussed people that I had been using

9    with, things of that nature.

10   Q.    Did there come a point in time where you signed an

11   agreement to become a CI?

12   A.    Yes.

13   Q.    Do you recall anything about that agreement?

14   A.    It said -- I signed not to violate any laws, not to

15   discuss it, things like that.

16   Q.    After you signed this agreement, what happened

17   next?

18   A.    What do you mean?

19   Q.    You signed the agreement.  Did there come a point

20   in time when you actually conducted controlled purchases --

21   A.    Yes.

22   Q.    -- of drugs?

23   A.    Yes, sir.

24   Q.    And what drugs did you purchase?

25   A.    I purchased methamphetamine.

1     Q.    Now, when you purchased methamphetamine as a CI,

2  were you under the supervision, for lack of a better term,

3  of Mike Hall?

4     A.    Yes.

5     Q.    Now, you understood that you were not employed by

6  DCI; correct?

7     A.    Yes.

8     Q.    Let's talk about the first time you conducted a

9  controlled purchase of any drugs.  Do you remember when that

10  was?

11     A.    The beginning of November, I believe, of 2009.

12     Q.    Do you recall if it was November 5th of 2009?

13     A.    I think so.

14     Q.    Okay.  And tell us what happened.

15     A.    We had it arranged to meet -- Rob had talked to me

16  to meet him in Basin at a gas station.  And then there was a

17  local cop there, so he wanted me to follow him to another

18  gas station.  And then we went to his house, and then we

19  went to the retirement center in Basin.

20     Q.    Okay.  And what happened at the retirement center?

21     A.    We met behind the retirement center and did the

22  exchange.

23     Q.    And when you say "we," who was there?

24     A.    Rob and I.

25     Q.    Okay.  Do you know Rob's last name?

1    A.    Velasquez.

2    Q.    Now, if Robert Velasquez is in this courtroom

3    today, can you please indicate where and describe what he's

4    wearing.

5    A.    Directly behind you in a tanner shirt, a

6    button-down.

7          MR. FUN:  Let the record reflect the witness has

8    correctly identified the defendant, Robert Velasquez.

9          THE COURT:  The record will so reflect.

10   Q.    (By Mr. Fun)  Ms. Riggs, did you know Robert

11   Velasquez prior to November 5th of 2009?

12   A.    Yes, sir.

13   Q.    How is it that you knew him?

14   A.    A friend that I had graduated high school with was

15   dating him.

16   Q.    So how long have you known Robert Velasquez?

17   A.    Since I was about 15.

18   Q.    Did you go to school with him?

19   A.    No, sir.

20   Q.    How is it -- had you previously obtained any drugs

21   from him?

22   A.    Yes, sir.

23   Q.    Prior to November 5th of 2009?

24   A.    Yes, sir.

25   Q.    Tell us briefly about that.

1    A.    In high school we would party at his house.

2    Q.    Okay.  And where was his house at at this time?

3    A.    In Greybull.

4    Q.    And that's in Wyoming?

5    A.    Yes, sir.

6    Q.    When you were at his house partying in Greybull,

7    what type of drugs did you receive from Robert Velasquez?

8    A.    Marijuana.

9    Q.    Anything other than marijuana?

10   A.    No.

11   Q.    Do you recall in what quantities you received the

12   marijuana?

13   A.    I couldn't say exact amount.  I don't remember for

14   sure.

15   Q.    Did you have to pay anything for it?

16   A.    If we -- if we were partying, we would just smoke,

17   like all of us together.

18   Q.    Okay.  Now, you previously indicated that you had

19   never used any methamphetamine.

20   A.    Correct.

21   Q.    How did that -- how did it come about then leading

22   up to the November 5th of 2009?

23   A.    Before I had gotten in trouble and gotten pulled

24   over and talked to Officer Hall, Rob and Melissa were in

25   Billings with me, and Rob basically asked me if I would want

1   to help him sell some stuff up in Montana, because I was

2   living in Billings at the time.

3       Q.   Do you recall when that was?

4       A.   Not the exact date.

5       Q.   Do you remember the time --

6       A.   In the -- in the fall.

7       Q.   Okay.  Do you remember the time -- the fall of what

8   year?

9       A.   '09.

10      Q.   So shortly before -- sometime before you were

11  stopped in October of '09?

12      A.   Yes.

13      Q.   Okay.  Now, at the time you indicated that you were

14  living in Billings.

15      A.   Yes, sir.

16      Q.   And you met with Rob Velasquez and Melissa?

17      A.   Yes, sir.

18      Q.   And how do you know Melissa?

19      A.   I went to high school with her.

20      Q.   Okay.  What was the relationship at that time

21  between Melissa and Rob?

22      A.   They were together.

23      Q.   Together meaning boyfriend/girlfriend or just --

24      A.   Yes.  Mm-hum.

25      Q.   Do you know why they were in Billings?

1    A.    I'm not for sure.

2    Q.    Okay.  Tell me how it is that you met up with Rob

3    and Melissa in Billings.

4    A.    I think that Melissa called me or texted me and

5    said that she was in Billings because she knew that I lived

6    there.  And then they were staying at a hotel, and I met

7    them at their hotel room.

8    Q.    And when you met with them, what is it that Rob

9    told you or asked you?

10   A.    We were in the car, and he -- I don't remember the

11   exact words he used.  But he asked if I wanted to help him

12   sell some stuff up there.

13   Q.    Was Melissa present?

14   A.    Yes.

15   Q.    Did she say anything?

16   A.    Yes.

17   Q.    What did she say?

18   A.    She, basically, tried to stop him from saying it.

19   Q.    What was Rob's reaction, if you can remember?

20   A.    I don't remember exactly.

21   Q.    What was your response?

22   A.    I told him that I could maybe, but I wasn't really

23   for sure.

24   Q.    Now, when he asked you if you could help him sell

25   some stuff, what is it that you understood that to mean?

1    A.    Meth.

2    Q.    Why meth?

3    A.    I think he said something about sell some dope or

4    something like that.

5    Q.    How would that have been different from marijuana,

6    say, for example?

7    A.    Because you would say weed or pot.

8    Q.    Okay.  So he used a different term then?

9    A.    Yes.

10   Q.    Now, did you, in fact, sell methamphetamine for

11   Robert Velasquez?

12   A.    Through Officer Hall?

13   Q.    No, before November 5th.

14   A.    No.

15   Q.    So between the fall of '09 up to November 5th of

16   2009, did you obtain any methamphetamine from Robert

17   Velasquez?

18   A.    No.

19   Q.    Okay.  So the November 5th, 2009, was the first

20   time that you obtained methamphetamine?

21   A.    Yes, sir.

22   Q.    And that was while you were a confidential

23   informant?

24   A.    Yes, sir.

25   Q.    Okay.  Now, let me talk a little bit about the

1  November 5th, 2009.  Where did this controlled buy take

2  place?  What city?

3       A.    Basin.

4       Q.    And that would be Basin, Wyoming?

5       A.    Yes, sir.

6       Q.    Now, you indicated that you went to one location,

7  but a policeman was there?

8       A.    Mm-hum.

9       Q.    What was that first location?

10      A.    Just a gas station.

11      Q.    Did you see Robert Velasquez come to that gas

12  station?

13      A.    I -- I don't remember for sure.

14      Q.    How is it then that you ended up going to a

15  different location?

16      A.    I believe he called me.

17      Q.    Where did you go after the gas station?

18      A.    We went to meet at another gas station down the

19  road, but he kind of just pulled over and called me.

20      Q.    And what happened during that phone call?

21      A.    He said to follow him to his house.

22      Q.    And did you follow him to his house?

23      A.    Yes, sir.

24      Q.    And do you remember where his house was located?

25      A.    On the out -- outskirts of Basin.

1    Q.    Do you recall what the house looked like?

2    A.    I don't remember exactly what the house looked

3    like.  I remember like how we had to drive like down and

4    around through a bunch of trees.

5    Q.    When you got to the house, what happened?

6    A.    I followed him inside and went into the garage

7    right behind him.

8    Q.    Was there anyone else there?

9    A.    Someone was in the shower.

10   Q.    Do you know who that was?

11   A.    I assumed Melissa.

12   Q.    What happened in the garage?

13   A.    We discussed money and how much he was going to

14   give me.

15   Q.    Tell me about what was discussed concerning the

16   money.

17   A.    I don't remember exactly.

18   Q.    Do you remember if Rob said anything to you?

19   A.    I don't remember the exact detail.

20   Q.    Do you remember how much methamphetamine you were

21   supposed to get?

22   A.    Initially we had thought an ounce, but then I got

23   different -- like a smaller amount.

24   Q.    Why is it that there was some initial thoughts of

25   an ounce?

1     A.     I think when we had first talked about it, he had

2   said that he was going to get an ounce.

3     Q.     Okay.  Now, as you're discussing this with Rob in

4   the garage, was there anyone else present?

5     A.     No.

6     Q.     Do you recall if an individual by the name of Vance

7   Horton was present?

8     A.     I don't believe he was right there.

9     Q.     Do you recall how much methamphetamine you obtained

10  on that first occasion?

11    A.     7 grams.

12    Q.     Did you pay anything for it?

13    A.     Not at that time.

14    Q.     Why didn't you pay anything for it at that time?

15    A.     When we had first talked about it, I asked him.

16  And he said that he would front it to me, not to like -- we

17  didn't really discuss the money amount.

18    Q.     What do you mean by the term "front to you"?

19    A.     To give it without paying.

20    Q.     And what were you going to do -- what were you

21  supposed to do with that methamphetamine?

22    A.     Sell it.

23    Q.     Was there discussions of that?

24    A.     Yes.

25    Q.     Tell us about that.

1    A.    When we did the buy behind the retirement center,

2    he told me that there were seven there and not to mess with

3    it, like not to touch it.  And then that I needed to bring

4    him back -- I think it was a little over a thousand.

