1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF WYOMING

3    _____

4    UNITED STATES OF AMERICA,          Case No. 10-CR-329-F
                                        Volume VI of XX
5              Plaintiffs,              (Pages 1 through 220)

6              vs.                      Cheyenne, Wyoming
                                        October 4, 2011
7    ROBERT VELASQUEZ, JR.,             9:36 a.m.
     MIGUEL ANGEL ORDAZ,
8    DANIEL GEORGE RENTERIA,
     ALEX GARCIA, JR.,
9
               Defendants.
10   _____

11

12           TRANSCRIPT OF TRIAL PROCEEDINGS

13   BEFORE THE HONORABLE NANCY D. FREUDENTHAL
            CHIEF UNITED STATES DISTRICT JUDGE
14
       and a jury of twelve and two alternates
15

16

17

18

19

20

21   Court Reporter:     MRS. MARGIE R. DAUSTER, RPR, CRR
                         1500 Longs Peak Drive
22                       Fort Collins, Colorado 80524
                         (970) 631-5925
23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

```
 1   APPEARANCES:

 2   For the Plaintiff:        MR. DARRELL FUN
                               Assistant U.S. Attorney
 3                             U.S. ATTORNEY'S OFFICE
                               100 East "B" Street, Suite 2211
 4                             P.O. Box 22211
                               Casper, Wyoming 82601
 5
                               MR. L. ROBERT MURRAY
 6                             Assistant U.S. Attorney
                               U.S. ATTORNEY'S OFFICE
 7                             P.O. Box 668
                               2120 Capitol Avenue, Suite 4000
 8                             Cheyenne, Wyoming 82003

 9   For Defendant             MR. VINCENT HORN, JR.
     Velasquez:                Attorney at Law
10                             9774 Chanteclaire Circle, Suite 100
                               Littleton, Colorado 80126
11
     For Defendant Ordaz:      MR. PETER TIMBERS
12                             Attorney at Law
                               SCHWARTZ, BON, WALKER & STUDER, LLC
13                             141 S. Center Street, Suite 500
                               Casper, Wyoming 82601
14
     For Defendant             MR. THOMAS A. FLEENER
15   Renteria:                 Attorney at Law
                               FLEENER & VANG, LLC
16                             2523 Garfield, Suite D
                               P.O. Box 1186
17                             Laramie, Wyoming 82073-1186

18   For Defendant Garcia:     MS. JILL A. HIGHAM
                               Attorney at Law
19                             THE HIGHAM LAW OFFICE
                               1001 E. Harmony Road, Suite A-366
20                             Fort Collins, Colorado 80525-3354

21

22

23

24

25
```

1                    INDEX TO WITNESSES

2    GOVERNMENT'S WITNESSES                          PAGE

3    JUAN L. MARQUEZ, JR.
         Direct – Mr. Fun                              7
4        Cross – Mr. Horn                             42
         Cross – Ms. Higham                           46
5        Cross – Mr. Timbers                          49
         Cross – Mr. Fleener                          53
6        Redirect – Mr. Fun                           61

7    BRIAN E. GOODBY

8        Direct – Mr. Murray                          65
         Cross – Mr. Timbers                          72
9        Redirect – Mr. Murray                       117

10   MICHAEL HALL
         Direct – Mr. Murray                         118
11       Cross – Mr. Horn                            119

12   BRITTANY HUNTINGTON
         Direct – Mr. Fun                            122
13       Cross – Mr. Horn                            129
         Cross – Mr. Timbers                         130
14       Redirect – Mr. Fun                          133

15   MELISSA D. MORGAN
         Direct – Mr. Fun                            134
16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX TO EXHIBITS

 2      GOVERNMENT'S                        IDENTIFIED/RECEIVED

 3      100                                     67          70
        101                                     67          70
 4      102                                    125         126
        103                                     67          70
 5      104                                     67          70
        105                                     67          71
 6      109                                     70          72
        110                                    125         126
 7      111                                     70          72
        501                                    202         202
 8      517                                    182         183
        523                                     22          22
 9      525                                     24          25
        1200                                   173         174
10      1201                                   175         176
        1412                                     6           6
11      1603                                    19          20

12      DEFENDANTS'                         IDENTIFIED/RECEIVED

13      Velasquez A                             85          86
        Ordaz A                                100         101
14      Ordaz B                                102         103
        Ordaz C                                104         104
15      Ordaz D                                107         108
        Ordaz F                                108         114
16      Ordaz H                                110         114
        Ordaz I                                111         114
17      Ordaz J                                112         114

18

19

20

21

22

23

24

25
```

```
 1                     P R O C E E D I N G S

 2          (Trial proceedings reconvened

 3          9:36 a.m., October 4, 2011.)

 4               THE COURT:  Are we ready for the jury?

 5               MR. TIMBERS:  Just a second.  Your Honor?

 6               THE COURT:  Yes.

 7               MR. TIMBERS:  May my client and I sit over here?

 8               THE COURT:  Yes.  Mr. Ordaz, are you comfortable

 9     there?  Are you comfortable, Mr. Timbers?

10               MR. TIMBERS:  Yes, ma'am.  Thank you.

11               THE COURT:  Are we ready to proceed?  All right.

12     Let's bring in the jury.

13          (Following in the presence of the jury.)

14               THE COURT:  Please be seated.  Good morning,

15     everyone.  We are here today in the continuation of the jury

16     trial in United States versus Velasquez, et al.  The court

17     notes the presence of the jury with roll call waived.

18               The government, I believe -- your next witness; is

19     that correct, Mr. Fun?

20               MR. FUN:  May it please the court, yes, Your Honor.

21               THE COURT:  Please proceed to call your next

22     witness.

23               MR. FUN:  Thank you.  Counsel.

24               MR. FLEENER:  Counsel.

25               MR. FUN:  Ladies and gentlemen of the jury, good
```

1    morning.

2            Before we begin, I spoke with defense counsel

3    yesterday as we broke concerning Government's Exhibit 1412.

4    And what 1412 is -- it's a better copy of Defense Renteria

5    Exhibit B.  And if there's no objection, I'd move for the

6    admission of that -- this exhibit, 1412, Your Honor.

7            MR. FLEENER:  May I see it, please?

8            MR. FUN:  It's the funds control log for Lisa

9    Riggs.

10           THE COURT:  Hearing no objection, Government

11   Exhibit 1412 is admitted.

12           MR. FLEENER:  Your Honor, may I have a minute,

13   please.  I'm actually inspecting the document.

14           THE COURT:  Oh, I'm sorry.

15           MR. FLEENER:  No worries.  I just . . .

16           I have no objections.  Thank you, Your Honor.

17           THE COURT:  Thank you.  Government Exhibit 1412 is

18   admitted.

19       (Government's Exhibit 1412 received in evidence.)

20           MR. FUN:  Thank you, Your Honor.  Your Honor,

21   United States now calls Juan Marquez to the stand.  Please

22   come forward to be sworn.

23                   (Witness sworn.)

24           THE CLERK:  Please take a seat.  State and spell

25   your name for the record.

1          THE WITNESS:  My name is Juan Luis Marquez, Jr.

2     J-u-a-n L-u-i-s M-a-r-q-u-e-z.

3                    JUAN L. MARQUEZ, JR.,

4     Having been first duly sworn, was examined and testified as

5     follows:

6                    DIRECT EXAMINATION

7     Q.    (By Mr. Fun)  Mr. Marquez, have you testified in

8     court before?

9     A.    Yes, I have.

10    Q.    In connection to a criminal case?

11    A.    No, just for myself.

12    Q.    Okay.  I know you're a little bit nervous, so try

13    to relax.

14    A.    Yes, sir.

15    Q.    Sir, let's just start with your background.  Where

16    did you grow up at?

17    A.    Powell, Wyoming.

18    Q.    What education level have you achieved?

19    A.    Graduated high school.

20    Q.    Are you married?

21    A.    Yes, sir.

22    Q.    Do you have children?

23    A.    Yes, sir.

24    Q.    Sir, have you been convicted of any felony crime?

25    A.    No, I haven't.

```
 1        Q.    Have you been convicted of any crime, whether

 2   misdemeanor or felony, involving perjury?

 3        A.    No, I have not.

 4        Q.    How about false statements?

 5        A.    Nope.

 6        Q.    How about forgery?

 7        A.    No, sir.

 8        Q.    Sir, have you been granted any immunity for your

 9   testimony today?

10        A.    No, I have not.

11        Q.    Have you been promised anything?

12        A.    No.

13        Q.    Have you been promised whether or not you would be

14   charged or not?

15        A.    No.

16        Q.    Are you being paid anything for your testimony?

17        A.    No, I haven't.

18        Q.    Do you have any criminal charges pending against

19   you?

20        A.    Not that I'm aware of.

21        Q.    Sir, I just need to take a moment to talk about

22   your past history concerning drugs, okay?

23              Sir, have you used drugs in your life?

24        A.    Yes, I have.

25        Q.    What type of drugs have you used?
```

```
 1      A.    I've used cocaine, marijuana, methamphetamine,

 2  mushrooms.

 3      Q.    And what do you mean by mushrooms?  What are

 4  mushrooms?

 5      A.    I guess a psychedelic drug, I guess.

 6      Q.    What was the first time you used any drug?

 7      A.    I was probably about 13 or 14.

 8      Q.    And what drug was that, sir?

 9      A.    Marijuana.

10      Q.    Was there a drug that you used more often than the

11  others?

12      A.    Oh, for a long period of time it was marijuana,

13  yeah.

14      Q.    When was the last time you used marijuana?

15      A.    Close to two years.

16      Q.    How about cocaine?

17      A.    Cocaine I don't remember.

18      Q.    Has it been more than two years?

19      A.    No.

20      Q.    How about mushrooms?

21      A.    Oh, yeah.  Three years probably.

22            THE COURT:  I'm sorry.  I couldn't understand your

23  response.  If you could sit a little closer.  I have a

24  hearing problem.

