1        IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF WYOMING

3    _____

4    UNITED STATES OF AMERICA,            Case No. 10-CR-329-F
                                          Volume VIII of XX
5              Plaintiffs,                (Pages 1 through 53)

6              vs.                        Cheyenne, Wyoming
                                          October 6, 2011
7    ROBERT VELASQUEZ, JR.,               8:54 a.m.
     MIGUEL ANGEL ORDAZ,
8    DANIEL GEORGE RENTERIA,
     ALEX GARCIA, JR.,
9
               Defendants.
10   _____

11

12           TRANSCRIPT OF TRIAL PROCEEDINGS

13    BEFORE THE HONORABLE NANCY D. FREUDENTHAL
          CHIEF UNITED STATES DISTRICT JUDGE
14
          and a jury of twelve and two alternates
15

16

17

18

19

20

21   Court Reporter:     MRS. MARGIE R. DAUSTER, RPR, CRR
                         1500 Longs Peak Drive
22                       Fort Collins, Colorado 80524
                         (970) 631-5925
23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

```
 1    APPEARANCES:

 2    For the Plaintiff:        MR. DARRELL FUN
                                 Assistant U.S. Attorney
 3                               U.S. ATTORNEY'S OFFICE
                                 100 East "B" Street, Suite 2211
 4                               P.O. Box 22211
                                 Casper, Wyoming 82601
 5
                                 MR. L. ROBERT MURRAY
 6                               Assistant U.S. Attorney
                                 U.S. ATTORNEY'S OFFICE
 7                               P.O. Box 668
                                 2120 Capitol Avenue, Suite 4000
 8                               Cheyenne, Wyoming 82003

 9    For Defendant             MR. VINCENT HORN, JR.
      Velasquez:                Attorney at Law
10                              9774 Chanteclaire Circle, Suite 100
                                Littleton, Colorado 80126
11
      For Defendant Ordaz:      MR. PETER TIMBERS
12                              Attorney at Law
                                SCHWARTZ, BON, WALKER & STUDER, LLC
13                              141 S. Center Street, Suite 500
                                Casper, Wyoming 82601
14
      For Defendant             MR. THOMAS A. FLEENER
15    Renteria:                 Attorney at Law
                                FLEENER & VANG, LLC
16                              2523 Garfield, Suite D
                                P.O. Box 1186
17                              Laramie, Wyoming 82073-1186

18    For Defendant Garcia:     MS. JILL A. HIGHAM
                                Attorney at Law
19                              THE HIGHAM LAW OFFICE
                                1001 E. Harmony Road, Suite A-366
20                              Fort Collins, Colorado 80525-3354

21

22

23

24

25
```

USA v. AL-GEORGE, et al.                                    VOL VIII

Case 1:10-cr-00329-NDF   Document 487   Filed 01/04/12   Page 3 of 53

3

1                           INDEX TO WITNESSES

2    GOVERNMENT'S WITNESSES                                    PAGE

3    MELISSA D. MORGAN
         Cross - Ms. Higham                                    10
4        Redirect - Mr. Fun                                    16
         Recross - Mr. Horn                                    37
5

6    DAYLE SINCLAIR
         Direct - Mr. Fun                                      40
7        Cross - Mr. Horn                                      45
         Cross - Mr. Timbers                                   46
8

9                           INDEX TO EXHIBITS

10                    (No trial exhibits entered.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                P R O C E E D I N G S

 2        (Trial proceedings reconvened

 3         8:54 a.m., October 6, 2011.)

 4        (Following out of the presence of the jury.)

 5            THE COURT:  Go ahead and be seated.  Thank you.

 6            The court has been advised that a medical emergency

 7    is facing the family of Mr. Fleener.  And while we are not

 8    exactly sure how to proceed, I thought I would address this

 9    to the group and see what the schedule is and what the

10    convenience or inconvenience of the parties would be

11    present.

12            My concern is that Mr. Renteria receive a full and

13    adequate defense in this case.  I'm certainly not suggesting

14    that Mr. Fleener is unable to do that.  But if his mother's

15    condition continues to deteriorate -- she's in surgery and

16    is an at-risk patient at this time, having suffered a major

17    stroke, and she has a serious heart condition top of that.

18            Her husband is 88 years old and is not in the best

19    position to keep the family apprised of her circumstances.

20    If it reaches the point, which we certainly hope it doesn't,

21    that family is asked to gather, we may be facing a situation

22    where, in the best interest, we would need to continue this

23    trial and allow Mr. Fleener to join his family and address

24    his mother's condition.

25            So with that as a backdrop, Mr. Fleener, is there
```

1   anything further that you want to bring to the attention of

2   the parties?

3          MR. FLEENER:  No, Your Honor.  I think that -- I

4   don't have any more information than I did 30 minutes ago.

5   I know nothing more than what Your Honor said.  And what

6   Your Honor said is accurate.

7          THE COURT:  And for the marshals' information, I

8   have allowed Mr. Fleener or his legal assistant to have a

9   cell phone in the courtroom on vibrate to allow more ready

10  contact than what might be available through emails.

11         Mr. Fleener has been advised of the court's

12  concerns with cell phones, and I've been assured that the

13  court's concerns with the use of cell phones to transmit

14  proceedings outside the courtroom is not an issue.  And he's

15  certainly an officer of the court, and I'll rely on that.

16         So at this point -- I know the government has --

17  from my perspective, I would really like to conclude the

18  testimony of Ms. Morgan.  Past that, I don't know what the

19  government's order of witnesses might be and how this might

20  influence witnesses that, as an example, may either be here

21  under custody or may have traveled to be here for the trial.

22         So Mr. Fun or Mr. Murray.

23         MR. MURRAY:  Your Honor, the government agrees

24  that, at a minimum, Ms. Morgan's testimony be concluded.

25  Mr. Fleener has cross-examined her.

1        THE COURT:  Yes.  And Mr. Fleener did tell me that

2    at this point he does not anticipate having any -- seeking a

3    request to ask to recross.

4        MR. MURRAY:  And we also have a couple of

5    out-of-town witnesses.  Mr. Dayle Sinclair and --

6        MR. FUN:  Ricardo.

7        MR. MURRAY:  -- Ricardo Gonzales.  They are both

8    from out of the state.  And so we would take them out of

9    order and conclude their testimony.  Mr. Sullivan will

10   testify with regard to laying the foundation for the jail

11   calls, and Ricardo will testify with regard to his

12   investigation in the Fresno area and his involvement with

13   these defendants.

14       THE COURT:  Is Mr. Ricardo an agent?

15       MR. MURRAY:  He is a member of the Fresno Police

16   Department, Your Honor.

17       THE COURT:  Okay.

18       MR. MURRAY:  Currently assigned to the task -- or

19   the gang unit there.

20       THE COURT:  All right.  Thank you.

21       MR. MURRAY:  And we don't believe his testimony or

22   Mr. Sullivan's will take that long.  Also, depending on how

23   the redirect and continuing cross-examination go, there may

24   be a very brief recall of Officer Hall, simply to establish

25   the package, the seizure, and the like.

```
 1                THE COURT:  All right.  Thank you.