5    Q.    Now, when you say seven, seven what?

6    A.    Grams.

7    Q.    Of what?

8    A.    Meth.

9    Q.    Okay.  And this conversation took place behind the

10   retirement center?

11   A.    Yes.

12   Q.    So between the house that you went to and the

13   retirement center, what happened?

14   A.    I think I -- he told me to go up there because he

15   was taking Melissa to work, and I just waited.

16   Q.    Okay.  So you didn't get any methamphetamine while

17   you were at the house?

18   A.    No.

19   Q.    So that occurred behind the retirement center?

20   A.    Yes.

21   Q.    Okay.  And where was the retirement center located?

22   A.    In Basin.

23   Q.    Did you drive there?

24   A.    Yes, sir.

25   Q.    And do you know how Robert Velasquez got there?

1    A.    He was in a dark car, like a dark blue car.

2    Q.    And when he arrives there, what do you do?

3    A.    I went to get out of my car to get into his car,

4    but then he was out of the passenger side of that car and

5    got in my car.

6    Q.    When he gets into your car, does he say anything?

7    A.    He handed it to me and said, "There's seven."

8    Q.    What is it that he handed to you?

9    A.    A small package.

10   Q.    Please describe for us what it looked like.

11   A.    It was really small, like small enough to fit just

12   in my hand.  And it was wrapped up tight, like in saran

13   wrap.

14   Q.    Now, after he handed you this package, was there

15   any conversation?

16   A.    He told me to have the -- I think it was 1,050 in

17   about a week and not to touch it.

18   Q.    What was your understanding as to what he meant by

19   not touch it?

20   A.    That it was ready to sell.

21   Q.    Did you know how much you were supposed to sell

22   each gram bag for?

23   A.    I asked, and he told me to sell it for 150.

24   Q.    Why is it that you asked him?

25   A.    Because I didn't know how much to sell it for.

1    Q.    What happens after that?

2    A.    He got back in the car, and then I drove back to

3  the meet spot to meet with the cops.

4    Q.    And when you met with the cops, did you give them

5  anything?

6    A.    Yes.

7    Q.    What was it that you gave them?

8    A.    The package that Rob had given me.

9    Q.    Ms. Riggs, were you paid anything for that

10  particular -- on that particular occasion for conducting the

11  controlled buy?

12    A.    I think so.

13    Q.    Would it help if you saw something to refresh your

14  memory?

15    A.    Yes.

16    Q.    Ma'am, what I'm going to show you is what has been

17  marked Defense Renteria Exhibit B consisting of five pages.

18  Looking at that first page there --

19    A.    Yes, sir.

20    Q.    -- does it have a date?

21    A.    Yes, sir.

22    Q.    Okay.  What date is that?

23    A.    November 5th of 2009.

24    Q.    Does it say how much you were paid?

25    A.    $120.

1    Q.    Okay.  Thank you, ma'am.  Can you just hang onto

2    those for a minute.  You can put them up on -- on the top

3    there.

4          Now, ma'am, what did you do with that $120?

5    A.    I used it for gas.

6    Q.    And where did you have to travel from?

7    A.    From Billings, Montana.

8    Q.    Did you use your own vehicle?

9    A.    Yes, sir.

10   Q.    Other than $120, were you paid anything else at

11   that time?

12   A.    At that time, no.

13   Q.    Did you have to take -- were you working at that

14   time?

15   A.    Yes, sir.

16   Q.    Did you have to take time off work?

17   A.    Yes, sir.

18   Q.    Were you paid by your employer for the time you

19   took off?

20   A.    No, sir.

21   Q.    I assume you had living expenses.

22   A.    Yes, sir.

23   Q.    Did DCI pay for any of your living expenses?

24   A.    With the money that I was given, yes.

25   Q.    Just the 120?

```
 1      A.     Yes.

 2      Q.     So you used some of that to pay living expenses?

 3      A.     Mm-hum.

 4      Q.     Ma'am, let me just ask you a few more questions

 5  about that November 5th controlled buy.

 6      A.     Okay.

 7      Q.     Were you searched prior to meeting with Robert

 8  Velasquez?

 9      A.     Yes, sir.

10      Q.     Tell us about how you were searched.

11      A.     I was searched in Powell, I think.  That's

12  basically how it was.  I was searched in Powell in a little

13  room by one of the women agents.  And then when we got to

14  the meet point, like they have you meet before you go do the

15  buy, she searched me again.  And then we did the buy.  And

16  then after the buy, she searched me again.

17      Q.     I don't want to -- I'm trying to think about how I

18  want to ask this question.  I don't want to cause any

19  embarrassment.

20      A.     Sure.

21      Q.     Were you strip-searched, for lack of a better term?

22      A.     I didn't remove clothing, but she felt my body.

23      Q.     Okay.  Did she check any body cavities?

24      A.     No.

25      Q.     Did you ever hide in a body cavity any
```

1    methamphetamine?

2        A.    No.

3        Q.    Okay.  Now, you indicated that there -- when you --

4    once you got to the meet place in Basin, you were searched

5    again?

6        A.    Yes, sir.

7        Q.    Were you searched in the same manner?

8        A.    Yes, sir.

9        Q.    Do you know if your vehicle was searched as well?

10       A.    I think so.  I know that it was searched in Powell

11   at the office.

12       Q.    Okay.  Now, at the end of the controlled buy on

13   November 5th, after you met with law enforcement to provide

14   them the package, the 7 grams, were you searched then?

15       A.    Yes, sir.

16       Q.    In the same manner?

17       A.    Yes, sir.

18       Q.    Now, after November 5th, would there come another

19   occasion where you had some contact with Robert Velasquez?

20       A.    Yes, sir.

21       Q.    Tell us about that in brief.

22       A.    We arranged to meet again.

23       Q.    Okay.  How is it that arrangement came about?

24       A.    Through text.

25       Q.    Ma'am, I'm going to show you what's been previously

1    admitted as Government's Exhibits 1303-A through 1303-O.

2        A.    Okay.

3        Q.    Ma'am, can you take a look at those and just let me

4    know, once you're done, if you recognize those.

5        A.    Yes, sir.

6        Q.    Okay.  I'll retrieve those exhibits back from you.

7    Now, ma'am, are these the text messages that you received

8    from Rob Velasquez?

9        A.    Yes, sir.

10       Q.    How is it that you know that you had received these

11   from Robert Velasquez?

12       A.    I had the number that he had given me saved in my

13   cell phone.

14       Q.    Ma'am, was this your cell phone?

15       A.    Yes, sir.

16       Q.    Who paid the bill on this cell phone?

17       A.    I did.

18       Q.    Ma'am, I'm going to display a few of these on the

19   overhead here, and it will show up on the screen in front of

20   you.

21       A.    Okay.

22       Q.    I'm going to show you 1303-A.  I'll zoom in just a

23   little bit there.  Ma'am, can you see that?

24       A.    Yes, sir.

25       Q.    Okay.  Who was that particular message from?

1      A.     From Rob.

2      Q.     Now, I'm looking at the very bottom.  There's a

3  time and date stamp, 11:41 p.m., 6/11/09.

4      A.     Yes, sir.

5      Q.     Do you know what date that was?

6      A.     It was the 6th of November.

7      Q.     Why do you say that?

8      A.     My phone had a weird date stamp that it did

9  backwards.  I don't know the actual term for it.

10     Q.     Okay.  Now, you indicated that this message was

11 from Robert Velasquez?

12     A.     Yes, sir.

13     Q.     What did this message mean to you?

14     A.     I took it as he needed the money because he had to

15 pay money tomorrow for a $7,200 bill.

16     Q.     Okay.  And I'm going to skip ahead to Exhibit

17 1303-D.  You received this message from Robert Velasquez?

18     A.     Yes, sir.

19     Q.     And what did it mean to you?

20     A.     It was when I hadn't given him the money back yet,

21 and he started kind of freaking out.

22     Q.     Okay.  Exhibit 1303-F.  Same thing, please tell us

23 what that meant to you.

24     A.     That he was coming to Billings.

25     Q.     1303-G?

1    A.    That he will find me.

2    Q.    1303-H?

3    A.    It wasn't -- I wasn't responding, so he kept --

4    Q.    1303-I?

5    A.    He was telling me that he knows where I worked.

6    Q.    And do you know whether or not -- do you know

7    whether or not he knew where you were working?

8    A.    Mm-hum.  Yes, he did.

9    Q.    Why do you think that?

10   A.    From when he and Melissa were up in Billings

11   before.

12   Q.    I'm going to skip ahead to 1303-K.  What was going

13   on there?

14   A.    I believe I told him that he had told me I had a

15   week.

16   Q.    1303-L?

17   A.    He was on his way up and had passed Greybull.

18   Q.    And then skipping ahead to 1303-N.

19   A.    I think that was when -- after I had contacted him

20   after he was sending those texts, and I told him how he had

21   made me uncomfortable and kind of scared me.

22   Q.    And the final one, which is 1303-O.

23   A.    I think that was from the next one.

24   Q.    Was that your message?

25   A.    Yes.  I sent that.

1    Q.    And who did you send that to?

2    A.    To Rob.

3    Q.    And what were you trying to say to Rob?  What were

4    you telling him?

5    A.    That I was confused about amounts, because he gave

6    me 8 grams and told me at that time that two were for me and

7    that I owed him 900.  But then he was telling me that I owed

8    him 950.  Or I might have just got my numbers mixed up.

9    Q.    Now, did there come a point in time when you paid

10   him the money from the 7 grams that were fronted on

11   November 5th?

12   A.    Yes.

13   Q.    Tell us how that came about.

14   A.    I believe that's when we wired him the money.

15   Q.    Do you recall if you met with him on November 9th?

16   A.    Yes.

17   Q.    Tell us about that.

18   A.    November 9th we arranged to meet in Cody at the

19   Kmart.

20   Q.    Okay.  And how did that particular meeting come

21   about?