25            MR. FUN:  If you want, you can move that mike up a
```

1  little bit higher, and it will be right in front of your

2  mouth there.

3          THE WITNESS:  Okay.

4          THE COURT:  Thank you.

5     Q.  (By Mr. Fun)  How about methamphetamine, when was

6  the last time you used methamphetamine?

7     A.     I don't remember the exact date on that either.

8     Q.     Okay.  Approximately how long ago?

9     A.     Oh, gosh.  Probably close to a year.

10    Q.     When was the first time you used methamphetamine?

11    A.     I was probably 17 or 18 years old.

12    Q.     How would you use your methamphetamine?

13    A.     I would either smoke it or snort it in lines.

14    Q.     How often were you using methamphetamine?

15    A.     Oh, I don't know.  Couple times a month, few times

16  a month.  Just kind of depended if it was around.

17    Q.     And in what quantities would you use

18  methamphetamine when you used it?

19    A.     Oh, I'd usually get like a half a gram or a gram,

20  something, you know, that would last for a day or two.

21    Q.     When you were using methamphetamine, did you suffer

22  any memory loss?

23    A.     No.

24    Q.     Did you suffer any blackouts?

25    A.     No.

1    Q.    Did you hallucinate at all?

2    A.    No.

3    Q.    How did it make you feel?

4    A.    Made me feel like I was -- had a lot of energy or

5    adrenaline.

6    Q.    Did you consider yourself an addict?

7    A.    A drug addict?

8    Q.    Yes.

9    A.    Yes, sir.

10   Q.    Have you received any type of treatment for your

11   addictions?

12   A.    Oh, just -- I don't know.  As far as just like NA

13   classes, that type of thing, yeah.  No actual treatment.

14   Q.    Have you received any type of in-patient treatment?

15   A.    Never.

16   Q.    How about out-patient?

17   A.    Nope.

18   Q.    Sir, were you a confidential informant for the

19   Wyoming Division of Criminal Investigation?

20   A.    Yes, I was.

21   Q.    Tell us how you became a confidential informant.

22   A.    Well, around my house where I was living at the

23   time in Powell, I was seeing -- this is a small town where

24   we live.  You know who the police are.  You know what they

25   drive.  And I kept seeing them more often around my house

1    sitting there for long periods of time.  And I'd be certain

2    areas or around certain people, and I'd see them more and

3    more.

4            So one day I approached one of them and asked him,

5    you know -- or I actually don't remember if I gave him a

6    call.  Somehow I got ahold of him and asked him what was

7    going on.

8            And they kind of explained to me, you know, what

9    they were investigating and wanted to know my part or my

10   role in their investigation.

11   Q.    And what was -- what were you told concerning the

12   investigation?

13   A.    That there was some people dealing meth and that

14   they wanted to know how I was, I guess, tied into it.

15   Q.    At that point in time, were you using

16   methamphetamine?

17   A.    You mean when I talked to them or --

18   Q.    No.  During that time frame.

19   A.    During that time period, yeah, off and on.

20   Q.    Okay.  And what happened after you talked to the

21   police?

22   A.    After I talked to them, I guess I was pretty

23   nervous, pretty scared as -- you know, myself being in

24   trouble.  So they had asked me if I would become a

25   confidential informant for them or make a couple buys for

1    them, and I agreed to it.

2        Q.    Did there come a point in time when you talked to

3    Special Agent Michael Hall?

4        A.    Yes, sir.

5        Q.    How did that come about?

6        A.    I actually met him out there at their office there

7    in Powell.  It's the Fitch Building.

8        Q.    Do you remember when you met with him?

9        A.    I don't remember the exact day, no.

10       Q.    Do you remember what year it was?

11       A.    Maybe last year.  I really don't remember.

12       Q.    And when you met with Agent Hall, what happened?

13       A.    Well, I guess we made a phone call, and I think it

14   was recorded and went from there.

15       Q.    Now, when you say you made a phone call, who did

16   you call?

17       A.    Guy I knew by the name of Rob.

18       Q.    Did you know Rob's last name?

19       A.    After -- after they told me, yeah.  I didn't know

20   it before.

21       Q.    Now, how did you know Rob?

22       A.    I had met him through different people that we know

23   and at parties and things like that in the past.

24       Q.    How did you know to call Rob?

25       A.    Because I got stuff from him before.

1    Q.    So prior to becoming a confidential informant, you

2    had received something from Rob before?

3    A.    Yes.

4    Q.    What is it that you had received from him?

5    A.    Methamphetamines.

6    Q.    Do you recall the first time you received

7    methamphetamine from Rob?

8    A.    No, I don't remember the first time.

9    Q.    Do you remember how long prior to becoming a

10   confidential informant it was?

11   A.    Oh, probably over a year.

12   Q.    And in what quantities did you receive

13   methamphetamine from Rob?

14   A.    At different times I would get half a gram here and

15   there, sometimes a gram, sometimes 2 grams.  Just kind of

16   depended on how much money I had or what was available at

17   the time.

18   Q.    Did you have to pay for this methamphetamine?

19   A.    Yes, I did.

20   Q.    Do you recall how much you paid for a gram?

21   A.    $150.

22   Q.    How long would that 1 gram last you?

23   A.    Oh, probably two days.

24   Q.    Now, prior to calling Rob with Agent Hall, did you

25   tell him about your involvement with Rob?

1    A.    Yeah.

2    Q.    Is that what led up to the phone call?

3    A.    Yes, sir.

4    Q.    At the time you met with Agent Hall, were there any

5    charges pending against you?

6    A.    Not that I knew of.

7    Q.    Why is it then that you became a confidential

8    informant for DCI?

9    A.    Well, in the past I have -- I have known people

10   that I was really close with.  And as soon as they were --

11   became involved, they were like, I don't know, doing

12   business with these -- when they're doing this big

13   investigation like this, everybody gets caught.  I didn't

14   really want to lose my family or my job or anything like

15   that over getting high.

16   Q.    Okay.  So is it fair to say that you were afraid of

17   getting caught?

18   A.    Yes, sir.

19   Q.    Did you sign an agreement with DCI to become a

20   confidential informant?

21   A.    Yes, I did.

22   Q.    Do you recall anything about that agreement?

23   A.    Oh, that I shouldn't be -- that I wouldn't be

24   allowed to use drugs while doing -- while working for them.

25   That they were going to be able to record my phone calls.

1   Things like that.  That's really the two things I remember

2   the most.

3       Q.   Now, you mentioned that you made a recorded call to

4   Rob?

5       A.   Yes, sir.

6       Q.   Okay.  Tell us what happened in that phone call.

7       A.   That first time I made a phone call to him and

8   asked him if there was anything around, and he had said yes.

9   And asked him where to meet up with him at.  And he had told

10  me to go ahead and head over to Cody from Powell, and he

11  would meet with me.

12      Q.   And did you, in fact, meet with him?

13      A.   Yes, I did.

14      Q.   Tell us about that.

15      A.   We met in a parking lot at Albertsons there in

16  Cody.  He pulled in in a -- I think it was a green car.

17  Pulled in there.  Got out.  Talked to me for a minute.

18           And then, you know, we did our -- I exchanged him

19  money for the stuff, and I took off from there and met up

20  with the agents down the road.

21      Q.   Okay.  Now, when you say you provided him money, do

22  you remember how much money you provided?

23      A.   I think at that time it was $150 for a gram.

24      Q.   A gram of what?

25      A.   Gram of meth.

1    Q.    Now, prior to meeting with Rob, were you searched

2    by law enforcement?

3    A.    Yes, I was.  I was searched.  My vehicle was

4    searched also.

5    Q.    Now, when you went to the Albertsons parking lot,

6    where was this Albertsons located, what town?

7    A.    In Cody, Wyoming.

8    Q.    Do you recall how Rob arrived?

9    A.    Yeah.  He was -- he was in a car, and his

10   girlfriend Melissa was driving.  He was in the passenger

11   seat.

12   Q.    Okay.  So when Rob and Melissa arrived at the

13   Albertsons parking lot, what happened?

14   A.    I was parked waiting for him to pull in.  I got out

15   of my truck.  Walked over to the car.  He opened up the

16   door, and we had a little conversation.  I don't know, 30

17   seconds or whatever.

18         He told me it was good stuff.  Handed him the

19   money, and he handed me a box, like a Sucrets box or Altoid

20   box, something like that, little tin can -- or tin box,

21   excuse me, and it had stuff inside there.  Put it in my

22   pocket, turned around and got back in my truck.

23   Q.    Did you ever get inside of his vehicle?

24   A.    No, I did not.

25   Q.    Okay.  So where did this transaction exactly take

1  place at?

2  A.    Right in the parking lot outside of Albertsons.

3  Q.    Did you pay him the $150?

4  A.    Yeah.  I gave him the money to his hand, yeah, from

5  my hand.

6  Q.    When did you give him the money?

7  A.    What's that?

8  Q.    When did you give him the money?

9  A.    Right there when we were talking to each other

10 outside of his -- while he was sitting in his car kind of

11 with his legs out.

12 Q.    Afterwards you indicated that you met up with the

13 agents?

14 A.    Yeah.  Mike Hall.

15 Q.    And what happened when you met up with Mike Hall?

16 A.    I gave him the tin can, and he placed it in his

17 car.  He searched me again.  Then we drove -- well, he

18 searched my vehicle.  Then we went back to the motel where

19 we were meeting at.

20 Q.    Now, the $150 that you gave to Rob, where did you

21 get that money?

22 A.    From DCI.

23 Q.    And after the controlled buy, were you paid

24 anything?

25 A.    Yeah.  I think -- I can't remember exactly how much

1   they gave me.  But gave me some money to cover for my fuel

2   and stuff like that.

3       Q.   To get to the controlled buy, did you have to use

4   your own vehicle?

5       A.   Yes, sir, I did.

6       Q.   Did you have to pay for your own gas?

7       A.   Yes, sir.

8       Q.   Did you have to take time off of work?

9       A.   No.

10      Q.   Sir, would there be anything that would help

11  refresh your memory as to how much you were paid on that

12  particular occasion?

13      A.   Yeah.  I mean, they gave me money two different

14  times.  I think maybe even three different times.  I don't

15  know.  Maybe it was -- I really don't remember.  Like maybe

16  $50 or . . .

17           MR. FUN:  Just a moment, Your Honor.

18      Q.   (By Mr. Fun)  Sir, I'm going to hand you what I've

19  marked for identification as Government's Exhibit 1603

20  consisting of three pages.  Just have you quickly take a

21  look at that and see if it refreshes your memory.

22      A.   Okay.  Yeah.  I remember now.  Yeah, I signed

23  these.  These are receipts that they had to write down for

24  the money they gave me.

25           MR. FUN:  Your Honor, move to admit 1603.

1          MR. FLEENER:  No objections, Your Honor.

2          THE COURT:  Hearing no objection -- could you

3    characterize what 1603 is.

4          MR. FUN:  Funds control log, Your Honor, consisting

5    of three pages, for CI 10-06.

6          THE COURT:  Government's Exhibit 1603 is admitted.

7        (Government's Exhibit 1603 received in evidence.)

8     Q.    (By Mr. Fun)  Mr. Marquez, let me hand these back

9    to you.  Sir, looking at that, can you tell how much you

10   were paid for that particular controlled buy in the

11   Albertsons parking lot?

12    A.    Yes, sir.  $50.

13    Q.    Do you know when this controlled buy took place?

14    A.    No.  I don't remember the exact date, no.

15    Q.    Do you recall if it was January 15th of 2010?

16    A.    Yeah, that sounds about right.

17    Q.    Sir, you mentioned you obtained a Sucrets tin from

18   Mr. Velasquez?

19    A.    Yes, sir.

20    Q.    Sir, I'm going to display for you what's been

21   previously admitted as Government's Exhibit 1601 on the

22   overhead screen.  Sir, does that look like the Sucrets tin

23   that you obtained?

24    A.    Yes, sir.

25    Q.    When you received it from him, did you open it up

1   and look inside?

2       A.      No, I didn't.

3       Q.      You just handed it to Agent Hall immediately?

4       A.      Yes, sir.

5       Q.      Okay.  Sir, when was the -- did you conduct a

6   second controlled buy?

7       A.      Yes, I did.

8       Q.      Do you recall when that was?

9       A.      Oh, maybe a week or two later.

10      Q.      So sometime after January 15th --

11      A.      Yes, sir.

12      Q.      -- of 2010?

13      A.      Yes, sir.

14      Q.      Tell us what happened.

15      A.      That time he had called me first and told me that

16  he had some good stuff and that I should get ahold of him.

17  So I contacted Mike Hall, told him about the phone call I

18  had received.  And I went and met with him at his office

19  there in Powell again, and we had made a tape recording of

20  the phone call.

21              He recorded the phone call that I made to him.  And

22  he told me to be out there at his house at the shop, to go

23  ahead and come out.

24      Q.      Okay.  Who told you that he would be at his house

25  at the shop?

1    A.    Rob did.

2    Q.    Okay.  Now, where was this -- where was Rob's house

3  with his shop located at?

4    A.    I'm not sure the exact name or number of the

5  highway, but it's outside of Cody headed towards Meeteetse

6  on the right-hand side.  There's a building for Park County

7  Road and Bridge right across the street from there.

8    Q.    Have you been to that house before?

9    A.    Yes, I had.

10    Q.    If you saw it, would you recognize it?

11    A.    Yes, sir.

12    Q.    Sir, I'm going to hand you what has been marked for

13  identification as Government's Exhibit 523.

14          Do you recognize that, sir?

15    A.    Yes, I do.

16    Q.    And what is it?

17    A.    That's the house that's by the shop that he

18  referred to in the phone call.

19          MR. FUN:  Move to admit 523, Your Honor.

20          THE COURT:  Hearing no objection, Government's

21  Exhibit 523 is admitted.

22      (Government's Exhibit 523 received in evidence.)

23    Q.    (By Mr. Fun)  Sir, I'm displaying for you Exhibit

24  523.  Is this the shop/house that was located outside of

25  Cody?

1    A.    Yes, it is.

2    Q.    Now, in this photograph is the -- where is the shop

3    located?

4    A.    It would be on the right-hand side, kind of where

5    those tan trees are right there.

6    Q.    When you met with Rob at the shop/house, were you

7    provided any money?

8    A.    You mean from DCI?

9    Q.    Correct.

10   A.    Yes.

11   Q.    How much money were you provided?

12   A.    I think $300 that time.

13   Q.    How much methamphetamine were you supposed to

14   obtain from Rob?

15   A.    2 -- 2 grams, I think.

16   Q.    When you went to the shop/house outside of Cody,

17   tell us what happened there.

18   A.    Well, I got there.  And I remember I knocked on the

19   door, and there was like a shorter kind of -- short white

20   guy answered the door.  Told me to come in.  I asked for Rob

21   or whatever.

22         Came in.  He's sitting there at a little small

23   table in front of the window looking out across the road,

24   looking out towards the highway.  And he pulled a

25   methamphetamine pipe out of the drawer and asked me if I

1    wanted some.  Told him no, I'm in a hurry.

2            Well, then he had asked me if I wanted coke, is

3    what I had come there for.  And I told him no, that I wanted

4    meth.  And he says, well, we'll have to go to town to get

5    that, to my other house.

6            So then we took off from there.  He put the pipe

7    away.  Took off from that house, got in my truck, drove to

8    town to a yellow house down by a car wash there.  I'm not

9    even sure what street name that is either.

10           But went inside there, went downstairs into a room,

11   and that's where he had that stuff at.  Weighed it out and

12   gave it to me.  Then we drove back out to that house, and I

13   went in for a minute.  Then I took off.  Met with the agents

14   again.

15   Q.    Okay.  So let's back up a minute.  You talked about

16   that you left this shop/house and went to another house?

17   A.    Yes, sir.

18   Q.    Where was this second house located?

19   A.    In Cody.  Actually in town in Cody.

20   Q.    If you saw it, do you think you'd be able to

21   recognize it?

22   A.    Oh, yeah.

23   Q.    Sir, I'm going to hand you Exhibit 525, see if you

24   recognize this.

25   A.    Yes, I do.

1    Q.    And what is it, sir?

2    A.    That's the second house we went to in town.

3    Q.    Thank you.  Let me retrieve that back from you.

4         MR. FUN:  Move to admit Government's Exhibit 525.

5         MR. FLEENER:  No objections.

6         THE COURT:  Hearing no objection, Government's

7    Exhibit 525 is admitted.

8      (Government's Exhibit 525 received in evidence.)

9    Q.    (By Mr. Fun)  Sir, is that the house in Cody?

10   A.    Yes, it is.

11   Q.    What happened when you arrived at this house in

12   Cody?

13   A.    We showed up there, and the doors were locked, if I

14   remember right, so he had to knock on the door.  His

15   girlfriend opened it up.  She took off to a different part

16   of the house, and me and him went downstairs, kind of to the

17   right side when you're looking at this picture there.

18   There's a room down there.

19        We went downstairs, and he went into a closet.  And

20   I guess that must -- that was where he had the meth at.  And

21   he had a scale in there.  And I was kind of looking around

22   at pictures on the walls and stuff.

23        And he had weighed it out -- weighed out the meth,

24   put it -- put it in a bag.  And then he told me he

25   double-wrapped it so none would spill out or anything.

1    Handed it to me.  I gave him the cash.

2        Q.    Now, let's back up a minute and talk a little bit

3    more about that.  When -- I assume it's the same -- is it

4    the same Rob from the first time you obtained

5    methamphetamine?

6        A.    Yes, sir.

7        Q.    Now, when Rob provided you the methamphetamine, did

8    you see where he got it from?

9        A.    Yeah, from the closet.

10       Q.    Was it already weighed out and packaged?

11       A.    No.

12       Q.    Tell us -- explain what happened.

13       A.    He poured it out of one -- a bigger bag, put it

14   onto a plate.  And then from there I think he used a playing

15   card or an ID or something to put it onto a small

16   hand-held -- well, a digital scale.

17             Put it on a small scale and weighed it out, and

18   then from there put it into a separate baggy, like the

19   corner of a sandwich bag.

20       Q.    Now, when you say that there was a larger bag that

21   he obtained this small quantity from, can you describe that

22   for us?

23       A.    Well, just another piece of sandwich bag that was

24   bigger.

25       Q.    Approximately what size was this larger bag?

1     A.     I don't know.  Maybe 3 inches long or 3 inches or

2     something.

3     Q.     Could you tell how much methamphetamine was in this

4     larger bag?

5     A.     I couldn't.  Few grams.

6     Q.     Okay.  After Rob provided you this methamphetamine,

7     did you have any conversation with him?

8     A.     Yeah.  He had shown me some cocaine that he had in

9     his pocket too.  Asked me if I wanted to take it on a front,

10    let me -- that I could go ahead and pay him later for it.  I

11    told him, no, I don't want it.

12    Q.     What do you mean by take it on the front?

13    A.     Meaning like he lets me take it, I go sell it to

14    somebody, get the cash, and then come back to him with the

15    cash later on.

16    Q.     Okay.  Did you see how much cocaine was there?

17    A.     No.  I mean, I did.  I'm not sure exactly how much

18    was in there.  I think, if I remember right, I asked him.

19    Q.     And what is it that you asked him?

20    A.     What's that?

21    Q.     What is it that you asked him?

22    A.     I asked him how much was in the bag.

23    Q.     And what did he tell you?

24    A.     He told me a little less than an ounce.

25    Q.     Okay.  What happens after that?

1    A.    I think he left that in the closet.  Then he closed

2    up the door.  Then we took off from there.  Got back in my

3    truck and drove back out to the house where the shop is.

4    Q.    The one outside of Cody?

5    A.    Yes, sir.

6    Q.    Now, you mentioned that when you went to the house

7    in Cody, there -- was his girlfriend there?

8    A.    Yes.

9    Q.    Who was that?

10   A.    Melissa.

11   Q.    How did you know Melissa?

12   A.    I had met her out there at the shop before where

13   that green-and-white house is.

14   Q.    Did you know her very well?

15   A.    No.

16   Q.    Did you know her last name?

17   A.    Well, at that time I didn't.  But after talking

18   with DCI, they told me her last name was Morgan.

19   Q.    And I think you also talked about when you went to

20   the first house outside of Cody there was a short white guy

21   that answered the door?

22   A.    Yes, sir.

23   Q.    Do you know who that was?

24   A.    I don't.

25   Q.    So you get the methamphetamine and you go back to

1   the shop/house.  What happens there?

2      A.    When I got there -- well, on the way there, he was

3   talking about guns and stuff, his guns that he had.  And

4   when we got back there, he was telling me about an SKS.  And

5   I asked him if I could go check it out.

6          So we went inside, and he pulled it out from where

7   it was sitting next to that table where he was sitting at

8   when I first went in the house, the first time before we

9   went to town.  He pulled it out, showed it to me.  Told

10  me it was -- I think it was like a 30-round clip that it had

11  in there.

12         And then he pulled back the -- I'm not even sure --

13  I guess the bolt on it.  Then when he pulled that back, I

14  seen that it was loaded.  He went to go try to hand it to

15  me.  I told him, I don't want to touch it, man.  Kind of

16  made me nervous if there's bullets in there.

17     Q.    Okay.  Now, you indicated that the first time you

18  went to that house earlier in the day -- that's a bad

19  question.

20         When you went to the house on that day the first

21  time, you saw Rob with that gun?

22     A.    It was sitting within hand's reach of him, yeah.

23  He didn't actually have it in his hands, but it was within

24  arm's reach of where he was sitting at the table there.

25     Q.    Okay.  So Rob was sitting at a table?

1    A.    Yeah, in front of the window when I first went in

2    the house.

3    Q.    And where was the gun relative to where he was

4    sitting?

5    A.    He was sitting about where I am facing the window,

6    and it's on his left-hand side up against the wall hanging

7    from a shoulder strap.  Maybe hanging on a nail or

8    something.  I don't remember what it was hanging on.

9    Q.    Now, you indicated that on the way back to that

10   shop/house after going to the Cody house, Rob is talking

11   about guns?

12   A.    Yeah, that was -- when we first left the house to

13   go to town, we heard gunshots outside.  And there's a

14   shooting range right across the street.  I think it's the

15   sheriff's department shooting range or something.

16         I told him, "Wow, did you hear that?"

17         He said, "Yeah.  I'm fixin' to shoot back."

18         Just joking or whatever.

19         I told him you're kind of crazy saying stuff like

20   that, you know.  Would you really do it, or something.

21         And he started telling me about his guns.  You

22   know, I had asked him questions about them.  He started

23   telling me that, yeah, he's got this pistol, like a -- I

24   don't know, a .44 or .45 or something, a .9 over here, this

25   and that.

1        We had conversations about the guns that he had,

2   but they weren't there with him.  He said he had them over

3   in Greybull, I think.

4       Q.   Okay.  Now, in addition to talking about guns, did

5   he talk about any controlled substances?

6       A.   Yeah.  On the way to town, yeah.  He told me

7   about -- that if I would take some coke and go sell it

8   because he needs to find buyers.  There's quite a bit in

9   Greybull at his -- in his home.  Either somebody had a --

10  like a half a pound of coke.

11      Q.   Did you ever take any of that coke?

12      A.   No, I didn't.

13      Q.   All right.  Let's go back to the gun for a moment.

14  When you saw the gun, were you able to get a good look at

15  it?

16      A.   Oh, yeah.

17      Q.   If you saw it again, do you think you would

18  recognize it?

19      A.   Yes, sir.

20      Q.   Was there anything distinctive about it that you

21  would be able to recognize?

22      A.   The clip.  I had never seen a clip like that

23  before.  And then there's -- I remember a couple parts on

24  the gun that were kind of faded.  Different -- I don't know,

25  like the paint was fading off of them or something.

1    Q.    Tell me about the clip.  What was distinctive about

2    the clip?

3    A.    It was just like you see in the movies, a banana

4    clip, just the shape to it.

5    Q.    Sir, I'm going to show you what's been marked as

6    Government's Exhibit 200 and 200-A.  Sir, can you see that?

7    A.    That's the gun.

8    Q.    How can you tell it's the gun?

9    A.    I remember the part here on the bolt being a little

10   bit gray, like that color, and the barrel looks like it was

11   faded to me.  And the strap -- that's the strap that it was

12   hanging from.  And that clip is the same clip that was in

13   it.

14   Q.    Thank you, sir.

15   A.    Yes, sir.

16   Q.    Now, sir, on that particular occasion, were you

17   paid anything for conducting a controlled buy?

18   A.    Yes, I was.

19   Q.    How much were you paid?

20   A.    They paid me $100.

21   Q.    Okay.  On that particular occasion, can you

22   describe how the methamphetamine was packaged when you

23   received it from Rob?

24   A.    Yeah.  It was -- like I said, it was just in a --

25   in a plastic bag, I guess.  To me -- if I remember

1    correctly, it looked like, you know, the corner of a

2    sandwich bag or something.

3         Q.    Okay.  Approximately how big was this corner?

4         A.    Oh, gosh.  I don't know.  Like quarter size of a

5    dollar or something maybe.  I really -- it's hard to

6    describe, I guess.  Couple -- 3 inches.

7         Q.    Could you see the substance inside?

8         A.    Oh, yeah.

9         Q.    What did it look like?

10        A.    Like broken up pieces of glass.  Crystal meth, you

11   know.

12        Q.    Now, was this bag with the methamphetamine in it,

13   how tight was it tied?

14        A.    Well, it was pretty tight.  The knot on -- he'd tie

15   a knot on the top.

16        Q.    Okay.  Now, we talked a lot about Rob.  If you saw

17   him again, would you be able to recognize him?

18        A.    Yes, sir.

19        Q.    If he is in this courtroom today, can you please

20   indicate where and what he's wearing.

21        A.    He's sitting on the other side of the courtroom at

22   that table.  He's got a black and -- black shirt with gray

23   stripes on it.

24             MR. FUN:  Let the record reflect the witness has

25   correctly identified the defendant, Robert Velasquez.

1          THE COURT:  The record will so reflect.

2     Q.     (By Mr. Fun)  Now, sir, you talked about seeing

3   this firearm at the shop/house.  Had you seen him with guns

4   before?

5     A.     Yes, sir.

6     Q.     Prior to becoming a confidential informant?

7     A.     Yes, sir.

8     Q.     Tell me about that.

9     A.     Oh, I seen him one time in Greybull.  I went to go

10  over and talk with him and get some stuff on a weekend.  I

11  was up drinking, whatnot.  Went into the garage, and he had

12  told me to hang on a second.  Well, I walked through the

13  door anyways, and he was putting away a 12 gauge.  Picking

14  it up.  It was laying next to a car.  Was picking it up and

15  going to put it away.

16    Q.     And what were you doing there at the garage?

17    A.     I was going to buy some meth.

18    Q.     How did you feel about seeing the guns?

19    A.     Myself, I don't like guns.  Makes me nervous.

20  Especially being around, I don't know, people who are

21  getting high or drinking around guns.  Yeah, makes me really

22  nervous.  Yeah.

23    Q.     Had Rob ever told you anything about the guns?

24    A.     What do you mean?

25    Q.     Had he told you any stories about if he had ever

1   used any of the guns?

2      A.    Oh, yeah.    Just -- I mean, we'd be hanging out or

3   whatever and telling me stories about back in California.

4   He was in a gang over there and, you know, in his

5   neighborhood everybody has a gun.    Sometimes you got to use

6   them.

7          He told me a story one time, I don't know, that he

8   had to travel somewhere and do something for some people.

9   He didn't give me exact details or anything, but yeah.

10     Q.    Did you feel intimidated by that?

11     A.    Oh, yeah.

12     Q.    In total, how many times do you think you've seen

13  Rob with guns?

14     A.    At least twice that I can remember right off the

15  top of my head.

16     Q.    Was this twice in addition to the time that you

17  were a confidential informant or before you became a

18  confidential informant?

19     A.    It was before.

20     Q.    Okay.   I think you told us about the first time

21  which is the shotgun incident.

22     A.    Yeah.   Then the time after that I was at the shop,

23  and he had a pistol with him that time.    Or I guess like a

24  semi-automatic gun to me.    I'm not sure exactly what kind it

25  was or anything.    But it's the kind that has the clip in

1    there, you know.  It's not a six-shooter or anything like

2    that.  Or a revolver, I guess.

3        Q.    Do you remember what color this gun is?

4        A.    I think it was black and maybe -- I think it had

5    wood on it, on the -- on the handle, if I remember right.

6        Q.    Okay.  Where was this gun at, this particular --

7        A.    He had it in his side pocket at first.  And then we

8    sat down there in his shop, and we were getting high.  And

9    went to go -- well, he took it out of his pocket there, set

10   it down in front of him on his workbench.  He was working on

11   painting something.  Set it down there.

12            Then we got up to go inside the house -- I don't

13   remember for what -- but he had it with him.

14            I asked him, "Hey, is there a problem or

15   something?"

16            "No, it's just a habit.  Where I come from, keep

17   your gun on you at all times."

18            So he put it back in his pocket.

19       Q.    And for what reason -- why -- let me rephrase that

20   question.  Why were you there?

21       A.    That time?

22       Q.    Yes.

23       A.    I'm not sure if I was getting meth or if we were

24   just getting high together.  Sometimes in the past, you

25   know, I'd stop by, just hang out with him.

1    Q.    Now, you mentioned that Rob talked about being in a
2    gang in California?
3    A.    Yes, sir.
4    Q.    Had he talked about that frequently with you?
5    A.    Oh, yeah.
6    Q.    How did it make you feel?
7    A.    Oh, you know, I was intimidated a little bit by it.
8    Just the -- I mean, just the thought that there's a chance
9    his friends could show up or something, you know.  I've
10   never been in a gang.  Wouldn't know anything about gangs.
11   Around here in Wyoming, we really don't have that, you know.
12   So I guess it didn't worry me too bad, I guess.  It's not
13   California.  He's here in Wyoming.
14   Q.    Did Rob ever tell you where he was getting the
15   drugs he was selling?
16   A.    He had mentioned California once.
17   Q.    Was this before or after you became a confidential
18   informant?
19   A.    Before.
20   Q.    Did he say how he was getting them from California?
21   A.    Mentioned one time he gets it through the mail.
22   Q.    Have you heard Rob talking to other people about
23   drugs?
24   A.    Yeah.  I heard him have a phone call one time with
25   a guy, telling him he needed to re-up or needed to get some

1    more.  Needed to hurry up and send him some more.  There's

2    lots of business out here.

3        Q.    Do you know who he was talking to?

4        A.    I have no idea.

5        Q.    Again, was this before or after you became a

6    confidential informant?

7        A.    It was before.

8        Q.    Did you know Rob to have a job?

9        A.    No.  He had talked about doing some construction in

10   Sheridan, I think.  Roofing or some type of construction

11   over there.  Building houses or something.  As long as I

12   knew him, I never knew him to have a job.

13       Q.    Had there come a point in time when you no longer

14   assisted DCI as a confidential informant?

15       A.    Yes, sir.

16       Q.    Tell me about how -- how did that come about?  Why

17   did you stop?

18       A.    Rob was in jail, actually, was the reason why, I

19   think.

20       Q.    Now, beyond these two controlled buys, were you

21   involved -- let me rephrase that question.

22             Were you paid any other money by DCI?

23       A.    Another time I went over there to talk with

24   Melissa, and there was another guy there, I think his name

25   was Robert, a white guy that was there with her at that

1    house out there where that shop was.

2         And she -- when I talked to her one time in town,

3    she had mentioned that they were trying to sell the stuff --

4    or sell their things, like TVs or whatever, to get money to

5    get Rob out of jail because he was in jail on an assault

6    charge, I think.

7         And DCI had asked me to approach her and ask her

8    questions about a gun, seeing if she wanted to sell any

9    guns.  And so I went over there, and they paid me $40 for

10   fuel that time.

11       Q.   Did she want to sell any guns to you?

12       A.   No.

13       Q.   And who was that that was selling -- that DCI

14   wanted you to ask?

15       A.   Melissa Morgan.

16            MR. FUN:  Just a moment, Your Honor.

17       Q.   (By Mr. Fun)  Sir, I want to talk a little bit more

18   about the times when you obtained methamphetamine from Rob

19   prior to becoming a CI.

20       A.   Okay.

21       Q.   When you obtained methamphetamine from him, how did

22   you know it was meth?

23       A.   By the look of it.  Put it in a pipe and try to

24   smoke it.

25       Q.   Okay.  So you actually used it?

1    A.    Oh, yeah.

2    Q.    Did it have any particular smell to it?

3    A.    I don't really know how to describe it really, but

4   yeah.  I know what it smells like when I smell it.

5    Q.    Okay.  And so when you smelled it, did it smell

6   like meth?

7    A.    Yeah, sometimes.  Sometimes -- there's a couple

8   times I got fake stuff, I guess.  It didn't work.  Just

9   throw it in the garbage.  Waste of money.

10    Q.    So there were times when you actually received

11   something that wasn't -- didn't have any effect on you?

12    A.    Yes, sir.

13    Q.    And you could tell the difference?

14    A.    Oh, yeah.

15    Q.    Did methamphetamine have a particular taste to it

16   when you were using it?

17    A.    Yeah.  Once again, I really can't describe it.

18   But, yeah, it does definitely have a taste to it.

19    Q.    Compare that to when you used something that wasn't

20   meth.

21    A.    I really -- I mean, it gives you like -- to me, it

22   was like maybe a cold sensation or something.  You could

23   feel it kind of burning your lungs, you know.

24    Q.    Now, when you used methamphetamine, how did it make

25   you feel?

1    A.    At the time it made me feel good.  It was like, you

2  know, speed up or something, I guess.  Like I had a lot of

3  energy or adrenaline, you know.  Wasn't tired anymore,

4  that's for sure.

5    Q.    Was that the same feeling you got when you used

6  this pink stuff that you threw away?

7    A.    No.  Didn't get any feeling out of that.

8    Q.    Okay.  Is it fair to say that you could tell if it

9  was methamphetamine or not?

10    A.    Yes, sir.

11    Q.    Now, you talked about when you and Rob were

12  together, you would go to his house and party.  Do you

13  remember that?

14    A.    Yeah.  I mean, it wasn't really real parties or

15  anything.  Just kind of hanging out, drink a couple beers

16  and smoke some meth or smoke some pot or something, you

17  know.

18    Q.    Now, the pot -- what is pot?

19    A.    Marijuana, yeah.

20    Q.    Where did the pot come from?  Who provided the pot?

21    A.    I usually had it.

22    Q.    How about the methamphetamine?

23    A.    Rob would have it.

24    Q.    Now, sir, you indicated that you used marijuana and

25  methamphetamine.  Did you sell any drugs at all?

1    A.    Yeah.  I sold marijuana on occasions to some

2  friends, yeah.

3    Q.    Okay.  In what quantities would you sell marijuana?

4    A.    Gosh, I don't know.  Like a quarter ounce or

5  something like that here and there.  Usually I just had it

6  for myself.  But sometimes people want a little.  And they

7  would give me some cash, and I'd give them a bag, you know.

8    Q.    Did you make any money from selling this marijuana?

9    A.    Yeah.  I was paid money, yeah.

10    Q.    Did you make any profits?

11    A.    Well, no.  From what it cost me originally, no.

12    Q.    So is it fair to say that you sold it for what you

13  paid for it?

14    A.    Less than that probably.  I mean, I still had mine

15  that I was using too.

16    Q.    Sir, were you working at this time?

17    A.    Yes, I was.

18    Q.    Did you have to sell any drugs to support your

19  habit?

20    A.    No.

21          MR. FUN:  Okay.  Thank you, sir.  I don't believe I

22  have any further questions at this time.

23          THE COURT:  Thank you.

24                      CROSS-EXAMINATION

25    Q.    (By Mr. Horn)  Mr. Marquez, I think Mr. Fun asked

1    you when you quit using drugs, and you said you didn't

2    recall.  Do you remember that?

3         A.    Yes, sir.

4         Q.    Now that you've established the date of

5    January 15th, 2010, where there was a buy from

6    Mr. Velasquez, does that help you recollect as to when you

7    may have quit using drugs?

8         A.    Oh, I think I've used on occasion after that.

9         Q.    I thought you said earlier that you kind of gave it

10   all up, and then -- so you fell off the track, so to speak,

11   for a while there?

12        A.    I gave up the marijuana.

13        Q.    Okay.  Did you have any drugs after January 15th --

14   use any drugs after January 15th?

15        A.    Yes, I did.

16        Q.    Okay.  And did you tell Mr. Hall that?

17        A.    No.  He didn't ask me either.

18        Q.    How many times did you use after January 15th of

19   2010?

20        A.    I really -- I really couldn't tell you.

21        Q.    Was it more or less than five times?

22        A.    Oh, probably more.

23        Q.    More than five?

24        A.    Probably.

25        Q.    More than ten?

1      A.     I don't know.  Maybe.

2      Q.     Are you familiar with the Serranos gang?

3      A.     Oh, yeah.

4      Q.     Did you ever hang out with the Serranos in Powell?

5      A.     No.  I mean, people who call themselves that or

6  whatever.  I mean, even my little brother tried calling

7  himself that.  But they weren't really Serranos, you know.

8      Q.     How do you know they weren't real Serranos?

9      A.     They're just kids that grew up on a farm out here.

10  There is no gangs in Powell.

11      Q.     So Serranos aren't a gang?

12      A.     Oh, I'm sure it's a gang in a city.  But not where

13  we live it's not.

14      Q.     Did you -- among all of your friends, did you ever

15  say to any of your friends, hey, I'm a Serrano; I'm hanging

16  out with Serranos?

17      A.     No.

18      Q.     Just to make you look like a macho kind of guy, you

19  know.

20      A.     No.  I didn't need to.  No.

21      Q.     You never did that?

22      A.     Never.

23      Q.     When was the first time you met Mr. Velasquez?

24      A.     Gosh.  I really don't remember the exact date, sir.

25  That was a few years ago.

1    Q.    Well, we've established the date of January 15th of

2    2010; right?

3    A.    Right.

4    Q.    Can you place a time prior to that when you may

5    have met him?

6    A.    First time I met him, maybe a year, year and a half

7    before that.

8    Q.    So we're back to maybe late 2009?

9    A.    Yeah, could be.  I'm really not exactly sure.  I

10    just -- I know -- I know where it was at when I first met

11    him.

12    Q.    Where was it?

13    A.    It was out at my cousin Ramone and Becky Flores'

14    house.

15    Q.    Your cousin Ramone?

16    A.    Yeah.  Ramone and Becky Flores.

17    Q.    And where do they live?

18    A.    Live out on -- I guess we call it out on Willwood.

19    I'm not sure of the exact road.

20    Q.    I didn't hear the --

21    A.    Willwood.

22    Q.    Willwood?

23    A.    Outside of Powell, yeah.  Outskirts of Powell in

24    the country on a farm.

25    Q.    And did you smoke pot or any other drugs out there?

1    A.    That night, no.  We were just drinking beer.

2    Q.    Okay.  What about other nights out at your -- out

3  at the Flores property in Powell -- near Powell?

4    A.    No.  I was usually just drinking beer there.

5    Q.    But you're saying that you met Mr. Velasquez the

6  first time --

7    A.    Yeah.  I mean, I think he was -- his girlfriend at

8  the time was my cousin.  Her name is Destiny.  And she

9  introduced me to him.

10       MR. HORN:  Can I have a moment with my client, Your

11  Honor?

12    (Discussion off the record.)

13       MR. HORN:  Nothing further from this witness.

14       THE COURT:  Thank you.

15                    CROSS-EXAMINATION

16    Q.    (By Ms. Higham)  Good morning, Mr. Marquez.

17    A.    Morning.

18    Q.    I'm sorry.  I know you just probably answered this

19  same question from Mr. Horn.  But to make sure I'm clear,

20  you met Mr. Velasquez in late 2009?

21    A.    Yeah.  I mean, that's just my estimation.  I'm not

22  exactly sure when it was.

23    Q.    Something close to late 2009?

24    A.    Yeah.

25    Q.    So you have known him --

```
 1      A.      I can't remember the dates.

 2      Q.      So you've known him for a couple of years roughly?

 3      A.      Yeah.  I mean, there was times where I didn't see

 4  the guy for six months, seven months, you know.  And then

 5  just out of nowhere get a phone call or see him in town or

 6  something, you know.

 7      Q.      When you were around him, there was a lot of

 8  partying going on?

 9      A.      Yeah.  I mean, a few times.  Other times, you know,

10  he'd just be riding through town or whatever.  And, I mean,

11  I knew what he was associated with and kind of what I

12  thought he was into.  So I would ask him, you know.

13  Approach him.  "Hey, can I get something?"

14      Q.      Okay.  And when you would interact with him, is it

15  accurate to say that he is a man that likes to boast, to

16  brag about himself?

17      A.      Yeah, probably.  About his -- I mean, different

18  things he's into, yeah, or the gang and stuff like that,

19  yeah.