 2                MR. MURRAY:  And that would be about it.  And so

 3       with all -- Mr. Fleener should be with his family.  That's

 4       the bottom line.  And so if we can finish with Ms. Morgan,

 5       at a minimum, we're satisfied with that.  If Mr. Fleener

 6       believes that he can be present long enough for the

 7       out-of-state witnesses, that would be fine.

 8                I want to leave that call to Mr. Fleener and

 9       Mr. Renteria.  If they believe that it would be better that

10       he go be with his family and concentrate on his family, we

11       would have no objection to delaying right after Ms. Morgan.

12                THE COURT:  Thank you.  Mr. Fleener.

13                MR. FLEENER:  Ma'am, I -- and I appreciate the

14       United States' concessions.  I -- and I -- I apologize.  I'm

15       not thinking straight.  The second witness, Mr. Gonzales.

16       The first witness sounds just like a foundational witness.

17       Is the second witness foundational as well, or is that --

18                THE COURT:  No.  The second witness is, I think, a

19       member of the Fresno Police Department assigned to gang

20       activity.  And while the United States does not expect his

21       testimony to be lengthy, he would not be called simply for

22       foundational purposes.

23                MR. FLEENER:  Can I have a second, please, Your

24       Honor?

25                THE COURT:  Yes.  And just for clarification, at
```

1    this point, I believe the court's interest and what I heard

2    from the government is to conclude Ms. Morgan and then

3    assess -- have a -- an opportunity to assess where we are

4    and take our queue from Mr. Fleener, in consultation with

5    his client, as to whether we call subsequent witnesses.

6    Mr. Horn.

7         MR. HORN:  Your Honor, Mr. Fleener has asked me to

8    tell you that he would prefer to just finish with Ms. Morgan

9    so he can go to Salt Lake after that.  These are government

10   witnesses.  I don't think it's any real rush to have to have

11   them today.

12        I mean, I appreciate that they have to travel back.

13   But you know what, that's life.  And they're not -- they're

14   not going overseas, not going on vacation or anything like

15   that.  So he asked me to tell you that.  That he would just

16   prefer --

17        MR. MURRAY:  That's fine.  That's fine.  If

18   Mr. Fleener would prefer that we -- that we continue after

19   Ms. Morgan's testimony, then that's fine, Your Honor.

20        MR. FLEENER:  My concern is -- if it was a

21   foundational witness --

22        THE COURT:  We have one foundational witness and

23   then this police department witness.

24        MR. FLEENER:  The police witness is what concerns

25   me.  Because that may have substantive cross-examination and

USA v. Velasquez, et al.    Case 1:10-cr-00329-NDF    Document 487    Filed 01/04/12    Page 9 of 53    VOL VIII

9

1    stuff, and I don't -- I'm not there.

2              THE COURT:  I appreciate that.  Well, why don't we

3    bring in the jury, call Ms. Morgan, conclude with her.  We

4    can make a decision about whether we take the foundational

5    witness or not --

6              MR. FLEENER:  Yes, ma'am.

7              THE COURT:  -- or whether we continue at that

8    point.  Is that -- does that sound agreeable to everyone?

9              MR. FLEENER:  Yes, Your Honor.

10             THE COURT:  All right.  I'd ask the deputy clerk to

11   please bring in the jury.

12         (Following in the presence of the jury.)

13             THE COURT:  We're here this morning in the

14   continuation of the jury trial of United States of America

15   versus Robert Velasquez, et al., 10-CR-329.  The court notes

16   the presence of the jury.  Good morning.

17             We are in the continuation of Melissa Morgan's

18   testimony.  Ms. Morgan, I would remind you that you remain

19   under oath.

20             THE WITNESS:  Yes, ma'am.

21             THE COURT:  Thank you.  Mr. Timbers, this witness

22   is yours for cross.

23             MR. TIMBERS:  Morning, Ms. Morgan.

24             THE WITNESS:  Morning.

25             MR. TIMBERS:  I don't have any questions for you.

```
 1              THE COURT:  Good morning, Ms. Higham.

 2              MS. HIGHAM:  Good morning, Your Honor.

 3                       CROSS-EXAMINATION

 4       Q.   (By Ms. Higham)  Good morning, Ms. Morgan.

 5       A.   Good morning.

 6       Q.   My name is Jill Higham.  I'm not going to go too

 7  far into any of the issues of yesterday, but -- but I do

 8  have a few questions for you this morning.

 9            During your cross-examination with Mr. Fleener, you

10  mentioned that you -- you started dating Robert in high

11  school?

12       A.   Yes.

13       Q.   You were only 17 when the two of you met?

14       A.   Yes.

15       Q.   Would it be fair to characterize it as kind of an

16  off again -- on again/off again relationship?

17       A.   Yes.

18       Q.   Were there periods that the two of you broke up for

19  whatever reason?