22   A.    Via text again.

23   Q.    Can you tell us about meeting with Robert Velasquez

24   on that day.

25   A.    We went to Kmart parking lot, and then he was there

VOL V

1   by himself, and I got in his car with him.

2        Q.    What happened when you got into his car?

3        A.    He gave me more.

4        Q.    What more?  What do you mean by more?

5        A.    He gave me another bundle of meth, another package.

6        Q.    Do you remember how much methamphetamine?

7        A.    I believe it was 8 grams.

8        Q.    And did you provide Robert Velasquez with any

9   money?

10       A.    I think so.

11       Q.    Do you recall how much you paid him on that

12   occasion?

13       A.    I think that's when I owed him the 10 -- or 1,050.

14       Q.    Now, when he gave you the 8 grams, was there any

15   discussion about how much money you were supposed to bring

16   back?

17       A.    That was the time when he told me I was to keep two

18   for myself and then bring him back, I think, 900.

19       Q.    Now, when he said keep two for yourself, what did

20   you understand that to mean?

21       A.    I was assuming it was for the money, like to keep

22   that profit.

23       Q.    Okay.  So you were supposed to sell 6 grams and

24   then keep two of the grams?

25       A.    Yes.

1    Q.    And do you know how much you were supposed to sell

2    this methamphetamine for?

3    A.    150.

4    Q.    Why is it that you think that?

5    A.    Because that's what he told me the first buy.

6    Q.    Okay.  Did you talk to him about it on the second

7    buy?

8    A.    No.

9    Q.    Why not?

10   A.    Because he made it clear to sell it for 150

11   previously.

12   Q.    Did you need to ask him again how much to sell it

13   for?

14   A.    No.

15   Q.    Now, when he told you to pay him back $900, was

16   there any discussion as to how you were supposed to pay him

17   back?

18   A.    He said that he would either come up and get it or

19   I would wire it to him.

20   Q.    What's your understanding of what is meant by

21   "wire"?

22   A.    When you -- I don't know another word for it.  When

23   you go to like The Money Center and MoneyGram maybe.

24   Q.    After that particular controlled buy, what

25   happened?

```
 1    A.    We -- I went back to the meet point again.

 2    Q.    And did you provide the law enforcement with

 3  anything?

 4    A.    Yes.

 5    Q.    What?

 6    A.    The package that Rob had given me.

 7    Q.    Please describe for us again how that particular

 8  package was wrapped.

 9    A.    In a small bundle again.

10    Q.    Now, similarly, I assume on November 9th, you were

11  searched again before and after the controlled buy.

12    A.    Yes, sir.

13    Q.    Were you paid anything for that controlled buy?

14    A.    I don't remember for sure.  I believe so.

15    Q.    Okay.  If you would just take a look at Defense

16  Exhibit B, which you still have, and I believe if you go to

17  the second page -- take a look at that and see if that

18  helps.

19    A.    Yes.

20    Q.    Okay.  How much were you paid?

21    A.    50.

22    Q.    And what's the date on that?

23    A.    The 5th.

24    Q.    I don't know if you can see it very well.

25    A.    Am I looking at the wrong one?
```

1   Q.    You might be.  Take a look at the other pages and

2   see if that helps.

3   A.    Oh, that was from January 5th.  The date isn't

4   really clear.  Okay.  No, I wasn't paid at that time.

5   Q.    What I'll do is I'll provide you with a cleaner

6   copy, and I'll mark that as a prosecution government's

7   exhibit.

8   A.    I think the copy -- I have a copy dated the 17th

9   that refers to the 9th and the 17th.

10   Q.    Just a moment, ma'am.

11   A.    Okay.

12   Q.    Ma'am, I'm going to hand you what I've marked as

13   Government's Exhibit 1412.  Is that a little bit better,

14   easier to read?

15   A.    Yes.

16   Q.    Let me get back Exhibit B then from you.  Again,

17   look at the second page.  Does that help?

18   A.    Yes.

19   Q.    For that particular -- the November 9th, 2009,

20   controlled buy, were you paid on that day?

21   A.    Not on November 9th.

22   Q.    Were you paid later?

23   A.    Yes.

24   Q.    When were you paid later?

25   A.    November 17th.

1     Q.    And how much were you paid in total on

2   November 17th?

3     A.    $200 for both days.

4     Q.    And what two days were you paid for?

5     A.    November 9th and November 17th.

6     Q.    Now, ma'am, when you met with Mr. Velasquez on

7   November 9th, do you recall the vehicle he was driving?

8     A.    Yes.

9     Q.    I'm going to show you a series of exhibits that

10  have been previously admitted, Exhibits 1400 through 1405-A.

11  Ma'am, do you recognize those photographs?

12    A.    I do.

13    Q.    I'm going to display at least two of them for you.

14  I'm displaying Government's Exhibit 1405.  Ma'am, do you

15  recognize that?

16    A.    I do.

17    Q.    And whose vehicle is that?

18    A.    Rob's.

19    Q.    Ma'am, I'm going to show you 1405-A.  Do you

20  recognize that photograph?

21    A.    I do.

22    Q.    And what's that a photograph of?

23    A.    That's a photograph of me getting into Rob's car,

24  into the front passenger.

25    Q.    Okay.  So which one is Rob's car?

1      A.     On the left.

2      Q.     And so I assume that would be your car on the

3  right?

4      A.     Yes.

5      Q.     Thank you, ma'am.  Now, ma'am, after this

6  particular controlled buy, do you recall what happened next?

7      A.     We arranged to meet again.

8      Q.     Did you ever pay Mr. Velasquez for the 8 grams?

9      A.     Yes.

10     Q.     Do you recall when that was?

11     A.     I don't recall the exact sequence.

12     Q.     Okay.  Do you recall how -- if Mr. -- you and

13  Mr. Velasquez had contact again?

14     A.     Yes.

15     Q.     How is it that you ended up having contact with

16  him?

17     A.     Through -- through text or call.

18     Q.     Okay.  Ma'am, I'm going to hand you what's been

19  previously admitted as 1411-A through 1411-N.

20     A.     Okay.

21     Q.     If you'd just take a look at those.

22     A.     Yes.

23     Q.     I'm going to retrieve those back from you.  Ma'am,

24  do you recognize those?

25     A.     I do.

1    Q.    And what are they?

2    A.    The texts between Rob and I about wiring him the

3    money.

4    Q.    And did there come a point in time when you, in

5    fact, wired him money?

6    A.    Yes.

7    Q.    How did that come about?

8    A.    He texted me and told me to wire it to him.

9    Q.    How did you get the money?

10   A.    From the DCI guy, the agent.

11   Q.    Okay.  So was it your money?

12   A.    No.

13   Q.    Now, prior to these text messages, were there any

14   phone calls?

15   A.    Yes.

16   Q.    Okay.  And who was that phone call between?

17   A.    Rob and I.

18   Q.    Do you know whether or not -- excuse me.  Let me

19   rephrase that question.

20         Do you know whether or not that phone call was

21   recorded?

22   A.    Yes.

23   Q.    Ma'am, let me hand you what's been previously

24   admitted as Exhibit 1410.  Do you recognize that?

25   A.    Yes.

1      Q.     And what is it?

2      A.     A recorded call between Robert and I.

3      Q.     And you had an occasion to listen to that call?

4      A.     Yes.

5      Q.     Was that call accurately recorded on that

6   particular day?

7      A.     Yes.

8      Q.     How do you know that's the same call?

9      A.     Because I know what I sound like on the phone.

10     Q.     Okay.  Is there any markings on that that indicates

11  to you that that is the same CD you heard?

12     A.     I initialed it and dated it.

13     Q.     Thank you.  Now, tell us in general what that phone

14  call was about.

15     A.     I don't remember the exact context.

16     Q.     Do you recall if Robert Velasquez gave you some

17  instructions as to a name to wire it under?

18     A.     Yes.

19     Q.     After that was there any more conversation or

20  contact with Robert Velasquez?

21     A.     Through the texts.

22     Q.     Ma'am, I'm just going to show you a few of these.

23  I'm going to show you 1411-A.  Is that one of the text

24  messages?

25     A.     Yes.

1      Q.    What's going -- what's your understanding as to

2   what's happening there?

3      A.    He was asking me to make it soon to go wire in the

4   money.

5      Q.    And then 1411-B.

6      A.    That was me telling him I hadn't got the text.

7      Q.    What text were you supposed to get?

8      A.    Of who exactly to send the message to or the wire

9   to.

10     Q.    1411-C.

11     A.    That was Rob telling me to send it to Vance Horton.

12     Q.    And 1411-D.

13     A.    And then he said, yes, to Cody, Wyoming, and to put

14   his phone number down.

15     Q.    And I'm going to skip ahead to 1411-G.

16     A.    That was after I had sent the money, and I told him

17   that they took some of it out -- some out of the thousand

18   for the fee, and then the reference number for the wire.

19     Q.    While we're there, let me just briefly talk about

20   the actual wire transfer.  Where did you transfer the money

21   to?  Where did you go to make a wire transfer?

22     A.    I went to The Money Center at the Wal-Mart.

23     Q.    And did anyone go with you?

24     A.    Yes.

25     Q.    Who?

1      A.      I forget his exact name, but the lead investigator

2  with DCI.

3      Q.      Okay.  So it was a DCI agent?

4      A.      Yes.

5      Q.      And what happened when you went to The Money

6  Center?

7      A.      I just went to The Money Center, and the DCI agent

8  gave me the cash, and then I went to -- like I filled out

9  the paperwork and sent it.

10     Q.      Okay.  Ma'am, I'm going to hand you two different

11 exhibits.  I'm going to hand you 1409, that's been

12 previously admitted, and have you take a quick look at that.

13     A.      Okay.

14     Q.      Do you recognize that, ma'am?

15     A.      Yes.

16     Q.      Okay.  And what is that?

17     A.      The receipt.  A photocopy of the receipt from the

18 wire transfer.