20      Q.      So he'd brag about Fresno?

21      A.      Mm-hum.

22      Q.      He'd brag about some sort of gang membership in

23  Fresno?

24      A.      Yeah.

25      Q.      He mentioned he had, I think you said, a roofing or
```

1  construction job in Sheridan?

2      A.    Yeah.  He had mentioned that, yup.

3      Q.    Where were you when he mentioned that?  Do you

4  remember where you were when he mentioned that detail to

5  you?

6      A.    Yeah.  I think -- I think we were at that yellow

7  house in town in Cody.  Because he was telling me about

8  helping the landlord or a friend of the landlord or

9  something roof a shed out back.  Asked him where he learned

10  how to do that.  Told me that's what he did in Sheridan.  So

11  yeah.

12     Q.    So he indicated to you that he did have some sort

13  of construction job lined up in Sheridan?

14     A.    Right.

15     Q.    Whether you believed that or not.  Did you believe

16  that?

17     A.    I'm sure he probably did in the past.  At that

18  time -- I mean, at that time he was living in Cody.  He was

19  renting a house in Cody.  So kind of hard to have a job

20  there, you know.

21     Q.    Right.  And construction jobs are kind of on

22  again/off again anyway.

23     A.    Right.

24     Q.    You mentioned you were somewhat intimidated by him

25  because of the gang affiliation.  Is that accurate?

1    A.    That, yeah.  I mean -- yeah, that.  And, I mean,

2  seeing weapons around too, hearing stories.

3    Q.    Would it be fair to say that whatever words came

4  out of Robert's mouth, whether they related to construction

5  jobs or gang membership, you always filtered them through

6  the perception that he may be boasting or not telling you

7  the truth?

8    A.    Oh, no.  I believe a lot of the stuff he told me,

9  yeah.  I mean, there are certain things -- you know, you can

10  kind of tell when a person is telling a story or making up a

11  story.  But, yeah, there is a lot of stuff I believe out of

12  his mouth.  Sure.

13    Q.    Okay.  There was a lot of stuff he said that was

14  true, and there were certain things that you just assumed

15  were not true?

16    A.    (Nods.)

17          MS. HIGHAM:  Okay.  Thank you.

18          THE WITNESS:  You're welcome.

19                         CROSS-EXAMINATION

20    Q.    (By Mr. Timbers)  Morning, Mr. Marquez.

21    A.    Morning.

22    Q.    I'd like to talk a little bit about when you

23  noticed that the police were -- did you say they were

24  parking near your house?

25    A.    Yes.

1     Q.    And you noticed that they were near a certain set

2     of friends that you were hanging out with?

3     A.    No.  It was just -- I mean, there's a couple times

4     that one of my cousins was over there that I would see them

5     drive by.  Actually, I saw Mr. Hall drive by.  It's pretty

6     obvious they're not watching the neighbors.  They're

7     thinking I'm into something.  We're working on a car, you

8     know, or whatever.

9     Q.    Okay.  And with regard to that, in all honesty,

10    were you up to something?  I mean, were you -- were you

11    selling marijuana?

12    A.    No.  I mean, just on occasion just to friends.

13    Like that particular cousin, yeah, sometimes he'd buy a

14    little bit from me.  He didn't know where else to get it.

15          I would get it for myself to use it for myself.

16    But at the time I always had a full-time job, you know, had

17    insurance, made good money.  Made, you know, close to $20 an

18    hour.  I didn't need to sell drugs.  No, I didn't.

19    Q.    Okay.  So part of your life was legit, and part of

20    your life was involved in drug distribution; correct?

21    A.    I wouldn't call it drug distribution.  But, yeah,

22    sharing drugs with -- sharing marijuana with a couple of my

23    family members, yeah.

24    Q.    And selling sometimes?

25    A.    Well, I mean, yeah, to them.  They would give me

1  some money for what I paid for it.  They would give it to me

2  just to reimburse me so I'm not out and not giving it to

3  them for free.

4       Q.   Okay.  And you knew that was wrong; correct?

5       A.   Yeah.  According -- I mean, it's illegal, yeah.

6       Q.   Okay.  And is it correct in saying that you have

7  seen -- you have seen when there's a big investigation going

8  down, everyone gets rolled up; correct?

9       A.   Yeah.  I seen it once in the past.  I mean, during

10  that time, I ended up moving away.  I got a job in another

11  state.  But when I came back, yeah, like 16 of my friends

12  were gone.  So yeah.

13       Q.   Okay.  And that's a pretty impressive thing when

14  the United States government focuses their energy on that

15  group of people; true?

16       A.   Yeah.  It's pretty scary, yeah.

17       Q.   It's intimidating; correct?

18       A.   Very.

19       Q.   And you knew you didn't want to be any part of

20  that; correct?

21       A.   No, I did not.

22       Q.   And so did you see -- when you started to make

23  contact with Officer Hall, did you see it as an opportunity

24  to get out of that potential net that would bring you in?

25       A.   I don't know if I would explain it like that.  I

1    just kind of wanted to make sure that they knew exactly what

2    I was doing.  That I wasn't selling drugs like these guys.

3    I had a job.  And I know they knew I had a job.  I wanted to

4    make sure they knew I'm not getting the stuff to go sell it.

5    I'm getting it to use it.  I was buying it myself and using

6    it myself.

7            I wasn't taking it and selling it to anybody else

8    like I had ever did with pot before or anything.  The

9    methamphetamines I used myself.  And I wanted to be sure

10   they knew that.  I mean, as far as getting out of jail or

11   anything like that, if it was going to happen, it was going

12   to happen.

13       Q.    Okay.  But there was part of your activity that you

14   recognize, the distribution part, that was illegal; correct?

15       A.    No.  During that time, no.  I guess what made me

16   nervous is in the past -- what I had done in the past.  That

17   automatically comes to your mind, you know.  But that had

18   nothing to do with what was going on with Rob or anything

19   when I had talked to DCI.  That was strictly dealing with

20   methamphetamines and that.  I mean, I used it, yeah.

21       Q.    Okay.  So is it fair to say that your interaction

22   and your activity with DCI and Mr. Hall was done in an

23   attempt to avoid any prosecution in the future?

24            MR. FUN:  I'm going to object, Your Honor.  Asked

25   and answered numerous times.  This witness keeps on telling

1    Mr. Timbers his motives behind what he did.

2              THE COURT:  Sustained.

3              MR. TIMBERS:  No further questions, Your Honor.

4    Thank you.

5              THE COURT:  Thank you.

6                        CROSS-EXAMINATION

7    Q.    (By Mr. Fleener)  Mr. Marquez, good morning.

8    A.    Good morning.

9    Q.    My name is Tom Fleener.  I'm a lawyer from Laramie.

10   It's nice to meet you.

11   A.    You too.

12   Q.    Sir, you testified on direct examination that Rob

13   told you that he would get drugs from California, that he'd

14   get them through the mail?

15   A.    Yeah.  On occasion he said that.  Other times he

16   said he would drive out there.

17   Q.    To California?

18   A.    Yes, sir.

19   Q.    And it's true that he told you that he would have

20   drugs shipped to a P.O. box in Cody or in -- somewhere in

21   the Basin?

22   A.    He didn't ever really say where it was going to.

23   Just --

24   Q.    So your testimony is you never -- did you ever tell

25   that to Agent Hall, that he sent drugs to a P.O. box?

1      A.      I don't remember if I did or not.

2      Q.      Do you recall being interviewed by Agent Hall?

3      A.      Yes, I do.

4      Q.      Lots of times; correct?  Several?

5      A.      A few times, yeah.

6      Q.      You don't recall telling Agent Hall that his

7  methamphetamine comes from California, is usually shipped

8  through the United States Postal Service, and generally goes

9  to a post office box?

10     A.      Yeah.  If I remember right, I really -- I don't

11 know, man.  It was a long time ago.  I could have.  What

12 sits in my mind is the conversation with him telling me that

13 he gets it in the mail.  I don't remember exact details

14 after that.  I was really worried about getting what I came

15 for.

16     Q.      So you may have told Agent Hall that he ships it to

17 a post office box; you may not?

18     A.      Possibility.  I even think I remember something

19 about maybe somebody's house, find somebody's house or

20 something.

21     Q.      Well, there's a difference between a house and a

22 post office box, you would agree; would you not?

23     A.      Yeah.  That's right.

24     Q.      Do you believe you told Agent Hall post office box?

25             MR. FUN:  Objection.  Asked and answered.

1          MR. FLEENER:  It hasn't been answered.

2          MR. FUN:  The witness already answered, Your Honor,

3   several times.

4          MR. FLEENER:  He answered zero times.

5          THE COURT:  Mr. Fleener, I think, from my look at

6   your question, it's:  Do you remember that you told Agent

7   Hall about the post office box?

8          And I believe he said he doesn't remember.  If

9   you'd like to attempt to refresh his recollection.

10          MR. FLEENER:  May I just clarify that for the

11   record, Your Honor?

12          THE COURT:  If you could re --

13          MR. FLEENER:  Rephrase the question?

14          THE COURT:  Either rephrase your question or have

15   it read again, that would be helpful to me.  Thank you.

16     Q.    (By Mr. Fleener)  Do you recall telling Agent Hall

17   that Mr. Velasquez usually shipped his methamphetamine

18   through the United States Postal Service and generally goes

19   to a post office box?

20     A.    The post office box part, I don't remember that.

21   But I do remember telling him that he had told me that he

22   gets it through the mail.  Yes, I do.

23     Q.    Mr. Marquez, how many times have you met Robert

24   Velasquez, sir?

25     A.    Excuse me?

U.S. v. Green, et al. - Cross of Marquart

1    Q.    How many times have you met him?

2    A.    Have I?  I don't know.

3    Q.    More than a dozen?

4    A.    Oh, yeah.  Well, I don't know.  Maybe between a

5    dozen and 20.

6    Q.    You said you met him in 2009 -- in late 2009, I

7    believe.  Somewhere in 2009?

8    A.    Somewhere, I think, yeah.

9    Q.    And that you partied with him a few times; correct?

10   A.    Yes, sir.

11   Q.    And the reason why I say "correct," is because when

12   you nod, it doesn't get into the record.

13   A.    Okay.

14   Q.    And then in -- I think you testified under

15   somebody's questioning, I can't recall exactly whose, that

16   he'd disappear or you guys drifted away for several months,

17   six, nine months, something like that?

18   A.    Sure.

19   Q.    And then you must have gotten back together again

20   when you decided you needed more drugs.  That's true?

21   A.    Could be.  I just -- I mean, when I would see him,

22   yeah, I would talk to him about it.

23   Q.    Where did you live, sir?  What city/town?

24   A.    I live in -- you know, in my dealings with Rob, I

25   lived in Cody at one time -- part of the time and lived in

1    Powell part of the time.

2        Q.    Okay.  So during the -- during your dealings with

3    Mr. Velasquez, you lived both in Cody and Powell?

4        A.    Yes.

5        Q.    And Mr. Velasquez was living at the time where,

6    sir?

7        A.    The first -- I guess when I first knew him before I

8    ever talked to DCI or anything, I knew him to live like in

9    Basin and in Greybull, two different spots.  I don't know if

10   either one was even his house.  I guess he made reference to

11   one time was his brother's house maybe, another one was a

12   cousin or something.

13       Q.    Okay.

14       A.    And then once I talked to DCI at that time, yeah,

15   he was living in Cody.

16       Q.    And when you were -- when you -- I'm going to

17   piggyback a little bit on Mr. Timber's questions about, you

18   know, how you felt when the -- the police -- you felt the

19   police were sort of watching you.  Do you recall that?

20       A.    Yes.

21       Q.    Where were -- at that time, what drugs were you

22   using, sir, on a regular basis?  Certainly marijuana.

23   You're going to have to say yes or no again.

24       A.    I'm just thinking.  Sorry about that.

25       Q.    Okay.  I apologize.

1    A.    Yeah.  I think I was using -- I mean, slowly easing

2    out of marijuana.  But, yeah, I was still using from time to

3    time marijuana, yeah.

4    Q.    And you were using methamphetamine?

5    A.    Yeah, on occasion.  I mean, not really too much.

6    Q.    What was your drug of choice?  What is your drug of

7    choice?

8    A.    It would be a toss-up between cocaine and marijuana

9    if I was still using, yeah.

10   Q.    And you still use occasionally?

11   A.    Oh, not -- not now.

12   Q.    You're done now?

13   A.    Yeah.

14   Q.    When's the last time you've used, sir?

15   A.    Gosh, I don't know.  I really can't remember.  It's

16   been a while.  I've had this job that I have now.  I take

17   randoms.  And I was on supervised probation for a little

18   while.  So that's been, I mean, easily over, I guess, eight,

19   nine months.

20   Q.    What were you on supervised probation for?

21         MR. FUN:  Objection, Your Honor.  Improper 609.

22         MR. FLEENER:  He brought it up on his own, Your

23   Honor.

24         THE COURT:  The witness can answer.  Overruled.

25   A.    For a simple battery charge.  The reason I brought

1   it up is I had to take random UAs with my probation officer

2   is why.

3        Q.   I understand that.  And I appreciate your honesty

4   on that, sir.

5        A.   No problem.

6        Q.   When did you pick up that battery charge, sir?

7        A.   I don't remember the exact date.

8        Q.   And I'm not asking for the exact date, sir.  Was it

9   in 2009 or 2010 or 2011?

10        A.   Probably -- I think in -- I think it might have

11   been January 2011.

12        Q.   Okay.  So it was in the last ten months or so?

13        A.   Yeah, probably.  Yup.  Actually, I guess that's

14   when I was actually prosecuted on it, you know.

15        Q.   Right.

16        A.   I think it actually happened in August 2010, is

17   when it actually happened.

18        Q.   Were you still working as a confidential informant

19   for DCI or --

20        A.   No, I was not.

21             MR. FLEENER:  May I have a minute please, Your

22   Honor?

23             THE COURT:  Yes.

24        Q.   (By Mr. Fleener)  Why didn't you tell us about that

25   prior battery charge when Mr. Fun was questioning you?

1          MR. FUN:  Objection, Your Honor.  Improper

2  impeachment.

3          THE COURT:  Sustained.

4          MR. FLEENER:  Can we approach?

5          THE COURT:  Yes.

6      (Following outside the presence of the jury.)

7          THE COURT:  Mr. Fleener, I don't see that this

8  relates to either a crime of falsity or a felony.

9          MR. FLEENER:  I would agree, but it's a prior

10  inconsistent statement.  His testimony was different with

11  Mr. Fun than it was with me.

12          MR. FUN:  I did not ask him about any crimes.

13          THE COURT:  He did not ask him about this crime.

14          MR. FLEENER:  I believe he asked him -- and that's

15  why I was conferring with --

16          THE COURT:  He asked him about prior felonies.

17  Prior convictions for non-felony matters, such as perjury or

18  false statements or --

19          MR. FLEENER:  I would agree that if -- if Mr. Fun's

20  question was -- was that narrow, then this wouldn't be a

21  proper area of impeachment because it is outside 609.

22          My understanding, though, is that his question was

23  not that narrow, that he essentially asked this witness --

24  and I don't have the record in front of me, Your Honor, so

25  that's why I huddled with everybody.  And they all told me

1    the same thing.

2         MR. FUN:  For the record, Your Honor, my question

3    is that narrow because I even write the question down.

4         MR. TIMBERS:  That's fine.  I have a different

5    memory.  I'm sorry.

6         THE COURT:  My memory is the same as Mr. Fun's.  I

7    was paying attention to that line of questions primarily

8    because of your prior objection.

9         MR. FLEENER:  Then I will -- I guess, you could

10   just -- objection --

11        THE COURT:  I sustained the objection, so you don't

12   have to withdraw.

13        MR. FLEENER:  Thank you.

14      (Following in the presence of the jury.)

15        MR. FLEENER:  Mr. Marquez, I don't have any more

16   questions for you.  Thank you for your time, sir.

17        THE WITNESS:  Yes, sir.

18        THE COURT:  Any redirect, Mr. Fun?

19        MR. FUN:  Just briefly, Your Honor.

20                   REDIRECT EXAMINATION

21   Q.   (By Mr. Fun)  Mr. Marquez, Mr. Horn asked you some

22   questions about using drugs after you were a confidential

23   informant.  Do you remember those questions?

24   A.   Yes, sir.

25   Q.   After you were a confidential informant, did you

1   have any further contact with Rob?

2       A.    Oh, I talked to him -- not really -- yeah, I talked

3   to him maybe once or twice.  Well, yeah.  Actually, he made

4   some phone calls to me from -- when he was in jail.  Not

5   directly to me, but through Melissa.  Talked to him there.

6           Like he would call her phone.  And then she asked

7   me to meet her at a McDonald's parking lot, you know, and he

8   had asked me to do him a favor.  Clean out a shop -- that

9   shop up at that house, the green-and-white house.  Asked me

10  to clean out some things and take some tires to Greybull or

11  something.  I just agreed, but I didn't do anything.

12      Q.    Did you ever get any drugs from Melissa Morgan?

13      A.    No, I didn't.

14      Q.    How about John Morgan?

15      A.    No.

16      Q.    Did you know Kimberly Perkins?

17      A.    I did not.

18      Q.    Now, Ms. Higham asked you questions about Rob

19  boasting.  Do you remember those questions?

20      A.    Yes, sir.

21      Q.    And you indicated you could tell when someone was

22  bragging or boasting versus when they were telling a story

23  that was true.

24      A.    Yeah.  I kind of think I can read a person.  I

25  mean, it's pretty obvious at times.  Yes, sir.

1    Q.    When Rob told you stories about his activities

2    concerning the gang, was that -- did that ring true to you,

3    or did it appear to be boasting?

4    A.    I would say it was pretty true.  I mean, he's got

5    the tattoos and stuff.  Not just anybody gets those kind of

6    tattoos if you're not in a gang.

7    Q.    How about when he was talking about getting the

8    drugs from California, did that appear boasting or true to

9    you?

10   A.    Oh, it was true.  Melissa had backed it up one time

11   saying she went with him there to go get it.  So I believe

12   it to be true.

13   Q.    Now, Mr. Fleener asked you some questions about

14   what you had said to Agent Hall during an interview.  Do you

15   remember that, those questions about the post office box?

16   A.    Yes, sir.

17   Q.    Do you remember when you were interviewed by Agent

18   Hall?

19   A.    That particular time, no, I really don't.

20   Q.    Do you recall if it was roughly June of 2010?

21   A.    I really don't remember.

22   Q.    Have you had an occasion to review Agent Hall's

23   report?

24   A.    That report that he was reading from?

25   Q.    Correct.

1     A.     I don't think so.

2     Q.     Did you ever see it?

3     A.     I don't remember seeing it, no.

4     Q.     Did you have a chance to proofread Agent Hall's

5     report before it was finalized?

6     A.     No.

7            MR. FUN:  Thank you.  I don't think I have anything

8     further.

9            THE COURT:  Thank you.  Mr. Marquez, thank you very

10    much for your testimony.  You're excused and released from

11    your subpoena.

12           THE WITNESS:  Thank you.

13           THE COURT:  Thank you.  You can --

14           MR. FUN:  I'll retrieve those back from the

15    witness, Your Honor.

16         (Witness excused.)

17           THE COURT:  Thank you.  At this time, I would like

18    to take a mid-morning break.  It's a little late, but I

19    think a break might still be appropriate.  I'd ask that the

20    jury be ready to return at 11:15.  We stand in recess until

21    11:15.

22         (Trial proceedings recessed

23          10:56 a.m. to 11:15 a.m.)

24           THE COURT:  We're back in the continuation of

25    Docket 10-CR-329.  The court notes the presence of the jury

United States vs. Drake direct examination by Mr. Murray

1   with roll call waived.  Mr. Murray, if you'd like to call

2   your next witness.

3           MR. MURRAY:  The United States called Dr. Brian

4   Goodby.

5       (Witness sworn.)

6           THE CLERK:  Please take a seat.  State and spell

7   your name for the record.

8           THE WITNESS:  My name is Brian Edward Goodby.

9   That's B-r-i-a-n E-d-w-a-r-d G-o-o-d-b-y.

10                  BRIAN E. GOODBY,

11  having been first duly sworn, was examined and testified as

12  follows:

13                  DIRECT EXAMINATION

14      Q.    (By Mr. Murray)  Dr. Goodby, where do you work?

15      A.    I work at the Wyoming State Crime Lab.

16      Q.    What is your present position?

17      A.    I'm a forensic chemist there.

18      Q.    How long have you been so employed?

19      A.    Three and a half years.

20      Q.    Please for the jury describe your job duties.

21      A.    My primary job duty is processing evidence,

22  criminal evidence for the presence of controlled substances.

23      Q.    And also, if you would, please -- for the jury,

24  would you describe your education, training and previous

25  professional background.

1      A.      I have a bachelor's degree in chemistry, and I also

2  have a Ph.D from the University of Arizona in analytical

3  chemistry.  I've been in-house trained at the Wyoming State

4  Crime Lab for the last three-and-a-half years in the

5  controlled substance area.

6      Q.      Where else have you worked?

7      A.      I've worked in the fields of environmental science

8  and food testing primarily.

9      Q.      For how long has your career been involved in that

10  line of work?

11      A.      I have 25 years experience.

12      Q.      With regard to all of your experience, government

13  versus nongovernment experience; is that fair to say?

14      A.      Yeah, it's about half.  About half.

15      Q.      Have you chemically analyzed substances to

16  determine whether a substance contains either

17  methamphetamine or other controlled substances?

18      A.      That's what I primarily do at the crime lab, yes.

19      Q.      How many times?

20      A.      I've done over 300 samples for methamphetamine.

21      Q.      Describe the procedures used by the Wyoming State

22  Crime Lab and yourself before you analyze something

23  submitted for analysis as a controlled substance.

24      A.      Well, when I take custody of the evidence, I then

25  would open the evidence and make sure that it looks like the

1    described evidence that's in the paperwork, make sure the

2    seals are intact, make sure there's no tampering of the

3    evidence.

4         Q.    Dr. Goodby, I have placed before you, prior to your

5    taking the stand, drug exhibits.  They are marked as

6    Government Exhibit Numbers 100, 101, 103, 104, and 105.  Do

7    you see those?

8         A.    Mm-hum.  Yes.

9         Q.    Would you please examine individually each packet,

10   referring to its government exhibit number, and identify

11   what it is.

12        A.    This is Government Exhibit 100.  It's a plastic bag

13   with a number of small plastic bags inside of it.  I see my

14   initials and seals on a lot of this -- a lot of the plastic

15   bags.

16             This is Exhibit 101, and it's very similar to the

17   other one.  It's a plastic bag sealed with a number of small

18   plastic bags inside.

19             This is Government Exhibit 103.  And, again,

20   plastic bags sealed -- looks like only one plastic bag

21   inside here.

22             And this is Government Exhibit 104.  This is a

23   plastic sleeve that's been heat-sealed all the way around,

24   and it has one small plastic bag inside of it.

25             This is Government Exhibit 105, and it's a plastic

1    bag with a tape sealing it, and there's one small plastic

2    bag inside.

3        Q.    Where and when did you previously receive these

4    exhibits?

5        A.    I received them in the crime lab.  And I'd have to

6    estimate off the dates of these reports when I received

7    them.

8              December of 2009 I received the first -- the first

9    two, which are Government Exhibits 100 and 101.  And then

10   February, it looks like, I received the other ones, of 2010.

11       Q.    What was the condition of the drug exhibits when

12   you first received them?

13       A.    They were properly sealed and intact.  And this one

14   had heat sales on it, and it was intact also.

15       Q.    Were there any signs of -- that the contents within

16   these exhibits were tampered with/altered when you first

17   received the exhibits?

18       A.    No, there was no evidence of that.

19       Q.    What did you do with the exhibits?

20       A.    I opened them and described on my case notes what

21   was inside.  And then I would weigh these -- the white

22   crystalline material that I received, I would weigh it, and

23   then I would test it by two different independent tests.

24             And then when I was done with that testing, I would

25   seal it back up and then resubmit it back to the evidence

1    custodians.

2       Q.    With regard to the tests you performed -- what

3    tests did you perform?

4       A.    We do two different independent tests.  The

5    presumptive color test is called the Marquis test, and it

6    turns orange in the presence of methamphetamine.  And then I

7    do gas chromatography/mass spectroscopy.  It's an

8    instrumental technique that proves that -- identifies the

9    molecules present in the sample.

10      Q.    Were you able to form an opinion as to what the

11   contents of these exhibits contains?

12      A.    Yes.  Both -- both tests proved positive for the

13   presence of methamphetamine.

14      Q.    After your analysis, what did you do with the drug

15   exhibits?

16      A.    Well, I carefully sealed them up, and then I just

17   returned them to the evidence custodians.  In our evidence

18   room they're secured.

19      Q.    Are the drug exhibits in the same condition now

20   that they were after you completed your analysis?

21      A.    Yes.  It does look like that, yes.

22      Q.    You mentioned weighing the methamphetamine.  What

23   were the -- the average weights of the items?

24      A.    Well, the first submission in December of 2009,

25   they were all around 1 gram exactly.  That was 15 items at

1    that time.  And then the second -- the second submission had

2    2.3, .7, and 2 grams of white crystalline material.

3        Q.    Dr. Goodby, having just offered the opinion that

4    the drug exhibits contain methamphetamine, have you

5    testified before in any court with regard to the same

6    opinion?

7        A.    Yes.  I've testified nine times in the state of

8    Wyoming.

9            MR. MURRAY:  Your Honor, I move for admission into

10   evidence Government Exhibit Numbers 100, 101, 103, 104, and

11   105.

12           THE COURT:  Hearing no objections, Government's

13   Exhibits 100, 101, 103, and 104 are admitted.

14       (Government's Exhibits 100, 101, 103, and 104 received

15   in evidence.)

16       Q.    (By Mr. Murray)  Dr. Goodby, did you make a report

17   of your analysis?

18       A.    I did.

19       Q.    For what purpose?

20       A.    To give back to the law enforcement agencies.

21       Q.    And with regard to your reports, I had previously

22   placed before you Exhibit Numbers 109 and 111.  Do you

23   recognize those?

24       A.    Yes, I do.  Those are my reports.

25       Q.    Are your reports kept in the ordinary course of the

1    Wyoming crime lab's business?

2        A.    Yes.

3        Q.    Are they kept under your care, custody and control?

4        A.    No.   They're -- they're kept digitally.

5        Q.    Meaning -- digitally.   Do you have access --

6        A.    I do have access to them, yes.

7        Q.    Do you have control over those?

8        A.    I don't have control over them.

9        Q.    Well, if you need to access those reports, can you

10   control the digital mechanism for which you can print a

11   report?

12       A.    Yes.

13            THE COURT:   Mr. Murray, excuse me for interrupting.

14   In checking the record, I notice that 105 was moved for

15   admission, and I had not checked it.   I did not hear that.

16   So I will at this time admit Government's Exhibit 105.

17            MR. MURRAY:   Thank you, Your Honor.

18        (Government's Exhibit 105 received in evidence.)

19            THE COURT:   Please continue.

20       Q.    (By Mr. Murray)   Do you make your reports timely?

21       A.    Yes.

22            MR. MURRAY:   Your Honor, I move for admission into

23   evidence Government Exhibit Numbers 109 and 111.

24            MR. TIMBERS:   Your Honor, could I see a copy of it?

25            THE COURT:   Yes.

1    (Discussion off the record.)

2         MR. TIMBERS:  Your Honor, they're fine.  I didn't

3    recognize them under their exhibit number.  Thank you.

4         THE COURT:  Thank you, Mr. Timbers.  Government

5    Exhibit 109 and 111 are admitted.

6    (Government's Exhibits 109 and 111 received in

7    evidence.)

8         MR. MURRAY:  Your Honor, may I publish the drug

9    exhibits as well as the reports to the jurors?

10        THE COURT:  Yes, they may be published to the

11   jurors.

12        MR. MURRAY:  I have no further questions at this

13   time.

14                   CROSS-EXAMINATION

15   Q.   (By Mr. Timbers)  Dr. Goodby, again, my name is

16   Peter Timbers.

17   A.   Hello.

18   Q.   How are you doing?  Let's talk a little bit

19   about -- the government mentioned procedures that you

20   follow.  When you obtain the samples, for example, that the

21   jury is passing around, you mentioned that you perform a

22   Marquis test.

23   A.   Yes.

24   Q.   Okay.  Could you tell the jury a little bit about

25   what that is?

1    A.    Yeah.  That's a wet chemistry.  We mix reagent with

2    the material of interest and that will change color.  And

3    the positive color for methamphetamine is orange.

4    Q.    Okay.

5    A.    It will turn a bright orange.

6    Q.    And what -- do you know what -- what the reagents

7    are?

8    A.    I do not.

9    Q.    Okay.  But, nevertheless -- do you know what the

10   specific sites on the methamphetamine molecule are that are

11   activated when that test makes it turn color?

12   A.    I don't know that either.

13   Q.    Okay.  You next mentioned that -- well, have you

14   ever been curious why that test makes the sample turn

15   orange?

16   A.    Yes, I have.  I mean . . .

17   Q.    Okay.  But you've never pursued -- pursued it?

18   A.    I knew it at one time.

19   Q.    Okay.  Yeah.  I've forgotten a lot of stuff too.

20   Let's talk about how you handle samples and preparation for

21   gas chromatography --

22   A.    Okay.

23   Q.    -- and mass spectrometry.

24   A.    And --

25   Q.    Yeah.  Can you go through how you -- how you handle

1    those powder samples?

2       A.    Sure.  In this case, we weigh them always to get a

3    weight.  And then I take a small portion, and I will place

4    that in a small test tube and grind it -- I'll pulverize it

5    with my spatula to make it fine -- fine powder.

6            And then methamphetamine is an amine, so we do a

7    base-to-hexane extraction, which means -- which means we put

8    a little water in there and we put some base.  We adjust the

9    pH basically, and then we extract it into an organic

10   solvent.

11           You can think of it as like gasoline.  Hexane is a

12   primary component of gasoline.  So the methamphetamine gets

13   extracted into the hexane, and then I analyze the hexane for

14   the presence of methamphetamine.

15      Q.    Okay.  Let's start back when you're holding the

16   bag.  Where in the bag -- I mean, is the bag mixed --

17      A.    I pour the bag out to weigh it.  I weigh all the

18   content.

19      Q.    My question is, does it matter where in -- like

20   when you look at the bag, do you observe -- does it -- do

21   you look for whether or not it seems generally uniform?  In

22   other words, do you have powder and crystals and --

23      A.    Of course I do.  And then I give it all -- I take

24   it all out to weigh it.

25      Q.    Okay.  And do you mix it then?

1    A.    Yeah.  There's a slight amount of mixing, yes.

2    Q.    Okay.  So you take the contents of the bag, you

3  pour it out, and it's all weighed.  And I assume you have

4  some sort of scale there, and then you have a dish.  And

5  then you hit tare, and it zeros the scale.

6    A.    Yes.

7    Q.    Okay.  And then you pour the material onto the dish

8  and you weigh it; correct?

9    A.    Yes.

10    Q.    Okay.  And then you remove it from the dish, and

11  you -- you say you grind it?  You make it a uniform sample?

12    A.    I don't grind all of it.  I take a small portion.

13    Q.    Okay.  And how do you choose what part of the --

14  what portion to take?

15    A.    I just take a random sample.

16    Q.    Okay.  And if you had two sort of different-looking

17  portions of the sample, how would you handle that?  Or does

18  that ever occur?

19    A.    It has occurred.  Not for me personally.  But we

20  would actually separate that out and analyze it separately.

21    Q.    Okay.  And that would be noted in your lab book;

22  correct?

23    A.    Of course.

24    Q.    Okay.  So if it's not noted in your lab book, that

25  was not a problem that you perceived at the time; correct?

1    A.    Correct.

2    Q.    Okay.  Now, you've -- you've taken this sample out,

3   and you've taken a small amount of it; correct?

4    A.    Yes.

5    Q.    Okay.  Now, you pour it into -- you pour the

6   sample -- the fine sample into a beaker; correct?

7    A.    No.  It stays in a test tube.

8    Q.    Stays in a test tube?

9    A.    It's a small -- a very small quantity.

10    Q.    Okay.  100 milliliters?

11    A.    30 milligrams.

12    Q.    30 milligrams?

13    A.    Of, say, solid.  Yeah.

14    Q.    Of solid.  Okay.  And a test tube is

15   100 milliliters or --

16    A.    No.  No.  It's like a 10 mL.

17    Q.    10 mL?

18    A.    10-milliliter test tube.

19    Q.    Okay.  Now, you add -- you add sodium hydroxide to

20   that, correct, and water?

21    A.    Yes, and water.

22    Q.    Okay.  And the purpose of that is to -- could you

23   explain the purpose of that to the jury?

24    A.    That's to make the methamphetamine real soluble and

25   hexane.  It makes it non-charged.

1     Q.    Okay.  Because methamphetamine salt is ionic;

2  correct?

3     A.    Correct.

4     Q.    And so when you're going to do a separation, you

5  want to have an aqueous water layer; correct?

6     A.    Yes.

7     Q.    And you want to have a hexane layer; correct?

8     A.    Yes.

9     Q.    Okay.  And this is kind of important because you

10  want your methamphetamine to be neutral.  So you don't want

11  it to be a salt.  You want it to be neutral and go into the

12  neutral hexane layer.  And you don't want it in the less

13  ionic aqueous layer; correct?

14     A.    Correct.

15     Q.    Okay.  So what you've done then is you have -- you

16  have your organic molecules in the hexane layer; correct?

17     A.    Yes.

18     Q.    Okay.  So the interesting part to DCI Laboratories,

19  the organic molecules that tend to be drugs, are in your

20  hexane layer; correct?

21     A.    Correct.

22     Q.    Okay.  And they're all nice and neutral; correct?

23     A.    Correct.

24     Q.    Okay.  What do you do with that hexane layer, that

25  oil layer?

1    A.    Well, that's what we inject into the instrument --

2    the GC/mass spec.

3    Q.    Okay.  And do you -- when you do that -- okay.  So

4    I'm envisioning a sample.  Is it still aqueous and --

5    A.    Oh, no.  No, no.  The hexane is on top of the

6    water, and we pull that off with a, you know, eye dropper

7    and put it in a small vial.

8    Q.    So you pipette --

9    A.    It's just hexane.

10    Q.    Okay.  So you pipette that hexane layer into a

11    vial; correct?

12    A.    Yes.

13    Q.    Okay.  And you put that vial onto some sort of

14    tray; correct?

15    A.    Yes.

16    Q.    Okay.  And, now, explain what happens with the

17    GC/MS.

18    A.    Okay.  Alrighty.  First of all -- first of all, gas

19    chromatography is -- if you can imagine a very small garden

20    hose wrapped around lots of -- lots of wraps.  And through

21    that tube we put helium gas.  And we flow helium gas through

22    this tube, and we inject what I just told you about, the

23    hexane layer, into the gas phase, into the helium, and so it

24    gets -- it goes through.

25         And it's in the gas phase now heated up.  And it

1    gets separated in time because it has different time that

2    it's on the garden hose, we'll call it, okay, up in the gas

3    phase.

4            So if this -- if this is the surface of the garden

5    hose and the helium is flowing over it, the gas, the

6    molecules that we're interested in, do this (indicating),

7    and they sit down -- they sit down on the surface for a

8    different amount of time depending on what their atomic

9    composition is, what they're made of.

10           So at the end -- at the end of the tube -- they

11   come out at different times so we can separate them in time.

12   And then we detect them with a technique called mass

13   spectroscopy which is the detector of choice for this.

14      Q.   Okay.  Now, so if I understand, you have an

15   injection of your sample.  Whatever is in that hexane

16   layer --

17      A.   Right.

18      Q.   -- whatever that is, that is -- you -- you --

19   your -- I guess you have a -- you have like a syringe sort

20   of top that goes in --

21      A.   Yeah, it's an automatic syringe that --

22      Q.   Okay.

23      A.   -- injects a very small quantity.

24      Q.   Like a microliter; right?

25      A.   It's a microliter.

1    Q.    So like one-millionth of a liter?

2    A.    Yes, it's --

3    Q.    Okay.  So it's a very small quantity.  But it's

4    representative of everything that's in the hexane layer;

5    correct?

6    A.    Yes.  Usually -- yeah, it's a clear homogenous

7    hexane layer.

8    Q.    Okay.  Because part of the assumption of mass spec,

9    when you're doing these hexane injections, is that the

10   sample is uniform in the hexane layer; correct?

11   A.    That's -- yes.

12   Q.    I mean theoretically.  It wouldn't work if that

13   wasn't the case; correct?

14   A.    Oh, no.  The sample could be a mess, and it would

15   still give you data.

16   Q.    It would give you data, but part of -- one of the

17   underlying assumptions is that that syringe is -- is

18   sampling a uniform amount of the hexane layer?

19   A.    Yes.

20   Q.    And there's good mixing in the hexane layer;

21   correct?

22   A.    Yes.

23   Q.    Okay.  So we take a microliter, and we have a

24   really, really -- well, it's a pretty long tube, correct,

25   the gas chromatograph portion?

1      A.    Yeah, it can be really long.  We use 15 meters,

2   which is --

3      Q.    Okay.  So that microliter sample gets injected onto

4   that -- and it's called a column; correct?

5      A.    It's a column or a tube, yes.

6      Q.    Okay.  And so -- and -- and you have different

7   materials on the inside of that tube that interact with

8   the -- with the microliter sample; correct?

9      A.    Yes.

10      Q.    Okay.  And so, in general, heavier molecules take

11   longer to go through that tube than lighter molecules;

12   correct?

13      A.    Yes.

14      Q.    Okay.  Now, let's talk about what happens when --

15   so in time -- as that carrier gas is sort of pushing the

16   molecules through the chromatographic column, in time

17   there's a separation; right?

18      A.    Yes.

19      Q.    So if you have 20 compounds, your hope is that that

20   column separates into 20 peaks; correct?

21      A.    Correct.

22      Q.    Okay.  Now, what happens when those molecules --

23   those compounds make it out the other end of the column?

24      A.    They're -- they're detected.

25      Q.    Okay.  But in the case of mass spec, it's a little

1    bit -- it's a little bit different.  I mean, not only are

2    they detected, but you actually have an electron beam.

3        A.    Yes.  The molecules come out of the end of the

4    column, and they're fragmented, basically explode into

5    pieces.  And those pieces are characteristic of each

6    molecule we're looking at.

7             So they have different ratios, and they're

8    different pieces depending on what the molecule, again, is

9    made of.  So we get mass spec information out of that.

10       Q.    Okay.  And every molecule has a fragmentation

11   pattern; correct?

12       A.    Yes.

13       Q.    And would you agree with me that you could

14   characterize that as sort of the molecule signature?

15       A.    Yes.  Yes.

16       Q.    Okay.  And in the case of methamphetamine, it busts

17   apart into a very characteristic signature?

18       A.    Yes.

19       Q.    And you would recognize it if you saw it?

20       A.    Yes.

21       Q.    Okay.  Now, about that signature, would you agree

22   with me that one of the important things that you look for

23   is what's called the parent ion peak?

24       A.    Not in all cases.

25       Q.    Not in all cases?

1     A.     Not in all cases.

2     Q.     Why not?

3     A.     Well, methamphetamine has a very weak parent ion.

4     Q.     Okay.  But is it one of the things that sort of

5 tips you off?

6     A.     Well, we -- we run a standard -- a drug standard at

7 the same time in the same run within -- within a few hours

8 usually.  We run drug standards and have to have a perfect

9 match almost between the drug standards and our unknowns.

10 We compare that.  That's how we do the analysis.

11     Q.     Okay.  Let's -- oh, you also use -- instead of

12 GC/mass spec, which explodes the molecules to give you your

13 signature, you also use GC/FID, which is --

14     A.     Flame ionization detection, yes.

15     Q.     Okay.  And what's the difference between using a

16 mass spec, which has exploded the molecules, and a flame

17 ionization detector?

18     A.     Well, they both are gas chromatography techniques.

19 And the retention time -- the time that it takes to get

20 through the column is called the retention time, and that is

21 very characteristic of the molecules we're looking for.

22            And on GC/FID, all you have is the retention time

23 that it takes for the molecules to get through the column.

24 With mass spec, you have the additional information of the

25 mass spec fragmentation.

1    Q.    Okay.  And your lab -- is it correct that your lab

2    does an identi -- a definitive identification based on the

3    mass spec as opposed to the GC/FID?

4    A.    Right.  That is true.  That is correct.

5    Q.    Why is that?  Why do you prefer -- because if I

6    understand FID correctly, it just looks at, well, this

7    compound or the compounds that came off at this time, there

8    was this much of them.

9          But the -- the mass spec actually looks at the

10   compounds and how they break apart to get the signature;

11   correct?

12   A.    Correct.

13   Q.    Okay.  And why is it that you use the mass spec to

14   affirmatively identify the presence of a -- of a -- of a

15   drug molecule?

16   A.    Because we can compare the mass spec fragmentation

17   of the unknown to the standard.

18   Q.    Okay.

19   A.    And that is the definitive, you know, comparison.

20   Q.    Okay.  And now we've -- we've talked about that.  I

21   would like to take a second to go through some of your

22   analysis, and maybe you could point out to the jury what you

23   were looking at.  Okay?

24   A.    Sure.

25         MR. TIMBERS:  Your Honor, this is quite a few

1    pages.  I wasn't sure if you wanted this bound.  But, for

2    example, there's 82 pages in his lab report.

3              THE COURT:  We can just paperclip it.

4              MR. TIMBERS:  Okay.  I tried, but it sort of

5    mutilated it.  May I approach the witness, Your Honor?

6              THE COURT:  Yes.

7              MR. TIMBERS:  I have handed the witness Defense

8    Exhibit Velasquez A, and there are 82 pages.

9        Q.    (By Mr. Timbers)  Could you tell me -- could you

10   take a second to look through that.  And as you do that, I'd

11   like to apologize.  The PDF I received had a page and then a

12   blank page.

13       A.    Yeah.  We scan all the blank pages.

14       Q.    Okay.  And I wanted to fairly represent exactly

15   what I received.  So only every other page has information.

16   My apologies.

17       A.    Okay.  Okay.  I --

18       Q.    Is that your report, Doctor?

19       A.    Yes, this is my report.

20       Q.    Okay.  And with regard to the laboratory notebook,

21   is that your laboratory notebook regarding the samples

22   contained in this report?

23       A.    Yes.

24       Q.    Fantastic.

25             MR. TIMBERS:  I move -- excuse me.  I offer Defense

1    Exhibit Velasquez A.

2              MR. MURRAY:  No objection, Your Honor.

3              THE COURT:  Velasquez A is admitted.

4              MR. TIMBERS:  All right.

5         (Defendants' Exhibit Velasquez A received in evidence.)

6    Q.   (By Mr. Timbers)  All right.  Now, I'd like to take

7    some time to sort of go through what's involved here.

8    That's perfect.

9              All right.  You've talked about this and included

10   this as your cover page.  This is your official report;

11   correct?

12   A.   Correct.

13   Q.   Okay.  And on this you're telling the government,

14   specifically Mike Hall, via this report that sample items

15   have tested positive for methamphetamine; correct?

16   A.   Correct.

17   Q.   Okay.  All right.  I have put on the screen Drug

18   Worksheet Form 1A, and it says Goodby.  Could you explain

19   what this page is?

20   A.   This is a -- where we write all our case notes, all

21   our observations of the samples, the nature of the sample,

22   what kind of sample it is, how we process the sample.

23             The weight is over here on the right-hand side.

24   All the tests we do.  All the tests that we do are

25   documented on this sheet, the type of extraction method.

1    This is all the information that we do with the sample

2    summarized.

3        Q.    All right.  Very good.  And if I -- if I just --

4    this is -- I think this has something to do with your

5    laboratory procedure.  But if I look over in the column

6    that's marked "weight returned," you have a number that

7    looks like it reads 0.939 grams.  You've crossed that out,

8    written 0.885 grams, and put your initials there; correct?

9        A.    Yes.

10       Q.    Okay.  And why did that occur?

11       A.    I decided to take a larger sample, I imagine.

12       Q.    Okay.  Very good.  And so -- and that's proper

13   laboratory technique, isn't it?

14       A.    Oh, yes.  Yeah.

15       Q.    I mean, we learned that in freshman chemistry;

16   right?

17       A.    Yes.

18       Q.    All right.  And down here we have sort of a second

19   section.  And you talked about this before.  You do this

20   Marquis test.  And if a sample comes up presumptive positive

21   for methamphetamine, you'll see a reaction here; right?

22       A.    Yes.  You'll see an orange color.