20       A.   Yes.

21       Q.   And then, obviously, you'd get back together.

22       A.   Yes.

23       Q.   Would he make promises to you that things would

24  improve, or did he just come groveling back to rekindle the

25  relationship?  What did that look like?
```

```
 1      A.    We just wouldn't talk for a while and somehow just
 2  met up again.  It kind of went both ways.
 3      Q.    And it seems like it's -- it's fair to say that you
 4  cared about him.
 5      A.    Yes.
 6      Q.    And that you perhaps even loved Robert --
 7      A.    Yes.
 8      Q.    -- during that relationship.  And I couldn't help
 9  but notice, as you answered some of Mr. Fleener's questions,
10  how raw your emotion became when -- when you talked about
11  the volatile nature of the relationship.  Is that a fair
12  observation on my part?
13      A.    The what?
14      Q.    When the questions addressed some of the volatility
15  or the abusive nature of your relationship with Robert, your
16  emotion was pretty raw --
17      A.    Yes.
18      Q.    -- when you had to talk about that.
19      A.    Yes.
20      Q.    And I apologize.  This is sensitive material.  And
21  I'm going to do my best to -- to not use language that I
22  don't have to use.
23            But you have made statements, have you not, to
24  individuals such as Mr. Hall that Robert would call you
25  things like a stupid bitch?
```

1     A.     Yes.

2     Q.     And you had some allegations that he left bruises.

3     A.     Yes.

4     Q.     Is that accurate?  And, again, I apologize for

5  having to go into this territory.  There was just a lot of

6  fighting and discord going on in that relationship?

7     A.     Yes.

8     Q.     And when you went to Fresno on that trip when you

9  were at the lake and visiting his family reunion, you guys

10  were fighting quite a bit?

11     A.     Yes.

12     Q.     And would it -- would it be fair to say you weren't

13  real happy on a good part of that trip?

14     A.     That's correct.

15     Q.     And in your disagreement and upset with Robert, you

16  were more focused on some of that emotion than you were on

17  being kind or hospitable to some of the people you were

18  introduced to?

19     A.     Can you rephrase that a little?

20     Q.     Yeah.  That was kind of a bad question.  I

21  apologize.  When you were fighting with him and you had some

22  of that raw emotion because of the nature of that trip and

23  being upset with him, you weren't totally focused on other

24  people that were around or people you were meeting.  You

25  were upset with Robert.

1    A.    Yes.

2    Q.    And without getting into more than I have to, you

3    did -- on that trip to Fresno -- you did tell Mr. Hall at

4    one point that during that trip, you were even punched in

5    the face a couple times.

6    A.    Yes.

7    Q.    Was that your statement?  Is it a fair

8    characterization of your relationship with Robert Velasquez

9    that it was a relationship that was often disrespectful and

10   dishonest with you?

11   A.    Yes.

12   Q.    And, obviously, physical abuse is disrespectful --

13   A.    Yes.

14   Q.    -- would you agree?  And would you agree that a lot

15   of the things Robert told you and had you involved in were

16   dishonest?  Not just on your part, but on Robert's part.

17   A.    Yes.

18   Q.    He had you -- he had you execute fraudulent

19   documents in the sales of automobiles --

20   A.    Yes.

21   Q.    -- with Ms. Kysar, I believe --

22   A.    Yes.

23   Q.    -- is that true?  And he was fraudulent in his

24   dealings with Timber?

25   A.    Yes.

1    Q.    And I'm sorry.  I don't remember that individual's

2    full name.  But Timber is the person that you mentioned in

3    your prior statement?

4    A.    Yes.

5    Q.    And he lied to you on a number of occasions?

6    A.    Yes.

7    Q.    Maybe one of the most painful lies he told you was

8    that he wouldn't get your best friend, I believe Lisa Riggs,

9    involved in methamphetamine.

10   A.    Yes.

11   Q.    He lied about his own family; is that -- one

12   instance that you were asked about was when he -- he said

13   let's go to Red Lodge, I think for New Year's Eve, and my

14   brother's going to be there.  And you thought that was the

15   case, but that likely was a lie because you got to Red Lodge

16   and no brother was there.

17   A.    Yes.

18   Q.    Okay.  So it's safe to assume that when it comes to

19   Robert, if we are to believe many of the experiences you've

20   shared with us in your testimony, there's a lot of

21   disrespect and a lot of dishonesty going on with the guy?

22   A.    Yes.

23   Q.    And Robert was -- he was your source of information

24   on shipments and wire transfers?

25   A.    Yes.

1    Q.    I'm going to backtrack just a little bit.  I know

2  you answered something similar to this yesterday.  But maybe

3  the question wasn't phrased right.

4          When you were asked if Robert ever worked, you --

5  you do remember that he had, no matter how temporary or

6  short-lived it was, that construction job behind the

7  hospital in Basin?

8    A.    That's correct.

9    Q.    Okay.  And I know it maybe was for a few months.

10   A.    Maybe a month.

11   Q.    Okay.  So it was short-lived.  And I understand why

12  that --

13   A.    Yes.

14   Q.    But you -- you do admit that he was employed in a

15  construction capacity on that project behind the hospital?

16   A.    Yes.  That was before we got involved in the drugs.

17   Q.    Okay.  And you gave him rides to work --

18   A.    Yes.

19   Q.    -- on at least a couple of occasions?

20   A.    Yes.

21   Q.    Do you recall him working hauling beets, a job

22  along those lines?

23   A.    I don't recall that.

24   Q.    Okay.  But you do remember the construction work --

25   A.    Yes.

1      Q.    -- that he was doing?  I know you guys were -- you

2    got high a lot together.

3      A.    Yes.

4      Q.    And some things aren't as clear sometimes.  You

5    know, getting high can cloud your judgment and your

6    recollection of things; is that correct?

7      A.    I remember most things pretty clearly.

8      Q.    Okay.  That's just an assumption I make about drug

9    addictions.  And I don't speak from experience, so I believe

10   your -- your impressions on that.  You know what, Melissa,

11   you've been up there for a long time.  I'm going to end my

12   questioning there.

13             MS. HIGHAM:  Thank you.

14             THE WITNESS:  Thank you.

15             THE COURT:  Mr. Fun, do you have any redirect?

16             MR. FUN:  Yes, Your Honor.  May it please the

17   court, counsel.

18                      REDIRECT EXAMINATION

19     Q.    (By Mr. Fun)  Good morning.  Ms. Morgan, I have

20   some questions for you based upon the cross-examination of

21   the defense attorneys.  And let me just first start with

22   Ms. Higham's questions.  She asked you about Rob Velasquez

23   working.  Do you remember those questions?

24     A.    Yes.

25     Q.    If I understand your testimony correctly, he had a

1    job for one month?

2        A.    Approximately.

3        Q.    But that was before there was drug involvement?

4        A.    Yes.

5        Q.    So was that before April's party in 2009?

6        A.    I believe so.

7        Q.    And April's party was the first time that you used

8    methamphetamine?

9        A.    Yes.

10       Q.    And that methamphetamine came from Robert

11   Velasquez?

12       A.    Yes.

13       Q.    And Robert Velasquez had told you that that

14   methamphetamine came from Danny Hernandez?

15       A.    Yes.

16       Q.    And you saw Danny Hernandez and met him at that

17   party?

18       A.    Yes.

19       Q.    Ms. Higham also extended upon Mr. Fleener's

20   questions about the abuse you suffered --

21       A.    Yes.

22       Q.    -- at Robert Velasquez's hands.  Now, I need to ask

23   some questions about that.  When you began -- when you first

24   met Robert Velasquez in high school, you characterized your

25   relationship as an on-and-off-again relationship?

1    A.    Yes.

2    Q.    At that point were you dating Robert Velasquez

3  steady?

4    A.    For the most part.  We weren't as deeply involved.

5    Q.    So at what point did your relationship with Robert

6  Velasquez change where you became more deeply involved with

7  him?

8    A.    When we got back together in 2009.

9    Q.    And was that the -- was that from after April's

10  party, or was that during New Year's?

11          And when I say New Year's, I'm referring to the Red

12  Lodge party that you went with him to in January of 2009.

13    A.    I believe the party at April's was really the

14  beginning of our stronger relationship.

15    Q.    Okay.  So after he provided you with

16  methamphetamine to use, things changed?

17    A.    Yes.

18    Q.    Ma'am, after that time, after April's party, is it

19  fair to say that he beat you often?

20    A.    Yes.

21    Q.    Can you describe for us the circumstances of how it

22  would come about that he would hit you?

23    A.    A lot of times if I was coming down off the meth,

24  he -- I would -- I would get upset and tired and probably a

25  little cranky, and he would tell me I was a fucking junkie.

1    And most of those times led to him hitting me.

2        Q.    Okay.  Now, were there times when he would hit you

3    when you didn't do what he told you to do?

4        A.    When he didn't?

5        Q.    Excuse me.  That was a bad question.  Were there

6    times that he hit you when you didn't do what he asked you

7    to do?

8        A.    Yes.

9        Q.    Were any of those occasions related to drug