19     Q.      Let me now hand you Exhibit 1409-A.  Do you

20 recognize that?

21     A.      The actual copy of it, the original copy of it.

22     Q.      How do you know that that's the original?

23     A.      Because it has the blue ink.  It's not like

24 photocopied.

25     Q.      Does your signature appear on 1409-A?

1     A.    Yes.

2     Q.    Is that your signature?

3     A.    Yes.

4           MR. FUN:  Move to admit 1409-A, Your Honor.

5           MR. HORN:  No objection, Your Honor.

6           THE COURT:  Government's Exhibit 1409-A is

7     admitted.

8           (Government's Exhibit 1409-A received in evidence.)

9           MR. FUN:  And for the record, Your Honor, it

10    consists of three stapled pages which appears to be a

11    Wal-Mart receipt -- two Wal-Mart receipts and then a

12    MoneyGram receipt.

13    Q.    (By Mr. Fun)  Ma'am, I'm just going to display the

14    MoneyGram receipt for a minute.  Ma'am, I assume that

15    appears to be your signature in the bottom --

16    A.    Yes, sir.

17    Q.    -- there.  Okay.  And the information that's in

18    there that it was to Vance Horton, that was based upon what

19    Rob Velasquez told you?

20    A.    Yes.  That's who Rob told me to send it to.

21    Q.    And in addition, I think on the right side here, on

22    the bottom right, right below the 940, there's a reference

23    number?

24    A.    Yes.

25    Q.    Did you subsequently have any communications with

1   Rob after you sent this wire transfer?

2       A.    Yes.  After I sent it, I told him that I had sent

3   it and gave him the reference number.

4       Q.    Ma'am, I'm going to display for you Exhibit 1411-H.

5   Oops.  Actually let me go back.  1411-G.  Sorry.  Is that

6   your text message to Robert Velasquez?

7       A.    Yes.

8       Q.    And what's going on there?

9       A.    I had told him that I had sent it and that they

10  took money out for the fee to send it, and then the

11  reference number.

12      Q.    Ma'am, I'm going to skip ahead a little bit to

13  1411-K.  Did you have some more conversations via text with

14  Robert Velasquez?

15      A.    That was in response to the text he had sent me.

16  And I told him that -- yes, and that I would see him Monday,

17  because we had it arranged.  And I was asking him if he was

18  going to give me more than just a little bit.

19      Q.    What did you mean by that?

20      A.    If he was going to give me more meth.

21      Q.    Why would you ask that?

22      A.    Because we had still thought that he was going to

23  give us larger amounts.

24      Q.    Okay.  And then now go to 1411-L.

25      A.    Mm-hum.

1    Q.    Is that the response you got back?

2    A.    Yes.

3    Q.    1411-M.

4    A.    That was me asking him if he had picked the money

5    up yet.

6    Q.    And then, finally, 1411-N.

7    A.    And that was him responding that he was there.

8    Q.    Now, ma'am, after you met with the DCI agent on

9    November 12th and wired this money, were you paid anything

10   on that day?

11   A.    Yes.  No.  What date was that?

12   Q.    November 12th.

13   A.    No.

14   Q.    Now, was there another -- a third controlled buy

15   that you were involved with?

16   A.    Yes.

17   Q.    And I believe you said that was the 17th of

18   November.

19   A.    Yes, sir.

20   Q.    Tell us about that.

21   A.    That day we had arranged again to meet in Cody at

22   the Dollar Store.  And I think Rob called me or texted me

23   and said that he had to drop Melissa off so she wouldn't see

24   and that he would be right there.

25   Q.    Okay.  Tell us what happened when you got to the

1    Dollar Store.

2        A.    It was a really quick exchange.  He pulled up next

3    to my car.  I got in his car and got it and then got back

4    out, and he left.

5        Q.    Okay.  Do you recall how much methamphetamine you

6    obtained on that occasion?

7        A.    I believe at that time it was 10 grams.

8        Q.    Had there been some discussion before that about

9    quantities?

10       A.    In -- like in the text?

11       Q.    Yes, either text or by phone call.

12       A.    When I texted him and asked him if he was going to

13   give me more than just a little.

14       Q.    Was there any discussion, when Robert Velasquez

15   provided you this 10 grams, as to how much methamphetamine

16   there was there?

17       A.    I think he told me there was 10.

18       Q.    I guess that was a bad question.  My question is,

19   how did you know there was 10 grams?

20       A.    He told me.

21       Q.    Was there any discussion about how much you were

22   supposed to pay?

23       A.    Yes.  I don't remember the exact amount.

24       Q.    After you obtain -- well, let me just go back a

25   minute.  How was this 10 grams packaged?

1    A.    It was in a tight bundle like the previous two

2    times.

3    Q.    Okay.  After obtaining the substance from Robert

4    Velasquez, what did you do with it?

5    A.    I put it in my pocket and left the car and then

6    went back to the meet point and gave it to DCI.

7    Q.    Again, I assume before the controlled buy and at

8    the end you were searched?

9    A.    Yes, sir.

10   Q.    Were you paid anything on that occasion?

11   A.    Yes, sir.

12   Q.    And was that the $200 you previously talked about?

13   A.    Yes, sir.

14   Q.    And that included the 9th of November and the 17th?

15   A.    Yes.

16   Q.    Now, where was -- where -- what city did this

17   controlled buy take place in?

18   A.    In Cody again.

19   Q.    Yep.  You mentioned that.  Sorry.  Did there come a

20   point in time after that that you were involved with paying

21   Robert Velasquez --

22   A.    Yes.

23   Q.    -- for those 10 grams?  Do you remember how that --

24   how that came about?

25   A.    It was -- I think he texted me again.

1      Q.     Okay.  And what happened?  How is it that you paid

2    him?

3      A.     I sent a MoneyGram again.

4      Q.     Okay.  Now, ma'am, you mentioned there was some --

5    you had some text messages with him prior -- leading up to

6    that MoneyGram.

7      A.     Yes, sir.

8      Q.     Ma'am, I'm going to hand you Exhibits 1804-A to

9    1804-E.

10     A.     Okay.  I remember that.

11     Q.     You recognize those?

12     A.     Yes.

13     Q.     And what are they?

14     A.     Those are the texts between Rob and I about -- the

15   first one was about getting some more meth for my friend.

16   And then I told him not until I came down again, and then I

17   asked him who to send the money to.

18     Q.     Now, again, was this on your phone?

19     A.     Yes.

20     Q.     Do these photographs accurately depict the text

21   messages as they appeared on your phone?

22     A.     Yes.

23            MR. FUN:  Move to admit 1804-A to 1804-E, Your

24   Honor.

25            THE COURT:  Hearing no objections, Government's

1    Exhibits 1804-A through 1804-E are admitted.

2         (Government's Exhibit 1804-A, 1804-B, 1804-C, 1804-D

3         and 1804-E received in evidence.)

4    Q.    (By Mr. Fun)  Ma'am, I'm going to display some of

5    these.  Let's take a look first at 1804-A.  Again, just look

6    at the bottom, the date.  I assume nothing has really

7    changed with your date there.

8    A.    Mm-hum.  Sure.  Right.

9    Q.    Look at that text message.  What was your

10   understanding of what was happening?

11   A.    He was asking me if I still wanted an 8-ball for my

12   friend.

13   Q.    Okay.  1804-B.

14   A.    And that was my response, and then asking who to

15   send the money to.

16   Q.    1804-C.

17   A.    And he was asking if I remembered the last one,

18   like the last person I sent it to.

19   Q.    Okay.  1804-D.

20   A.    And that was me saying Vince Horton.

21   Q.    And 1804-E?

22   A.    And that was him correcting me on Vance's first

23   name.

24   Q.    Ma'am, did you, in fact, wire money to Robert

25   Velasquez that day?

     1          A.     Yes, sir.

     2          Q.     And where did you get the money?

     3          A.     From the DCI agents again.

     4          Q.     Ma'am, let me show you what's been marked for

     5    identification as 1802 consisting of two pages.

     6          A.     Okay.

     7          Q.     Do you recognize that, ma'am?

     8          A.     Yes, sir.

     9          Q.     What is it?

    10          A.     That's the receipt of the MoneyGram.

    11          Q.     How do you know it's the receipt?

    12          A.     Because that's what the receipt looked like from

    13    the other one.

    14          Q.     Is it your receipt?

    15          A.     Meaning?

    16          Q.     Let me rephrase the question.  Did you -- does your

    17    signature appear on this receipt anywhere?

    18          A.     Yes.  I filled that out.

    19          Q.     Is this a copy or the actual receipt?

    20          A.     That's a copy.

    21          Q.     How do you know that this is the copy that you had

    22    previously seen?  Do your initials appear on this receipt

    23    anywhere?

    24          A.     Yes.

    25          Q.     Where?

1     A.     On the bottom.

2            MR. FUN:  Okay.  Move to admit 1802, Your Honor.

3            MR. FLEENER:  No objections.

4            THE COURT:  Government's Exhibit 1802 -- that

5     exhibit is admitted, not hearing any objections from

6     counsel.

7        (Government's Exhibit 1802 received in evidence.)

8        Q.    (By Mr. Fun)  Ma'am, I'm displaying 1802.  This was

9     the receipt that you used for the MoneyGram wire transfer?

10       A.     Yes, sir.

11       Q.     And that was to Vance Horton?

12       A.     Yes, sir.

13       Q.     Now, that was at the direction of Robert Velasquez?

14       A.     Yes, sir.

15       Q.     And for how much was it for?

16       A.     $1,000.

17       Q.     And does your signature appear on the bottom?  I

18    think you previously indicated that.

19       A.     Yes, sir.

20       Q.     Now, just briefly look at the second page.  That's

21    just the Wal-Mart receipts related to that transaction?

22       A.     Yes.

23       Q.     Now, when you wired this money, was there someone

24    with you?