23       Q.    So if there's methamphetamine there, it will make

24   the sample turn orange; correct?

25       A.    Correct.

1    Q.    All right.  Now, here you've also said, over on the

2    right-hand side -- as you've talked about earlier, you have

3    your base, and that's your sodium hydroxide, pouring that on

4    the sample, probably stirring it up a bit, and then adding

5    hexane.  And once again, that's moving the organic molecules

6    into the hexane layer; correct?

7    A.    Correct.

8    Q.    Okay.  And you did that on all four samples, 1.1

9    through 1.4; correct?

10   A.    Correct.

11   Q.    All right.  Now, what is happening sort of at the

12   bottom of your lab notebook page, this first page, 1 of 38?

13   A.    The very bottom?

14   Q.    Yes.

15   A.    Where I date and --

16   Q.    Oh, I'm sorry.  The next box.  Item 1.1.  My fault.

17   I'm sorry.

18   A.    Okay.  This is where we report our instrumentation

19   analysis.  You can see the GC/mass spec there.  You can see

20   FID over here.  So on these samples, we got positive

21   methamphetamine.

22   Q.    All right.  And so here you're saying, with regard

23   to sample 1.1, in that -- in the box underneath the GC/MS,

24   which stands for gas chromatography/mass spectrometry --

25   what is the "B" in the upper left-hand corner?

1      A.    We take two independent samples, and we call them

2    alpha and beta, and test those independently.  In this -- by

3    the color test, we test the alpha sample.  And then the beta

4    sample is tested by the GC/mass spec.  So we take two

5    independent samples out of each sample.

6      Q.    Thank you.  I've been dying to know what that

7    meant.  I appreciate that.  All right.  And sort of that

8    middle column at the bottom, that five-box set, you're

9    saying your alpha sample tested positive for meth, and your

10   beta sample tested positive for meth?

11     A.    Yes.  That's the results there, yes, for the tests.

12     Q.    Okay.  And then the identification, you just write

13   out methamphetamine.

14     A.    Right.  Yeah.  That's what goes on the report.

15     Q.    Great.  And just for continuity sake, these are

16   samples 1.5 to 1.8.  And you're recording the weight

17   received/weight retained similar to the first page; correct?

18     A.    Sample -- yes.  1.7 and 2.1 wrap it up, yes.

19     Q.    Okay.  And, likewise, you don't -- here you don't

20   do anything with what's been labeled as item 2 but, rather,

21   you sample item 2.1; correct?

22     A.    Yeah.  When we have numerous sub items we, you

23   know, call them sub items and number them accordingly.

24     Q.    Okay.  And this is items -- let's see.  2.1 was on

25   the previous page.  This page, page 3 of 38, you've recorded

1    testing items 2.2 to 2.5; correct?

2    A.    Correct.

3    Q.    And everything there, similar to the previous page,

4    is testing positive for the presence of methamphetamine?

5    A.    Yes.

6    Q.    All right.  And I believe this is your last sort of

7    notebook, I guess, intro to the -- it's your drug worksheet,

8    last page.  And this has items 2.6 to 2.9, all of them

9    testing positive for methamphetamine; correct?

10   A.    Well, 2.8 is the last drug sample.

11   Q.    Oh, I'm sorry.  Thank you.  The package you didn't

12   test?

13   A.    Yeah.  We -- we -- this packaging was sent over to

14   the print section for fingerprint analysis.

15   Q.    Thank you.  Now, this is page 5 of 38.  Can you

16   tell me what's happening here?

17   A.    Yes.  We're getting into the gas chromatography/

18   mass spectroscopy data now.  This is the -- what's called a

19   sequence of runs.  You can see -- if you look -- look here,

20   all these samples we just discussed are listed in numerical

21   order.

22         And this is the order -- this is the order that the

23   mass spec -- the instrument would run the samples.  It's all

24   automatic.  It takes the vials and injects them, gathers the

25   data and saves the data for me to look at.  And this can

1    occur overnight.  So this is the sequence of events.

2        Q.    Okay.  So this -- this machine -- so, again, you

3    take your powder sample, and you pour it into -- you pour it

4    into your test tube, you add your sodium hydroxide, you add

5    your hexane.  All the organic molecules are now in the

6    hexane.  You pipette off that hexane layer, and you put

7    those into vials.

8        A.    Yes.  Small vials.

9        Q.    Small vials.  And so, for example, if we look at

10   sample number 4, that is -- that corresponds to sample 1.1,

11   and sample 6 corresponds to sample 1.2; correct?

12       A.    Yes.  The vials are numbered there, and then the

13   associated -- you know, the descriptions that I type in --

14   into this file are associated with it.

15       Q.    Very good.  Okay.  Now, you start off with a wash.

16   Could you explain to the jury what the wash is?

17       A.    The wash is just hex -- well, it's methylene

18   chloride in this case, another organic solvent.  And it's

19   simply to warm the instrument up, just to -- to get it ready

20   for analysis basically.

21       Q.    Okay.  Make sure you don't have any contaminants on

22   that -- on that chromatographic column; correct?

23       A.    Yes.

24       Q.    And make sure your instrument is -- is going to

25   function for the test; correct?

1    A.    Correct.

2    Q.    Okay.  So here's an example of that wash; correct?

3  And that's page 6 of 38.

4    A.    Yes.

5    Q.    Okay.  And could you tell the jury what they're

6  looking at with regard to the X and Y axis there?

7    A.    Okay.  The X axis is the retention time.  It's a

8  10-minute run.  So you can see out here 9.5.  So it ends at

9  10 minutes.  So its injection time, zero out to ten minutes

10  on the X axis.  The Y axis is the abundance, simply the

11  instrument response.  And in this case, since it's just pure

12  solvent, pure clean solvent, we don't really get any

13  information.

14    Q.    Okay.  In fact, that -- that -- that looks kind of

15  like scribbling to the right starting at about 6 and a half

16  minutes through your attention -- through your entire --

17    A.    That's just -- that's just column bleed and noise.

18    Q.    Noise.

19    A.    It's -- it's --

20    Q.    Yeah.  Okay.  And that kind of gives you your

21  baseline for what -- hopefully you will see signal if -- if

22  you're detecting things properly?

23    A.    Yes.

24    Q.    Well, I want to apologize.  This is -- it's very,

25  very faint.  Is your copy darker?

1          MR. TIMBERS:  May I approach, Your Honor?

2     A.    No, not really.

3          THE COURT:  Yes.

4     Q.    (By Mr. Timbers)  It's a little better than mine.

5  I think that's a little better.  And my apologies for that.

6  I will replace the toner on my printer.  So we're back at

7  vial number 2.

8     A.    Mm-hum.

9     Q.    And could you tell the jury what we're looking at?

10    A.    This is our mix standard which has the

11 methamphetamine in it.  And we run -- we run this as our

12 standard of comparison to compare to all the unknowns.

13    Q.    Okay.  And so this would be all your suspect --

14 your most usual candidates for suspected drug activity;

15 correct?

16    A.    Yes.  This is -- primarily amphetamine,

17 methamphetamine and cocaine are in here.

18    Q.    Okay.  And so as we go -- if we look at that line

19 that says "miscellaneous information."  That says -- if I'm

20 reading that correctly, that says amphetamine, phentermine,

21 methamphetamine, ephedrine, and cocaine.

22    A.    That's correct.

23    Q.    Now, does that -- does that correspond to where

24 they're coming off in time off that column?

25    A.    Yes.  The time at the top of the peak is the

1 retention time.

2     Q.    All right.  So when we look at this, we know that

3 in -- in that particular column, amphetamine is coming off

4 with a peak center at 2.53 minutes; phentermine is coming

5 off at 2.67 minutes; methamphetamine at 2.75 minutes;

6 ephedrine at 3.448 minutes; and cocaine is coming off at

7 5.84 minutes; correct?

8     A.    Correct.

9     Q.    Okay.  So, again, that has to do with how fast

10 those particular compounds go through our column; correct?

11     A.    Correct.

12     Q.    All right.  Now, could you explain what is

13 happening in the bottom portion of this experiment?

14     A.    Yes.  This is the mass spec fragmentation pattern

15 for methamphetamine.  It's all the pieces that the

16 methamphetamine molecule is made up of after we bust it up

17 and detect the pieces.

18     Q.    All right.  And let's talk about the

19 methamphetamine molecule.  There is a benzene ring; correct?

20     A.    Correct.

21     Q.    And then there's an alkane chain?

22     A.    Yes.

23     Q.    And by alkane chain, I mean a carbon -- an atomic

24 carbon -- series of carbon atoms in this molecule attached

25 to the -- the benzene ring; correct?

1        A.      Yes.

2        Q.      Then it goes -- and then it also has a nitrogen

3    attached to it; correct?

4        A.      Right.

5        Q.      Okay.  And then it has a tail on that molecule as

6    well?

7        A.      Another methyl group.

8        Q.      Another methyl group which makes it

9    methamphetamine; correct?

10       A.      Correct.

11       Q.      All right.  Now, when we look at this, the bottom

12   portion of this, if we imagine that benzene ring and then

13   the alkane chain and then the nitrogen with the methyl group

14   attached, when that molecule explodes apart by that electron

15   beam at the end of the column, this is your signature for

16   methamphetamine; correct?

17       A.      Correct.

18       Q.      All right.  And could you explain what 148 is?

19       A.      That's the parent ion.

20       Q.      Because when we add up all the atoms of the

21   methamphetamine molecule, we get roughly 148 atomic mass

22   units; correct?

23       A.      Correct.

24       Q.      All right.  That's a nice spectrum.  Actually, I've

25   got another question about that.  Is it also important --

1    when you're looking at these things when you're identifying

2    unknowns with regard to this 7 of 38, these other fragments

3    are also important, aren't they?  So 58, 65, 77, 91, 115.1,

4    134, are very important to identify that signature; correct?

5        A.    Correct.  We -- we compare this to the unknowns,

6    and they have to match perfectly.

7        Q.    They have to match perfectly?

8        A.    Just -- just -- yes.

9        Q.    As good as your standard?

10       A.    As -- as -- usually as good as our standard, yes.

11       Q.    All right.  So now we've done the methylene

12   chloride wash.  We've done the standard.  And your third

13   vial is this.  What is this?

14       A.    When we prepare the samples -- and we'll prepare,

15   say, a batch of ten samples at a time -- we prepare what's

16   called a blank.  And that blank is -- has nothing to do with

17   the samples.  It's just the reagents.  It's the water; it's

18   the sodium hydroxide; it's the hexane.  It's all the

19   chemicals that we use in the preparation.

20             We make that up and call it a blank.  And it needs

21   to be clean and free of any kind of interferent or any kind

22   of drug.  If it had a drug in it, then the work I was doing

23   would be invalidated.  So it has to be clean.

24       Q.    Okay.  So it's -- it's kind of like a check on the

25   system.  If that blank comes back with anything in it, you'd

1  have to start over; correct?

2     A.    Yes, I would.  It's kind of a check on the human

3  being.

4     Q.    It's a very good check on the human being.

5  Correct.  And, now, did this blank -- seeing this blank, did

6  that cause you any concern?

7     A.    Oh, no.  No.  This blank is clean.  It looks just

8  like the first wash that we saw.

9     Q.    It looks like your methylene chloride wash?

10     A.    Yes.

11     Q.    Okay.  And that is something that's meant to

12  guarantee that the system is clean and pure; correct?

13     A.    Yes.

14     Q.    Great.  All right.  This is -- I've just put up

15  page 9 of 38.  And could you tell me what this is?

16     A.    This is sample 1370-1.1, the first sample.

17     Q.    All right.  And what has happened here?

18     A.    I have analyzed sample 1.1 on the GC/mass spec and

19  got this information.

20     Q.    Okay.  And is this information important?

21     A.    Yes.  This is the retention time for

22  methamphetamine and the mass spec information.

23     Q.    Okay.  Let's just compare that.  So -- so on this

24  sample, your fourth injection onto the gas chromatograph

25  which -- now, did it start at 16:05, or the data was

1  obtained at 16:05?

2      A.      Is that the number at the top here?

3      Q.      Yeah, the 14 December 2009.

4      A.      That's the injection time.

5      Q.      Okay.  So that's the time the sample was injected

6  on the column?

7      A.      Correct.

8      Q.      Okay.  Now -- and no problem with that.  Let's just

9  look at -- so this 2.752 is important to you because that is

10  the time your standard -- your methamphetamine standard came

11  off at; correct?

12      A.      Correct.

13      Q.      And let's just take a look at that.  And as we went

14  through before, that's the standard that has amphetamine,

15  phentermine and our candidate here, methamphetamine, and

16  that's come off at 2.751 minutes.

17      A.      Correct.

18      Q.      Okay.  And, again -- so we have a good retention

19  time?

20      A.      Yes.

21      Q.      Okay.  And that's our first tip-off.  Because,

22  really, 2.751 minutes is really close to 2.752 minutes;

23  right?

24      A.      Yes.

25      Q.      Okay.  So you're within your acceptable criteria?

1      A.    Correct.

2      Q.    Okay.  And now let's just recall -- here's what

3   your standard looked like back on page 7 of 38.  That's that

4   wonderful signature; right?

5      A.    Yes.

6      Q.    Okay.  And we have our parent ion at 148.1.  And

7   that's -- and that, actually, is one of the methamphetamine

8   molecules that was hit by the electron beam, and it just

9   sort of knocked an electron off.  And so the whole parent

10  molecule made it through, and it was hit by the detector;

11  right?

12     A.    Correct.

13     Q.    Okay.  And so what you're telling us is that that

14  signature right there on page 9 is almost identical to the

15  signature that we saw on page 7 which was a standard?

16     A.    Correct.

17     Q.    And that looks spot on, doesn't it?

18     A.    Yes.  I . . .

19           THE COURT:  Mr. Timbers, I'd like to take a lunch

20  break.  I thought I'd see where we are from your

21  perspective.

22           MR. TIMBERS:  I think this would be a good place to

23  break.  I have some more to go through.

24           THE COURT:  Okay.  We'll take a lunch break until

25  1:30.  I'd like the jurors back, ready to report, at --

1    if -- if I could ask the jurors to be back at, say, 1:20,

2    then we can get ready to receive you into the courtroom by

3    1:30.  With that, we'll stand in recess until 1:30.

4         (Trial proceedings recessed

5         12:14 p.m. to 1:39 p.m.)

6         THE COURT:  Please be seated.  We're here in the

7    continuation of Docket Number 10-CR-329.  The court notes

8    the presence of the jury after our lunch recess with roll

9    call waived.  Mr. Timbers, you are on cross.

10        MR. TIMBERS:  Thank you.

11        THE COURT:  Please proceed.

12        MR. TIMBERS:  Thank you, Your Honor.

13   Q.   (By Mr. Timbers)  Dr. Goodby, I'd like to sort of

14   change gears for a second.  I'd like to hand you a document,

15   and I'm wondering if you could identify that document, sir.

16        It's Exhibit Ordaz A.  And there are 11 pages to

17   it.  I think you've seen it before.

18        MR. TIMBERS:  Your Honor, may I approach the

19   witness?

20        THE COURT:  Yes.

21   A.   This is our technical SOP, standard operating

22   procedure.

23   Q.   (By Mr. Timbers)  Okay.  Why is this -- is that

24   document important?

25   A.   Yes.  We refer to it when we're doing our work

1  sometimes.

2      Q.    Okay.  Does it govern how you are to perform

3  analysis in the laboratory?

4      A.    Yes.  It completely governs the rules of acceptable

5  analysis.

6      Q.    And all chemists are expected to follow that

7  procedure; correct?

8      A.    Yes.

9      Q.    And if they ever do not follow that procedure, they

10  are expected to make note of it?

11      A.    Yes.

12          MR. TIMBERS:  All right.  I offer Exhibit Ordaz A,

13  1 through 11.

14          MR. MURRAY:  No objection, Your Honor.

15          THE COURT:  Ordaz A is admitted.

16      (Defendants' Exhibit Ordaz A received in evidence.)

17      Q.    (By Mr. Timbers)  I have another document here for

18  you.

19          MR. TIMBERS:  Your Honor, may I approach the

20  witness?

21          THE COURT:  Yes.

22      A.    This is our technical SOP for our chemical screen

23  test, the wet chemistry test that we talked about.

24      Q.    (By Mr. Timbers)  All right.  And if we could just

25  take a second.  So you recognize that document?

1    A.    Yes.

2    Q.    This governs how your laboratory is to perform

3    chemical screening tests?

4    A.    Yes.

5    Q.    Okay.  If I could direct your attention to page 7

6    of 11.

7    A.    Yes.

8    Q.    Could you explain to me what -- actually --

9          MR. TIMBERS:  Did you do that or did I do that?

10         THE CLERK:  I did.

11         MR. TIMBERS:  You made me look smart.

12         THE CLERK:  What is that, Peter?

13         MR. TIMBERS:  This document is Exhibit Ordaz B, and

14   there are 11 pages to it.  And we're on page 11.

15   A.    You mean 7; right?

16   Q.    (By Mr. Timbers)  I'm sorry.  Page 7, yes.  That

17   was a long lunch.  Thank you, Doctor.  Acceptance criteria.

18   A.    Yes.

19   Q.    Could you explain to me what is meant by acceptance

20   criteria?

21   A.    That the changes -- the changes noted have to be --

22   they're defined here.  The colors that are noted are -- have

23   to be correct when performing the test.  We perform -- we

24   perform this on known standards also.

25         MR. TIMBERS:  I would like to offer Exhibit Ordaz

1   B.

2            MR. MURRAY:  No objection, Your Honor.

3            MR. TIMBERS:  Thank you.

4            THE COURT:  Ordaz B is admitted.

5            MR. TIMBERS:  Thank you, Your Honor.  Sorry about

6   that.

7        (Defendants' Exhibit Ordaz B received in evidence.)

8        Q.   (By Mr. Timbers)  Okay.  I was a bit distracted

9   there.  If you -- to pass the quality control, the reagent

10  shall give the following reactions with the following

11  compounds.

12           So this is what you've talked about before.

13  Methamphetamine will turn orange; correct?

14       A.   Correct.

15       Q.   Okay.  What is meant by "any other reactions with

16  these three compounds constitutes a fail check"?

17       A.   That means if there are any other colors noted,

18  then that reagent would be failed.  It would fail -- fail

19  the test.

20       Q.   Okay.  What if there's no reaction, does that

21  constitute a fail test?

22       A.   Well, it has to meet -- has to meet all three of

23  these tests above.  The cocaine, actually, is a no reaction.

24       Q.   Okay.  But for methamphetamine, if it -- if you

25  don't get an orange, does that mean that there's no

1    methamphetamine?

2       A.    Are you talking about the QC check here?

3       Q.    Yeah, the acceptance --

4       A.    Yeah.  That would be a fail, and we would dispose

5    of the reagent.

6       Q.    Okay.

7             MR. TIMBERS:  Your Honor, may I approach the

8    witness?

9             THE COURT:  Yes.

10      A.    This is our technical SOP.

11      Q.    (By Mr. Timbers)  Okay.  I -- I have just handed

12   you --

13      A.    Okay.

14      Q.    -- Exhibit Ordaz C.  It's a 26-page document.  Do

15   you recognize that document?

16      A.    I do.

17      Q.    What is that document, Doctor?

18      A.    That's our technical SOP for the controlled

19   substance analysis procedure.

20            MR. TIMBERS:  Your Honor, I'd like to offer into

21   evidence Exhibit Ordaz C.

22            MR. MURRAY:  No objection.

23            THE COURT:  Ordaz C is admitted.

24       (Defendants' Exhibit Ordaz C received in evidence.)

25      Q.    (By Mr. Timbers)  If I could direct your attention

1    to page 4 of 26.

2        A.    Okay.

3        Q.    And, actually, it would probably help if I directed

4    your attention first to page 3 of 26.  Toward the bottom,

5    Section 3.4.5 deals with your gas chromatograph/mass

6    spectrometer.

7             So the continuation of that page, section viii --

8    Roman numeral -- or little Roman numeral viii.  Could you

9    explain to the jury what is necessary, then, to make an

10   identification of a sample?

11       A.    On the GC/mass spec run?

12       Q.    Yes.  Yes, Doctor.

13       A.    We have to have the retention time compared between

14   the standard and the unknown.  Has to be within .03 minutes.

15   And the mass spectra, the fragmentation patterns, have to

16   match to a reasonable degree.

17       Q.    And that's -- and we went through that exercise

18   before lunch.  But that's where at a certain time, you know

19   you have a certain peak on your chromatograph that comes

20   out.  And in addition -- not only do you have to have that,

21   but you have to have that fragmentation pattern, that

22   character -- that signature of the molecule that is unique

23   to that molecule; correct?

24       A.    Yes.  It's -- it's unique, and it indicates a

25   pure -- pure compound too.

1    Q.   Okay.  And -- yes.  So you're not -- so there

2   aren't multiple peaks.  There aren't --

3    A.   The mass spec allows us to see if there's multiple

4   peaks.

5    Q.   Okay.  Because the problem could be that as the --

6   as the molecules go through the chromatogram -- or go

7   through the -- the column, you could have what's called

8   co-eluting peaks.  In other words, you could have multiple

9   peaks coming off at the same time.

10       So what the mass spec allows you to do -- and

11   correct me if I'm wrong -- is it allows you to identify just

12   that particular molecular compound.

13   A.   It allows you to determine the purity of the peaks

14   coming out.

15   Q.   Okay.  And so, again, when you look at that

16   signature, you want to see that parent ion, and you want to

17   see all those other signature peaks in the proper ratios;

18   correct?

19   A.   You want to see a good comparison between the

20   standard and the unknown, yes.

21   Q.   Great.  Thank you.

22       MR. TIMBERS:  Your Honor, may I approach the

23   witness?

24       THE COURT:  Yes.

25   Q.   (By Mr. Timbers)  Doctor, do you recognize the

1  document that I just handed you?

2     A.    Yes.

3     Q.    Okay.  It's labeled Ordaz D, and it's a 15-page

4  document.  What is it?

5     A.    This is the technical SOP for instrument operation,

6  calibration and maintenance.

7     Q.    Why is that document important?

8     A.    It documents the procedures that we use for

9  operating and calibrating and maintaining our -- our

10 analytical instrumentation.

11    Q.    In general, would you say that -- how many GC mass

12 specs do you have in your laboratory?

13    A.    We have four.  No, wait.  Yeah, we have four.

14    Q.    Okay.  And is there one that's used particularly

15 often?

16    A.    We have three for drug chemistry, and they're used

17 equally.

18    Q.    Used equally?

19    A.    Yeah.

20    Q.    Okay.  So it's a shared burden on each instrument?

21    A.    Yeah.

22    Q.    Okay.  And in -- in general, would you say those

23 instruments function very, very well?

24    A.    Yes, they do.  We maintain them very well.

25    Q.    And you're not seeing any spurious peaks appearing

1    anywhere?

2        A.    Well, when that happens, we perform maintenance on

3    the instrument.

4        Q.    Okay.  And is there a characteristic shape to those

5    kind of peaks?

6        A.    Which?

7        Q.    Like a spurious peak that would indicate to you

8    that you need to do maintenance.

9        A.    Well, the peak shape can look, you know, poor, and

10   we would know that we need to do maintenance, yes.

11       Q.    Okay.

12            MR. TIMBERS:  Your Honor, may I approach the

13   witness?

14            THE COURT:  Yes.

15            MR. TIMBERS:  Your Honor, I would like to move to

16   introduce Exhibit Ordaz D.

17            MR. MURRAY:  Your Honor, no objection.  And for the

18   record, the government will have no objection to any

19   document the witness identifies as being an accurate copy of

20   a -- of a crime lab document or record.

21            THE COURT:  Thank you, Mr. Murray.

22            MR. MURRAY:  Thank you.

23            THE COURT:  Ordaz D is admitted.

24            MR. TIMBERS:  Thank you, Your Honor.

25            (Defendants' Exhibit Ordaz D received in evidence.)

1    Q.    (By Mr. Timbers)  I have just handed you what is

2    labeled Exhibit Ordaz F.  It's a three-page document.  Do

3    you recognize that document, Doctor?

4    A.    Yes, I do.

5    Q.    And what is that document?

6    A.    It's our technical SOP that -- it's the drug

7    chemistry unit abbreviation list.  It defines -- it defines

8    any abbreviation that we would use during the course of our

9    work.

10   Q.    Because sometimes it's -- it probably is a bit

11   tedious to write out all the --

12   A.    Yeah.  The things that are real repetitious on

13   our -- on our case notes, we use these abbreviations, and

14   then we all understand what they mean, so . . .

15   Q.    Okay.  And it would aid somebody as your -- as

16   somebody would -- somebody from the outside would go through

17   your laboratory notebook, this would aid them in

18   understanding what happened, how much was used, what the

19   quantities were, the tests that were performed?

20   A.    Yes.  If you were outside, you'd have to have this

21   to review.

22   Q.    Thank you.

23         MR. TIMBERS:  Your Honor, may I approach the

24   witness?

25         THE COURT:  Yes.

1      Q.     (By Mr. Timbers)  Doctor, I've just handed you what

2    is labeled as Exhibit Ordaz H.  It's a 20-page document.  Do

3    you recognize that document?

4      A.     I do.

5      Q.     Okay.

6      A.     It's a compilation of maintenance information that

7    I gave you, so --

8      Q.     All right.

9      A.     It's not a technical SOP.

10     Q.     No, it's not.  It's -- it's actually -- would it be

11   fair to characterize that as the log of activity done to

12   your instrument?

13     A.     Yes.  This front page is the maintenance record.

14     Q.     Okay.  So when there's problems on the instrument,

15   according to your procedures, they're logged here?

16     A.     Yes.  Anything done to the instrument is logged

17   here.

18     Q.     And if it's not done -- well, if -- in the absence

19   of it being marked here, you would -- you could assume that

20   the instrument was running perfectly fine?

21     A.     Correct.

22            MR. TIMBERS:  Your Honor, may I approach the

23   witness?

24            THE COURT:  Yes.

25     Q.     (By Mr. Timbers)  I have just handed you -- I have

1    just handed you Exhibit Ordaz I, a 10-page document.  Can

2    you tell me what that is?

3       A.    This is the maintenance record and a printout of

4    the method for the GC/FID.  The previous one was the GC/mass

5    spec.

6       Q.    Right.  And so this is for the flame ionization

7    detector.

8       A.    Yes, this is for the --

9       Q.    All right.  And so, again, same questions.  If

10   anything is done to the instrument, it would be logged here;

11   correct, Doctor?

12      A.    Correct.  Correct.

13      Q.    All right.  And any problems with that instrument

14   would be logged here?

15      A.    Correct.

16      Q.    All right.  And in the absence of any log entry for

17   this particular unit, you would assume -- you could

18   legitimately assume that, in fact, the instrument was

19   functioning perfectly correct?

20      A.    Correct.

21      Q.    All right.  This next one is very important.

22            MR. TIMBERS:  Your Honor, may I approach the

23   witness?

24            THE COURT:  Yes.

25      Q.    (By Mr. Timbers)  I have handed you what is labeled

1    as Exhibit Ordaz J.  Could you tell me what that document

2    is?

3       A.    This is a certificate of quality from a chemical

4    standard manufacturer named Alltech, and it's

5    fluoromethamphetamine.

6       Q.    Okay.  And before lunch, we were talking about the

7    molecular structure of methamphetamine with regard to when

8    the mass spectrometer explodes the molecule -- when the

9    electron beam of the mass spectrometer explodes the molecule

10   and it breaks into a fragmentation pattern, and we referred

11   to the molecular structure of methamphetamine.  Do you

12   remember that?

13      A.    Yes.

14      Q.    Okay.  And sometimes I forget that not everyone has

15   maybe experience with a fennel group, an alkane chain and a

16   methyl group off of nitrogen.  Could you go through that

17   molecular structure and sort of explain what -- what we were

18   talking about, if you can?

19      A.    Well --

20            MR. TIMBERS:  Is there a marker up there?

21            THE CLERK:  If he just touches the screen --

22            MR. TIMBERS:  Oh, if you touch the screen.  Okay.

23            THE CLERK:  The jury can't see this.  You haven't

24   admitted it.

25            MR. TIMBERS:  Oh.  I'd like to offer, I'm sorry,

 1   Exhibit Ordaz J.

 2           MR. MURRAY:  Your Honor, I also believe that F, H

 3   and I as well have not been offered, and we would have no

 4   objection.

 5           MR. TIMBERS:  I would like to offer those exhibits.

 6   I was under the impression I didn't have to offer.

 7           THE COURT:  No.  You need to offer or they won't

 8   be.  I have to rule or they're not in the record.

 9           MR. TIMBERS:  Thank you, Your Honor.

10           THE COURT:  And was there a -- did we refer to

11   Exhibit F?  I only have H and I.

12           THE CLERK:  I have E, H, I, and J that needed to be

13   offered.

14           MR. TIMBERS:  There is an F, and there is -- I

15   haven't introduced E yet.  Okay.  So I'd like to offer F, G,

16   H, I, and now J.  So we're only missing E.

17           THE COURT:  I -- I don't have any record of F or G

18   or what those relate to.

19           MR. TIMBERS:  Your Honor, F was an abbreviations

20   list for the laboratory, and I'd like to offer that.

21           THE COURT:  And could you refresh my memory on G?

22   Maybe I missed G too.

23           MR. TIMBERS:  Your Honor, I'm not offering G at

24   this point.

25           THE COURT:  All right.  Thank you.  Ordaz H -- or,

1    excuse me, F, H, I, and J are admitted.

2          MR. TIMBERS:  Thank you, Your Honor.

3          (Defendants' Exhibits Ordaz F, H, I, and J received in

4          evidence.)

5    Q.   (By Mr. Timbers)  Doctor, I believe your screen is

6    activated.  If you could point out what the fennel group is.

7    A.   Oh, okay.  The fennel.  That's that ring structure

8    there.

9    Q.   Okay.  And that actually is -- every corner of that

10   ring is a carbon atom; correct?

11   A.   Yes.  It's a six-carbon atom ring.

12   Q.   All right.  And that six-member ring is called a

13   benzene ring, sometimes it's called a fennel ring; correct?

14   A.   Yes.

15   Q.   And there's an attachment from that ring that goes

16   off to the top right.  What -- what is that?

17   A.   That's also three carbons.

18   Q.   Okay.  So there's one, two, three carbons?

19   A.   Yes.

20   Q.   All right.  And then -- that's what we were calling

21   an alkane chain; correct?

22   A.   Correct.

23   Q.   Okay.  And the second carbon of that chain is

24   attached to a nitrogen molecule there; correct?

25   A.   Right.  Amine group.

1    Q.    All right.  And then in addition to that nitrogen

2    being attached to that alkane chain, that three-member

3    alkane chain, it's also attached to another methyl group

4    right there; correct?

5    A.    Correct.

6    Q.    All right.  And that's what makes it

7    methamphetamine; correct?

8    A.    Yes.  That's -- yes.

9    Q.    Okay.  Now, when methamphetamine breaks apart, we

10   see -- and this is -- could you explain what this spectrum

11   is down here at the bottom of that page?

12   A.    That's the mass spec fragmentation pattern, and

13   then it's the GC run below it.

14   Q.    All right.  And so there's a single peak because

15   it's a pure molecule that you're getting from the

16   manufacturer; correct?

17   A.    Correct.

18   Q.    Okay.  And there's that parent ion out there, and

19   then there's the fragmentation pattern that looks like what

20   you should get when you do a mass spec?

21   A.    Yes.  We compare the standard to the unknown.

22   Q.    Have you had an opportunity to work with Josh

23   Williams?

24   A.    Yes.  He's a co-worker of mine.

25   Q.    Okay.  Is it fair to say he follows the laboratory

1  procedures?

2      A.    Yes.

3      Q.    And he washes his glassware?

4      A.    Yes.

5      Q.    Completely and thoroughly?

6      A.    Yes.

7      Q.    When I was looking at some of your laboratory

8  analysis, his initials appear in some of the corners.  Why

9  is that?

10     A.    During our peer review, only certain pages,

11 critical pages, are initialed and dated.

12     Q.    Okay.

13     A.    We have a procedure for that.

14     Q.    Okay.  And why is that important?

15     A.    Because it proves that the peer review of the data

16 was performed.

17         MR. TIMBERS:  All right.  Doctor, I don't have any

18 further questions for you.  Thank you very much for taking

19 your time.

20         THE WITNESS:  Thank you.

21         THE COURT:  Thank you, Mr. Timbers.  Any

22 questioning by any other members at the defense table?

23         MR. FLEENER:  Not from Mr. Renteria.

24         MR. HORN:  Not from Mr. Velasquez.

25         MS. HIGHAM:  Nothing from Mr. Garcia, Your Honor.

1      THE COURT:  All right.  Thank you.  Mr. Murray, any

2  redirect?

3                    REDIRECT EXAMINATION

4      Q.   (By Mr. Murray)  Doctor, I have to apologize in

5  advance.  I believe, if you actually could, I achieved a

6  score of F minus in chemistry.  So I just want to ask you,

7  after all of that, the drug exhibits you previously

8  testified to, is it still your opinion they contain

9  methamphetamine?

10     A.   Yes.

11     MR. MURRAY:  I have no further questions, Your

12  Honor.

13     THE COURT:  Thank you, Doctor.  You're excused,

14  released from your subpoena.

15     (Witness excused.)

16     THE COURT:  Mr. Murray or Mr. Fun, if you'd like to

17  call your next witness.

18     MR. MURRAY:  The United States calls Officer Mike

19  Hall.

20     THE COURT:  Officer Hall, even though you've

21  previously taken the stand, I did excuse you, so we'll go

22  ahead and administer the oath again.

23     (Witness sworn.)

24     THE CLERK:  Please take a seat.  State and spell

25  your name for the record.

1        THE WITNESS:  Michael Hall.  M-i-c-h-a-e-l H-a-l-l.

2                   MICHAEL HALL,

3    having been first duly sworn, was examined and testified as

4    follows:

5                   DIRECT EXAMINATION

6    Q.    (By Mr. Murray)  Officer Hall, a couple of days ago

7    you testified with regard to a number of controlled

8    purchases.  Do you recall that testimony?

9    A.    I do.

10   Q.    I believe during the -- the course of your

11   testimony, you pointed out that one of the controlled

12   purchases involved bunk; correct?

13   A.    Yes.

14   Q.    And, again, what's bunk?

15   A.    Like I said, define it as a substance in this case

16   purported to be methamphetamine that was sold as

17   methamphetamine and actually was not methamphetamine.

18   Q.    Do you recall the date of that controlled purchase?

19   A.    November 17th, 2009.

20   Q.    Who was the CI and where did it take place?

21   A.    CI was Lisa Riggs.  And that took place at the

22   Family Dollar Store in Cody, Wyoming.

23   Q.    And you collected the evidence pursuant to the

24   procedures you testified to much earlier; correct?

25   A.    Yes.

1    Q.    I'm handing you what has been marked as Government

2    Exhibit 102.  Do you recognize it?

3    A.    I do.

4    Q.    What is it?

5    A.    It is my package that contained the evidence and --

6    actually in another package from the Drug Enforcement

7    Administration.

8    Q.    I note that it is an evidence bag of the DEA;

9    correct?

10   A.    Yes.

11   Q.    Why is it that this bag contains -- this evidence

12   is sealed in a DEA bag and not a DCI bag?

13   A.    I gave my bag containing the evidence to Special

14   Agent Ely Hebert from DEA so that he could send it to their

15   lab for testing.

16   Q.    And why did you do that?

17   A.    Because the DEA lab can test for purity of the drug

18   or -- where, at least in my experience, the state crime lab

19   does not.  So this way we would have an idea of how pure the

20   methamphetamine was or was not.

21        MR. MURRAY:  I have no further questions of Officer

22   Hall, Your Honor.

23        THE COURT:  Thank you.  Oh, Officer Hall.  Any

24   cross?

25                    CROSS-EXAMINATION

SAL-Lopez-Perez  Jury Trial VI

1    Q.    (By Mr. Horn)  Let me understand.  You -- you sent

2  it to DEA.  Why?  Because they have a better lab; is that

3  what you're saying?

4    A.    No.  They just have a process or procedure, I

5  guess, for testing the purity of that methamphetamine.

6    Q.    And DCI doesn't have that ability to do it?

7    A.    Not that I know of.  I've never seen that come back

8  on our reports.

9          MR. HORN:  Okay.  Thank you.  Nothing further, Your

10  Honor.

11          THE COURT:  Anything further on cross from the

12  defense counsel?

13          MS. HIGHAM:  Nothing on behalf of Mr. Garcia.

14          MR. FLEENER:  Nor on behalf of Mr. Renteria.  Thank

15  you, Your Honor.

16          THE COURT:  Mr. Timbers?

17          MR. TIMBERS:  Nothing, Your Honor.  Thank you.

18          MR. MURRAY:  Your Honor, may Officer Hall be

19  excused subject to recall?

20          THE COURT:  Yes.  Thank you.  You're excused,

21  Officer Hall.

22          THE WITNESS:  Thank you, Your Honor.

23       (Witness excused.)

24          MR. FUN:  Your Honor, the United States now calls

25  Brittany Huntington to the stand.  Please come forward and

1    be sworn.

2         (Witness sworn.)

3         THE CLERK:  Please take a seat.  State and spell

4    your name for the record.

5         MR. FLEENER:  Your Honor, may we approach?

6         THE COURT:  Yes.

7         (Following outside the presence of the jury.)

8         MR. FLEENER:  All the witnesses were supposed to be

9    sequestered.  That woman has been in the courtroom for the

10   last three hours.

11        MR. FUN:  Except for experts, Your Honor.

12        MR. FLEENER:  I didn't know she was an expert, Your

13   Honor.

14        THE COURT:  I think she's with the DEA.

15        MR. FUN:  Results are not controlled substances.

16   The results came back --

17        MR. TIMBERS:  Yeah, I understand.

18        MR. FUN:  -- as not controlled substances.

19        MR. TIMBERS:  I understand.  Do you have -- do you

20   have those with you?

21        MR. FUN:  Yeah.

22        MR. TIMBERS:  Thank you.  Does she have them?

23        MR. FUN:  I don't think she has them.

24        THE COURT:  Thank you, Mr. Fleener.

25        (Following in the presence of the jury.)

1          THE COURT:  Excuse the interruption.  I don't

2     believe we had you state and spell your name.

3          THE WITNESS:  My name is Brittany Huntington.

4     First name B-r-i-t-t-a-n-y; last name, H-u-n-t-i-n-g-t-o-n.

5                     BRITTANY HUNTINGTON,

6     having been first duly sworn, was examined and testified as

7     follows:

8                      DIRECT EXAMINATION

9     Q.    (By Mr. Fun)  Ms. Huntington, where are you

10    employed?

11    A.    I'm employed at the Drug Enforcement

12    Administration's western lab in San Francisco, California.

13    Q.    In what capacity are you employed with the DEA lab?

14    A.    I'm employed as a forensic chemist.

15    Q.    And what does a forensic chemist generally do at

16    the DEA lab?

17    A.    My daily responsibilities are the analysis of

18    evidence that's been submitted to our laboratory for the

19    presence or absence of controlled substances.

20    Q.    And how long have you been a forensic chemist?

21    A.    Since June of 2009.

22    Q.    As part of your duties, have you had an occasion to

23    testify in court before?

24    A.    I have.

25    Q.    Do you know how many times?

1    A.    Five times.

2    Q.    And what did you do prior to becoming a forensic

3  chemist with DEA?

4    A.    I received my bachelor's of science in chemistry in

5  2007 and my master's of science in forensic science in 2009.

6    Q.    And why did you decide to become a forensic

7  chemist?

8    A.    I've always wanted to go into the criminal justice

9  system.  And in high school, I found that I enjoyed

10 chemistry, so I went into forensic chemistry.

11   Q.    Now, other than formal education, what other types

12 of things did you do to become a forensic chemist?

13   A.    As part of my undergraduate degree, I completed a

14 six-month intern as an evidence technician at a police

15 department.  And as part of my master's program, I completed

16 an internship as a controlled substance intern at the

17 Sacramento County Crime Lab.

18   Q.    Did you receive any specialized training in

19 analyzing chemicals or substances for the presence of

20 illegal narcotics?

21   A.    Once I started working at the DEA, I had to go

22 through a five-month training program.

23   Q.    And where was this five-month training program at?

24   A.    It was all in-house.

25   Q.    Were you supervised during that training?

1    A.    I was.

2    Q.    What types of substances have you had to test while

3    working at DEA?

4    A.    I have tested pretty much every controlled

5    substance that there is under the sun.

6    Q.    Now, with regards to methamphetamine, how many

7    times have you tested for methamphetamine?

8    A.    I am always looking for any controlled substances

9    that are present.  And out of my 900 exhibits that I've

10   analyzed, approximately 290 have come up positive for

11   methamphetamine.

12   Q.    Are there other forensic chemists in the laboratory

13   you work in?

14   A.    Yes.  I am one of 20.

15   Q.    Do you have to go through any type of proficiency

16   training or certification?

17   A.    Yes.  Before I was allowed to start doing case

18   work, I had to analyze ten proficiency tests which had to

19   come up accurately.  And since then I complete at least two

20   proficiency test samples every year.

21   Q.    Now, when you testified in court, did you testify

22   as a forensic chemist?

23   A.    I did.

24   Q.    Were you qualified as an expert witness in forensic

25   chemistry?

1    A.    I was.

2          MR. FUN:  Your Honor, I move to qualify

3    Ms. Huntington as an expert in chemistry, forensic

4    chemistry, and the testing analysis of methamphetamine.

5          THE COURT:  Hearing no objections, Ms. Huntington

6    is so qualified.

7    Q.    (By Mr. Fun)  Now, Ms. Huntington, just in general,

8    can you tell us about the testing procedures that happen

9    when something arrives in a DEA lab for testing?

10   A.    It definitely varies depending on what the sample

11   looks like.  But usually, once we receive it, we try to

12   create a uniform sample out of the material, and then we

13   take at least two portions and run two different tests on

14   each of those portions.

15   Q.    When you say two different tests, what type of

16   tests do you conduct?

17   A.    We have to do one test that is at least

18   confirmatory.  So, for instance, I'll always run the GC/mass

19   spec, and then the other one just depends on what the sample

20   is.

21   Q.    Ma'am, let me hand you what's been marked for

22   identification as Government's Exhibits 110 and 102.  Can

23   you just please tell us what those exhibits are?

24   A.    Sure.  Exhibit 102 is our DEA self-sealing evidence

25   envelope that has one of the exhibits that I've analyzed in

1    the past.  And then Exhibit 110 is my laboratory report of

2    my findings for said exhibit.

3        Q.    Okay.  With regards to Exhibit 102, is that the

4    substance you tested?

5        A.    Yes, it is.

6        Q.    And is Exhibit 110 the report from your testing?

7        A.    Yes, it is.

8              MR. FUN:  Move to admit 102 and 110, Your Honor.

9              THE COURT:  Hearing no objections, Government's

10   Exhibit 102 and 110 are admitted.

11       (Government's Exhibits 110 and 102 received in

12   evidence.)

13       Q.    (By Mr. Fun)  Okay.  Now, looking at Exhibit 102,

14   you mentioned that it was sealed.

15       A.    Yes, it is sealed.

16       Q.    Who is the one that sealed it?

17       A.    It is sealed across the top by one of our DEA

18   special agents, and then it is sealed on the bottom by

19   myself.

20       Q.    Now, what happens in terms of procedure when you

21   receive this exhibit initially for testing?

22       A.    When I first receive this exhibit, the bottom of

23   the heat seal should still be -- it's factory seal.  And I

24   make sure that the top seal hasn't been tampered with.  And

25   from then, I cut open the bottom leaving the original seal

1    intact and analyze the contents within.

2        Q.    On this particular occasion were the seals intact?

3        A.    Yes, they were.

4        Q.    And when you opened it, did you, in fact, test the

5    substances inside?

6        A.    I did.

7        Q.    What were some of the tests that you initially ran?

8        A.    The tests that I ran -- when I received this

9    exhibit, it was ten separate baggies of crystalline

10   material.  And so I ground all of those individually to try

11   to form those uniform samples, and I ran the GC/mass spec

12   and the GC/FID on all ten samples.

13       Q.    Now, you mentioned that there were ten separate

14   samples that you ground together?

15       A.    I ground them each individually.

16       Q.    And then did you -- what did you do after you

17   ground each one individually?

18       A.    I took a small portion from each one to run on the

19   GC/mass spec and then took another small portion from each

20   one to run on the FID.

21       Q.    And what were the results of your examination?

22       A.    I found that all ten bags contained dimethyl

23   sulfone.

24       Q.    What does that mean?

25       A.    Dimethyl sulfone is something that we commonly see

1    mixed with methamphetamine.  It's referred to as MSM, and

2    it's usually sold as a dietary supplement.

3         Q.    Are you aware of what MSN (sic) is used for other

4    than a dietary supplement?

5         A.    I am not.

6         Q.    Do you know where MSN would be available?

7         A.    I believe you can find it at any nutrition

8    supplement store, such as GNC, that kind of place.

9         Q.    Did you find anything else in that exhibit?

10        A.    I did not.

11        Q.    Okay.  After you conducted your analysis, what did

12   you then do with the substances?

13        A.    After I found that all ten bags were consistent and

14   needed no further testing, I combined them all and put them

15   into a small ziplock back which I heat-sealed back into the

16   self-sealing evidence envelope.

17        Q.    And after that, what happened to it?

18        A.    I returned it to our evidence vault.

19              MR. FUN:  Just a moment, Your Honor.  Thank you,

20   ma'am, I have nothing further.

21              THE WITNESS:  Thank you.

22              MR. FUN:  I'll retrieve those exhibits back from

23   you as well.  And permission to publish to the jury, Your

24   Honor.

25              THE COURT:  Yes.  Permission granted.