10   transactions?

11       A.    Yes.

12       Q.    Do you remember any of those?

13       A.    If I didn't take him where he wanted me to take

14   him.  I can remember at least one time that he let a certain

15   individual take my vehicle.  I was left stranded at the

16   house in Cody outside of town.  He let that person take my

17   car home to Lovell because I did not want to go.  And that

18   resulted in him hitting me, and I had to sleep in the living

19   room on the floor with nothing.

20       Q.    Now, did you hide the fact that you were being

21   abused from your parents?

22       A.    Yes.

23       Q.    Why is it that you didn't report this to the

24   police?

25       A.    I was scared that if I did and he didn't get picked

1    up that it would just happen again or his family might do

2    something.  I didn't know what would happen.

3        Q.    Now, after the times that he would beat you, did he

4    provide you with methamphetamine to use?

5        A.    Yes.

6        Q.    Is it fair also to say that it wasn't until March

7    of 2010, when he was arrested and in jail, that you were

8    able to get away from him?

9        A.    Yes.

10       Q.    Now, ma'am, Ms. Higham also asked you some

11   questions about the Fresno trip.

12       A.    Yes.

13       Q.    And there were occasions on that trip to Fresno

14   when Robert Velasquez hit you?

15       A.    Yes.

16       Q.    Were there any times -- let me back up a minute.

17   You also testified previously that you met Alex Garcia on

18   that trip.

19       A.    Yes.

20       Q.    Do you remember if you met him before or after or

21   during the reunion with Robert Velasquez's family?

22       A.    After.

23       Q.    Was that in Fresno?

24       A.    Yes.

25       Q.    The point in time that you met Alex Garcia in

1    Fresno, were you mad at Robert Velasquez?

2        A.    Yes.

3        Q.    Can you describe the circumstances of how Robert

4    Velasquez introduced Alex Garcia to you in Fresno?

5        A.    The first time was at a motel that Robert and I

6    were staying in.  We had been fighting, so I just had tried

7    to go to sleep.  And Alex showed up with a girl.  Introduced

8    him.  But I was upset.  I didn't -- I don't even remember

9    saying hi.  I just wanted to be left alone.

10        Q.    Now, was that the only time that you had seen Alex

11    Garcia?

12        A.    No.

13        Q.    When was the other time you had seen him?

14        A.    We went to the lake the next day or a couple days

15    later.

16        Q.    And how much time do you recall spending at the

17    lake with Alex Garcia?

18        A.    Just maybe a couple of hours.

19        Q.    Did you have the occasion to talk to him while you

20    were at the lake?

21        A.    Not more than a few words.

22        Q.    Did you have the occasion to closely see him?

23        A.    Yes.

24        Q.    How close were you able to get to Alex to see him?

25        A.    Within a foot or two.

1    Q.    Now, was there anything distinctive about his

2  appearance that sticks out in your mind that you're still

3  able to remember who he is?

4    A.    All of his tattoos, glasses.

5    Q.    Likewise, Mr. Fleener asked you questions about

6  seeing Noe and Isasias only a coup -- what he phrased as a

7  couple of times.  Do you remember that?

8    A.    It was more than a couple.

9    Q.    Right.  How many times do you think you saw Noe?

10   A.    Five to seven.

11   Q.    How close were you able to get to Noe on any of

12  those occasions?

13   A.    Within a foot or two.

14   Q.    Did have you occasion to talk to Noe?

15   A.    Yes.

16   Q.    I believe you also testified that after Robert was

17  in jail, a drug deal was set up where Noe came to the house.

18   A.    Yes.

19   Q.    Is there any question in your mind that Noe is the

20  same individual that you pointed out in court yesterday?

21   A.    Same Noe.

22   Q.    Okay.  How about Isasias?

23   A.    Same.

24   Q.    Hondo?

25   A.    Same.

1    Q.    Likewise with Isasias, you -- Isasias was with Noe

2    on many of these occasion when you went to Sheridan with

3    Rob?

4    A.    Yes.

5    Q.    Is it fair to say that you also got within a few

6    feet of him?

7    A.    Yes.

8    Q.    Talked to him as well?

9    A.    Yes.

10    Q.    Ma'am, Mr. Fleener went through extensive questions

11    yesterday over this recorded call between you and your

12    brother.  Do you remember those questions?

13    A.    Yes.

14    Q.    Was it your -- what was your plan?  I mean, what

15    were you trying to do when you were talking to your brother?

16    What was going through your mind at that time, and what is

17    it that you planned on doing?

18    A.    I just wanted a story to tell my parents to protect

19    me and my brother for the time being until we knew how to go

20    about explaining it to law enforcement, to Mike.  It was

21    never our intention to tell that story to Mike.

22    Q.    And, in fact, you didn't tell that particular story

23    to Mike.  I mean, you didn't say that this package was Rob's

24    package.

25    A.    No.

1    Q.    And you, obviously, didn't say that yesterday or

2    today under oath to this jury.

3    A.    No.

4    Q.    Now, ma'am, I think it goes without saying that you

5    have got good parents.

6    A.    Yes.

7    Q.    And you didn't want to hurt them.

8    A.    Absolutely not.

9    Q.    And you wanted some time to be able to sort out in

10   your own mind how to explain this to them.

11   A.    Yes.

12   Q.    And since then, have you told them the truth?

13   A.    Yes.

14   Q.    Ma'am, there was also some questions about a

15   statement that Mr. Fleener took and excised out of that

16   recording about lining out Drayton.  Do you remember that?

17   A.    Yes.

18   Q.    Mr. Fleener tried to allege that it was either

19   drug-related or something of that nature.  Do you remember

20   that?

21   A.    Yes.

22   Q.    But he never gave you a chance to explain it.  What

23   was going on there?  What was happening?

24   A.    In our past, Drayton would get a little drunk and

25   mouthy and loud, and I just didn't want to hear it.  So I'd

1   call my brother, and he'd come over and line him out, just

2   calm him down, sober him up.

3       Q.   Mr. Fleener also asked about the federal letter

4   that you received from our office, the U.S. Attorney's

5   Office.  Do you remember those questions?

6       A.   Yes.

7       Q.   Let me just display for you Government's Exhibit

8   604.

9           MR. FUN:  Abby, it's not coming up on this screen.

10          (Discussion off the record.)

11      Q.   (By Mr. Fun)  Ma'am, as Mr. Fleener was going

12  through this letter with you, there was -- there's two

13  aggravated assault charges?

14      A.   Yes.

15      Q.   And Mr. Fleener tried to indicate that that was an

16  error; do you remember that?

17      A.   Yes.

18      Q.   Had you, in fact, been charged for two aggravated

19  assaults?

20      A.   Yes.

21      Q.   Did it occur out of the same incident?

22      A.   Exactly the same time.

23      Q.   Could you please explain that.

24      A.   I believe it's because there were two different

25  victims in that circumstance.

1    Q.    Tell us about the circumstance of how there were

2    two victims.  Well, let me back up.  Let me ask a different

3    question.  On that part -- those -- did those two aggravated

4    assaults occur on the same day?

5    A.    Yes.

6    Q.    And was it the exact same incident, just two

7    different individuals?

8    A.    Yes.

9    Q.    Was Robert Velasquez involved with that?

10    A.    Yes.

11    Q.    Was it -- was it concerning a drug deal of some

12    sort?

13    A.    Yes.

14    Q.    Explain the circumstances of how -- of what

15    happened in that occasion then.

16    A.    I was under the impression that we were supposed to

17    be going back to the shop from our house in town.  I got in

18    the vehicle with Rob and Snuff.  We were supposed to be

19    going back to the shop.  Instead, Rob asked Snuff to go the

20    other way, and he directed Snuff to the residence of these

21    two individuals.

22          Robert got out of the truck, and I was still in the

23    vehicle watching.  I saw Rob hit one individual and walk in

24    the house.  He was in there for a while.  Snuff went in.  I

25    got nervous and scared, and I went in there and just tried

1   to get everybody to leave.

2       Q.    Okay.  What was Rob doing there; do you know?

3       A.    When I walked in, he was dragging Joe across the

4   floor into the kitchen, kicking him, hitting him, and then

5   busted a coffee pot over his head.

6       Q.    And you got charged for both Rob assaulting Snuff

7   and Rob assaulting Joe?

8       A.    Not Snuff.  Joe and Mike.

9       Q.    Joe and Mike.

10      A.    Yes.

11      Q.    How was that related to a drug transaction?

12      A.    Robert gave Joe $400 to go to, I believe, Riverton

13  and pick up some meth from a source of his.  Joe never got

14  back in contact with Robert.  And Robert was mad and wanted

15  his money or the drugs.  And that's how he went about trying

16  to do it.

17      Q.    And let's now look at the final charges there that

18  Mr. Fleener asked you about.  The first one, aiding and

19  abetting distribution of methamphetamine; do you remember

20  that particular occasion?

21      A.    Yes.

22      Q.    If I recall, that was relative to Lisa Riggs?

23      A.    Yes.

24      Q.    And that's when you drove Rob to meet with Lisa

25  Riggs?

Case 1:10-cr-00329-NDF   Document 487   Filed 01/04/12   Page 28 of 53