25       A.     Yes.

```
 1      Q.    Who?

 2      A.    Officer Hall and, I think, the lead investigator.

 3      Q.    After November 21st, did you have any more contact

 4   with Robert Velasquez?

 5      A.    Yes.

 6      Q.    Tell us what that is about.

 7      A.    I don't -- it wasn't much.  It was spotty talking

 8   about getting together again for more.

 9      Q.    Okay.  Did you, in fact, get together later on with

10   Robert Velasquez?

11      A.    Later on, yes.

12      Q.    Tell us about that.

13      A.    I believe it was in January.

14      Q.    Okay.  Do you remember when in January?

15      A.    The beginning.

16      Q.    The beginning of January?

17      A.    (Nods.)

18            THE COURT:  Ma'am, you need to answer orally.  You

19   just nodded your head.

20            THE WITNESS:  Okay.

21      Q.    (By Mr. Fun)  Just say yes or no.

22      A.    Yes.

23      Q.    Tell us what happened in January.

24      A.    We arranged, I think through text or call, again to

25   meet in Powell.
```

1     Q.    Okay.  And did you, in fact, meet with Robert

2  Velasquez in Powell?

3     A.    Yes.

4     Q.    Tell us what happened.

5     A.    We had it planned to meet at the IGA in Powell, and

6  I was waiting for him at the IGA.  And I -- he either called

7  or texted and told me to go to Blair's.  But the team was

8  already set up at IGA, so I told him to just go there.

9         And then he and Melissa were there and told me to

10  follow them to the gas station.  And we were driving down

11  like the main street in Powell, and they turned, and then I

12  followed them again, and then we did the buy.

13     Q.    And so where is it that you did the buy at?

14     A.    On a side street in front of like a cleaning place.

15     Q.    And on that occasion, do you know how much

16  methamphetamine you obtained from Robert Velasquez?

17     A.    An 8-ball.

18     Q.    How do you know it was an 8-ball?

19     A.    Because that's what we had arranged.

20     Q.    Did you pay Robert Velasquez any money on that

21  occasion?

22     A.    I did.

23     Q.    How much?

24     A.    400.

25     Q.    Where did you get the money?

1    A.    From the DCI agents.

2    Q.    Now, let's talk about that particular transaction

3    in a little more detail.  You mentioned in front of the

4    Kleen Kare place?

5    A.    Melissa just pulled over on the side of the street,

6    and there was like a cleaning place there, yes.

7    Q.    So did -- how is it that you got the

8    methamphetamine from Robert Velasquez?

9    A.    Melissa -- the car had pulled over, and I pulled up

10   behind it.  And then I got out and went to the passenger

11   side because I could see that Rob was on the passenger side.

12   And I opened the back door, but there was a bunch of stuff

13   in the car.  So I just left the door open, and I just

14   squatted down there and got it.

15   Q.    And when you say you got it, tell us how you got --

16   A.    Rob reached behind the seat and handed it to me.

17   And then in the same hand, I put the money.

18   Q.    Can you describe how -- what he handed to you?

19   A.    What he handed to me?

20   Q.    Yes.

21   A.    A small bundle like the bundles were before.

22   Q.    Can you describe how it was wrapped?

23   A.    Tight, like in a little package.

24   Q.    Did you have any conversation with Robert Velasquez

25   at that time?

1   A.   Small chat.  I think that was when he invited me --
2   he wanted me to stay the night with them because I think
3   they had just gotten a new house or something.

4   Q.   Did you ever take him up on that offer?

5   A.   I did not.

6   Q.   And what happened right after that?

7   A.   Right after that we went back to the meet point.

8   Q.   And what happened at the meet point?

9   A.   I was searched again, and then -- well, first I
10  handed -- I gave the drugs to Mike, and then I was searched
11  again.

12  Q.   Now, were you paid anything for that particular
13  controlled buy?

14  A.   I don't recall.

15  Q.   Have you take a look at government's exhibit.  Does
16  that help?

17  A.   Yes, I was.

18  Q.   How much?

19  A.   $50.

20  Q.   Ma'am, I'm going to hand you three photographs,
21  they're Government's Exhibits 1502 to 1504 --

22  A.   Okay.

23  Q.   -- and have you take a look at that.  Do you
24  recognize those?

25  A.   I do.

1    Q.    Are these photographs from the controlled buy from

2    January 5th of 2010?

3    A.    Yes, sir.

4    Q.    I will display for you 1502.  Can you describe to

5    us -- there's a vehicle that's pointing forward.  Whose

6    vehicle is that?

7    A.    Rob's.  Or -- sorry.  The car on the left or the

8    car that's driving?

9    Q.    Good clarification.  The car on the left side of

10   the photograph.

11   A.    The car on the left side was my car.

12   Q.    And the vehicle on the right side?

13   A.    Was Rob's.

14   Q.    Okay.  And you indicated on this particular

15   occasion Melissa was there?

16   A.    Yes, sir.

17   Q.    Who was driving the vehicle?

18   A.    Melissa was.

19   Q.    And so where was Rob Velasquez seated?

20   A.    In the passenger seat.

21   Q.    I'll do a close-up here.  Now, you indicated that

22   this particular controlled buy took place in front of a

23   place called Kleen Kare?

24   A.    Yes, sir.

25   Q.    I will display for you what I've marked for

1    identification as 1503.  Zoom out that.  Is that the

2    location where this occurred?

3         A.    Yes, sir.

4         Q.    And do you know which one was Rob's vehicle?

5         A.    Rob's vehicle is the Grand Prix where it looks like

6    maybe the back-up lights are on.

7         Q.    Okay.  And then, finally, Exhibit 1504.  Okay.  And

8    do you recognize that photograph?

9         A.    Yes, sir.

10        Q.    Okay.  Do you see your vehicle there?

11        A.    I do.

12        Q.    Which one is it?

13        A.    The Focus, the one on the right.

14        Q.    It appears that there is someone on the passenger

15    side.

16        A.    Yes, sir.

17        Q.    Do you know who that was?

18        A.    That was me squatting down.

19        Q.    Ma'am, let me now just turn to a different topic.

20    You've indicated that you've previously known Robert

21    Velasquez for some time.

22        A.    Yes sir.

23        Q.    Did he ever talk about his affiliation with anyone

24    else?

25        A.    Not really.

1    Q.    Did he ever talk about whether or not he was a

2    member of a gang?

3    A.    Yes.

4    Q.    Tell us in general about that.

5    A.    It wasn't detailed.  It was always brief.  But it

6    was a gang in California.

7    Q.    How did that make you feel?

8    A.    Uncomfortable.

9    Q.    Did you ever tell -- did Robert Velasquez ever tell

10   you any stories about anything that happened in Fresno?

11   A.    Not really.

12   Q.    Let me refer you back momentarily for the -- to the

13   text messages that you received back in November --

14   November 6th and 7th.  Do you recall those text messages?

15   A.    Yes, sir.

16   Q.    Do you recall that Robert Velasquez said he was

17   coming to Billings?

18   A.    Yes, sir.

19   Q.    How did that make you feel?

20   A.    I was scared.

21   Q.    Why were you scared?

22   A.    Because he told me to say my prayers.

23   Q.    Was there anyone else that you conducted controlled

24   buys from on behalf of DCI?

25   A.    No, sir.

1    Q.    Other than Robert Velasquez?

2    A.    Correct.

3    Q.    Do you recall any transactions involving John

4    Morgan?

5    A.    Oh, yes, sir.

6    Q.    Tell us about that in brief.

7    A.    After the January buy, I did a buy with Johnny.

8    Q.    Okay.  And who is Johnny?

9    A.    John Morgan, Melissa's brother.

10    Q.    Do you recall what you obtained from John Morgan?

11    A.    Meth.

12    Q.    Do you remember how much?

13    A.    I don't recall the amount.

14    Q.    Do you remember if you were paid anything for that

15    controlled buy?

16    A.    Yes.

17    Q.    Do you remember how much you were paid?

18    A.    I don't remember the exact amount.

19    Q.    It may not be reflected on those exhibits.  Let's

20    see.  Let me show you page 5 of Defense Exhibit Renteria B

21    and just direct you to the third entry and see if that helps

22    refresh your memory.

23    A.    Yes.

24    Q.    Okay.  Do you remember how much you were paid now?

25    A.    I think it was 250.

1    Q.    Thank you, ma'am.  Let me retrieve those exhibits

2    back from you now.  I'm retrieving back Defendants' Renteria

3    B as well as Government's Exhibit 1412.

4         Now, ma'am, in your discussions with Robert

5    Velasquez, have you ever known him to have a job?

6    A.    No.

7    Q.    Did he ever tell you if he had a job?

8    A.    No.

9    Q.    Did he ever say what he did for a living?

10   A.    No.

11   Q.    Did he ever indicate that he was in construction or

12   building houses?

13   A.    No.

14   Q.    Just a moment, please.  Well, ma'am, let me just go

15   back for a minute, and I want to talk a little bit more

16   about the January 5th, 2010, controlled buy.

17   A.    Okay.

18   Q.    You indicated that you obtained an 8-ball.

19   A.    Yes, sir.

20   Q.    What's an 8-ball?

21   A.    It's roughly 3-and-a-half grams.

22   Q.    Is there a reference of what 8-ball means?

23   A.    What do you mean?

24   Q.    What does it mean?  I know it's 3-and-a-half grams,

25   but is there a reference to what it is?

1    A.    Drugs.

2    Q.    Would you agree that it's roughly an eighth of an

3    ounce?

4    A.    I -- yes.

5          MR. FUN:  Thank you.  I have nothing further.

6    Thank you, ma'am.

7          THE COURT:  Thank you.

8                     CROSS-EXAMINATION

9    Q.    (By Mr. Horn)  Ms. Riggs, do you know whether or

10   not the misdemeanor possession charge -- what the status of

11   that is right now?