```
 1          MR. FUN:  110 and 102.

 2                    CROSS-EXAMINATION

 3     Q.   (By Mr. Horn)  Ms. Huntington, can you tell me --

 4  since I flunked chemistry like Mr. Murray did, can you tell

 5  me what the difference is between gross weight and net

 6  weight on your --

 7     A.   Abs --

 8     Q.   I'm sorry.  -- on your report here that you

 9  provided?

10     A.   Yes.  The gross weight is the weight of the entire

11  package when I check it out of the vault.  So as soon as I

12  get it, while it's still sealed, I weigh it and make sure

13  that it matches the weight that the agent said that it was

14  on the paperwork.

15          And then after that, I weigh just the crystalline

16  material, and that would be the net weight.

17     Q.   So the gross weight would include the packaging on

18  the outside; is that what you're saying?

19     A.   That is correct.

20     Q.   Okay.  So the net weight of the purported drug is

21  10.1 grams?

22     A.   Yes.  That is correct.

23          MR. HORN:  Okay.  Thank you.  That's all I have,

24  Your Honor.

25          THE COURT:  Thank you, Mr. Horn.
```

```
 1              CROSS-EXAMINATION

 2     Q.    (By Mr. Timbers)  Hi, Ms. Huntington.

 3     A.    Good afternoon.

 4     Q.    Good afternoon.  Yes.  You described you had ten

 5 little baggies of suspected methamphetamine; correct?

 6     A.    That is correct.

 7     Q.    And you -- you then deposit those in ten little

 8 piles, I'd assume, and then you tried to make those as

 9 uniform as possible mixing them; correct?

10     A.    Yes, within a mortar and pestle.

11     Q.    A mortar and pestle.  And you were here for the

12 testimony of Dr. Goodby; correct?

13     A.    I was.

14     Q.    Okay.  That procedure sounds fairly uniform.  In

15 other words, the DEA does it the way Wyoming DCI does it;

16 correct?

17     A.    It sounded fairly similar.

18     Q.    Okay.  And the purpose for that is you would want

19 to make sure that that sample was as uniform as possible so

20 you wouldn't be sort of cherry picking from one area of the

21 sample or another; correct?

22     A.    Exactly.

23     Q.    All right.  And not to go over the whole thing

24 again, but could you describe how a GC/mass spec works.