```
 1    A.    Yes.

 2    Q.    Now, at that -- when you were doing that, did you

 3  know that that's what Rob was doing?

 4    A.    No.

 5    Q.    It wasn't until you saw Lisa that that's what was

 6  happening?

 7    A.    That's right.

 8    Q.    And that count was dismissed?

 9    A.    Yes.

10    Q.    Final count, which you've pled guilty to, ma'am,

11  that incident -- I'm displaying Exhibit Renteria C.  Count

12  II.  That incident occurred on March 29th of 2010; is that

13  correct?

14    A.    Yes.

15    Q.    Okay.  Ma'am, do you need a break?

16    A.    I'm okay.

17    Q.    That incident you previously testified about was

18  when Rob was in jail?

19    A.    Yes.

20    Q.    And he set up a drug deal with Demoney -- excuse

21  me.  That was not correct.  He set up a drug deal to get

22  drugs from Snuff?

23    A.    Yes.

24    Q.    That was 1 ounce of cocaine?

25    A.    Yes.
```

1    Q.    And he arranged for you to be involved in that?

2    A.    Yes.

3    Q.    He had you obtain the drugs from Snuff?

4    A.    Yes.

5    Q.    And had you distribute those drugs for him?

6    A.    Yes.

7    Q.    Now, Rob was in jail.  Why would you do that?  At

8    that point in time, were you still using drugs?

9    A.    Yes.

10   Q.    Were you still emotionally attached to Rob?

11   A.    Yes.

12   Q.    Did you have any fear of Rob or others?

13   A.    Yes.

14   Q.    And, again, go back to 604, ma'am.  And I'll go to

15   the second page here.  Mr. Fleener asked you some questions

16   about this part.  And specifically I want to look at -- and

17   I've circled the last -- second-to-last paragraph starting

18   with "as previously mentioned."

19         Now, you had a chance to read this; correct?

20   A.    Yes.

21   Q.    And go over it with your attorney?

22   A.    Yes.

23   Q.    And now that it's admitted into court, could you

24   please read what I've circled there.

25   A.    As previously mentioned, the agreement not to

1  federally prosecute Ms. Morgan is express -- expressly

2  conditioned on her guilty pleas, a sentence of 8 to 10 years

3  of imprisonment, and her continued truthfulness and complete

4  cooperation.  In regards to the later, Ms. Morgan must

5  provide to the United States and/or State of Wyoming a

6  complete and truthful account of her involvement, and the

7  involvement of all others of whom she has any knowledge

8  whatsoever, in the crimes which are the subject of the

9  government's investigation or any other crimes which she has

10  knowledge consistent with full use of all said statements or

11  information, not full use --

12     Q.   Okay.  That's fine, ma'am.  I don't need you to

13  read any further than that.

14          Ma'am, has this been one of the hardest things

15  you've had to do?

16     A.   Yes.

17     Q.   Now, there is no question that you were addicted to

18  methamphetamine after Rob provided you with methamphetamine.

19     A.   Yes.

20     Q.   So the first time you used it, did you think that

21  you would be hooked after that?

22     A.   No.

23     Q.   Did you, in fact, become hooked after that first

24  use?

25     A.   Very.

1    Q.    Have you since then been able to recover?

2    A.    Yes.

3    Q.    How were you able -- did you receive any formal or

4    in-patient treatment for your recovery?

5    A.    No.

6    Q.    You did it on your own?

7    A.    Yes.

8    Q.    Ma'am, do you recall the questions that Mr. Fleener

9    went through and tried to say that you were lying when you

10   continued to use drugs while you were out on bond?

11   A.    Yes.

12   Q.    Were you ever asked under oath if you continued to

13   use drugs while you were out on bond?

14   A.    No.

15   Q.    It wasn't until Mr. Fleener asked his questions

16   that you were under oath?

17   A.    Yes.

18   Q.    And you told the truth about that?

19   A.    Yes.

20   Q.    Is it more accurate to say, in your mind, that you

21   violated the court's order concerning conditions of bond?

22   A.    Yes.

23   Q.    Did you ever lie to the court in Park County under

24   oath?

25   A.    No.

1    Q.    Now, Mr. Fleener asked you extensive questions

2    about this package, the package concerning you and your

3    brother that was coming from Denver.  Do you remember that?

4    A.    Yes.

5    Q.    Were those drugs being packaged in candles?

6    A.    No.

7    Q.    Only the packages that came from Fresno were being

8    packaged in candles?

9    A.    Yes.

10   Q.    Now, Mr. Fleener also asked you questions that

11   tried to indicate that the -- if you didn't see it yourself,

12   it was inaccurate.  Such as if it was based on what Rob was

13   telling you, that that was inaccurate.  Do you remember

14   those questions?

15   A.    Yes.

16   Q.    Okay.  Now, if I recall correctly, Rob had told you

17   these packages were coming from Fresno.

18   A.    Yes.

19   Q.    Did you in fact see those packages?

20   A.    Yes.

21   Q.    Did you in fact see them being opened?

22   A.    I only remember seeing the empty packages.

23   Q.    Do you remember getting methamphetamine from those

24   packages from Rob?

25   A.    Yes.

1      Q.    Do you remember any occasions -- I think you

2   previously testified to this -- that you were in Sheridan at

3   times with Rob?

4      A.    Yes.

5      Q.    And a package arrived there?

6      A.    Yes.

7      Q.    And you obtained methamphetamine from Rob from that

8   package?

9      A.    Yes.

10     Q.    And that was when Rob was with Noe and Isasias?

11     A.    Yes.

12     Q.    Ma'am, Mr. Fleener asked you some questions about

13  your job at the nursing home.

14     A.    Yes.

15     Q.    I think you indicated that you worked there from

16  January to October of 2009.

17     A.    Yes.

18     Q.    And you left the nursing home?

19     A.    Yes.

20     Q.    Did you leave voluntarily?

21     A.    Yes.

22     Q.    Were you fired?

23     A.    No.

24     Q.    I think you testified that you left because at that