12   A.    No, sir.

13   Q.    Is it still open, as far as you know?

14   A.    Yes, sir.

15   Q.    Have you been told that it's going to be dropped in

16   exchange for your test -- for your testimony?

17   A.    No, sir.

18         MR. HORN:  That's all I have, Your Honor.

19         THE COURT:  Any other questions?

20                     CROSS-EXAMINATION

21   Q.    (By Mr. Timbers)  Hi, Ms. Riggs.

22   A.    Hi.

23   Q.    I just have some questions.  You've known Melissa

24   Morgan since high school?

25   A.    Yes, sir.

1    Q.    Okay.  What is your knowledge of her involvement in

2  drug distribution?

3    A.    She and I never fully discussed it.  I don't -- so

4  I couldn't say if -- what she was doing exactly.

5    Q.    Did you have any suspicions?

6    A.    Yes, sir.

7    Q.    Could you tell me what those suspicions were?

8    MR. FUN:  Objection.  Your Honor, calls for

9  speculation.

10    THE COURT:  Sustained.

11    Q.    (By Mr. Timbers)  What sort of -- when you

12  talked -- did you ever talk to Melissa Morgan about drugs?

13    A.    Yes.

14    Q.    And could you -- what -- what did those

15  conversations entail?

16    A.    Do you mean did we ever discuss it?

17    Q.    Yeah.  Yes.

18    A.    Yes.  We discussed it when we would be smoking

19  marijuana together.

20    Q.    Okay.  And when was the last time you smoked

21  marijuana with Ms. Morgan?

22    A.    When Rob and Melissa were in Billings.

23    Q.    Okay.  On some of these transactions that you're

24  saying took place, Melissa was -- she was driving Rob?

25    A.    In January she was.

1    Q.    Okay.  Is it your impression that she was involved

2    in that activity because she was driving?

3              MR. FUN:  Objection.  Calls for speculation.

4              THE COURT:  Overruled.  You may answer.

5    A.    Can you repeat the question?  Sorry.

6    Q.    (By Mr. Timbers)  I'm asking if it's your

7    impression that Melissa Morgan was involved in drug dealing

8    with Mr. Velasquez.

9    A.    Just because she was driving?

10    Q.    Well, if there's any other reasons -- if there's

11    any other facts you can point to, what your impression was.

12    A.    Did you say distribution?

13    Q.    Yes.

14    A.    No.

15    Q.    So she was just driving the car.  And Velasquez, in

16    your opinion, was just -- was doing the deal?

17    A.    Yeah.

18    Q.    Okay.

19    A.    Yes.

20    Q.    All right.  Do you know if -- well, do you have an

21    opinion as to whether or not she was actively involved in

22    Mr. Velasquez's drug dealing?

23              MR. FUN:  Objection, Your Honor.  Relevance.  This

24    witness's opinion concerning Melissa Morgan is really

25    irrelevant to the issues that need to be determined.

1              THE COURT:  I --

2              MR. FUN:  This witness can testify to facts which

3    she saw, heard or witnessed, but not to what her opinion is.

4              MR. TIMBERS:  Your Honor, you've allowed Mr. Fun to

5    ask her her feelings, her impressions with regard to her

6    feeling threatened.  I think she could offer an opinion with

7    regard to whether or not Melissa Morgan was actively

8    participating in drug distribution.

9              THE COURT:  Well, Mr. Timbers, I thought that she

10   had answered that question.

11             MR. TIMBERS:  And I guess I was asking her to

12   articulate.

13             THE COURT:  Maybe you could restate your question

14   because I don't have it clearly in mind.

15             MR. TIMBERS:  Okay.

16      Q.   (By Mr. Timbers)  Actually, I think I'll just move

17   on.

18      A.   Okay.

19      Q.   When -- let's see.  I think I --

20             MR. TIMBERS:  May I approach, Your Honor?

21             THE COURT:  Yes.

22      Q.   (By Mr. Timbers)  That's labeled Government Exhibit

23   1802.

24      A.   Yes, sir.

25      Q.   And down at the very bottom of that --

1    A.    Yes, sir.

2    Q.    -- you have your signature; correct?

3    A.    Are we referring to my signature or my initials?

4    Q.    Your signature at the very bottom.

5    A.    Yes, sir.

6    Q.    Sender's signature.  And could you tell me the date

7    on that, the date directly to the right of your signature?

8    A.    I believe November 21st of 2009.

9    Q.    And why is it dated that way?

10   A.    Because that was the day I sent it.

11   Q.    Okay.  And it's dated just the day that we as

12   Americans say, and so it's month, then date, then year?

13   A.    It's dated month, date, year, yes.

14   Q.    Okay.  So it's 11 -- could you read the numbers

15   across?

16   A.    11/21/2009.

17   Q.    Okay.  Thank you.  That exhibit is 1409; correct?

18   A.    Yes, sir.

19   Q.    Okay.  And there I think the officer who was

20   directing you at that time -- the lead investigator,

21   correct, on this particular transaction?

22   A.    I don't understand the question.

23   Q.    Okay.  You were -- that is a controlled buy where

24   you were sending -- you were supposedly sending money to

25   Mr. Velasquez; correct?

1     A.     This says that I was sending it to Vance.

2     Q.     Vance Horton, okay.  And -- okay.  So you were

3  sending money to Vance Horton.  And if you could tell me --

4  I just have a question about -- it's your signature at the

5  bottom of that MoneyGram again; right?

6     A.     Yes, sir.

7     Q.     Okay.  In that one, you're saying that that took

8  place on November 12th, 2009?

9     A.     I'm not for sure.

10     Q.     Okay.  What are the -- next to your signature --

11  what are the numbers next to your signature?

12     A.     12/11/2009.

13     Q.     Okay.  So that would be the 12th of November 2009

14  or the -- you see, I guess I'm wondering in that particular

15  case, if you read that date, it would read as December 11th,

16  2009.

17     A.     Yes.

18     Q.     But on this other one, you've dated it the American

19  style.  Why did you switch styles?

20     A.     I -- I'm not for sure.  I think maybe I just

21  flipped open my phone and looked at the date.

22     Q.     Okay.  That's exactly what I was wondering.  Were

23  you -- were you aware of the drug distribution activity of

24  John Morgan?

25     A.     At which point?

1    Q.    Well, actually, when did you become aware of drug

2    distribution activity of John Morgan?

3    A.    When I bought from him.  I --

4    Q.    I'm sorry.  Go on.

5    A.    I guess kind of before.  I don't really understand.

6    Q.    Okay.  Yeah.  When did you first become aware of

7    John Morgan dealing drugs?

8    A.    I knew it in high school.

9    Q.    You knew it in high school?

10   A.    Yes, sir.

11   Q.    What was he dealing in high school?

12   A.    I don't know that I could say for sure because I

13   never -- I mean, there was rumors.  It was a small town.  We

14   heard, and I knew through Melissa, I guess.

15   Q.    Okay.  And what did Melissa say about John Morgan's

16   drug activity?

17   A.    I don't recall exactly.

18   Q.    Your best recollection.

19   A.    It was known that he was into pills and weed.

20   Q.    Okay.  And when did -- when did you contact him in

21   2010 again?

22   A.    I don't recall the exact date.

23   Q.    Okay.  And you were -- you were contacting him to

24   purchase methamphetamine?

25   A.    Yes, sir.

1   Q.    Okay.  And why did you know he would be able to

2   sell you methamphetamine?

3   A.    I don't recall if he had called me or texted me,

4   but I think it was through that.

5   Q.    Were you in contact with Melissa to get in contact

6   with John Morgan?

7   A.    I don't recall.

8   Q.    Were you confident he'd be able to supply you with

9   methamphetamine?

10  A.    Yes.

11  Q.    And why is that?

12  A.    We discussed it.  I don't remember if we called or

13  texted.  I think maybe both.

14        MR. TIMBERS:  All right.  No further questions.

15        THE WITNESS:  Okay.

16        MR. TIMBERS:  And I'll take that from you, if

17  that's okay.  Thank you.

18        THE WITNESS:  Thank you.

19                   CROSS-EXAMINATION

20  Q.    (By Mr. Fleener)  Ms. Riggs, how are you?

21  A.    Fine.  Thank you.  How are you?

22  Q.    I'm well.  My name is Tom Fleener.  I'm a lawyer

23  from Laramie.

24  A.    Okay.

25  Q.    It's nice to meet you.

```
 1      A.     Nice to meet you.

 2      Q.     Ma'am, did you grow up in Basin/Greybull?  Which

 3  town?  Cody?  You went to high school with the Morgans?

 4      A.     Yes, sir.

 5      Q.     And what town was that?

 6      A.     In Basin.

 7      Q.     Okay.

 8      A.     Well, actually, Melissa went to high school there.

 9  Johnny didn't.

10      Q.     But you went to high school with Melissa?

11      A.     Yes, sir.

12      Q.     That was in Basin?

13      A.     Yes, sir.

14      Q.     And you guys graduated, I assume, in 2006?

15      A.     She was a year ahead of me.

16      Q.     So you were 2007?

17      A.     Yes, sir.

18      Q.     Were you and Melissa close?

19      A.     Yes, sir.

20      Q.     How close?

21      A.     We referred to each other as best friends.

22      Q.     Do you still refer to each other as best friends?

23      A.     No, sir.

24      Q.     What happened between you and Melissa?

25      A.     I haven't spoke to her since -- I couldn't recall
```

1    the last date.

2        Q.    More than a year?

3        A.    Yes, sir.

4        Q.    Were you speak -- were you actively speaking with

5    Melissa during your involvement with Mr. Velasquez?

6        A.    Not really.

7        Q.    What happened to you two?

8        A.    I think we had just fallen apart.

9        Q.    Did you approve of some of the activities she was

10   engaging in, involving herself in?

11       A.    No, sir.

12       Q.    Is it safe to say you observed her using a lot of

13   drugs?

14       A.    In high school, yes.

15       Q.    Hanging out with people that you probably didn't

16   approve of?