25     A.    Sure.  Once I have the sample that I've weighed out
```

1    that I want to analyze, I put it into a solution which goes

2    into a vial. And then our GC/mass spec will take a small

3    bit of that sample and inject it onto its column.

4        Q.    Okay. Do you do the sodium hydroxide with the

5    hexane to have a bi-layer?

6        A.    I personally use a base called sodium carbonate and

7    one of the different organic solvents.

8        Q.    Okay. Do you use hexane or methylene chloride?

9        A.    Methylene chloride.

10       Q.    Okay. And when you -- so you have the aqueous

11   layer at the bottom, and you have the organic layer on the

12   top?

13       A.    The organic layer actually settles on the bottom in

14   the case of methylene chloride.

15       Q.    That's right. It does. Thank you. Because that

16   is a denser material.

17       A.    Correct.

18       Q.    Very good. I forgot that. So the methylene

19   chloride is on the bottom. How do you extract the methylene

20   chloride into your vials for testing?

21       A.    I just use a pipette that holds about 1 milliliter

22   of volume of fluid. And I pull it out, and then I put it

23   over this powder that dries it out, just to make sure that

24   there's no water going onto our mass specs because that can

25   ruin an instrument.

1    Q.    Right.

2    A.    And after I filter it through that drying powder,

3    it goes on -- into the vial and onto the instrument.

4    Q.    Okay.  Do you use one set of vials for the GC/MS

5    and another set for the GC/FID?

6    A.    No.  They're all the same vials.

7    Q.    In other words -- so after you finish with your

8    mass spec, do you take that same vial and put that vial on

9    your FID?

10   A.    No.  Two different samples, just the same brand of

11   vial.

12   Q.    All right.  And why do you do that?

13   A.    We want to be able to see the controlled substance

14   or lack of controlled substance twice, just for

15   confirmational purposes.

16   Q.    All right.  And -- right.  So it sort of confirms

17   itself.

18   A.    Correct.

19   Q.    When you see consistent results from the FID and

20   the mass spec, you feel confident about your results?

21   A.    That is correct.

22   Q.    Now, I had an opportunity to look at your results.

23   And it looked to me like every single time you tested

24   samples 1 through 10, there was essentially nothing but

25   noise at the bottom of the spectrum.  Do you recall that?

1     A.    That is correct.

2     Q.    And that, in fact -- and you stopped your analysis

3   at that point; correct?

4     A.    Correct.

5     Q.    Why did you stop it at that point?

6     A.    I had run concentrated samples, so I would know

7   that if anything had been present -- you know, even below

8   the 1 percent value or 1 percent range concentration, I

9   would have seen it.  And so after I saw twice that both of

10  them only contained dimethyl sulfone and absolutely nothing

11  else was indicated, I closed it up and turned in my results.

12    Q.    All right.  And how did you concentrate up your

13  sample?  Did you bubble nitrogen in?

14    A.    No.  I just used more material.

15    Q.    Oh, I see.  You used the heavier -- you used more

16  material that you extracted into your organic layer?

17    A.    Correct.

18          MR. TIMBERS:  No further questions.  Thank you.

19          MR. FLEENER:  I have nothing, Your Honor.

20          THE COURT:  Ms. Higham?

21          MS. HIGHAM:  Nothing, Your Honor.  Thank you.

22          THE COURT:  Redirect?

23          MR. FUN:  Yes, ma'am.

24                    REDIRECT EXAMINATION

25    Q.    (By Mr. Fun)  Ms. Huntington, I only have one

1   question for you.  You heard the testimony of Brian Goodby

2   from the DCI crime lab?

3      A.    I did.

4      Q.    Anything wrong with his procedures?

5      A.    Not that I heard.

6            MR. FUN:  Thank you, ma'am.

7            THE COURT:  Thank you.

8            THE WITNESS:  Thank you.

9            THE COURT:  Ms. Huntington, you're excused and

10   released.

11      (Witness excused.)

12            THE COURT:  Do you want to call your next witness?

13            MR. FUN:  I'd like to now call Melissa Morgan to

14   the stand.

15        Ma'am, please come forward.  Prepare to be sworn.

16      (Witness sworn.)

17            THE CLERK:  Please take a seat.  State and spell

18   your name for the record.

19            THE WITNESS:  It's Melissa Dawn Morgan.

20   M-e-l-i-s-s-a D-a-w-n M-o-r-g-a-n.

21                    MELISSA D. MORGAN,

22   having been first duly sworn, was examined and testified as

23   follows:

24                    DIRECT EXAMINATION

25      Q.    (By Mr. Fun)  Ms. Morgan, you can move that

1   microphone closer to you or adjust it so we can hear you

2   clearly.  Okay.  Ms. Morgan, where did you grow up at?

3        A.   In Wyoming.

4        Q.   Are you married?

5        A.   No.

6        Q.   Do you have any kids?

7        A.   No.

8        Q.   What's your current age?

9        A.   23.

10       Q.   Ma'am, have you been convicted of any felony

11  crimes?

12       A.   Yes, I have.

13       Q.   What felonies have you been convicted of?

14       A.   Delivery of cocaine.

15       Q.   Any other crime other than delivery of cocaine?

16       A.   Aiding and abetting and assault and battery.

17       Q.   Were those felony crimes?

18       A.   Yes.

19       Q.   Were those convictions -- did they -- the incidents

20  happen during time periods when you were using drugs?

21       A.   Yes, they did.

22       Q.   Have you been convicted of any crime, whether it be

23  a misdemeanor or felony, involving perjury?

24       A.   No.

25       Q.   False statements?

1    A.    No.

2    Q.    Now, these three felonies you had, what state and

3  county did those convictions occur in?

4    A.    Park County, Wyoming.

5    Q.    All three of them?

6    A.    Yes.

7    Q.    What was the most recent conviction?

8    A.    Delivery of cocaine.

9    Q.    Do you know when that occurred?  Let me rephrase

10  the question.  When were you convicted of that offense?

11    A.    The 7th of last month I made a guilty plea.

12    Q.    7th of September?

13    A.    I think -- yes.

14    Q.    Do you recall when you were convicted of aiding and

15  abetting?

16    A.    I believe it was the same day.

17    Q.    How about the assault and battery?

18    A.    I'm sorry.  The aiding and abetting was dismissed.

19  The assault and battery was the same day as the cocaine

20  charge.

21    Q.    I'm sorry.  Could you say that again, please.

22    A.    The aiding and abetting on the drug charge was

23  dismissed.  The delivery of the cocaine and the aiding and

24  abetting and the assault was the same day.  The conviction

25  was on the same day.

1      Q.      Ma'am, let's talk a little bit about your drug use.

2  Have you used any drugs before?

3      A.      Yes.

4      Q.      What type of drugs have you used?

5      A.      Methamphetamine, cocaine, prescription pills.

6      Q.      Have you used any marijuana?

7      A.      Yes.

8      Q.      Anything other than those four drugs?

9      A.      No.

10     Q.      Have you attended college?

11     A.      Yes.

12     Q.      How long did you attend college?

13     A.      Two-and-a-half years.

14     Q.      What degree were you working towards?

15     A.      A year in business and a year and a half in

16  sociology.

17     Q.      Do you have any plans to return to school?

18     A.      Yes.

19     Q.      Let's talk about your use of prescription pills.

20  When was the first time you used prescription pills?

21     A.      In college.

22     Q.      How about marijuana?

23     A.      High school.

24     Q.      Methamphetamine?

25     A.      I was about 21.

1    Q.    21?

2    A.    20 to 21.  Just before 21, I think.

3    Q.    Cocaine?

4    A.    21, 22.

5    Q.    Was there a drug that you had a preference for?

6    A.    Yes.

7    Q.    Which drug was that?

8    A.    Meth.

9    Q.    How is it that you first came to use

10   methamphetamine?

11   A.    I was at a party and was drinking and it was given

12   to me.

13   Q.    Where was this party at?

14   A.    In Basin, Wyoming.

15   Q.    How old were you at the time?

16   A.    21.  Excuse me.  I think I was still 20.  I wasn't

17   21 yet.

18   Q.    Now, you said the methamphetamine was given to you?

19   A.    Yes.

20   Q.    Tell us about that.

21   A.    I had a lot to drink that night.  And I went to the

22   restroom, was followed in by my boyfriend at the time, and

23   he pulled out a bag and crushed it up on the countertop by

24   the sink and told me if I snorted it, it would make me feel

25   better.

```
1       Q.      Prior to that occasion, had you seen
2   methamphetamine before?
3       A.      No.
4       Q.      Had you used it before?
5       A.      No.
6       Q.      You said your boyfriend followed you into the
7   bathroom?
8       A.      Yes.
9       Q.      Who was your boyfriend at that time?
10      A.      Robert Velasquez.
11      Q.      If you see Robert Velasquez in this courtroom,
12  would you please indicate where and describe what he is
13  wearing.
14      A.      Over there.  Black-and-gray striped shirt.
15              MR. FUN:  Let the record reflect the witness has
16  correctly identified the defendant, Robert Velasquez.
17              THE COURT:  The record will so reflect.
18      Q.      (By Mr. Fun)  Now, you mentioned that he pulled a
19  bag out of his pocket?
20      A.      Yes.
21      Q.      Can you please describe for us what that bag looked
22  like.
23      A.      It was a plastic bag, and it had chunks of a clear
24  crystal-like substance in it.
25      Q.      Could you tell how much was in there?
```

1     A.     Half an ounce to an ounce.

2     Q.     And Rob crushed it up on the counter.  Did you in

3  fact snort it?

4     A.     Yes.

5     Q.     How much of it did you snort?

6     A.     Probably about an inch, inch and a half, lines

7  worth.

8     Q.     Do you know approximately how much in terms of

9  quantity that would have been?

10     A.     I don't know.

11     Q.     Okay.  Did the methamphetamine have any effect on

12  you?

13     A.     Yes.

14     Q.     Tell us about it.

15     A.     That first time it just sobered me up from the

16  alcohol and kept me awake all night.

17     Q.     Other than yourself, did anyone else use that

18  methamphetamine?

19     A.     Robert.

20            THE COURT:  Mr. Fun, if we could take a short

21  break.  Mr. Fun, did you want to take an afternoon break at

22  this time?

23            MR. FUN:  Yes, it might be appropriate to go ahead

24  and take a recess.

25            THE COURT:  All right.  We'll recess until

1   3:00 o'clock.  Members of the jury, please remember the

2   admonition against discussing this case with anyone, against

3   doing any research or independent inquiry into the facts or

4   persons involved in this case, and please keep an open mind

5   until all the evidence is in.

6           We stand in recess until 3:00 o'clock.

7       (Trial proceedings recessed

8       2:41 p.m. to 3:02 p.m.)

9           THE COURT:  Please be seated.  We are back on the

10  record in the jury trial in 10-CR-329.  The court notes the

11  presence of the jury with roll call waived.

12          Ms. Morgan, I would remind you that you remain

13  under oath.

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  Mr. Fun, please proceed.

16          MR. FUN:  Thank you.  Could I please have the court

17  reporter read back my last question and answer.

18      (Requested portion read by the reporter.)

19      Q.   (By Mr. Fun)  Ms. Morgan, how much methamphetamine

20  did Robert use with you in that bathroom?

21      A.   The equivalent that I did, possibly a little more.

22      Q.   On that particular day, did you use any more

23  methamphetamine than that one time?

24      A.   The following morning.

25      Q.   And when you used methamphetamine the following

1    morning, where did it come from?

2        A.    Robert.

3        Q.    Tell us about how that came about.

4        A.    I had to go to work, and I hadn't slept all night,

5    and he asked me if I would like some more.

6        Q.    What was your response?

7        A.    Yes.

8        Q.    And so what happened?

9        A.    So he crushed out another line, and I snorted it.

10       Q.    Other than yourself, did anyone else use

11   methamphetamine with you?

12       A.    Robert.

13       Q.    Do you recall how much methamphetamine you used

14   that second occasion?

15       A.    I would say the same as the first.

16       Q.    How about Robert?

17       A.    Same.

18       Q.    Now, did you know Robert Velasquez by any nickname,

19   or did you call him anything else other than Robert?

20       A.    No.

21       Q.    Let's back up a minute.  You were at this party.

22   Do you recall who else was at this party?

23       A.    Robert's cousin April, Margaret and Danny.

24       Q.    Danny.  Let's talk about Danny.  Did you know who

25   Danny was?

1    A.    That was the first time I had met him.

2    Q.    How is it that you came about meeting Danny?

3    A.    He flew in -- into Cody from Fresno and was at the

4  same house that I was.

5    Q.    Did anyone introduce you to Danny?

6    A.    Yes.

7    Q.    Who?

8    A.    Robert.

9    Q.    How is it that he introduced Danny to you?

10   A.    He told me his name was Danny and he was a friend

11 from Fresno.

12   Q.    Do you recall when this party at April's was?

13   A.    Around March 2009.  2008 or 2009.  I'm sorry.

14   Q.    Excuse me?

15   A.    It was 2008 or 2009.

16   Q.    Okay.  Did you ever learn where Robert got the

17 methamphetamine that you used that night in 2009?

18   A.    Yes.

19   Q.    Where did it come from?

20   A.    Danny.

21   Q.    How do you know that?

22   A.    Robert told me.

23   Q.    When did he tell you?

24   A.    The day after we used it.

25   Q.    Did you ever learn Danny's last name?

1    A.    Yes.

2    Q.    What was his last name?

3    A.    Hernandez.

4    Q.    Now, prior to this party in early 2009 at April's,

5    did you know Robert before that?

6    A.    Yes.

7    Q.    How did you know him?

8    A.    I had met him, I believe, in 2006.

9    Q.    Tell us about meeting him in 2006.

10   A.    I was friends with his younger brother, and I met

11   Robert at his sister's house in Greybull.

12   Q.    How old were you at that time?

13   A.    17.

14   Q.    What was your relationship with Robert at that

15   point in time?

16   A.    We were friends for a while and then started

17   dating.

18   Q.    When did you start dating?

19   A.    About a week after we met.

20   Q.    Now, you began dating Robert during that time

21   frame.  Were you going steady with him?

22   A.    Yes.

23   Q.    Let me now direct your attention to the Christmas

24   of 2008.  Do you recall the events from Christmas of 2008?

25   A.    Yes.

1    Q.    Tell us about them.

2    A.    The morning of that Christmas I received a text

3  message from Robert asking if I would like to do something

4  for New Year's with him.

5    Q.    And what was your response?

6    A.    I told him yes.

7    Q.    And what is it that you ended up doing on New

8  Year's?

9    A.    We had a party at my house.

10    Q.    What else happened?

11    A.    The police showed up.

12    Q.    What happened when the police showed up?

13    A.    Robert went outside and left.

14    Q.    Other than Robert, was there anyone else there that

15  you knew?

16    A.    Yes.

17    Q.    Who?

18    A.    Just some college friends.

19    Q.    Did there come a point in time when you went to Red

20  Lodge, Montana?

21    A.    Yes.

22    Q.    When was that?

23    A.    New Year's Day.

24    Q.    Tell us about what happened on New Year's Day.

25    A.    Myself, Robert and one of my friends drove up to

1   Red Lodge, and there we met up at a motel with Margaret and

2   two of Robert's friends.

3       Q.    How did it come about that you ended up going to

4   Red Lodge, Montana, for New Year's?

5       A.    Robert asked if we wanted to go because he had

6   friends staying up there.

7       Q.    Now, you mentioned that two of Robert's friends

8   showed up.

9       A.    Yes.

10      Q.    Do you know where they were from?

11      A.    Fresno.

12      Q.    Were you introduced to these two friends?

13      A.    Yes.

14      Q.    Who introduced you?

15      A.    Robert.

16      Q.    Tell me about it.

17      A.    He introduced me to his friends Noe and Isasias.

18      Q.    Okay.  Now, after introducing you to Noe and

19  Isasias, did anything happen during the New Year's party?

20      A.    We sat around the motel, and I think we went -- we

21  went out and went to the bowling alley.

22      Q.    At that point in time, were there any drugs

23  involved?

24      A.    No.

25      Q.    At some point in time later did you learn why

1    Robert had gone to Red Lodge?

2       A.     He told me that we were supposed to pick his

3    brother up.

4       Q.     Do you know if that was the real reason?

5       A.     I don't know.  His brother wasn't there when we got

6    there.

7       Q.     Did you spend all of New Year's with Robert in Red

8    Lodge?

9       A.     Yes.

10      Q.     Were there any occasions where he left to go

11   somewhere?

12      A.     Not that I can remember.

13      Q.     Now, you mentioned you were introduced to Isasias

14   and Noe?

15      A.     Yes.

16      Q.     Since that time, or had you seen them before?

17      A.     No.

18      Q.     After that time did you see them?

19      A.     Yes.

20      Q.     How many times approximately?

21      A.     At least seven or eight.

22      Q.     If you saw Isasias again, would you be able to

23   recognize him?

24      A.     Yes.

25      Q.     Would you please take a look around the courtroom.

1    And if you see him, please indicate where he is and what

2    he's wearing.

3        A.    Right over here in a green shirt and tie.

4              MR. FUN:  Let the record reflect that the witness

5    has correctly identified Miguel Angel Ordaz, also known as

6    Isasias.

7              THE COURT:  The record will so reflect.

8        Q.    (By Mr. Fun)  Now, you mentioned Noe.  How about

9    him?  If you saw him, would you recognize him?

10       A.    Yes.

11       Q.    If he's in this courtroom today, please point him

12   out and indicate where he's at and what he's wearing.

13       A.    Right over here, light blue shirt, tie.

14             MR. FUN:  Let the record reflect that the witness

15   has correctly identified William Esquivel -- excuse me,

16   Daniel George Renteria, also known as William Esquivel, also

17   known as Noe.

18             THE COURT:  The record will so reflect.

19       Q.    (By Mr. Fun)  Now, after this New Year's party in

20   January of 2009 -- is that when April's party occurred, was

21   after the January of '09 party?

22       A.    Yes.

23       Q.    And after April's party, you used methamphetamine

24   again?

25       A.    Yes.

1    Q.    That was before going to work?

2    A.    Yes.

3    Q.    Where were you working at that time?

4    A.    The Wyoming Retirement Center.

5    Q.    And in what capacity were you working?

6    A.    Can you repeat that?  Sorry.

7    Q.    Yes.  What was your job there?

8    A.    I was a CNA.

9    Q.    After that time, did you begin using

10   methamphetamine on a regular basis?

11   A.    Yes.

12   Q.    How often were you using methamphetamine?

13   A.    For about a month once a week.  After that, every

14   day.

15   Q.    In what quantities were you using the

16   methamphetamine?  How much would you use each time?

17   A.    At least three lines a day.

18   Q.    Where were you getting the methamphetamine you were

19   using?

20   A.    Robert.

21   Q.    Did you have to pay anything for it?

22   A.    No.

23   Q.    How is it that -- how is it that you got it from

24   him then?

25   A.    He just gave it to me.

1    Q.    Did you have to ask for it?

2    A.    No.

3    Q.    Was he also using methamphetamine with you?

4    A.    Yes.

5    Q.    You mentioned you were working at the Wyoming

6    Retirement Center?

7    A.    Yes.

8    Q.    How long did you work there?

9    A.    Eight to nine months.

10   Q.    How long after you began using methamphetamine did

11   you continue to work at the Wyoming Retirement Center?

12   A.    After I stopped working there?

13   Q.    Let me rephrase the question.  When you began using

14   methamphetamine, you were still working at the Wyoming

15   Retirement Center?

16   A.    Yes.

17   Q.    How long did you continue to work there?

18   A.    For the eight months.

19   Q.    Do you know whether or not Robert Velasquez --

20         MR. FLEENER:  I apologize.  Could I have the

21   witness repeat the answer -- I sneezed -- regarding how many

22   months.

23         MR. FUN:  The court reporter can read it back as

24   well.

25         THE COURT:  I would ask the court reporter to read

1    her response.

2           MR. FLEENER:  Thank you, Your Honor.

3        (Requested portion read by the reporter.)

4           MR. FLEENER:  Thank you.  Thank you, Mr. Fun.

5     Q.    (By Mr. Fun)  Do you know whether or not Robert

6    Velasquez had a job?

7     A.    To my knowledge, no.

8     Q.    Now, at the time that -- in early 2009 and when you

9    were at April's party, where were you living at?

10    A.    I was living with my parents.

11    Q.    Did you at some point in time move?

12          MR. HORN:  Your Honor, excuse me.  I'm having a

13   real hard time hearing her.  Could I ask you to move the

14   microphone closer to you, please.

15          THE COURT:  You may have to sit forward too.  Thank

16   you.

17          MR. FUN:  And the mike is movable, so you can slide

18   it forward, if that helps.

19    Q.    (By Mr. Fun)  At some point in time did you move?

20    A.    Yes.

21    Q.    Where is it that you first moved to?

22    A.    I moved to a house just outside of Basin.

23    Q.    And at the Basin house, who lived with you?

24    A.    Robert and his brother Johnny.

25    Q.    While you were living at the house in Basin with

1   Robert and his brother Johnny, were you still using

2   methamphetamine?

3      A.    Yes.

4      Q.    Were you still getting methamphetamine from Robert

5   then?

6      A.    Yes.

7      Q.    Was he also still using?

8      A.    Yes.

9      Q.    How about his brother Johnny?

10     A.    Not that I know of.

11     Q.    While you were at the house in Basin, do you recall

12  receiving any packages?

13     A.    Yes.

14     Q.    Tell me about that.

15     A.    They would come in small boxes.  Inside was a

16  candle, and inside the candle was an ounce of

17  methamphetamine.

18     Q.    Okay.  Now, you said that these small boxes would

19  come.  Can you describe how big these boxes were by

20  dimensions?

21     A.    Probably 10 inches to a foot around.

22     Q.    Were they square boxes?

23     A.    Yes.

24     Q.    And you mentioned that inside these boxes were --

25  was a candle?

1     A.     Yes.

2     Q.     Just one candle?

3     A.     One large candle.

4     Q.     And tell me -- describe for me the size of this

5     candle.

6     A.     Big enough to fill the box.  Probably 8 to

7     10 inches high and --

8     Q.     You can use your hands as well, if that helps.

9     A.     (Indicating.)

10     Q.     Let the record reflect the witness is describing --

11     displayed with her hands approximately 12 inches tall and

12     approximately 10 to 12 inches in diameter.

13            THE COURT:  The record will so reflect.

14     Q.     (By Mr. Fun)  And you mentioned that inside these

15     candles was methamphetamine?

16     A.     Yes.

17     Q.     Do you know how much methamphetamine was inside

18     each of these candles?

19     A.     1 ounce.

20     Q.     How do you know that?

21     A.     Robert told me.

22     Q.     How do you know it was methamphetamine?

23     A.     I was using it.

24     Q.     Did you use the whole 1 ounce of methamphetamine

25     that was coming in the candle?

```
 1      A.    No.

 2      Q.    How much of that 1 ounce would you use; do you

 3   know?

 4      A.    I don't.

 5      Q.    Were these packages being sent to you or someone

 6   else?

 7      A.    Someone else.

 8      Q.    Who?  Who was receiving these packages?

 9      A.    Robert.

10      Q.    Who was opening the packages up?

11      A.    Robert.

12      Q.    And after they were open, was Robert also providing

13   you the methamphetamine?

14      A.    Yes.

15      Q.    Did he provide you any methamphetamine from these

16   candles to sell?

17      A.    No.

18      Q.    Do you know where these packages were being sent

19   from?

20      A.    Yes.

21      Q.    Where?

22      A.    Fresno.

23      Q.    How do you know that?

24      A.    Robert told me.

25      Q.    What specifically did he tell you about who was
```

1    sending these packages from Fresno?

2        A.    He just told me that he had friends there that were

3    packaging them up and sending them.

4        Q.    Did he say what friends were sending it?

5        A.    I believe it was Danny.

6        Q.    Anyone else other than Danny?

7        A.    Hondo.

8        Q.    At that point in time did you know who Danny was?

9    Had you seen him before?

10       A.    Yes.

11       Q.    How about Hondo?

12       A.    No.

13       Q.    Did you later actually meet a person named Hondo?

14       A.    Yes.

15       Q.    Do you recall whether or not Robert said if anyone

16   else was sending these packages other than Danny and Hondo?

17       A.    No.

18       Q.    Let's talk about the candle for a moment.  How was

19   this -- the methamphetamine inside the candle?

20       A.    It -- the candle was dug out from the bottom.  The

21   drugs were put inside of it, and the wax was melted over the

22   bottom.

23       Q.    Can you please keep your voice up or move the mike

24   a little bit closer.

25       A.    Okay.

```
 1      Q.    Now, was the methamphetamine wrapped in anything
 2   inside of the candle?
 3      A.    It was in a plastic bag, and I believe there may
 4   have been like saran wrap around it.
 5      Q.    And when this methamphetamine was removed from the
 6   candle, can you describe what it looked like?
 7      A.    Most of it was in large -- I don't know, dime-size
 8   and smaller.  Clear like crystal rocks.
 9      Q.    Had you seen substances like that before?
10      A.    Yes.
11      Q.    Where?
12      A.    With Robert.
13      Q.    Immediately after the methamphetamine was removed
14   from the candle, was -- did you use any of it?
15      A.    Yes.
16      Q.    How did it make you feel?
17      A.    Jittery, wide awake, high.
18      Q.    Could you tell it was methamphetamine?
19      A.    Yes.
20      Q.    After it was removed from the candle, what happened
21   to it?
22      A.    Robert used MSM to -- used half MSM and half of the
23   methamphetamine and put it into gram-size bags.
24      Q.    Do you know what MSN (sic) is?
25      A.    MSM.  It's something to do with horses.  I don't
```

1    really know.

2       Q.    Do you know whether or not MSN is a controlled

3    substance or a drug?

4       A.    I don't believe it is.

5       Q.    Now, you mentioned that Robert would mix it --

6       A.    Yes.

7       Q.    -- MSN with the methamphetamine?

8       A.    Yes.

9       Q.    How much MSN -- would he mix all the drugs with

10   MSN?

11      A.    He would leave some of the methamphetamine pure.

12   He wouldn't mix some of it.

13      Q.    Approximately how much of it would he leave in the

14   pure form?

15      A.    A couple grams for personal use.

16      Q.    Okay.  So out of this ounce, a couple grams were

17   kept for use?

18      A.    Yes.

19      Q.    Had you used some of that pure methamphetamine?

20      A.    Yes.

21      Q.    Now, I assume the rest of it was then mixed with

22   this MSN.

23      A.    Yes.

24      Q.    And in what proportions was it mixed?

25      A.    Half and half.

1    Q.    So in total, how much of a mixture of

2    methamphetamine and MSN did Robert end up with?

3    A.    An ounce would make 2 ounces.

4    Q.    And then what happened?  What did Robert do with

5    this 2 ounces of a mixture of MSN and methamphetamine?

6    A.    He would put them into small plastic baggies, weigh

7    it out by the gram and distribute seven at a time to people

8    he knew to sell.

9    Q.    Did you help Robert in this process of mixing the

10   methamphetamine with MSM?

11   A.    No.

12   Q.    I think before I was calling it MSN, but it's

13   really MSM.  Is that correct?

14   A.    Yes.

15   Q.    That's my mistake.  How about when he packaged this

16   2 ounces into 1-gram bundles.  Did you help him with that?

17   A.    A couple times.

18   Q.    Now, you mentioned he would distribute these

19   bundles of methamphetamine that was mixed with MSM seven at

20   a time?

21   A.    Yes.

22   Q.    Did Robert have a process of why he was

23   distributing it out seven at a time?

24   A.    Yes.

25   Q.    What was that process?

1    A.    He would give one person the seven; six to sell and

2    one for themselves.

3    Q.    Approximately how many people was Robert providing

4    this seven bundles of methamphetamine to sell?

5    A.    Three or four that I can think of.

6    Q.    Were you with him at times when he distributed

7    these seven bundles to people?

8    A.    Yes.

9    Q.    Do you recall whether or not, when Robert

10   distributed the seven bundles, he'd receive any money at

11   that time?

12   A.    He would usually just drop it off and let them

13   collect money, sell it, and then he would go back and get

14   the money.

15   Q.    So he wouldn't get paid for it at the time he

16   provided the methamphetamine?

17   A.    Rarely.

18   Q.    Is there a term for that that was used?

19   A.    They called it a front.

20   Q.    Now, you mentioned that later on the money would be

21   picked up?

22   A.    Yes.

23   Q.    Did Robert pick up that money?

24   A.    Yes.

25   Q.    How do you know that?

1    A.    I was with him.

2    Q.    Did you take him there?

3    A.    Yes.

4    Q.    How much time passed between the time that the

5    methamphetamine was delivered to someone for distribution

6    and you returned to pick up the money?

7    A.    Anywhere from a couple days to a week.

8    Q.    How long did you live in that house in Basin with

9    Rob and his brother Johnny?

10   A.    I believe until that December.

11   Q.    December of what year?

12   A.    2009.

13   Q.    And what happened after December of 2009?

14   A.    We -- excuse me.  I believe it was 2008.

15   Q.    Okay.  What happened after 2008?

16   A.    We moved to Cody.

17   Q.    Where in Cody did you move to?

18   A.    To a small house with a shop on the Meeteetse

19   Highway.

20   Q.    If you saw a picture of that house, would you be

21   able to recognize it?

22   A.    Yes.

23   Q.    I will display for you what has been admitted as

24   Government's Exhibit 523.  And it will show up on the screen

25   right below your left knee there.

161 of 220

```
1              Do you recognize that house?