25  point, you knew that because of the addiction, you

1    couldn't -- you believed you couldn't do your job.

2        A.    Yes.

3        Q.    At that point in time, were you -- did you then

4    begin helping -- well, let me rephrase the question.

5            While you were working at the nursing home, I think

6    you also testified that you were -- it was wearing you out

7    because you were working there.  But then you would come

8    home, and then you'd have to take Rob places.

9        A.    Yes.

10       Q.    And you had to take him to distribute drugs?

11       A.    Yes.

12       Q.    And pick up money?

13       A.    Yes.

14       Q.    And so you were getting very little rest?

15       A.    Yes.

16       Q.    And Rob was also giving you methamphetamine to use?

17       A.    Yes.

18       Q.    Now, ma'am, is it accurate to say that when Rob was

19   giving you the methamphetamine, he would either put a line

20   out for you or load the pipe for you to smoke?

21       A.    Yes.

22       Q.    And he would also use while you used at the same

23   time?

24       A.    Yes.

25       Q.    Now, ma'am, Mr. Fleener also tried to indicate that

1    you lied about the marijuana that was found -- that your

2    mother found in your room.  Remember those questions?

3       A.    Yes.

4       Q.    After the marijuana was found, did you tell your

5    mom that it was yours?

6       A.    Yes.

7       Q.    You didn't lie to her about it?

8       A.    No.

9       Q.    Ma'am, Mr. Fleener also asked you if you felt that

10   you were more involved with your brother in the distribution

11   of drugs than with Rob Velasquez.

12      A.    Yes.

13      Q.    But it's true that you did help Robert Velasquez

14   distribute drugs?

15      A.    I drove him places.

16      Q.    And pick up money -- take him to pick up money?

17      A.    Yes.

18      Q.    And when he went to jail, you were involved with

19   the Snuff cocaine and distributing that to Demoney?

20      A.    Yes.

21      Q.    That was at his direction?

22      A.    Yes.

23      Q.    And you wired money to Alex Garcia in Fresno?

24      A.    Yes.

25      Q.    And that was for drugs?

1    A.    Yes.

2    Q.    And drugs were returned after that money was wired?

3    A.    Yes.

4    Q.    Within a few days?

5    A.    Yes.

6    Q.    And that was, again, at the direction of Robert

7    Velasquez?

8    A.    Yes.

9    Q.    And your involvement not only with the cocaine

10   offense but with the aggravated assault was also with Robert

11   Velasquez?

12   A.    Yes.

13   Q.    As well as going to Fresno with him?

14   A.    Yes.

15   Q.    Is it fair to say that you wouldn't have -- well,

16   withdraw that question.

17         I want to now just turn to -- specifically to the

18   transaction involving Noe.  And that was when Robert

19   Velasquez was in jail?

20   A.    Yes.

21   Q.    Do you recall how much methamphetamine Noe brought

22   to you and your brother?

23   A.    I believe it was an ounce.

24   Q.    Do you know why Noe was bringing the

25   methamphetamine to you and your brother?

1    A.    He said it was to help us out with money and to

2    help Robert out with money.

3    Q.    Had you had any conversations with Robert prior to

4    Noe showing up with that 1 ounce of methamphetamine?

5    A.    Yes.

6    Q.    Were those conversations about methamphetamine?

7    A.    Yes.

8    Q.    What is it that Robert said?

9    A.    To get ahold of his boy.

10    Q.    And who did you understand "his boy" to mean?

11    A.    Noe.

12          MR. FUN:  Thank you.  I have nothing further.

13          THE COURT:  Thank you, Mr. Fun.  Any recross?

14          MR. HORN:  Thank you, Your Honor.  It will be very

15    brief.

16                    RECROSS-EXAMINATION

17    Q.    (By Mr. Horn)  Did you write letters to

18    Mr. Velasquez while he was in jail?

19    A.    Yes.

20    Q.    How often did you write letters, if you recall?

21    A.    Quite often.  Every other day.

22    Q.    Okay.  And did you go visit him in jail as well?

23    A.    No.

24    Q.    Did you talk to him on the phone?

25    A.    Yes.

1   Q.   Daily?

2   A.   Yes.

3   Q.   And was there a time with you and Mr. Velasquez

4  that you had talked -- each of you talked about the

5  possibility of getting married?

6   A.   Yes.

7   Q.   And did you actually obtain a marriage certificate

8  at the courthouse?

9   A.   Yes.

10   Q.   And was it ever actually filed?

11   A.   I don't believe so.

12   Q.   Well, in terms -- okay.  You answered the question.

13  So there was no marriage that actually took place?

14   A.   No.

15      MR. HORN:  Can I have a moment with my client, Your

16  Honor?

17      THE COURT:  Yes.

18      MR. HORN:  Nothing further, Your Honor.

19      THE COURT:  Thank you.  Mr. Fleener?

20      MR. FLEENER:  Can I have a minute, Judge?

21      THE COURT:  Yes.

22      MR. FLEENER:  On behalf of Mr. Renteria, we have no

23  questions.  Thank you, Your Honor.

24      THE COURT:  Thank you.  Mr. Timbers?

25      MR. TIMBERS:  Nothing from Mr. Ordaz.  Thank you.

```
 1            THE COURT:  All right.  Thank you.

 2            MS. HIGHAM:  I'm sorry, Your Honor.  Nothing from

 3     Mr. Garcia either.

 4            THE COURT:  Thank you.  Ms. Morgan, the court very

 5     much appreciates your testimony over the last several days.

 6     And you're excused and released from your subpoena.

 7            THE WITNESS:  Thank you.

 8            THE COURT:  Thank you.

 9         (Witness excused.)

10            THE COURT:  The government may call its next

11     witness.

12            MR. FUN:  Thank you, Your Honor.  I'd like to call

13     Dayle Sinclair.

14            MR. HORN:  Judge, I -- I understood we had --

15            THE COURT:  If we could do a --

16            MR. HORN:  I'm sorry.  Sidebar.

17            THE COURT:  -- sidebar.

18         (Following out of the presence of the jury.)

19            THE COURT:  Mr. Horn, this is the foundational

20     witness.