17       A.    Yes, sir.

18       Q.    Partying more than you think she should?

19       A.    Yes, sir.

20       Q.    Was -- and you guys were close at the time;

21   correct?  I mean as she started -- as you started watching

22   these changes in her.

23       A.    Yes, sir.

24       Q.    Did you have a chance to talk to her about this

25   stuff?

1     A.    Not really.

2     Q.    She didn't want to talk too much about it, I

3  assume.

4     A.    Not really.

5     Q.    She would make up excuses and stories about where

6  she was and who she was hanging out with?

7     A.    No.

8     Q.    She just -- you guys just didn't talk much about

9  it?

10    A.    Not really.  She had said that she was with Rob and

11 had been working a lot, but that was basically it.

12    Q.    Is it safe to say that you don't like Rob

13 Velasquez?

14    A.    No.

15    Q.    And --

16    A.    Is it -- sorry.

17    Q.    I'm sorry.  Is it safe -- do you like Rob

18 Velasquez?

19    A.    Yes.

20    Q.    You do like him?

21    A.    Yes.

22    Q.    What do you like about Rob?

23    A.    Rob was generally friendly.  When he would take

24 Melissa and I out, he would pay for everything.

25    Q.    And this is back when you and Melissa were still

1    friends?

2       A.     In high school, yes.

3       Q.     When you were -- you were pulled over -- I know

4    Mr. Horn asked you briefly.  I want to focus a little bit on

5    exactly how you got involved with DCI.

6       A.     Okay.

7       Q.     You said you got pulled over, and you had a

8    misdemeanor marijuana ticket hanging around.

9       A.     I got the ticket for that when I got pulled over,

10   yes.

11      Q.     Your -- tell me about that incident.  You were

12   pulled over.  You had marijuana in your car, I assume.

13      A.     Yes, sir.  I was pulled over, and I had marijuana

14   in my car.  And they ticketed me and arrested me.

15      Q.     And at the same time they asked you if you wanted

16   to come talk to Agent Hall?

17      A.     When I got to the Powell police department, the

18   officer who arrested me was talking to me and basically just

19   asked me what was going on and why I had it and if I was

20   smoking it.  And then he asked me if I wanted to talk to

21   Officer Hall.

22      Q.     Who first brought up Robert Velasquez, you or Agent

23   Hall?

24      A.     I believe it was myself.

25      Q.     How did the conversation go as to -- regarding how

1    you decided to -- to do a controlled buy or two for DCI?

2              Did Agent Hall say, "Do you want to do this?"

3              Did you say, "I know people who could help."

4    A.    I told him that I had known people from the town

5    from when I was using.

6    Q.    And he -- and then he asked you who, and you told

7    him --

8    A.    Yes.

9    Q.    -- what you knew?

10   A.    Yes.

11   Q.    And then he asked you, would you like to wear a

12   wire or do controlled buys, or something like that?

13   A.    Yes.

14   Q.    And at the time -- I believe you testified on

15   direct examination, ma'am, and please correct me if I'm

16   wrong, you were using drugs at the time.

17   A.    When I --

18   Q.    When you were -- were first approached by DCI.

19   A.    Yes, sir.

20   Q.    And the drugs were marijuana?

21   A.    Yes, sir.

22   Q.    Cocaine?

23   A.    No, sir.

24   Q.    You had not done cocaine?

25   A.    I had tried it, but I wasn't using it.

1    Q.    Had you used meth?

2    A.    No.

3    Q.    Have you ever used meth?

4    A.    No.

5    Q.    And you're sure?

6    A.    Yes, sir.

7    Q.    That marijuana ticket -- so you were pulled over.

8  It would have been sometime in late 2009?

9    A.    In that fall, yes, sir.

10    Q.    And that ticket still hasn't been disposed of?

11    A.    No, sir.

12    Q.    Are you hopeful that it goes away from testifying

13  today?  Truthfully.

14    A.    I'm hopeful that if I continue to live a clean life

15  that it will go away, yes.

16    Q.    And that includes testifying today?

17    A.    Yes.

18    Q.    And when you originally -- when you testified on

19  direct examination, I believe Mr. Fun asked you if you had

20  been paid, and you said no.  And then he went through an

21  exhibit with you.  You have been paid money by DCI.

22    A.    Yes, sir.

23    Q.    How did you get into -- you said you did one

24  controlled buy with John Morgan?

25    A.    Yes, sir.

1    Q.    And how did that come about?

2    A.    I think we arranged it through a text message or a

3    call.

4    Q.    Had you been -- were you working with DCI at the

5    time, or is this something -- was it your idea, their idea,

6    or is it something that just sort of came up?

7    A.    I think that while I had been working for DCI, I

8    think that Johnny had called or texted me or something.  I

9    don't remember the exact detail.  But it was while I was

10   working for DCI.

11   Q.    One of your messages to Rob -- if I can find it, my

12   question would be a lot smoother, I promise you.  Well, I'm

13   going to paraphrase it and see if you can recall the

14   message.

15         He had sent you a message, apparently, where it

16   said -- the message said something about not to touch it.

17   A.    No, sir.  That wasn't in text.

18   Q.    That was in conversation?

19   A.    Yes, sir.

20   Q.    And you knew that not to touch it meant that it was

21   ready to sell?

22   A.    Yes, sir.

23   Q.    How did you know that?

24   A.    From previously when I was using.

25   Q.    Okay.  And -- and I appreciate your response

1   because I -- well, strike that.  Were you using or had you

2   sold drugs in the past?

3       A.    Both.

4       Q.    Okay.  What drugs had you sold, ma'am?

5       A.    Marijuana.

6       Q.    And when you were selling the marijuana, how many

7   times had you sold marijuana?

8       A.    I couldn't say for sure.

9       Q.    Several?

10      A.    Yes.

11      Q.    More than ten?

12      A.    Yes.

13      Q.    More than a hundred?

14      A.    No.

15      Q.    And how old were you, ma'am, when you were selling?

16      A.    18 and 19.

17      Q.    Were you selling in Basin?  Greybull?

18      A.    In Powell where I was going to college.

19      Q.    Powell.  Who were you selling to?  I'm not asking

20  about names.

21      A.    Other people that I knew.

22      Q.    How did you get involved in selling marijuana?

23      A.    People asked if I could get them some.

24      Q.    And you knew where to get marijuana from?

25      A.    Yes, sir.

1    Q.    Where were you getting marijuana from?

2    A.    Other people in Powell, or sometimes people in

3    Billings.

4    Q.    Who were those people, ma'am?

5    A.    Names?

6    Q.    Yes.

7    A.    I got it sometimes from a kid, Bryson, in college.

8    I got it from a girl, Karen, in Billings, or another guy,

9    Jimmy, in Billings.

10    Q.    You were getting -- were you getting most of your

11    marijuana from Billings or from Powell?

12    A.    Probably Billings.

13    Q.    And you'd get marijuana from Billings, bring it

14    back and sell it to the college students?

15    A.    Yes, sir.

16    Q.    Did you finish college, or did you end up not?

17    A.    I did not.

18    Q.    What happened?

19    A.    I couldn't afford to.

20         MR. FLEENER:  Can I have a minute, please, ma'am?

21         THE COURT:  Yes.

22         MR. FLEENER:  May I have a second, please?

23      (Discussion off the record.)

24    Q.    (By Mr. Fleener)  Did you tell Agent Hall that you

25    were selling drugs?

1    A.    Yes, sir.

2    Q.    And you told him that prior to -- well, when did

3    you tell him that?  Was that before or after you started

4    doing controlled buys?

5    A.    It was at the initial meeting when I had first met

6    with him.

7    Q.    Did he ask you about that or did you volunteer

8    that; do you remember?

9    A.    I believe that I volunteered it.

10   Q.    Are you sure?

11   A.    Not positive, no.

12   Q.    You recognize, don't you, that -- well, let me ask

13   you this.  Selling -- selling drugs, do you -- I'm just

14   trying to make the question right.

15         Do you know that selling drugs could be a felony?

16   A.    Yes, sir.

17   Q.    And that's certainly one of your -- that was one of

18   your concerns when you're -- and I know you're wanting to

19   clean up your life and do things differently but --

20   A.    Yes, sir.

21   Q.    It's not just that you have a misdemeanor

22   possession charge.  You also have told Agent Hall about

23   selling marijuana to people.

24   A.    Yes, sir.

25   Q.    And that concerns you because you know you can get

1    in big trouble for that.

2        A.    Had I been caught, yes.

3        Q.    Well, you actually admitted to a law enforcement

4    officer though.  So it wouldn't take much to be charged.

5    You don't believe so, do you?

6        A.    I didn't -- I didn't think that I could be charged,

7    I guess, for what I was telling him.

8        Q.    When's the last time you've spoken with Agent Hall?

9        A.    This morning.

10       Q.    Did you prepare -- prepare for trial talking with

11   Agent Hall?

12       A.    I met with him and Mr. Fun.

13       Q.    And you talked about what was going to be --

14   questions that were going to be asked of you and what --

15       A.    We looked over all the texts and pictures and

16   everything, yes.

17       Q.    You prepared for -- you prepared to testify?

18       A.    Yes.

19       Q.    Did you ever sell marijuana to minors?

20       A.    I don't believe so.

21       Q.    Do you hope that with the living a good life,

22   including your testimony today, that not only will you not

23   be charged with the misde -- or the misdemeanor charge may

24   be dismissed against you, but you certainly won't be charged

25   for any of the selling of marijuana?

 1        A.    I hope not.

 2              MR. FLEENER:  May I have one second, please, Your

 3    Honor.

 4        (Discussion off the record.)

 5              MR. FLEENER:  Ms. Riggs, I appreciate your time.

 6    Thank you.

 7              THE WITNESS:  Thank you.

 8              MS. HIGHAM:  Your Honor, I have no questions for

 9    this witness.  Thank you.