2    A.    Yes.

3    Q.    What house is that?

4    A.    That's the house with the shop on the Meeteetse

5    Highway.

6    Q.    Now, when you moved there, who lived with you?

7    A.    Just Robert and myself.

8    Q.    While you were living there, do you recall any

9    packages being sent there?

10   A.    Yes.

11   Q.    Same type of packages as in the Basin house?

12   A.    Yes.

13   Q.    What was inside of those packages?

14   A.    Methamphetamine.

15   Q.    Now, at the Basin house -- do you remember how many

16   packages were received at the Basin house?

17   A.    At least six.

18   Q.    How about at the house outside of Cody?

19   A.    At least four.

20   Q.    Now, how do you know that?

21   A.    I was there.

22   Q.    Now, do you recall how long you lived at that house

23   outside of Cody?

24   A.    About two months.

25   Q.    And where did you move to after that?
```

```
 1      A.    A house in the town of Cody.

 2      Q.    If you saw that house, would you be able to

 3   recognize it?

 4      A.    Yes.

 5      Q.    Let me display for you what has been previously

 6   admitted as Government's Exhibit 525.

 7            Do you recognize that photograph?

 8      A.    Yes.

 9      Q.    What is it?

10      A.    That is the house we moved into in town in Cody.

11      Q.    Now, did you receive any packages at the house in

12   Cody?

13      A.    Not that I can remember.

14      Q.    How long did you live at the house that was in

15   Cody?

16      A.    Two months.

17      Q.    Excuse me.  How long?

18      A.    About two months.

19      Q.    And what happened after that?

20      A.    Robert and I were arrested.

21      Q.    Were you arrested in connection with the felony

22   conviction for distribution of cocaine?

23      A.    No.

24      Q.    For what -- excuse me.  For what were you arrested

25   for?
```

1        A.       Aggravated assault and battery.

2               MR. FUN:  Your Honor, at this point in time, it

3        might be appropriate to give a Davis instruction.

4               THE COURT:  I'd like to see counsel at the sidebar.

5          (Following out of the presence of the jury.)

6               MR. FUN:  Your Honor, the witness has testified

7        concerning her convictions for, basically, the drugs and

8        assault and battery.  And the Davis -- we need to give an

9        instruction to the jury concerning -- that these

10       defendants -- although this defendant, as a coconspirator,

11       has been convicted, it doesn't mean these defendants are

12       necessarily also guilty of the same crimes.

13              MR. MURRAY:  Your Honor, we have a Davis

14       instruction that I asked our paralegal to go get.  I do know

15       that she testified to being convicted of a drug offense

16       which we understand to be associated with Robert Velasquez

17       and the aggravated assault.

18              And as Mr. Fun stated, the Davis instruction, in

19       the Tenth Circuit decision, said that it should be given

20       timely, at the time the witness is on the stand testifying,

21       that identifies that the jury has heard this witness admit

22       to being convicted of a drug offense and ag assault offense.

23       That no inference can be taken to the guilt or innocence --

24       or the guilt of the defendants on trial.

25              It's allowed for a limited purpose, which is to

1    bring forward the fact that she has been convicted.

2           MR. FUN:  Convicted.

3           MR. MURRAY:  And also her acceptance of

4    responsibility for that offense and nothing more.

5           MR. TIMBERS:  Is it for the assault only or is it

6    for the assault and the cocaine distribution?

7           MR. FUN:  Everything.  All the crimes that she's

8    been convicted of that are related.

9           MR. TIMBERS:  Are not to be inferred -- are not to

10   be --

11          MR. FUN:  Against the defendants.

12          MR. MURRAY:  It's a cautionary instruction so that

13   they're not tainted by her testimony.

14          MR. TIMBERS:  I appreciate that.  Do you --

15          MR. FLEENER:  I have nothing.  I mean, I don't --

16   if the instruction is appropriate, it's appropriate.  I

17   mean . . .

18          THE COURT:  Thank you.

19          MR. TIMBERS:  I agree.

20          THE COURT:  Mr. Horn?

21          MR. HORN:  My only question is, Judge, since your

22   paralegal is getting it, do you want to wait a minute, or do

23   you want to kind of ad lib it?

24          THE COURT:  I'll look at my trial instructions and

25   see if I see something suitable.

1     MR. HORN:  Okay.

2     THE COURT:  If I do, I'll use that.  If not, I'll

3   wait for your paralegal to return.

4     MR. FUN:  Thank you, Your Honor.

5     (Following held in the presence of the jury.)

6     THE COURT:  Members of the jury, you have heard

7   evidence that Melissa Morgan, who is on the stand now,

8   pleaded guilty to charges arising from certain events.  One

9   charge was a -- relating -- related to distribution of

10   cocaine, and another charge was related to aggravated

11   assault.

12     You must not consider Ms. Morgan's guilty plea as

13   any evidence of any of the defendants' guilt in this matter,

14   whether it's Mr. Velasquez, Mr. Ordaz, Mr. Renteria, or

15   Mr. Garcia.

16     Ms. Morgan's decision to plead guilty was a

17   personal decision about her own guilt.  You should disregard

18   Ms. Morgan's guilty plea completely when considering any of

19   the defendants' guilt or innocence.  Instead, you may

20   consider Ms. Morgan's guilty plea only for the purpose of

21   determining how much weight, if at all, to rely upon her

22   testimony or explaining the witness's firsthand knowledge of

23   the events.

24     As with all witnesses, you should give Ms. Morgan's

25   testimony the weight you believe it deserves, keeping in

1   mind that it must be considered with caution and great care.

2            MR. FUN:  Thank you, Your Honor.

3            THE COURT:  Thank you.

4       Q.   (By Mr. Fun)  Ms. Morgan, I need to digress briefly

5   and talk a little bit more about your convictions.  You

6   mentioned you were prosecuted in Park County.

7       A.   Yes.

8       Q.   Did you plead guilty pursuant to a plea agreement?

9       A.   Yes.

10      Q.   Did that plea agreement require anything of you?

11      A.   My cooperation with the court.

12      Q.   What type of cooperation did it require of you?

13      A.   To testify truthfully about the knowledge of -- I

14  have of the events.

15      Q.   Do you know whether or not you will be charged

16  federally for anything?

17      A.   With my cooperation, no.

18      Q.   What was the exact nature of the plea agreement

19  between you and the Park County prosecutor?

20      A.   I will be going to Wyoming State Women's Prison in

21  Lusk for 8 to 10 years.

22      Q.   Have you begun serving your sentence?

23      A.   Not yet.

24      Q.   Do you know when you will begin serving your

25  sentence?

1       A.      I don't believe there's a date set.

2       Q.      Have you been promised or told that your testimony

3   here today will change your sentence of the 8 to 10 years?

4       A.      No.

5       Q.      And you understand that as you testify today, you

6   are subject to the penalties of perjury?

7       A.      Yes.

8       Q.      Are you being paid anything for your testimony?

9       A.      No.

10      Q.      Have you been granted any type of immunity for your

11  testimony?

12      A.      Water and tissue.

13      Q.      Okay.  But no immunity?

14      A.      No.

15      Q.      Ma'am, let me just turn back a little bit.  You

16  talked about Rob had this deal where he would provide 7

17  grams of methamphetamine to someone to sell.

18      A.      Yes.

19      Q.      Do you recall that?  Do you recall how much Rob was

20  charging for the gram of methamphetamine?

21      A.      150 for each gram.  The six only.

22      Q.      Did it make a difference if it was the -- the

23  mixture of MSM and methamphetamine or the pure

24  methamphetamine?

25      A.      Yes.

1    Q.    What was the difference in price?

2    A.    The price was doubled if it was pure.

3    Q.    That would be $300 then?

4    A.    Yes.

5    Q.    For what quantity?

6    A.    Gram.

7    Q.    Now, we talked about these packages had been sent

8    to the Basin house and the house outside of Cody.

9          Do you recall how these packages were being sent

10   there?

11   A.    FedEx and UPS.

12   Q.    When you say UPS, do you mean the United States

13   Postal Service or the UPS delivery?

14   A.    Delivery.

15   Q.    Were there any occasions when more than one package

16   was received at any of these locations?

17   A.    Yes.

18   Q.    How many times was there more than one package?

19   A.    One time at the house in Basin and one time at the

20   house in Cody.

21   Q.    And on those occasions, how many packages were

22   received?

23   A.    Two.

24   Q.    At the Basin house?

25   A.    Yes.

1    Q.    And the Cody house?

2    A.    The one outside of town in Cody.

3    Q.    Now, did Robert follow the same procedures each

4  time a package was received?

5    A.    Yes.

6    Q.    He would open it up?

7    A.    Yes.

8    Q.    Would he mix it with MSM?

9    A.    Yes.

10   Q.    Maintain some in the pure form?

11   A.    Yes.

12   Q.    And then redistribute it to others?

13   A.    Yes.

14   Q.    Then go back and collect money later?

15   A.    Yes.

16   Q.    Ms. Morgan, you indicated that Robert did not work.

17   A.    That's correct.

18   Q.    How -- who paid the rent on the house in Basin?

19   A.    He did.

20   Q.    How about the utilities?

21   A.    He did.

22   Q.    Phone bill?

23   A.    He did.

24   Q.    How about the house outside of Cody?

25   A.    Robert.

1    Q.    How about the house in Cody?

2    A.    Robert.

3    Q.    Now, after these packages were opened, what

4    happened to them?  What happened to the boxes?

5    A.    They were burned in a fire.

6    Q.    What about the actual candle?

7    A.    Burned.

8    Q.    Who burned them?

9    A.    Robert.

10    Q.    How soon after the packages were opened were they

11    burned?

12    A.    Immediately.

13    Q.    Why?

14    A.    To get rid of the evidence.

15    Q.    Now, other than the houses, were there any vehicles

16    that you drove?

17    A.    Yes.

18    Q.    How about Robert?

19    A.    I drove the vehicles.  He didn't have a license.

20    Q.    How many vehicles did you have that you were

21    driving?

22    A.    Up to three at one point.

23    Q.    Do you recall what vehicles they were?

24    A.    Yes.

25    Q.    Please tell us what vehicles they were.

1    A.    A Pontiac Grand Am, a Pontiac Grand Prix, and a

2    Ford Taurus.

3    Q.    What color was the Pontiac Grand Am?

4    A.    It was originally white and then was painted pink

5    and black.

6    Q.    How about the Pontiac Grand Prix?

7    A.    It was silver.

8    Q.    If you saw a photograph --

9    A.    Yeah.

10   Q.    -- would it help refresh your memory?

11   A.    Yes.

12   Q.    I'm going to show you what has been previously

13   admitted as Government's Exhibit 1502.  Do you see any of

14   those three vehicles in that photograph?

15   A.    Yes.

16   Q.    Which one?

17         MR. FUN:  Let the record reflect the witness has

18   placed a white dot on the right side of the photograph on a

19   vehicle that is facing to the right of the photograph.

20   Q.    (By Mr. Fun)  Now, ma'am, which vehicle -- which

21   Pontiac vehicle is that?

22   A.    The Grand Prix.

23   Q.    Now, do you know who is sitting in the Grand Prix

24   there?

25   A.    Yes.

1    Q.    Who?

2    A.    Myself and Robert.

3    Q.    Where are you seated?

4    A.    On the driver's side.

5    Q.    And where is Robert seated?

6    A.    In the passenger seat.

7    Q.    You mentioned a third vehicle which was a Ford

8    Taurus?

9    A.    Yes.

10   Q.    What color was that vehicle?

11   A.    Green.

12   Q.    In whose names were these vehicles registered?

13   A.    Mine.

14   Q.    Who paid for these three vehicles?

15   A.    Myself and my mom paid for the Taurus and the Grand

16   Am, and Robert paid for the Grand Prix.

17   Q.    Let's focus in on the Grand Prix.  What do you mean

18   that Robert paid for it?

19   A.    He traded it for drugs.

20   Q.    What drugs did he trade this Grand Prix for?

21   A.    Methamphetamine.

22   Q.    Do you know how much methamphetamine?

23   A.    An ounce.

24   Q.    Do you know when?

25   A.    I don't remember the exact date.

1    Q.    Do you recall when you got this Grand Prix?  If you

2    don't recall, that's fine.

3    A.    I don't know.

4    Q.    If you saw official title records, would that help

5    you recall when this Grand Prix was purchased?

6    A.    Yes.

7    Q.    Let me hand you what's been marked for

8    identification as Government's Exhibit 1200.  Now, if you

9    could please just take a look at all three pages of that

10   document.

11         Do you recognize that document?

12   A.    Yes.

13   Q.    What is it?

14   A.    It's a title certificate for the car.

15   Q.    And in whose name is that title?

16   A.    Mine.

17   Q.    Does your signature appear anywhere on that

18   document?

19   A.    Yes.

20   Q.    Where?

21   A.    On the last page.

22   Q.    Let me retrieve that document back from you.

23         MR. FUN:  Move to admit Exhibit 1200.

24         THE COURT:  Hearing no objections, Government

25   Exhibit 1200 is admitted.

1        (Government's Exhibit 1200 received in evidence.)

2    Q.    (By Mr. Fun)  Ma'am, I'm going to display this on

3  the overhead for you.  Is there a purchase date on that

4  title?

5    A.    Yes.

6    Q.    Does it tell you when this vehicle was purchased by

7  Rob?

8    A.    Yes.

9    Q.    When?

10   A.    November 6th, 2009.

11   Q.    Now, the title is in your name?

12   A.    Yes.

13   Q.    Do you know why the title is in your name?

14   A.    Robert told me because he doesn't have a license

15  and that he got the car for me.

16   Q.    Did he tell you if there was any other reason why

17  he wanted the title in your name?

18   A.    No.

19   Q.    Did there come a point in time when this vehicle

20  was sold?

21   A.    Yes.

22   Q.    Who sold it?

23   A.    Robert.

24   Q.    He sold your vehicle?

25   A.    Yes.

1    Q.    Who did he sell it to?

2    A.    Candice Kysar.

3    Q.    I'm going to page 3 of Exhibit 1200.  Do the

4    markings on that page show a transfer of title to Candice

5    Kysar?

6    A.    Yes.

7    Q.    Do you know when this vehicle was sold to Candice

8    Kysar?

9    A.    Yes.

10   Q.    When?

11   A.    January 26th, 2010.

12   Q.    Do you know how much it was sold for?

13   A.    It was to repay a drug debt.

14   Q.    Did you end up signing -- other than title, did you

15   sign any other documents relating to the sale of this Grand

16   Prix?

17   A.    I don't believe so.

18   Q.    Let me show you Exhibit 1201.  See if you recognize

19   this document.

20   A.    Yes.

21   Q.    And what is it?

22   A.    It is a copy of me signing the Grand Prix over to

23   Candice.

24   Q.    Candy.  Who is Candy?

25   A.    Candice was Noe's girlfriend at that time.

1    Q.    Let me retrieve that document back from you.

2  Ma'am, also on the second page is just a receipt from Park

3  County as well?

4    A.    Yes.

5         MR. FUN:  Move to admit 1201, Your Honor.

6         THE COURT:  Hearing no objections, Government

7  Exhibit 1201 is admitted.

8       (Government's Exhibit 1201 received in evidence.)

9    Q.    (By Mr. Fun)  Displaying 1201.  Ma'am, that receipt

10  indicates that it was sold for $100.  Is that a correct

11  statement?

12    A.    No.

13    Q.    And I believe you indicated it was for a drug debt.

14    A.    Yes.

15    Q.    Do you know how much of a drug debt?

16    A.    I don't know.

17    Q.    Did you ever get $100 from the sale of your car?

18    A.    No.

19    Q.    Let's now turn to a different topic.  Ma'am, who

20  was the drug debt owed to?

21    A.    Noe.

22    Q.    The same Noe that is in the courtroom today?

23    A.    Yes.

24    Q.    That you've previously pointed out?

25    A.    Yes.

1      Q.      How do you know that that was a drug debt owed to

2  Noe?

3      A.      Robert told me.

4      Q.      Ma'am, let me now turn to a different topic.  When

5  you were with Robert Velasquez, did you ever have an

6  occasion to leave the state of Wyoming?

7      A.      Yes.

8      Q.      Do you know if Robert left the state of Wyoming?

9      A.      Yes.

10      Q.      Which came first, him leaving or you leaving?

11      A.      Him.

12      Q.      Do you know why he left Wyoming?

13      A.      To go pick up drugs.

14      Q.      Do you know where he went to go pick up drugs?

15      A.      Fresno, California.

16      Q.      Do you remember when that was?  Do you recall where

17  you were living at the time?

18      A.      We were living in Basin.

19      Q.      How do you know that Robert went to Fresno to get

20  drugs?

21      A.      He told me.

22      Q.      Before or after the trip?

23      A.      Before.

24      Q.      Was there a reason why Robert had to go to Fresno

25  as opposed to having the packages sent?

```
 1     A.    I don't know.

 2     Q.    At the point in time when Robert went to Fresno,

 3 did you have any methamphetamine to use?

 4     A.    I believe I had a small amount.

 5     Q.    And who provided you with that methamphetamine?

 6     A.    Robert.

 7     Q.    Before he left, did he give you any methamphetamine

 8 to sell?

 9     A.    No.

10     Q.    Did he instruct you before he left to pick up money

11 while he was gone?

12     A.    I don't recall.

13     Q.    How did Robert go to Fresno on that particular

14 occasion?

15     A.    Airplane.

16     Q.    While he was in Fresno, did you have any contact

17 with him?

18     A.    Yes.

19     Q.    Tell us about that.

20     A.    He asked me to send him some money.

21     Q.    Do you recall how much money you sent him?

22     A.    I don't know the exact amount.

23     Q.    How did you send the money to him?

24     A.    I wired it to him.

25     Q.    When you say you wired, what do you mean you wired
```

1    it to him?

2        A.    It was either MoneyGram or Western Union.

3        Q.    Okay.  So did you go somewhere to use Western Union

4    or MoneyGram?

5        A.    Yes.

6        Q.    Where would you typically go?

7        A.    Wal-Mart or there was another place in Cody across

8    from Wal-Mart.

9        Q.    Now, why were you sending him money in Fresno?

10       A.    He just asked me to send it.  He said he needed it.

11       Q.    Did he tell you why he needed it?

12       A.    To buy drugs.

13       Q.    How do you know that?

14       A.    He told me.

15       Q.    Did he tell you how much drugs he was buying in

16   Fresno?

17       A.    An ounce.

18       Q.    Did there come a point in time when Robert returned

19   to Fresno?

20       A.    Yes.

21       Q.    How did he get back to Wyoming?

22       A.    Plane.

23       Q.    Do you know whether or not he had brought any drugs

24   back with him from Fresno?

25       A.    Yes.

```
1       Q.      How do you know that?

2       A.      He told me, and I was there when he pulled it out.

3       Q.      Where did he pull it out from?  Was it a body

4    cavity?

5       A.      Yes.

6       Q.      How much methamphetamine did he bring back?  Let me

7    rephrase that question.  Do you know how much

8    methamphetamine he pulled out from his body cavity?

9       A.      An ounce.

10      Q.      And what happened with that one once of

11   methamphetamine that was brought back from Fresno?

12      A.      He kept out some of it pure for personal use and

13   split the rest with the MSM to sell.

14      Q.      So the same process as with the candles?

15      A.      Yes.

16      Q.      Did he ever tell you from whom he received this

17   methamphetamine in Fresno?

18      A.      I don't recall.

19      Q.      Was there another occasion when Robert went to

20   Fresno?

21      A.      Yes.

22      Q.      Now, the first time he went, do you know if anyone

23   went with him?

24      A.      He went by himself.

25      Q.      The second time he went, who went with him?
```

```
 1     A.    Myself and his two brothers.

 2     Q.    Which two brothers?

 3     A.    Johnny and Richard Velasquez.

 4     Q.    How did you get -- how did you get to Fresno?

 5     A.    We drove.

 6     Q.    Do you remember when that was or where you were

 7  living at the time?

 8     A.    I believe it was in August or September of 2009.

 9     Q.    Now, you said you, Robert, Johnny, and Richard

10  drove to Fresno?

11     A.    Yes.

12     Q.    Whose vehicle did you drive in?

13     A.    Isasias'.

14     Q.    The same Isasias that you identified in court

15  earlier?

16     A.    Yes.

17     Q.    How do you know it was his vehicle?

18     A.    We picked it up in Sheridan before we left for our

19  trip.

20     Q.    What type of vehicle was it?

21     A.    I believe it was an Explorer.

22     Q.    Do you remember the make -- the company that made

23  the vehicle?

24     A.    I don't remember.

25     Q.    Do you recall if it was an SUV or a passenger
```

1   vehicle?  Do you recall if it was a Ford Explorer?

2        A.    Yes.

3        Q.    Do you recall the color?

4              MR. FLEENER:  Objection.  He's leading the witness.

5        A.    Blue.

6              MR. FUN:  I just asked her if she recalled if that

7   was the vehicle.

8              MR. FLEENER:  The witness couldn't recall what the

9   car was, and then Mr. Fun said:  Do you recall whether it

10  was a Ford Explorer?

11             He led the witness to that answer, Judge.

12       Q.    (By Mr. Fun)  If you saw the vehicle, would you

13  recognize it?

14       A.    Yes.

15             THE COURT:  I'll sustain the objection.

16       Q.    (By Mr. Fun)  Ma'am, let me show you what I've

17  marked for identification as Government Exhibit 517.  Do you

18  recognize that --

19       A.    Yes.

20       Q.    -- photograph?

21       A.    Yes.

22       Q.    What is it a picture of?

23       A.    Isasias's Explorer.

24       Q.    Thank you.  I'm going to retrieve that back.

25             MR. FUN:  Move to admit 517, Your Honor.

1          THE COURT:  Hearing no objections, Exhibit 517 is

2    admitted.

3      (Government's Exhibit 517 received in evidence.)

4      Q.    (By Mr. Fun)  Ma'am, what color was that vehicle?

5      A.    Blue.

6      Q.    Do you know why you, Robert, Johnny, and Richard

7    were going to Fresno?

8      A.    Yes.

9      Q.    Why?

10     A.    I was told we were going to a family reunion.

11     Q.    Now, before you departed on this trip, did you have

12   any methamphetamine to use?

13     A.    Yes.

14     Q.    How much?

15     A.    Very little.

16     Q.    Did anyone else use methamphetamine before the

17   trip?

18     A.    No.

19     Q.    How about during the trip?

20     A.    No.

21     Q.    How long did it take to drive to Fresno?

22     A.    A little over a day.

23     Q.    Were any stops made in between Wyoming and Fresno?

24     A.    Just a few bathroom stops.

25     Q.    But no overnight stops?

```
 1        A.    No.

 2        Q.    Drove straight through?

 3        A.    Yes.

 4        Q.    Who drove?

 5        A.    Johnny.

 6        Q.    When you arrived in Fresno, did you actually go to

 7   a family reunion?

 8        A.    Yes.

 9        Q.    Did anything else happen while you were in Fresno?

10        A.    Yes.

11        Q.    What?

12        A.    Robert took me to a couple parties, houses of his

13   friends.

14        Q.    Did you meet any of his friends?

15        A.    Yes.

16        Q.    Who did you meet?

17        A.    Hondo and several others.  I don't remember names.

18        Q.    When you were introduced to Hondo, who introduced

19   you?

20        A.    Robert.

21        Q.    How did he introduce Hondo to you?

22        A.    As his friend Hondo.

23        Q.    Were you provided any other name at that time?

24        A.    No.

25        Q.    Did you later learn who Hondo was?
```

```
 1      A.     Yes.

 2      Q.     How?

 3      A.     Robert told me.

 4      Q.     What did Robert tell you who Hondo was?

 5      A.     Alex Garcia.

 6      Q.     If you saw Hondo or Alex Garcia again, would you be

 7   able to recognize him?

 8      A.     Yes.

 9      Q.     If he's in this courtroom today, can you please

10   indicate where and what he's wearing.

11      A.     There on the end; glasses, yellow shirt, blue tie.

12             MR. FUN:  Let the record reflect the witness has

13   correctly identified the defendant, Alex Garcia, a/k/a

14   Hondo.

15             THE COURT:  The record will so reflect.

16      Q.     (By Mr. Fun)  Now, when you met Hondo, what

17   happened?

18      A.     I believe one day we all went out to the lake and

19   just ate and had some drinks.

20      Q.     Did you use any methamphetamine while you were in

21   Fresno?

22      A.     Yes.

23      Q.     And where were you when you used this

24   methamphetamine in Fresno?

25      A.     Another friend of Robert's.
```

1   Q.   Who provided this methamphetamine?

2   A.   Robert's friend.

3   Q.   Do you recall any occasions when Robert and Hondo

4   left together?

5   A.   They -- no, not when I was there.

6   Q.   Do you recall if Robert sent any packages from

7   Fresno?

8   A.   Yes.

9   Q.   Tell me about that.

10  A.   We had stayed the night with his grandma, with

11  Robert's grandma.  And I woke up the next morning and Robert

12  was gone.  And when he came back, he told me that he left to

13  go send out the packages.

14  Q.   What was your understanding as to what was meant by

15  "sending out the packages"?

16  A.   Packaging them up in the candle and box them up and

17  shipping them to our house.

18  Q.   What?

19  A.   Methamphetamine.

20  Q.   How many times did that occur?

21  A.   Just one time.

22  Q.   Did you ever learn what happened to those packages?

23  A.   They were sent to our house.

24  Q.   How do you know that?

25  A.   Robert told me, and the packages were there when we

1    arrived home.

2        Q.    When you arrived home, were those packages opened?

3        A.    Yes.

4        Q.    Did you see what was inside of them?

5        A.    The drugs were gone.  It was just the boxes and the

6    candles.

7        Q.    So are you indicating that someone had

8    previously -- or had removed the drugs from the candle?

9        A.    Yes.

10        Q.    Do you know who?

11        A.    Yes.

12        Q.    Who?

13        A.    Robert's brother-in-law Carlos.

14        Q.    How do you know that?

15        A.    He told me.

16        Q.    Who is "he"?

17        A.    Robert.

18        Q.    While you were in Fresno, how often did you use

19    methamphetamine?

20        A.    Only once or twice that I can recall.

21        Q.    And both times where did the methamphetamine come

22    from that you used?

23        A.    Robert's friend.

24        Q.    Was that a different friend than Hondo?

25        A.    Yes.

1    Q.    Do you know who that friend was?

2    A.    I don't know his name.

3    Q.    While you were in Fresno, do you know whether or

4  not any money was sent to you or Robert?

5    A.    Yes.

6    Q.    Tell us about that.

7    A.    Robert had a guy named Joe sending us money.

8    Q.    Do you know how much money was sent?

9    A.    I don't recall exact amounts.

10    Q.    Do you know how many times Joe sent money?

11    A.    Two or three.

12    Q.    Do you know why Joe was sending you and Robert

13  money?

14    A.    It was money for us to get home on.

15    Q.    Any other reason?

16    A.    It was money that Joe had collected from selling

17  the drugs for Robert.

18    Q.    How long did you stay in Fresno before returning to

19  Wyoming?

20    A.    About a week.

21    Q.    What happened on the way home?

22    A.    We got into a fight.  Fought most of the trip.

23    Q.    Were you using any methamphetamine on the way home?

24    A.    No.

25    Q.    Was Robert?

```
 1      A.    No.

 2      Q.    Did you get methamphetamine on the way home to use?

 3      A.    No.

 4      Q.    When you arrived in Wyoming, did you obtain any

 5   methamphetamine to use?

 6      A.    Yes.

 7      Q.    How did you get that?

 8      A.    From Robert.

 9      Q.    Now, before you actually met Hondo or Alex Garcia,

10   did Robert tell you anything about him?

11      A.    Yes.

12      Q.    What?

13      A.    That he was a friend from Fresno, and he was

14   hooking him up with the meth.

15      Q.    Did you have any occasions to wire money, either

16   through Western Union or MoneyGram, to Fresno?

17      A.    Yes.

18      Q.    Tell me about that.

19      A.    Robert asked me to send the money in my name to a

20   lady by the name of Lynette Cardenas.