21            MR. HORN:  Oh.

22            THE COURT:  It's my understanding Mr. Fleener has

23     no concerns with the government calling this one

24     foundational witness.  And then we'll break and recess after

25     that.
```

1       MR. FLEENER:  That's fine, Judge.

2       MR. HORN:  That was not my recollection, Judge,

3  when Mr. Murray came up to the stand when I was there.

4  So -- that's fine.  If Mr. Fleener says it's okay, it's

5  okay.

6       THE COURT:  It's probably my confusion.

7       MR. HORN:  That's all right.

8       MR. MURRAY:  Your Honor, our position was that it's

9  up to Mr. Fleener, however he --

10       MR. FLEENER:  I appreciate everybody's concerns.

11  I'm ready to go.

12       THE COURT:  All right.  Thank you.

13       MR. HORN:  Thank you, Judge.

14     (Following in the presence of the jury.)

15       MR. FUN:  Mr. Sinclair, please come forward so you

16  can be sworn.  And please just stand right up here, sir.

17     (Witness sworn.)

18       THE CLERK:  Please take a seat.  State and spell

19  your name for the record.

20                      DAYLE SINCLAIR,

21  having been first duly sworn, was examined and testified as

22  follows:

23                   DIRECT EXAMINATION

24   Q.   (By Mr. Fun)  Sir, could you please state and spell

25  your name for the record.

1     A.     Dayle Sinclair.

2     Q.     Mr. Sinclair, where are you employed?

3     A.     Securus Technologies.

4     Q.     And how long have you been employed with Securus

5     Technologies?

6     A.     Nine years.

7     Q.     In what capacity are you employed with Securus?

8     A.     I am a field service technician that works on

9     inmate phone systems.

10    Q.     Could you please explain the phone -- the inmate

11    phone system?

12    A.     Every phone call out of a jail that's in an inmate

13    pod is recorded.  We are able to monitor that -- those phone

14    calls.  We record them.  We retain them for however long the

15    facility requests.

16    Q.     Okay.  Now, in this particular occasion, are you

17    the representative and field service technician for Wyoming?

18    A.     I am the field service technician for the vast

19    majority of Wyoming, Park County in particular.

20    Q.     All right.  Now, tell us about the system that's

21    installed at Park County.

22    A.     The system is called a CAM.  It's Called Access

23    Manager system.  That is a local looped system which

24    allows -- there is no interaction between the outside world

25    and the -- and the CAM system -- recording system.

1          So what it does is it -- we don't -- we don't put

2   anything out on the Internet, or there's no way to access

3   this system other than locally, either through the

4   detectives or the jail commander.

5      Q.    Okay.  Now, can you explain to us what happens when

6   an inmate makes a phone call?

7      A.    When an inmate picks up a phone, there is a prompt

8   in there that gives them the option for English, Spanish, or

9   a variety of other languages, letting them know what the

10  process is, how to make a collect call, how to make a debit

11  call.  That this call is subject to recording and

12  monitoring.

13         They would place the number in -- that they want to

14  call to either a friend or family member.  Then the call is

15  validated, so we check for different -- you know, whether

16  that call has been blocked, whether it is billable, whether

17  it's a prepaid card, whether it's a free call, attorney

18  call.  So we can go through all of that process while

19  they're waiting.

20         When the friend or family member pick up the phone,

21  they're notified that they're receiving a collect call or a

22  call from an inmate from whatever facility they're in.  This

23  gives them the ability then to accept the call, block the

24  call.  And once they accept the call, it's notified that

25  this call is subject to recording and monitoring as well.

1    Q.    Now, can -- do you know if friends or family can

2    call in to the jail?

3    A.    No.

4    Q.    So only an inmate can call out?

5    A.    Correct.

6    Q.    Who pays for the calls that the inmate is making to

7    friends or family?  Excuse me.  Who pays for the call that

8    the inmate makes to friends or family?

9    A.    I'm sorry.  I still -- I still can't hear you.

10   Q.    Who pays for the calls?

11   A.    Who pays for the call?  It depends on what type of

12   call.  If it is a collect call, then the friends and family

13   member, they pay for the call.  If it's a pre-paid card

14   called in, the inmate has purchased a card or a friend or

15   family member has purchased a card and given that to the

16   inmate.

17   Q.    Do you know when this CAM system was installed at

18   Park County?

19   A.    It would have been installed in June of 2006.

20   Q.    Who installed it?

21   A.    I did.

22   Q.    Since your installation of the CAM system at Park

23   County, have you been the field service rep for Park County?

24   A.    Yes.

25   Q.    Have there been any problems with that system at

1  Park County?

2      A.    No.

3      Q.    How do you know that?

4      A.    I went through the service records before I came

5  down to Cheyenne just to verify.  Plus, I know that I -- I

6  would have worked on the system.  But we haven't had any

7  recording failures, any hard drive failure, any system

8  failure on the platform side.

9          There have been, of course, some handsets and

10  things like that that we replace occasionally due to damage.

11  But there has not been any service other than preventive

12  maintenance, which we normally do.  But there hasn't been

13  any failure on that system at all.

14     Q.    If there had been a failure, would you have been

15  notified?

16     A.    Yes.

17     Q.    Now, does this CAM system accurately record the

18  conversation between the inmate and the person that they're

19  calling?

20     A.    Correct.

21     Q.    If there was a problem with that recording or any

22  particular recording, would there be some kind of system

23  malfunction or some kind of notification?

24     A.    Yes.

25     Q.    What kind of notification would be made?

USA v. _____ et al. - Kowalczyk - Cross
Case 1:10-cr-00329-NDE Document 487 Filed 01/04/12 Page 45 of 53   VOL VIII

45

1    A.    Either the facility would have called us and let us

2    know that there was an issue going on.  We would have opened

3    up a service ticket and been able to track that to make

4    sure.  Plus, when I do preventive maintenance for the site,

5    we go through the call logs and make sure that -- that

6    there's no issues been recorded or no issues that have been

7    detected in the system.

8    Q.    In this case there weren't any?

9    A.    No.

10         MR. FUN:  Just a moment, Your Honor.

11         THE COURT:  Thank you.

12         MR. FUN:  Thank you, sir.  I don't have any further

13   questions at this time.

14                        CROSS-EXAMINATION

15   Q.    (By Mr. Horn)  Sir, is there a sharing -- is there

16   a sharing of the revenue from the calls that's given either

17   to the sheriff of Park County or to the Park County -- in

18   its corporate name, so to speak?

19         In other words, do they get any money?  Does the

20   jail or the county get any money?

21   A.    There is a commission that is paid to the county.

22   Q.    Okay.  Do you know about what that is?

23   A.    I don't, sir.  I'm not the account manager for

24   that -- for that site.

25         MR. HORN:  That's all I have, Your Honor.  Thank

1  you.

2                    CROSS-EXAMINATION

3      Q.    (By Mr. Timbers)  You mentioned -- you mentioned

4  that if there's any malfunctions, you -- you make a log of

5  it.

6      A.    I'm sorry, sir.

7      Q.    You mentioned if there's any malfunctions, you make

8  a particular log of it.

9      A.    My company does, yes.

10     Q.    Okay.  And that would be on some sort of instrument

11 log or on some sort of machine log?  Where would that be?

12     A.    It would be -- for the system itself, it would be

13 on the system, what we can -- that we can check either

14 remotely and/or on site.  As far as our heat ticket system,

15 that is down in Dallas, Texas.