10              THE COURT:  Thank you.  Redirect?

11              MR. FUN:  Yes.  Just briefly, Your Honor.

12                      REDIRECT EXAMINATION

13        Q.    (By Mr. Fun)  Ms. Riggs, I need to ask you some

14    more questions based upon what the defense attorneys have

15    asked you.  Okay?

16        A.    Okay.

17        Q.    Now, ma'am, Mr. Fleener asked you questions about

18    not talking to Melissa for a long time.

19        A.    Mm-hum.

20        Q.    And -- well, just let me ask you.  Were you

21    romantically involved with Robert Velasquez?

22        A.    No.

23        Q.    You indicated that you liked him.  Were you

24    attracted to him?

25        A.    No.

1    Q.    Did you like him just merely because you were

2    friends in high school?

3    A.    Yes.

4    Q.    Do you have a grudge against Melissa Morgan?

5    A.    No.

6    Q.    Were you trying to steal Robert Velasquez away from

7    her?

8    A.    No.

9    Q.    Likewise, do you have a grudge against

10   Mr. Velasquez?

11   A.    No.

12   Q.    Now, ma'am, Mr. Fleener also asked you questions

13   about this misdemeanor possession in the fall of '09.

14   A.    Yes, sir.

15   Q.    Remember those questions, ma'am?

16   A.    Yes, sir.

17   Q.    Do you know whether or not that particular citation

18   has been dismissed without prejudice?

19   A.    I'm not sure.

20   Q.    Did you ever have to go to court on that ticket at

21   all?

22   A.    I don't think so.

23   Q.    Did you have to hire an attorney?

24   A.    No, sir.

25   Q.    Throughout this whole process, have you hired an

1    attorney?

2        A.      No, sir.

3        Q.      Likewise, when Mr. Fleener asked you questions

4    about selling marijuana -- do you remember that?

5        A.      Yes, sir.

6        Q.      And what quantities of marijuana did you typically

7    sell?

8        A.      An eighth, which is an eighth of an ounce.

9        Q.      Did you sell pounds of marijuana?

10       A.      I don't believe so.

11       Q.      And you indicated that mainly the people you were

12   selling to were people you were going to college with?

13       A.      People that I was smoking with, yes.

14       Q.      So you were using marijuana with them --

15       A.      Yes.

16       Q.      -- at the same time?  Did you make any money at

17   selling marijuana?

18       A.      Not really.

19       Q.      Did you sell marijuana for any particular reason?

20       A.      Money.

21       Q.      What would you use the money for?

22       A.      College.

23       Q.      Were you using that money to buy more marijuana?

24       A.      Yes.

25       Q.      For yourself or for others?

1      A.     Both.

2      Q.     Is it fair to say that you were selling marijuana

3   to support your habit of marijuana use?

4      A.     Yes.

5      Q.     Mr. Fleener also asked you about using

6   methamphetamine; do you remember that?

7      A.     Yes.

8      Q.     And that you never tried methamphetamine?

9      A.     Never.

10      Q.     Never sold it?

11      A.     I sold it -- do you mean --

12      Q.     Did you ever sell methamphetamine?

13      A.     No.

14      Q.     How is it, then, you were able to obtain

15   methamphetamine from Robert Velasquez?

16      A.     He offered it in the beginning.  He asked me if I

17   could help him sell some.

18      Q.     You didn't ask him, did you?

19      A.     No.

20      Q.     Mr. Fleener also asked you questions about telling

21   Mike Hall about your involvement with selling marijuana.  Do

22   you remember that?

23      A.     Yes, sir.

24      Q.     Other than telling Agent Hall about selling

25   marijuana, were you aware of any other evidence against you

1    concerning that?

2        A.    No.

3        Q.    Mr. Fleener also asked you questions about meeting

4    with me and Officer Hall.  Do you remember those?

5        A.    Yes, sir.

6        Q.    Did I ever put words in your mouth?

7        A.    No.

8        Q.    Did Agent Hall?

9        A.    No.

10       Q.    Did we ever tell you what to say?

11       A.    No.

12       Q.    Tell us generally what happened.

13       A.    I first met with you last week, and we basically --

14   you just asked me to tell you my involvement and how this

15   all happened and what -- what happened, and then we looked

16   at the texts and the pictures and my statements.

17       Q.    Okay.  Did I tell you if there was anything that

18   was important in this particular case --

19       A.    You said to always be honest.

20       Q.    Would you falsify evidence to get your misdemeanor

21   ticket or your felony for distribution of marijuana to go

22   away?

23       A.    No.

24       Q.    Would you lie about it?

25       A.    No.

```
 1          MR. FUN:  Nothing further.

 2          MR. FLEENER:  Your Honor, I have one or two

 3   questions for recross based on what the Government asked.

 4          THE COURT:  That's fine, Mr. Fleener.  You can

 5   proceed.

 6      (Discussion off the record.)

 7                  RECROSS-EXAMINATION

 8   Q.    (By Mr. Fleener)  What came first, Mr. Velasquez

 9   asked you about methamphetamine or you being arrested?

10   A.    Rob asking me.

11   Q.    How far in advance?

12   A.    I couldn't give you the exact date that Rob and

13   Melissa were in Billings, but it wasn't super.  I mean, I

14   think it was within a couple months.

15   Q.    And this took place up in Billings?

16   A.    Yes, sir.

17   Q.    And how much marijuana have you bought and sold?

18   A.    I couldn't tell you exact amounts.

19   Q.    More than a pound?

20   A.    I don't know that -- I don't know that I could say

21   that.

22          MR. FLEENER:  Thank you, Your Honor.

23          THE COURT:  Thank you.

24          MR. TIMBERS:  Actually, I have some follow-up to

25   that.
```

 1          THE COURT:  All right.  Thank you.

 2                    RECROSS-EXAMINATION

 3     Q.    (By Mr. Timbers)  So your conversation with Rob and

 4   Melissa happened in Billings before you get pulled over with

 5   your minor in possession?

 6     A.    My --

 7     Q.    Before you get your ticket, you had the

 8   conversation with Rob and Melissa?

 9     A.    Yes, sir.

10     Q.    About dealing drugs?

11     A.    Yes.

12     Q.    Okay.  Did you see -- okay.  So after you get

13   your -- pulled over, you volunteer to DCI that you have this

14   information and maybe you can go into some sort of

15   arrangement to get rid of your minor in possession and wipe

16   your slate clean; correct?

17     A.    I wouldn't say that it was an agreement to that.

18   When I met with Officer Hall, he basically asked me to tell

19   him what I was doing and amounts and what I was involved in.

20     Q.    Okay.  And how did the conversation turn to Robert

21   Velasquez and Melissa Morgan?

22     A.    I had told him about when I had smoked with them.

23     Q.    Did you offer to him that he had -- that Rob and

24   Melissa had discussed distributing methamphetamine?

25     A.    Yes.

1          MR. TIMBERS:  Thank you.

2          THE COURT:  Thank you, Ms. Riggs.  We appreciate

3    your time and testimony today.  You're excused and released

4    from your subpoena.

5          THE WITNESS:  Thank you.

6       (Witness excused.)

7          THE COURT:  I think rather than start with a new

8    witness, this would be a good time to take an evening

9    recess.  Members of the jury, please remember the admonition

10   that I have given you every day to not discuss this case

11   with anyone, to not conduct any research or to blog or text

12   or look on the Internet to find facts.  All facts have to be

13   found from what you hear in the courtroom and what you see

14   in the courtroom and the evidence that's properly admitted.

15         I'd like to ask that you be ready to return to the

16   jury box tomorrow morning at 9:15.  We'll start the day

17   tomorrow more consistent with our regular schedules.  I

18   appreciate your patience today while we were sorting out

19   some matters and waiting to call you in.

20         With that, we'll stand in evening recess until call

21   tomorrow morning at 9:15.

22         THE CLERK:  All rise.

23      (Following out of the presence of the jury.)

24         THE COURT:  Is there anything counsel needs from

25   the court before we recess for the evening?

1          MR. FUN:  Nothing from the United States, Your

2   Honor.  Thank you.

3          THE COURT:  Thank you.

4          MR. TIMBERS:  Your Honor, I have received some DEA

5   information regarding Brittany Huntington who was to

6   testify.  I've received nothing from Brian Goodby.  I don't

7   know if that request was ever made.

8          THE COURT:  What's the status of that, Mr. Fun?

9          MR. FUN:  Are you talking about the spectra

10  analysis or --

11         MR. TIMBERS:  Yeah.  Yeah.  His laboratory notebook

12  regarding how he tested, what he tested, how he got his

13  results.

14         MR. FUN:  I can get with Mr. Goodby tonight since

15  I'll be meeting with him to go over testimony.  We can ask

16  him about that, Your Honor.

17         THE COURT:  All right.  Thank you.  Anything else?

18         MR. TIMBERS:  No, Your Honor.

19         THE COURT:  Hearing nothing, we'll stand in recess.

20  And I'd ask the attorneys be here a little bit before 9:15

21  so we can start tomorrow morning.  Thank you.

22     (Trial proceedings recessed

23     4:54 p.m., October 3, 2011.)

24

25

1            C E R T I F I C A T E

2            I, MARGIE R. DAUSTER, Deputy Official Court

3    Reporter for the United States District Court for the

4    District of Wyoming, Registered Professional Reporter, and a

5    Certified Realtime Reporter, do hereby certify that I

6    reported by machine shorthand the foregoing proceedings

7    contained herein on the aforementioned subject on the date

8    herein set forth, and that the foregoing pages constitute a

9    full, true and correct transcript.

10           Dated this 31st day of December, 2011.

11

12                       */s/ Margie R. Dauster*

13                       ————————————————————————
                         MARGIE R. DAUSTER
                         Deputy Official Court Reporter
14                       Registered Professional Reporter
                         Certified Realtime Reporter
15

16

17

18

19

20

21

22

23

24

25