21      Q.    And who is Lynette Cardenas?

22      A.    I was told that she was Hondo's girlfriend.

23      Q.    Who told you that?

24      A.    Robert.

25      Q.    Other than Lynette Cardenas, did you wire money to
```

1   anyone else in Fresno?

2       A.    Alex Garcia.

3       Q.    Who asked you to do that?

4       A.    Robert.

5       Q.    Do you remember how much money?

6       A.    I believe 1,400.

7       Q.    Do you remember how many times?

8       A.    Two that I can recall.

9       Q.    Was it 1,400 each time?

10      A.    Yes.

11      Q.    Was this before or after you had actually met Hondo

12  in Fresno?

13      A.    Before.

14      Q.    Where did you get the money that you were wiring to

15  Alex Garcia in Fresno?

16      A.    Robert gave it to me.

17      Q.    How about the money for Lynette Cardenas?

18      A.    Robert gave it to me.

19      Q.    Do you know where that money came from?

20      A.    Selling drugs.

21      Q.    How do you know that?

22      A.    Robert told me and I saw him do some of it.

23      Q.    Do you know what was supposed to happen after you

24  wired the money to Alex Garcia in Fresno?

25      A.    He was supposed to send a package of

1    methamphetamine.

2        Q.    Who was supposed to send the package?

3        A.    Alex Garcia.

4        Q.    Who was he going to send it to?

5        A.    Robert.

6        Q.    How do you know that?

7        A.    Robert told me.

8        Q.    How about with regards to Lynette Cardenas, when

9    you wired her money?

10       A.    The money was for Alex Garcia to send to Robert

11   also.

12       Q.    Same thing?

13       A.    Yes.

14       Q.    Methamphetamine?

15       A.    Yes.

16       Q.    Do you know how much methamphetamine was supposed

17   to be sent to Robert?

18       A.    An ounce each time.

19       Q.    Ms. Morgan, you mentioned that you had helped

20   Robert distribute and pick up money after distributing

21   methamphetamine.

22       A.    Yes.

23       Q.    Did you actually -- were you actually with Robert

24   when he was doing these things?

25       A.    A few times, yes.

1    Q.    Now, ma'am, other than the individuals you have

2    mentioned, which is Robert, Hondo, Isasias, and Noe, was

3    there anyone else involved in this -- these incidents?

4    A.    Yes.

5    Q.    Was that your brother?

6    A.    Yes.

7    Q.    Tell me about the involvement of your brother.

8    A.    Robert asked him to distribute the drugs for him.

9    Q.    Who is your -- what's your brother's name?

10   A.    John Michael Morgan.

11   Q.    How do you know that Robert asked your brother John

12   to distribute drugs for him?

13   A.    We were all at our house in Basin, and Robert

14   wanted to talk to my brother alone.  And then later Robert

15   told me what they talked about.

16   Q.    Did you ever provide any methamphetamine to your

17   brother?

18   A.    No.

19   Q.    Do you know if Robert did?

20   A.    Yes.

21   Q.    How do you know that?

22   A.    Because I saw him do it.

23   Q.    Do you recall when Robert approached your brother

24   at the house in Basin, what time frame that was?

25   A.    Early winter of 2009.

1    Q.    Do you need a break, ma'am?

2    A.    No.

3          THE COURT:  There may be water up there and some

4    glasses, if you need it.

5    Q.    (By Mr. Fun)  Now, after you and Robert went to

6    Fresno, was your brother still involved?

7    A.    Yes.

8    Q.    Were you present during any conversations between

9    Robert and your brother?

10   A.    Yes.

11   Q.    Tell us about those conversations.

12   A.    Robert just told him how he was supposed to sell

13   the drugs and how much money he wanted, and that's just how

14   they did it.

15   Q.    Were you present any time when Robert and your

16   brother talked about shipments of methamphetamine that was

17   coming in from Fresno?

18   A.    I don't recall.

19   Q.    Do you recall at any point in time when these

20   shipments of methamphetamine that were coming to the houses

21   stopped?

22   A.    Yes.

23   Q.    Do you remember when the shipments to the houses

24   stopped or where you were living at the time?

25   A.    We were living in Cody, the house in town.

1    Q.    Do you know why these shipments of these packages

2    stopped?

3    A.    Robert owed money to the people they were coming

4    from.

5    Q.    That would be in Fresno?

6    A.    Yes.

7    Q.    Now, did these shipments stop before or after you

8    had gone to Fresno with Robert?

9    A.    After.

10    Q.    Now, ma'am, you talked about Danny.  How many times

11    had you seen Danny?

12    A.    Three.

13    Q.    The first time was at the party at April's?

14    A.    Yes.

15    Q.    That's where you used methamphetamine for the first

16    time?

17    A.    Yes.

18    Q.    When was the second time you saw Danny?

19    A.    In Fresno.

20    Q.    Okay.  Did anything happen when you saw him in

21    Fresno?

22    A.    No.

23    Q.    How about the third time?

24    A.    He flew to Cody and was staying with us.

25    Q.    You say he flew to Cody.  Who flew to Cody?

1    A.    Danny.

2    Q.    From where was he flying from?

3    A.    Fresno.

4    Q.    Do you know why Danny was coming from Fresno to

5    Wyoming?

6    A.    Robert told me that he was bringing meth with him.

7    Q.    Do you know how much meth Danny was supposed to

8    bring?

9    A.    An ounce.

10   Q.    How do you know that?

11   A.    Robert told me.

12   Q.    Did you actually see Danny when he came to Cody?

13   A.    Yes.

14   Q.    How is it that you saw him?

15   A.    He was staying at our house.

16   Q.    Did Danny ever tell you how he brought the

17   methamphetamine?

18   A.    We never saw it.

19   Q.    Did Robert ever tell you?

20   A.    No.

21   Q.    Who went to go get Danny at the airport?

22   A.    Robert and I.

23   Q.    Beyond that, do you know whether or not Danny again

24   came to Wyoming?

25   A.    Can you repeat that?

1    Q.    Do you know if Danny came -- let me rephrase the
2    question.  After that third time, did Danny come to Wyoming
3    again?
4    A.    That was the last time he came.
5    Q.    Now, again, was -- did Danny come to Wyoming with
6    the 1 ounce before or after the packages stopped being sent
7    to the house in Cody?
8    A.    After.
9    Q.    Were you still using methamphetamine at that time?
10   A.    Yes.
11   Q.    So after Danny had come with his 1 ounce, how were
12   you able to get any more methamphetamine?
13   A.    Robert started getting it from a source in Worland.
14   Q.    Tell me about that.
15   A.    He would get just small amounts and actually
16   distribute them the same way he would with his own, and then
17   give the person he was getting it from the money that he
18   owed.
19   Q.    Do you know from whom in Worland he was getting --
20   A.    Yes.
21   Q.    -- the methamphetamine?
22   A.    Yes.
23   Q.    Who?
24   A.    Snuff.
25   Q.    Was Snuff a real name or a nickname?

1    A.    Nickname.

2    Q.    Do you know Snuff's real name?

3    A.    Victor.

4    Q.    Do you know his last name?

5    A.    McCoy.

6    Q.    Do you know how much methamphetamine Robert

7  obtained from Victor McCoy in Worland?

8    A.    I really don't remember.

9    Q.    For how long did Robert obtain methamphetamine from

10  Victor McCoy or Snuff?

11    A.    That only happened a couple times.

12    Q.    Do you recall any occasions where you went to

13  Sheridan?

14    A.    Yes.

15    Q.    Who did you go to Sheridan with?

16    A.    Robert.

17    Q.    Why were you going to Sheridan?

18    A.    To pick up methamphetamine.

19    Q.    When was the first time you went to Sheridan with

20  Robert?  Do you recall where you were living at?

21    A.    In Basin.

22    Q.    When you went to Sheridan, did you go somewhere in

23  Sheridan?

24    A.    Yes.

25    Q.    Where did you go?

1    A.    We went to an apartment that Robert used to live in

2    with Isasias and Noe.

3    Q.    How do you know that that was the apartment that

4    Robert used to live in with Isasias and Noe?

5    A.    Because he told me.

6    Q.    When you went to the apartment, who was there?

7    A.    Noe and Isasias.

8    Q.    What happened while you were at the apartment with

9    Robert, Isasias and Noe?

10    A.    We snorted drugs.

11    Q.    What drugs did you snort?

12    A.    Meth.

13    Q.    Do you recall the time of the year that was?

14    A.    Probably about fall 2009.

15    Q.    I'm sorry.  Did you -- what time of the year?

16    A.    Like around fall 2009.

17    Q.    Fall of 2009?

18    A.    Yeah.

19    Q.    Did you or Robert obtain any methamphetamine when

20    you met with Isasias and Noe beyond what you used?

21    A.    That time I don't think so.

22    Q.    Prior to going to Sheridan, did you have -- did

23    Robert tell you anything about why you were going to

24    Sheridan to meet with Isasias and Noe?

25    A.    He said he just wanted to go hang out.

1    Q.    Do you know where Isasias and Noe -- let me back up

2    a minute.  When you arrived there to use methamphetamine,

3    who provided the methamphetamine?

4    A.    Isasias.

5    Q.    Do you know where Isasias got that methamphetamine

6    from?

7    A.    I don't know.

8    Q.    Were there any other occasions when you went to

9    Sheridan?

10   A.    Yes.

11   Q.    Approximately how many times?

12   A.    At least three or four.

13   Q.    And who did you go with?

14   A.    Robert.

15   Q.    And each time you went to Sheridan, where did you

16   go?

17   A.    To meet with Isasias.

18   Q.    On any of those occasions, do you know if Robert

19   obtained any methamphetamine from Isasias?

20   A.    Yes.

21   Q.    How do you know that?

22   A.    I was there.

23   Q.    Do you know how much methamphetamine?

24   A.    Half an ounce to an ounce.

25   Q.    Did you actually see it?

1    A.    Yes.

2    Q.    And that happened on each of the three to four

3 occasions you went to Sheridan with Robert?

4    A.    Yes.

5    Q.    How about Noe?

6    A.    One time Robert and I went to Sheridan.  Noe and

7 Isasias were supposed to receive two packages, an ounce in

8 each one, and one was for Robert to take home.

9    Q.    How do you know that Isasias and Noe were supposed

10 to receive packages?

11    A.    Robert told me.

12    Q.    Did you ever learn from where these packages were

13 coming from?

14    A.    No.  Fresno.  That's all I know.  I don't know from

15 who.

16    Q.    Do you know who in Sheridan was receiving these

17 packages?

18    A.    I don't know.

19    Q.    Do you recall if there was any conversation

20 concerning a Kim?

21    A.    Yes.

22    Q.    Tell me about that.

23    A.    I believe they were being sent to a store that a

24 girl they knew worked at.  She was signing for the packages.

25    Q.    Who told you that?

1    A.    Robert.

2    Q.    Other than you taking Robert to Sheridan, had

3    anyone else taken Robert to Sheridan?

4    A.    Snuff drove Robert and I up one time.

5    Q.    And why was Snuff taking you and Robert to

6    Sheridan?

7    A.    To pick up meth.

8    Q.    Do you know how much methamphetamine was obtained?

9    A.    An ounce.

10   Q.    Do you know from who?

11   A.    Isasias.

12   Q.    Were you present during that transaction?

13   A.    Yes.

14   Q.    Now, at this point in time, was -- well, let me

15   back up a minute.  You mentioned that the first time you

16   went to Sheridan was the apartment.

17   A.    Yes.

18   Q.    Were there any other places you went to in

19   Sheridan?

20   A.    Later Isasias had got a house in Sheridan that we

21   went to.

22   Q.    How many times did you go to that house in

23   Sheridan?

24   A.    Two.

25   Q.    If you saw that house, would you be able to

1    recognize it?

2        A.    Yes.

3        Q.    Let me hand you what's been marked for

4    identification as Government's Exhibit 501.  Do you

5    recognize that?

6        A.    Yes.

7        Q.    What is it?

8        A.    Isasias' house.

9        Q.    I'll display 501.

10            THE CLERK:  Are you offering it?

11            MR. FUN:  Move to offer Exhibit 501.

12            THE COURT:  Hearing no objection, Government

13   Exhibit 501 is admitted.

14        (Government's Exhibit 501 received in evidence.)

15        Q.    (By Mr. Fun)  Is that the house?

16        A.    Yes.

17        Q.    Now, you talked about Robert going to Sheridan to

18   pick up meth from Isasias and Noe.

19        A.    Yes.

20        Q.    Not on just this occasion but other occasions?

21        A.    Yes.

22        Q.    How do you know that Robert was picking up

23   methamphetamine from them?

24        A.    I was with him.

25        Q.    Did you use any of the methamphetamine that was

1  obtained?

2  A.  Yes.

3  Q.  How did it make you feel?

4  A.  Jittery, wide awake and high.

5  Q.  Could you tell it was methamphetamine?

6  A.  Yes.

7  Q.  Were there any occasions when Isasias came to you

8  and Robert's house, either in Basin or Cody?

9  A.  Yes.

10  Q.  Which one?

11  A.  One time in Basin.

12  Q.  Do you know why Isasias was coming to the house in

13  Basin?

14  A.  He had some methamphetamine that he was giving to

15  Robert.

16  Q.  Do you know how much methamphetamine?

17  A.  It was a small amount.

18  Q.  Did you use any of that methamphetamine?

19  A.  Yes.

20  Q.  Could you tell it was methamphetamine?

21  A.  Yes.

22  Q.  Do you know where Isasias had obtained that

23  methamphetamine?

24  A.  No.

25  Q.  Did Robert ever tell you?

```
 1      A.      No.

 2      Q.      Do you recall any times when Noe came to Cody or

 3  Basin?

 4      A.      Yes.

 5      Q.      And where did he come to?

 6      A.      To Cody.

 7      Q.      Which house in Cody?

 8      A.      Both.

 9      Q.      The house outside of Cody and the one in town?

10      A.      Yes.

11      Q.      So how many times in total did Noe come to Cody

12  that you recall?

13      A.      Three.

14      Q.      Do you recall anything about any of those

15  occasions?

16      A.      The first time he came with his girlfriend at the

17  time, Candice.

18      Q.      Candice who?

19      A.      Candice Kysar.

20      Q.      And what happened?

21      A.      They were staying at the house outside of town by

22  the shop.

23      Q.      Do you recall when that was?  Do you recall where

24  you were living at that time?

25      A.      We were living at the house in town in Cody.
```

205

1       Q.      So you and Robert still had the house outside the

2   town in Cody as well?

3       A.      Yes.

4       Q.      Do you know why Noe came to Cody?

5       A.      I believe he and Candice were planning on moving to

6   Cody.

7       Q.      Do you know if Noe brought any methamphetamine with

8   him?

9       A.      A small amount.

10      Q.      How do you know that?

11      A.      We used it.

12      Q.      And you could tell it was methamphetamine?

13      A.      Yes.

14      Q.      While Noe was there, did he and Robert have any

15  conversations that you overheard?

16      A.      No.

17      Q.      Do you recall any conversations between Robert and

18  Noe about methamphetamine?

19      A.      No.

20      Q.      Did anything else happen while Noe was there on

21  that first occasion?

22      A.      I think Candice and Noe had went to Basin for a day

23  because Isasias was there, and they were going to go meet

24  up.

25      Q.      Do you know why Noe was meeting with Isasias in

1    Basin?

2        A.    I was never told.

3        Q.    What happened after that?

4        A.    Candice and Noe came back to Cody.  I woke up to

5    Candice laying in bed with me with a fat lip.  Noe and her

6    had gotten into a fight.  Candice stayed with me that whole

7    day.

8            MR. FLEENER:  Objection.  404(b).

9            MR. FUN:  Res gestae, Your Honor, intertwined with

10   the events of that day and the conspiracy.  And we've

11   already heard testimony about the vehicle being sold to

12   Candice for a drug debt.

13           THE COURT:  I will instruct the jury that the

14   evidence concerning the fight that this witness is

15   testifying about is admitted simply for the limited purpose

16   of explaining why Candice was with Ms. Morgan during the day

17   that the government is questioning about -- the witness

18   about.

19           The jury should not consider the evidence for any

20   other purpose but for the context of this witness and

21   Candice Kysar being together for that day.

22       Q.    (By Mr. Fun)  Do you know why Noe and Candice were

23   fighting?

24       A.    Candice just told me that they --

25           MR. FLEENER:  Objection.  Hearsay.

1          MR. FUN:  Withdraw.  I'll ask a new question.

2     Q.    (By Mr. Fun)  Do you know if Candice was using

3  methamphetamine?

4     A.    At that time, I don't think so.

5     Q.    Had you ever been present when Noe and Robert had

6  guns?

7     A.    Yes.

8     Q.    When was that?

9     A.    I don't recall the date.  It was at our house in

10  town in Cody.

11     Q.    Was it on any of the occasions when Noe had come to

12  Cody?

13     A.    Yes.

14     Q.    Which of the three occasions?

15     A.    The third, I believe.

16     Q.    Tell us what happened on that occasion.

17     A.    Noe was staying with us.  The three of us went

18  inside the house in the bottom in the back door.  Noe wanted

19  to talk to Robert and wanted him to go upstairs with him.

20  And all of a sudden Noe had a gun and Robert had a gun, and

21  they were pointing them at each other.  And Robert pushed me

22  behind him, and we left.

23     Q.    Do you know what kind of gun Noe had?  Can you

24  describe it?

25     A.    I don't know.

1    Q.    How about Robert?

2    A.    I don't know what kind it was.  It was a large -- I

3   think it might have been black.

4    Q.    Now, while all this was going on, was there any

5   conversation or discussion between Robert and Noe?

6    A.    They were just yelling at each other.  I don't

7   recall what they were saying.

8    Q.    Any other times that you seen Robert with a gun?

9    A.    Yes.

10   Q.    Tell us about it.

11   A.    He had guns at our house.  I never saw him threaten

12   anyone with it; just the time with Noe.

13   Q.    Do you recall any occasions when Robert pulled a

14   gun on someone else other than Noe?

15   A.    No.

16   Q.    Do you know an individual by the nickname of Kid?

17   A.    Yes.

18   Q.    Who is that?

19   A.    Robert's cousin.

20   Q.    Were there occasions when Robert pulled a gun on

21   Kid?

22   A.    Yes, I do recall that.

23   Q.    Tell us about that.

24   A.    It was at our house in Basin outside of town.  And

25   Robert was cooking, and I was washing something in the sink.

1    And Kid came over beside me, and I flipped him with water,

2    and we were just messing around, just goofing off.

3           And Robert got mad and went and got his gun and

4    starting waving it around at him.

5       Q.    Again, do you recall -- could you describe the gun

6    that Robert was waving around?

7       A.    Large, black, rifle-like.

8       Q.    And are you familiar with firearms at all?

9       A.    Not really, no.

10      Q.    Do you recall any occasions when Robert and Noe had

11   an argument over a drug debt?

12      A.    Yes.

13      Q.    Tell us about it.

14      A.    I believe that's what the issue was the time at the

15   house when they had the guns.

16      Q.    What exactly was the argument over?

17      A.    Robert owed Noe money.

18      Q.    Do you know how much money Robert owed Noe?

19      A.    No.

20      Q.    Do you know why he owed him money?

21      A.    Money for drugs.

22      Q.    How do you know that?

23      A.    I just knew that it was money and that he owed him.

24   And that was the only source of income of either party,

25   so . . .

1     Q.    Now, you mentioned that Noe would come to Cody and

2  stay with you and Robert or at the house outside of Cody?

3     A.    Yes.

4     Q.    How long would he stay in Cody?

5     A.    When he and Candice came, they were there for

6  probably a couple of weeks.  And he came down another time

7  with Danielle, and they stayed there for a couple days

8  maybe.

9     Q.    Okay.  Danielle, who is that?

10     A.    Was Noe's girlfriend.

11     Q.    I thought Candice was Noe's girlfriend.

12     A.    It was kind of switched on and off, I guess.

13     Q.    Now, the time that Noe and Danielle were there, did

14  anything happen?

15     A.    Yes.

16     Q.    What?

17     A.    They had methamphetamine with them, and Noe was --

18  Noe and Robert were talking about Noe providing Robert with

19  some to sell.

20     Q.    Did they -- did Robert and Noe discuss how much

21  methamphetamine was to be provided?

22     A.    I didn't hear most of their conversations.

23     Q.    Do you know if Noe provided Robert with

24  methamphetamine to sell?

25     A.    Yes.

1   Q.   How do you know that?

2   A.   Because after Noe and Danielle left, Robert had

3   some.

4   Q.   Did you use some of that methamphetamine?

5   A.   Yes.

6   Q.   And was some of that methamphetamine sold?

7   A.   Yes.

8   Q.   In the same manner that you talked about before?

9   A.   Yeah.

10  Q.   You would drive around places?

11  A.   Yes.

12  Q.   Okay.  Now, you mentioned that Robert had guns at

13  the house.  Which house was that?

14  A.   The house in Cody in town.

15  Q.   At the time when there were guns at the house, did

16  people come to that house to obtain methamphetamine?

17  A.   Yes.

18  Q.   Now, you mentioned Snuff in Worland.

19  A.   Yes.

20  Q.   Do you recall any occasions when Robert got cocaine

21  from Snuff?

22  A.   Yes.

23  Q.   How did that come about?

24  A.   I was sleeping.  And when I woke up, Robert had

25  just come in with an ounce of cocaine.

1    Q.    Did you see that ounce?

2    A.    Yes.

3    Q.    And what did Robert do with that ounce of cocaine?

4    A.    He gave it to me and told me to take it to our room

5    and put it on a plate.

6    Q.    And did you do that?

7    A.    Yes.

8    Q.    Do you know why you were putting it on a plate?

9    A.    He told me so that it would dry out.

10    Q.    What happened after the cocaine was dried out?

11    A.    Robert weighed it out into grams, kept some for

12    personal use.

13    Q.    What happened to the rest of the cocaine?

14    A.    Some was sold, some was used.  And at some point

15    shortly after, Snuff arrived at our house and took the

16    remainder of the coke.

17    Q.    Now, was the coke -- the cocaine sold in the same

18    manner as the methamphetamine?

19    A.    I don't believe so.

20    Q.    How was it different?

21    A.    It just didn't go as fast as the meth.

22    Q.    Now, other than the cocaine and methamphetamine, do

23    you know if Robert sold any other drugs?

24    A.    Yes.

25    Q.    What?

```
 1    A.    Pills.

 2    Q.    When you say pills, what do you mean by that?

 3    A.    Prescription.  I think it was oxycodone.

 4    Q.    Where did Robert get these oxycodones?

 5    A.    His brother-in-law.

 6    Q.    Would that be your brother?

 7    A.    No.

 8    Q.    A different brother-in-law?

 9    A.    Yes.

10    Q.    You weren't married to Robert?

11    A.    No.

12    Q.    Had you used any of this oxycodone?

13    A.    I think I might have tried it once.

14    Q.    And from whom did you get it from?

15    A.    Robert.

16    Q.    Ms. Morgan, let me now turn to a different person.

17  Do you know a Lisa Riggs?

18    A.    Yes.

19    Q.    How do you know Lisa Riggs?

20    A.    We went to high school together.

21    Q.    Ma'am, do you remember any occasions when you met

22  with Lisa Riggs?

23    A.    Yes.

24    Q.    Was Robert with you?

25    A.    Yes.
```

1    Q.    Tell me about the first time.

2    A.    Robert and I had gone to Billings and got a motel

3  room for the night.  And Robert asked me if I would call

4  Lisa and see if she wanted to hang out, so I did.  And she

5  came to our motel room.

6    Q.    What happened when Lisa came to the motel room?

7    A.    We -- the three of us went out.  I think we went to

8  the strip club for like 20 minutes, left.  And Lisa took us

9  to a house, and we purchased a bag of marijuana.

10   Q.    Did Robert and Lisa ever have any conversations

11 about methamphetamine?

12   A.    Robert asked Lisa if she would be interested in

13 selling it for him.

14   Q.    Do you recall what Lisa's response was?

15   A.    She said she could probably do that.

16   Q.    Do you know whether or not Robert provided Lisa

17 Riggs with methamphetamine?

18   A.    That trip, no.

19   Q.    Subsequent trips?

20   A.    On our way home from that trip, I asked him to not

21 give her any.  And to my knowledge at that time, he wasn't

22 giving her any.

23   Q.    Why would you ask Rob not to give Lisa Riggs any

24 methamphetamine?

25   A.    Because at one point she was a very close friend.

1   Q.    Did Lisa Riggs use methamphetamine?

2   A.    I knew that she did when she was younger.

3   Q.    Now, did there come an occasion when you later

4   learned that Robert was providing Lisa with methamphetamine?

5   A.    Yes.

6   Q.    How did that come about?

7   A.    Robert told me that he needed me to drive him to

8   Powell, and I did.  He never told me why.  Said that we were

9   meeting up with one of my friends.  And eventually we parked

10  the car, and she drove up behind us.  And he gave her -- I

11  don't know how much, and she gave him money.

12  Q.    Now, at this time you were using methamphetamine

13  still?

14  A.    Yes.

15  Q.    Other than Robert, did you obtain methamphetamine

16  from anyone else?

17  A.    At that time, no.

18  Q.    Did there come a point in time when you did obtain

19  methamphetamine from someone else?

20  A.    Yes.

21  Q.    How did that come about?

22  A.    Robert was in jail.  And Noe came to Greybull to my

23  brother's house and gave us meth.

24  Q.    Do you remember when Robert went to jail?

25  A.    I think it was late January maybe.  The same -- we

1    both got arrested at the same time for the ag assault.

2        Q.    Now, when you say that Noe came to Greybull, what

3    happened?

4        A.    He had came with Candice.  They -- I think they

5    just had a little bit with them that we used.  And Noe left

6    and came back a day or two later, I believe, with an ounce

7    and fronted to my brother.

8        Q.    Do you know how much methamphetamine was fronted to

9    your brother?

10       A.    I think it was an ounce.

11       Q.    Did you use any of that methamphetamine?

12       A.    Yes.

13       Q.    What happened to the 1 ounce of methamphetamine?

14       A.    We used some of it.  Most of it was sold.

15       Q.    Tell me about how it was sold.

16       A.    The same way Robert was selling it; half MSM/half

17   meth gram bags, seven at a time, to specific people.

18       Q.    Did you help your brother sell this

19   methamphetamine?

20       A.    I might have made some phone calls.

21             MR. FUN:  Your Honor, I don't know if -- this might

22   be a good place to break for the evening.

23             THE COURT:  Thank you.

24             MR. FUN:  We do have some recorded calls, but I

25   think those will take some time.

1    THE COURT:  All right.  We'll take our evening

2    recess.  Members of the jury, I ask that you be here,

3    available to return to the courtroom, at 8:30 tomorrow

4    morning.  Please remember the admonition about not

5    discussing the case with anyone, including each other; to

6    not conduct any research or read anything or listen to

7    anything concerning this trial.

8         You must make your factual findings based solely on

9    the evidence you hear in this courtroom.  Please keep an

10   open mind until all the evidence is in and the case is

11   presented to you for deliberations.  We'll stand in recess

12   until tomorrow at 8:30.

13        (Following out of the presence of the jury.)

14        THE COURT:  Is there anything that requires the

15   Court's attention?

16        MR. FUN:  Nothing from the government, Your Honor.

17        MR. TIMBERS:  Your Honor.

18        THE COURT:  Yes, Mr. Timbers.

19        MR. TIMBERS:  Mr. Horn and I submitted a motion

20   last week for additional --

21        MR. MURRAY:  May the witness be excused before

22   we --

23        THE COURT:  Yes.  Thank you for reminding me.

24   Ms. Morgan, you're excused for -- subject to being recalled

25   tomorrow morning.

1            (Witness excused.)

2            THE COURT:  Yes, Mr. Timbers.

3            MR. TIMBERS:  Your Honor, last week Mr. Horn and I

4      submitted a motion for additional investigative services to

5      be performed by Randy Brooklyn.  I was wondering if you had

6      time to consider that.

7            THE COURT:  I believe that I entered that order

8      today.

9            MR. TIMBERS:  Oh, I'm sorry.

10           THE COURT:  No problem.

11           MR. TIMBERS:  My apologies.  Thank you.

12           THE COURT:  Yes.  Randy confirms that that was the

13     order I signed.

14           MR. TIMBERS:  Thank you.  Sorry.

15           THE COURT:  Anything else?  I would ask counsel to

16     be ready for -- to receive the jury approximately at 8:45 to

17     9:00 o'clock.  We'll need to -- even though I've asked them

18     to be ready to return at 8:30, the process is such that the

19     jury needs to be in their jury room, and the jury room then

20     needs to be closed before we bring in the parties to this

21     case.

22           And so I'm just trying to get -- to be in a

23     position to start a little closer to 9:00.  So I wanted to

24     give you those logistical facts so that you knew when we

25     were anticipating starting.

```
 1              Any questions or other issues?
 2              MR. FUN:  Nothing from the United States, Your
 3    Honor.
 4              THE COURT:  Thank you, Mr. Fun.  Hearing nothing,
 5    we'll stand in recess hoping to convene tomorrow morning at
 6    9:00 o'clock.
 7              (Trial proceedings recessed
 8              5:14 p.m., October 4, 2011.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1              C E R T I F I C A T E

2          I, MARGIE R. DAUSTER, Deputy Official Court

3    Reporter for the United States District Court for the

4    District of Wyoming, Registered Professional Reporter, and a

5    Certified Realtime Reporter, do hereby certify that I

6    reported by machine shorthand the foregoing proceedings

7    contained herein on the aforementioned subject on the date

8    herein set forth, and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 31st day of December, 2011.

11

12              */s/ Margie R. Dauster*

13              ─────────────────────────
                MARGIE R. DAUSTER
14              Deputy Official Court Reporter
                Registered Professional Reporter
15              Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25