16     Q.    Okay.  And do you have -- and you've looked at the

17 records with regard to the Park County, I guess, machine or

18 computer system, and there are no malfunctions; correct?

19     A.    Other than just the general handset replacement or

20 dial pad that we do within the pods.  But as far as the

21 system itself, except for the normal preventive maintenance

22 that we do, there has not been a failure on that system.

23          MR. TIMBERS:  Thank you very much, sir.

24          MS. HIGHAM:  I have no questions.

25          THE COURT:  Thank you.  Mr. Fleener, any questions?

1          MR. FLEENER:  Can I just have a minute, please,

2    Judge?

3          THE COURT:  Yes.

4          MR. FLEENER:  No questions, Your Honor.  Thank you.

5          THE COURT:  Any redirect, Mr. Fun?

6          MR. FUN:  Nothing further, Your Honor.  Thank you.

7          THE COURT:  Thank you, Mr. Sinclair.  We appreciate

8    your testimony.  You're excused and released.

9         (Witness excused.)

10         THE COURT:  Members of the jury, at this time we

11   will recess for the week.  We have a member of the defense

12   team that is facing a very serious family medical emergency

13   which may result in the loss of a parent.

14         We certainly want to make sure that the defense

15   counsel, as well as the counsel for the government, is here

16   representing the interests of their clients to their full

17   ability.  Under these circumstances, all things considered,

18   everyone believes it's in the best interest of justice to

19   recess today and continue this trial to commence on Tuesday.

20         We appreciate your patience and tolerance with this

21   situation.  I know if you were in the same position that you

22   would hope similar consideration could be given.  The court

23   does have a full schedule Tuesday morning.

24         Is that correct, Abby?

25         THE CLERK:  It is correct.

1        THE COURT:  We'll try to move those matters that I

2    had previously set for Tuesday morning to complete my

3    calendar for the rest of this week.

4        And so I would ask that the jury be back ready to

5    report at 8:30 in the morning.  I must say, though, that

6    things are a bit up in the air.  We hope to be available to

7    start this trial again Tuesday morning.  But if we still

8    are missing a member of the defense team, we may end up

9    calling you in and continuing it at that point.

10       But hopefully we'll know more over the course of

11   the next day, through the weekend.  And Monday, of course,

12   is a federal holiday.

13       So thank you very much for your attention this

14   week.  Please pay special attention to the admon --

15   Mr. Horn?

16       MR. HORN:  Judge, I'm familiar with some of the

17   procedures.  Perhaps we could have a sidebar.

18       THE COURT:  All right.  We'll be interrupted for a

19   moment.

20       (Following out of the presence of the jury.)

21       MR. HORN:  Judge, given the fact we don't know how

22   Mr. Fleener's mother is going to be coming out of her

23   surgery, I -- I would suggest we maybe use the jury system

24   where you can call in and they could be left a message on

25   that rather than having them come in on Tuesday.

1       I think that's what they -- I have -- they have had

2   that in the past, where you just dial in to a number and you

3   get a recording.

4       THE COURT:  Abby?  The suggestion has been made

5   that we use the system administered by Johnna where the

6   jurors call on whether to report.

7       THE CLERK:  Okay.

8       THE COURT:  Do you think that that's agreeable?

9       THE CLERK:  I believe we can set that up, yeah.  I

10  was actually just informed that Judge Johnson has set a

11  sentencing for Ms. Higham.

12      MS. HIGHAM:  Tuesday morning thinking that you were

13  going to be tied up.  And I think that would probably be the

14  best system, to work out a schedule and have them call in.

15      THE COURT:  All right.

16      MS. HIGHAM:  It is actually a change of plea at

17  8:30.  I don't expect it -- I'll do whatever the court needs

18  me to do.

19      THE COURT:  We'll use the juror call-in system.

20  They're familiar with that.  Is that agreeable to the

21  government?

22      MR. FUN:  Yes.

23      THE COURT:  Thank you.

24   (Following in the presence of the jury.)

25      THE COURT:  Thank you for that interruption.

1   Counsel has suggested, and I think it is a good suggestion

2   to, under the circumstances and considering the unknowns, to

3   utilize the juror call-in system so that you'll be using

4   that system, the juror call-in system that was -- had been

5   previously set up for you to call on whether you needed to

6   report.  And that way we'll be able to advise you of the

7   time and day for reporting.  It may not be Tuesday at 8:30

8   is the bottom line of that.

9        And, again, I regret the uncertainties.  But I

10  believe under the circumstances, that would save an

11  inconvenience for you if -- if we're not ready to start at

12  8:30 Tuesday morning and would accommodate the interests of

13  the family involved in this medical emergency.

14       Is there anything further that needs to come to the

15  attention of the court with the jury here?

16       MR. FUN:  Nothing from the United States, Your

17  Honor.

18       THE COURT:  Thank you, Mr. Fun.

19       MS. HIGHAM:  Nothing from the defense, Your Honor.

20       MR. TIMBERS:  Nothing from Mr. Ordaz?

21       MR. HORN:  Nothing from Mr. Velasquez.

22       THE COURT:  And let me again retrieve my thought.

23  I was going to -- again, I'm sure you were anticipating my

24  admonishment to not discuss this case with anyone.  Please,

25  given the length of the continuance, don't inadvertently

1    expose yourself to reading or hearing anything about the

2    course of this trial through news broadcast.  Don't research

3    anything about this case, the facts of the case or any of

4    the individuals involved in the case.

5         And as always, please keep an open mind throughout

6    the entire course of the case until the case is closed and

7    the case is ready and presented to you for your

8    deliberations.

9         Thank you for your time and patience.  We stand in

10   recess until call.

11       (Following out of the presence of the jury.)

12       THE COURT:  Back on the record.  Is there anything

13   that the court needs to attend to before we recess for the

14   week until call?

15       MR. FUN:  Nothing from the United States, Your

16   Honor.

17       THE COURT:  Thank you.

18       MR. FLEENER:  Your Honor, I will get a number from

19   the clerk's office and keep the clerk apprised of what's

20   going on.  I'm hopeful that I'll know, either good or bad,

21   in the next two days.  And, you know, if I know good, then

22   we can go -- I'll let everyone know, hopefully, tomorrow.

23   Because she should be out of surgery today.  And if it's

24   bad, I'll let everyone know that too, and then we'll figure

25   something out.  I'll coordinate with Abby.

1          THE COURT:  Please know you have everyone's --

2          MR. FLEENER:  Thank you, Your Honor.

3          THE COURT:  -- thoughts and prayers.

4          MR. FLEENER:  I appreciate that.  Thank you.  And

5   appreciate the United States in this matter.

6          THE COURT:  Hearing nothing further, we'll stand in

7   recess until call.

8       (Trial proceedings recessed

9       10:11 a.m., October 7, 2011.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2          I, MARGIE R. DAUSTER, Deputy Official Court

3    Reporter for the United States District Court for the

4    District of Wyoming, Registered Professional Reporter, and a

5    Certified Realtime Reporter, do hereby certify that I

6    reported by machine shorthand the foregoing proceedings

7    contained herein on the aforementioned subject on the date

8    herein set forth, and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 31st day of December, 2011.

11

12              */s/ Margie R. Dauster*

13              _____
                   MARGIE R. DAUSTER
                Deputy Official Court Reporter
14              Registered Professional Reporter
                Certified Realtime Reporter
15

16

17

18

19

20

21

22

23

24

25