1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    ----------------------------------------------------------------

4    UNITED STATES OF AMERICA,
                                        Case No. 10-CR-329-F
5            Plaintiff,                 Volume XII of XX
                                        (Pages 1 through 263)
6            vs.
                                        Cheyenne, Wyoming
7    ROBERT VELASQUEZ, ET AL.,          October 25, 2011
                                        8:50 a.m.
8            Defendants.

9    ----------------------------------------------------------------

10

11

                     TRANSCRIPT OF TRIAL PROCEEDINGS
12
           BEFORE THE HONORABLE NANCY D. FREUDENTHAL
13              CHIEF UNITED STATES DISTRICT JUDGE

14            and a jury of twelve and two alternates

15

16

17

18

19

20
     Court Reporter:          MRS. JANET DAVIS, RMR, FCRR
21                            United States Court Reporter
                              2120 Capitol Avenue, Room 2228
22                            Cheyenne, Wyoming 82001

23

24
     Proceedings recorded by mechanical stenography, transcript
25   produced with computer.

```
 1   APPEARANCES:

 2   For the Plaintiff:        MR. DARRELL L. FUN
                               Assistant U.S. Attorney
 3                             UNITED STATES ATTORNEY'S OFFICE
                               District of Wyoming
 4                             100 East B Street, Suite 2211
                               P.O. Box 22211
 5                             Casper, Wyoming  82601

 6
     For the                   MR. VINCENT J. HORN, JR.
 7   Defendant Velasquez:      Attorney at Law
                               9774 Chanteclair Circle, Suite 100
 8                             Littleton, Colorado  80126

 9
     For the                   MR. PETER J. TIMERS
10   Defendant Ordaz:          Attorney at Law
                               SCHWARTZ, BON, WALKER, STUDER, LLC
11                             141 South Center Street, Suite 500
                               Casper, Wyoming  82601-2588

12

13   For the                   MR. THOMAS A. FLEENER
     Defendant Renteria:       Attorney at Law
14                             FLEENER & VANG, LLC
                               2523 Garfield, Suite D
15                             Laramie, Wyoming  82073

16
     For the                   MS. JILL A. HIGHAM
17   Defendant Garcia:         Attorney at Law
                               THE HIGHAM LAW OFFICE
18                             1001 East Harmony Road, Suite A-366
                               Ft. Collins, Colorado  80525-3354
19

20

21

22

23

24

25
```

1                           I N D E X

2     PLAINTIFF'S WITNESSES                              PAGE

3     KIMBERLY PERKINS
      Direct (Continued) - Mr. Fun                         4
4     Cross - Mr. Fleener                                  57
      Cross - Mr. Horn                                    139
5     Cross - Mr. Timbers                                 141
      Cross - Ms. Higham                                  143
6     Redirect - Mr. Fun                                  146

7     AMBER BEAR
      Direct - Mr. Fun                                    162
8     Examination - The Court                             189
      Examination - Mr. Horn                              191
9     Cross - Mr. Horn                                    206
      Cross - Mr. Fleener                                 213
10    Redirect - Mr. Fun                                  250

11

      PLAINTIFF'S EXHIBITS                           RECEIVED
12
      606                                                172
13    606-A                                              172
      611                                                 81
14    3000                                               197

15

      DEFENDANTS' EXHIBITS                           RECEIVED
16
      Renteria Exhibit E                                 217
17

18

19

20

21

22

23

24

25

1                       P R O C E E D I N G S

2          (Trial proceedings reconvened

3          8:50 a.m., October 25, 2011.)

4          (Following in the presence of the defendants and jury.)

5               THE COURT:  Good morning.  We're here in the

6     continuation of Docket 10-CR-329.  The Court notes the presence

7     of the jury with roll call waived.

8               Ms. Perkins, I would like to remind you that you

9     remain under oath.

10              Mr. Fun, this is your witness.

11              MR. FUN:  Good morning, Your Honor.

12              THE COURT:  Good morning.

13              MR. FUN:  Counsel.

14              MR. FLEENER:  Counsel.

15              MR. FUN:  Ladies and gentlemen of the jury, good

16    morning.

17                         KIMBERLY PERKINS,

18    called for examination by the Plaintiff, being previously

19    sworn, on her oath testified further as follows:

20                    DIRECT EXAMINATION (CONTINUED)

21    Q.  (BY MR. FUN)  Ms. Perkins, when we left off yesterday, we

22    were talking about your employment at Shipton's Big R in

23    Sheridan.

24              When did you begin working at Shipton's?

25    A.  May of 2007.

1   Q.   At some point in time -- you began as a cashier?

2   A.   Yes.

3   Q.   And you eventually went into receiving?

4   A.   Correct.

5   Q.   When is it you got your job in receiving?

6   A.   Probably March of '08.

7   Q.   And as receiving, you were in charge of receiving the

8   shipments of whatever goods or things that were coming into the

9   store?

10  A.   Correct.

11  Q.   And at that point, you had been employed by Shipton's for

12  how long?

13  A.   At that point, probably ten months.

14  Q.   Now, once you got your job in receiving, did you have

15  conversations with Noe about the package of methamphetamine?

16  A.   That was probably to get at -- at Shipton's?

17  Q.   Yes.

18  A.   That was probably about March of '09.

19  Q.   Okay.  So tell us what the conversation was in March of

20  '09.

21  A.   Noe had asked if I wanted to make some extra money, and I

22  said yes.  And the understanding was packages were going to be

23  shipped to my work, and then once they -- once I received them,

24  then I was supposed to give them to -- to Noe.

25  Q.   At that point did you know what was going to be in these

1   packages?

2   A.   I was never told.  I just assumed.

3   Q.   What was your understanding as to what was going to be in

4   these packages?

5   A.   Drugs.

6   Q.   Did you later learn what was actually in those packages?

7   A.   Yes.

8   Q.   And what is it that you learned was in those packages?

9   A.   Methamphetamine.

10  Q.   When was the first package that you recall receiving at

11  Shipton's?  Do you remember when -- how long you had been in

12  receiving at that point?

13  A.   Probably two, three weeks.

14  Q.   And I want to find out, how is it that you knew this --

15  were you expecting this package to come?

16  A.   Yes.

17  Q.   How is it that you would know or expect it?

18  A.   The night before it was supposed to arrive, Noe would text

19  me and let me know.

20  Q.   Do you remember what he would text you?

21  A.   Most of the time it was we wanted to go to lunch the next

22  day, and then the next day when it would come.  Then I would

23  text him and tell him that I was ready to go to lunch.

24  Q.   Had you worked out -- was that some kind of code system?

25  A.   Yes.

1   Q.   Had you worked that out with Noe beforehand?

2   A.   Yes.

3   Q.   And what was that code supposed to mean?

4   A.   That the package had arrived, and so I was going to drop it

5   off or he was going to -- I was going to, yeah, take it to him.

6   Q.   How was the package delivered, I mean, by what type of

7   carrier?

8   A.   UPS.

9   Q.   Was it -- what kind of UPS?  Was it overnight, three-day

10  delivery or normal delivery?

11  A.   Overnight.

12  Q.   Were these packages always sent overnight delivery?

13  A.   Yes.

14  Q.   From your best recollection, were they always sent through

15  UPS?

16  A.   Yes.

17  Q.   Now describe the first package.  What did it look like?

18  A.   It was just a brown box, a plain brown box.

19  Q.   Okay.  Can you describe the rough dimensions of it?

20  A.   I don't know my measurements that well, about that

21  (indicating).

22  Q.   Let me just start.  Approximately how tall of a box?

23  A.   Maybe 12 inches (indicating).

24  Q.   And approximately how wide?

25  A.   Gosh, maybe 8, 12 by 8 (indicating).

1    Q.  So once the package would arrive -- did you know what time

2    it would be arriving?

3    A.  Just whenever UPS did their rounds.  Normally in the

4    mornings.

5    Q.  But you knew the day ahead of time that it would be coming?

6    A.  Correct.

7    Q.  And how did you know that?

8    A.  When Noe would text me.

9    Q.  Okay.  So walk us through, UPS shows up, a package arrives.

10   What is it that you do?

11   A.  Usually when the package would arrive, I would have other

12   freight, and I would unload it off the truck and put it on a

13   pallet.  And I would watch for it, the return address.  And

14   when I noticed that the -- which package it was, then I would

15   put it by my desk or kind of hide it away until I went to

16   lunch.

17   Q.  Did you have to sign -- excuse me -- did you have to

18   sign -- did you have to sign for the package?

19   A.  Yes.

20   Q.  Now, you mentioned you looked for the return address.  What

21   about the return address that you were looking for?

22   A.  A Fresno, California address.

23   Q.  Why were you looking for a Fresno, California address?

24   A.  Because I guess they were from Fresno, so...

25   Q.  Had Noe told you ahead of time where it was coming from?

1   A.  Uh-huh.

2   Q.  Was that a yes, ma'am?

3   A.  Yes.

4   Q.  I'm sorry.  You --

5   A.  Sorry.

6   Q.  We need a yes or no answer or answer versus a head nod.

7   A.  Okay.

8   Q.  Now, you mentioned that you would take this box and you

9   would separate it out from the normal packages?

10  A.  Correct.

11  Q.  Roughly, I mean, is it fair to say that you got a lot of

12  packages, I mean, some that were legitimately for the store?

13  A.  Correct.

14  Q.  And when you got legitimate packages for the store, what

15  would you do with those packages, the normal goods and stuff?

16  A.  Just keep it on the pallet until I was able to go and work

17  it, and then just separate it according to what company or what

18  department it would go to and then just receive it in.

19  Q.  Did you have to log those shipments into some sort of

20  database at Shipton's?

21  A.  No.

22  Q.  Did you have to keep any sort of log for what you were

23  receiving as part of the normal goods that Shipton's kept?

24  A.  Huh-uh, I wasn't required to.

25  Q.  Okay.  And then you would keep this box somewhere on your

1    desk?

2    A.  Correct.

3    Q.  How -- then once you had this box on your desk, what

4    happens next?

5    A.  I would just proceed throughout my day until it was

6    lunchtime, which normally about 12:00 or 1:00.

7    Q.  Okay.  So lunchtime comes and what happens?

8    A.  Well, in between there, you know, I would text Noe and let

9    him know that I was ready -- I wanted to go to lunch.  And then

10   when I went to lunch, then I would go pick him up, and I would

11   drop off the package, and then he would drop me off at work.

12   Q.  Up to this point had you opened the package?

13   A.  No.

14   Q.  You kept it sealed?

15   A.  Yes.

16   Q.  And who would you give the package to?

17   A.  To Noe.

18   Q.  Now, were these packages -- were they -- we talked about

19   the return address.  Did you ever notice any particular

20   location in Fresno, California, from the sender's address or

21   return address?

22   A.  One -- one time there was a return address for a tattoo

23   shop, and I had asked Noe to tell whoever was sending the

24   packages not to put that type of business on the return address

25   because we don't sell tattoo equipment at a feed and ranch

1    store.

2    Q.  And what was Noe's response to that?

3    A.  Okay.

4    Q.  After that did you notice a change in the return address?

5    A.  Yes.

6    Q.  Was there any more tattoo shops listed?

7    A.  No.

8    Q.  How about the location such as the city or state where the

9    packages were coming from?

10   A.  No.

11   Q.  Now, could you remember as a receiving clerk how many

12   packages you would receive via UPS overnight?

13   A.  I would have to say none.

14   Q.  So essentially this was the only item that would come

15   overnight delivery UPS?

16   A.  Correct.

17   Q.  So was it easy to figure out which package it was that you

18   needed to sort out?

19   A.  Yes, it was.

20   Q.  Now, if you began the receiving position in March and a

21   couple weeks later the first package came, how often -- well,

22   let me ask you, how long did this last?  When did you -- did

23   you -- well, let me back up a minute.

24         Did you -- were you eventually -- did you eventually

25   leave Shipton's?

12

1   A.  No, I didn't -- I wasn't -- I didn't leave Shipton's until

2   the following year.

3   Q.  Okay.  So how long did you continue to receive packages?

4   A.  Well, for Noe, until about September.

5   Q.  And September of what year?

6   A.  '09.

7   Q.  So from -- if you began in March of '09 to September '09

8   for Noe, then?

9   A.  Correct.

10  Q.  And so it sounds like, what, did you continue to get

11  packages after September of '09?

12  A.  Yes, I did, for Isaiah.

13  Q.  With Noe, from March of '09 to September of '09, how often

14  were these packages coming to Shipton's Big R?

15  A.  Weekly, like one a week.

16  Q.  How many in a week?

17  A.  Just one.

18  Q.  Did you eventually -- you mentioned you eventually learned

19  what was in those packages?

20  A.  Correct.

21  Q.  What was in those packages?

22  A.  Methamphetamine.

23  Q.  Was the methamphetamine packaged in something else?

24  A.  In a candle.

25  Q.  Okay.  And describe that for us, please.

1   A.   It was just like a big -- I don't know, like a five-wick

2   candle you buy at Wal-Mart.

3   Q.   And how was the methamphetamine within the candle?

4   A.   Like in a plastic bag, like it was gutted out, and then

5   plastic bag was put in it.

6   Q.   And then this candle in turn was within the box?

7   A.   Correct.

8   Q.   Do you know how much methamphetamine was in the candles?

9   A.   No, I don't.

10  Q.   Did you ever see it?

11  A.   One time.  That was it.

12  Q.   Tell us what you saw that one time.

13  A.   In January of '10, 2010, a package was opened in front of

14  me, and so I saw the methamphetamine out, you know, in the

15  candle.

16  Q.   How much methamphetamine did you see when that package was

17  opened?  Can you describe perhaps the shape?

18  A.   Like a huge chunk, like a big bag, I don't know, probably 2

19  ounces.

20  Q.   Approximately how big was this bag?

21  A.   About that big (indicating).

22  Q.   Let the record reflect the witness is indicating roughly a

23  size that was 8 by 8.  Would that be accurate?

24  A.   Yeah.

25  Q.   Of that bag, how much of it was full?

1   A.   From what I could tell, it was full.

2   Q.   Had you seen that much methamphetamine before?

3   A.   Yes.

4   Q.   Okay.  So based upon what you've seen in the past, did you

5   know how much it was?

6   A.   Yeah, it was probably about 2 ounces.

7   Q.   And that was in January of '10, you said?

8   A.   Correct.

9   Q.   Okay.  Before we get to January '10, from March of '09 to

10  September of '09, were you only giving these packages that were

11  coming from Fresno, California to Noe?

12  A.   Yes.

13  Q.   And what was the -- what did you get out of it, out of each

14  package?

15  A.   $250.

16  Q.   Did you ever get any of the methamphetamine from any of

17  those packages?

18  A.   Not from Noe, no.

19  Q.   What did you do with the $250 that you got for each

20  package?

21  A.   Spent it, paid bills.

22  Q.   When were you paid the $250 for the packages that you were

23  getting?

24  A.   Either the day it arrived or sometimes it would be like

25  partial payment and then couple days later he would pay the

1    rest.

2    Q.  Do you know why you would get a partial payment and then a

3    few days later get the rest of it?

4    A.  I assumed he just didn't have the full $250 on him at the

5    time.

6    Q.  Do you know what was happening to the methamphetamine after

7    you gave it to Noe?

8    A.  No, I don't.

9    Q.  Okay.  Now you mentioned that at some point in time you

10   stopped getting packages from Noe, and that was in September of

11   '09?

12   A.  Correct.

13   Q.  Did something happen?

14   A.  Well, right around that time a package had come in to

15   Shipton's, and I didn't know that it was supposed to arrive

16   that day, and it went missing, the package went missing.  And I

17   went looking for it.  And we tracked it with UPS tracking, and

18   it showed that I had signed for it that day, but I couldn't

19   find it anywhere in the store.  So there was a missing package.

20   Q.  Okay.  And when was -- when was it this package ended up

21   missing?

22   A.  In September, but I don't know which day.

23   Q.  Now, did you at that point -- did you know that a package

24   was coming?

25   A.  No, I did not.

1   Q.   So you weren't looking for it or expecting it?

2   A.   Correct.

3   Q.   How did you learn that a package had been sent, then?

4   A.   The day that I had signed for it, Noe had asked me if I was

5   going -- if I wanted to go to lunch, and I told him, you know,

6   I wasn't hungry, and so that was kind of like saying that it

7   wasn't there; there was nothing there.  And so then that's when

8   I knew that it was supposed to come, and we looked up the

9   tracking number on UPS, and it showed I had signed for it.  So

10  that's when I started looking for it in the store.

11  Q.   Okay.  How did you get the tracking number?

12  A.   Noe had given it to me.

13  Q.   And then you checked that, and you saw that you had signed

14  for it?

15  A.   Correct.

16  Q.   Did you look for that package?

17  A.   All over, for weeks.

18  Q.   Were you able to find it eventually?

19  A.   Eventually.  In December I was at home, and one of my

20  co-workers had called me, and because one of my jobs or one of

21  the things I did at work was price changes and new inventory, I

22  entered it into the computer, and they had called and said that

23  there was a candle a customer was trying to buy, and they

24  couldn't find it in the system.

25       So I told them to get the customer's name and number,

1    and I would deal with it on Monday because it was -- this was

2    on a Sunday.

3              And then that -- then that day on Sunday, after I hung

4    up the phone, then I went and got it because I knew -- the

5    minute that they said it was a candle, I knew what it was.

6    Q.  How was it that you knew it was going to be a candle?  How

7    did you know that was what you were looking for?

8    A.  Noe told me that's what the drugs were in.

9    Q.  Okay.  I want to go back a minute.  When you were getting

10   these packages and you were noticing that the sender's address

11   was from Fresno, California, did you also look at the

12   description of the item that was being sent within these boxes?

13   A.  No, I didn't.

14   Q.  Do you know if they always came as candles or something

15   else?

16   A.  As far as I know, candles.

17   Q.  Did you learn -- I mean, you're looking for this package

18   for several months.  You eventually found it in December,

19   December of what year, ma'am?

20   A.  '09.

21   Q.  Did you have any discussions from September to December of

22   '09 about the package with Noe?

23   A.  No.

24   Q.  Did you know what kind of package you were looking for at

25   that time?

1  A.  Well, I was just looking for the brown box that they

2  normally came in.

3  Q.  Do you know if this particular package that went missing

4  came in a brown box?

5  A.  No.  I was told that it was -- arrived in a blue -- like a

6  pool cleaning kit box, so that's why when it came in, I didn't

7  know, I mean, because normally I looked for a brown box, not a

8  blue box.

9  Q.  Who told you that it was going to be in a blue box, pool

10  cleaning kit?

11  A.  Noe.

12  Q.  When you were unable to find this package, did you tell Noe

13  about that?

14  A.  Yes, that day.

15  Q.  How about as you continued to look for it up through

16  December?

17  A.  How did I look for it?

18  Q.  No, let me rephrase that question.

19      While you were looking for it until you found it in

20  December, did you still continue to talk to Noe about this

21  missing package?

22  A.  Off and on.

23  Q.  And why were you only talking to him off and on?

24  A.  Because I was, I don't know, scared, I guess.  I mean, I

25  lost a package that had drugs in it, and, I mean, that's pretty

1   scary, so...

2   Q.  Who were you scared of?

3   A.  Noe.

4   Q.  Now, you indicated that -- that at this point in time --

5   well, let me back up.

6           You also indicated that beginning in September you

7   began getting packages for Isaias?

8   A.  Correct.

9   Q.  Was it the same deal with Isaias?

10  A.  Correct, yes.

11  Q.  Okay.  What was the deal you had with Isaias in terms of

12  getting packages?

13  A.  That the packages would come to my work at Shipton's, and

14  then I would drop the packages off to him with the same amount,

15  $250 for payment.

16  Q.  Did you and Isaias have discussions about that ahead of

17  time?

18  A.  Yes.

19  Q.  And did you get a package from -- well, let me rephrase

20  that question.

21          Beginning in September of '09, did you still get

22  packages?

23  A.  Yes.

24  Q.  And who were those packages for?

25  A.  Isaiah.

1   Q.   And where were they coming from?

2   A.   Fresno.

3   Q.   Were they packaged the same as Noe's packages?

4   A.   Yes.

5   Q.   Do you know if Noe knew that you were also getting packages

6   for Isaias?

7   A.   No.

8   Q.   How is it that you knew that?

9   A.   Because, well, when me and Isaiah talked about it, we

10  talked about keeping it from Noe.

11  Q.   Okay.  So did you ever tell Noe that that was the case?

12  A.   No.

13  Q.   Okay.  So let's go back for a minute.  How long, then, were

14  you getting packages for Isaias from September of '09 forward?

15  A.   Until about February of 2010.

16  Q.   And with regards to Isaias' packages, how often?

17  A.   About once a week.

18  Q.   And were those packages also shipped via UPS overnight?

19  A.   Correct.

20  Q.   Okay.  Now, now that we've kind of talked about Isaias a

21  little bit, you mentioned that -- now I don't mean to jump back

22  and forth, but you mentioned that you were afraid of Noe.  At

23  this point in time did Noe know about Isaias' packages?

24  A.   No.

25  Q.   So what was causing you the fear?  Well, let me ask you.

1  Had Noe said anything to you?

2  A.  No.

3  Q.  What caused you to be afraid, then?

4  A.  Just it was a scary thing, you know, when you lose

5  someone's stuff, you know, regardless of it is drugs or

6  anything, if it is of value and you lose something that you're

7  trusted with, then it is kind of scary, you know, or...

8  Q.  Okay.  Let's talk about this missing package.  You

9  mentioned that in December you get a call from a co-worker

10  about this missing package?

11  A.  Yes.

12  Q.  Do you remember who the co-worker was?

13  A.  It was a cashier.

14  Q.  And this co-worker told you that a customer wanted to know

15  a price on a candle?

16  A.  Yes.

17  Q.  Did the co-worker tell you what kind of candle it was at

18  the time?

19  A.  No, she just said it wasn't in the system.

20  Q.  And based upon that, you realized that was the candle that

21  was missing?

22  A.  Yes.

23  Q.  And what is it that -- did you instruct the co-worker to do

24  anything with that candle?

25  A.  I just told her to get the customer's name and address --

1   or name and number and to put it on my desk, and I would take

2   care of it on Monday morning.

3   Q.   And did you eventually get that candle?

4   A.   Yes, that day.

5   Q.   Did you ever contact the customer?

6   A.   No.

7   Q.   What did you tell your co-worker about that candle?

8   A.   Nothing.  They -- they never asked about it the next day.

9   Q.   Okay.  So you go get the candle.  What is it that you now

10  do with this missing candle that you now found?

11  A.   I took it home, and I called Isaiah and told him that I had

12  the candle.  And so he came over, and we talked about what I

13  wanted to do, if I was going to keep it or give it back to Noe.

14  And I agreed -- and I said I wanted to give it back to Noe.

15           So Isaiah said he was going to go to the house then

16  and make sure that Noe was home.  And so then I went over

17  there, and I took Noe the candle.  That was Sunday night.

18  Q.   Why is it that you were calling Isaias to tell him that you

19  had found the missing candle of Noe's?

20  A.   I guess I felt a little safer with Isaiah telling him

21  first.

22  Q.   Okay.  At this point were you getting packages of

23  methamphetamine for Isaias at Shipton's?

24  A.   Yes.

25  Q.   And up to this point were you having any contact with Noe?

1   A.   No.

2   Q.   So you had essentially stopped communicating with him?

3   A.   Yes.

4   Q.   Did you continue to communicate with Isaias?

5   A.   Yes.

6   Q.   Excuse me.  Why is it that you decided to give the candle

7   back to Noe?

8   A.   It wasn't mine.

9   Q.   Now, you mentioned you had some discussions with Isaias

10  about that?

11  A.   Uh-huh, yes.

12  Q.   What did Isaias think or what did he say?

13  A.   He said it was my decision.

14  Q.   Did you have any thoughts of keeping that candle and not

15  telling him?

16  A.   No.

17  Q.   Why not?

18  A.   Because it wasn't mine.  I mean, I -- because I knew

19  that -- I don't know, it just wasn't mine.  It wasn't mine to

20  keep, so...

21  Q.   All right.  So you mentioned that Isaias then went to Noe's

22  to see if he was there?

23  A.   Correct.

24  Q.   Where did he go?

25  A.   To their house.

1   Q.   What house was that?

2   A.   On Burkett Street.

3   Q.   Do you remember the color of the house?

4   A.   The blue one.

5   Q.   And I will show you what's been marked for identification

6   as Exhibit 527.  Is that the house?

7   A.   Yes.

8   Q.   Now, after Isaias went there, did you go there?

9   A.   Yes.

10   Q.   How did you know to go to the house?

11   A.   Isaiah told me to.

12   Q.   Okay.  When you show up at the house, tell us what happens.

13   A.   When I walked in the door, I handed Noe the candle, and I

14   thought he would be happy or at least, you know, glad that it

15   was found or whatever.  And he wasn't.  He was upset and yelled

16   at me for a couple hours about losing it and all that stuff.

17   Q.   Now, when you gave him the candle, was it wrapped in a box

18   or was it just the candle?

19   A.   It was just the candle.

20   Q.   Had you tried to open up the candle to see what was inside

21   at all at that time?

22   A.   No.

23   Q.   After you gave the candle to Noe, was that candle opened?

24   A.   Yes.

25   Q.   How do you know it was opened?

1   A.  I just assumed because Isaiah had taken it into the

2   kitchen.

3   Q.  Okay.  When Isaiah took it into the kitchen, did he come

4   back out?

5   A.  He came back out, but then he went into the front bedroom.

6   Q.  Did you try to explain to Noe why the candle ended up

7   missing or what happened to it?

8   A.  Yes, but he didn't believe me.

9   Q.  Did you ever learn what was in that candle?

10  A.  I assumed it was methamphetamine.

11  Q.  Why is it that you assumed it was methamphetamine?

12  A.  I don't know why -- why else would somebody get upset about

13  a candle if there was nothing in it?

14  Q.  Now, you mentioned that Noe was upset and yelled at you for

15  several hours?

16  A.  Yes.

17  Q.  Do you remember anything that he said?

18  A.  Basically that I was a liar and that he didn't -- he didn't

19  believe me about the package going missing.  He was just

20  talking crazy.

21  Q.  Okay.  And what happened after that?

22  A.  I went home.  And the next day Noe was calling me asking me

23  about the package and all this and then kept saying he was

24  going to come over and talk to me, that we needed to work it

25  out, we needed to work it out.  And so I told him to come over

1    and --

2    Q.  You say the next day.  You had gone over there with Isaias

3    and Noe on Sunday?

4    A.  Uh-huh.

5    Q.  So this would have been the following Monday?

6    A.  Correct.

7    Q.  Okay.

8    A.  And I don't know what day he came over, but he came over to

9    my apartment.  And he just kept going on about this package,

10   this missing package and how it was my fault that all this

11   stuff happened.  And when he was getting up to leave, then he

12   started hitting me.

13   Q.  And did Noe ever ask you if there was -- did he ever

14   confront you about getting methamphetamine for someone else?

15   A.  Yes.

16   Q.  What did he ask or how did he confront you about that?

17   A.  He asked -- he kept asking me if I was getting packages for

18   anyone else, and I kept telling him no.

19   Q.  Was that the truth or was that the lie?

20   A.  That was a lie.

21   Q.  Who were you getting packages for?

22   A.  Isaiah.

23   Q.  Why is it that you didn't tell him -- tell Noe that you

24   were getting packages for Isaiah?

25   A.  Because me and Isaiah agreed not to tell him.

 1    Q.   Were you trying to protect Isaiah?

 2    A.   Yeah.

 3    Q.   Now, you mentioned that Noe hit you?

 4    A.   Uh-huh.

 5    Q.   Did he say anything to you about what would happen to you?

 6    A.   No.  Just at the end before he walked out the door, he said

 7    next time he saw me I was going to be six feet under.

 8    Q.   What did you understand that to mean to you?

 9    A.   Well, he was probably going to kill me.

10    Q.   And did Noe leave?

11    A.   Yes.

12    Q.   After that did you have any more contact with Noe?

13    A.   Not really.  Just through texting.  That's about it.

14    Q.   Why would you continue to text him if he had threatened

15    you?

16    A.   Because he kept texting me and just kept asking about the

17    package and getting it for someone else.

18    Q.   Now, after this did you ever tell Isaias what happened?

19    A.   Yes, I did.

20    Q.   What is it that you told him?

21    A.   That night after Noe had left, I called Isaiah and told

22    him, and when I called, Noe was sitting right there next to

23    Isaiah so he couldn't say much.  And I think it was the next

24    day then he came over to a friend 's house, and we kind of

25    talked about it.

1  Q.  What was it that Isaiah said to you about that incident?

2  A.  That he felt bad, that it shouldn't have happened, I guess.

3  Q.  At that point in time did you continue to get any packages

4  for Noe?

5  A.  No.

6  Q.  Were you still getting packages?

7  A.  Yes, for Isaiah.

8  Q.  Okay.  I want to go back -- before we talk about the

9  packages for Isaiah, I want to go back to the beginning in

10 September of '09.  How is it -- when you first started talking

11 to Isaiah about getting packages during this time frame, do you

12 know where Isaiah was at?

13 A.  He was in California.

14 Q.  How do you know that?

15 A.  Because he was -- went back there when his baby was born.

16 Q.  Okay.  Was this in September of '09?

17 A.  Yes.

18 Q.  And so when you talked to him, how is it that you talked to

19 him?  Was it in person or on the telephone?

20 A.  On the phone.

21 Q.  And had you called him or did he call you?

22 A.  He called me.

23 Q.  And when he called you, what is it that he told you?

24 A.  That he was sending a package that day, and then it

25 would -- when he got back from California, then the package

 1  would be there.

 2  Q.  Do you know if he, in fact, sent a package that day?

 3  A.  Yes, he did.

 4  Q.  How do you know?

 5  A.  Because I got it at work.

 6  Q.  When you got the package at work, what did you do with it?

 7  A.  I took it home.  And then when Isaiah got into town, then

 8  he stopped at my house and picked it up.

 9  Q.  Now, you mentioned that you had the same deal with Isaiah

10  as you did Noe, which was $250?

11  A.  Yes.

12  Q.  When did Isaiah pay you the $250?

13  A.  Usually on the day the package came.

14  Q.  Now, when you got the first package for Isaias, do you

15  remember if it was in the beginning of September, the middle or

16  the end?

17  A.  Maybe the middle.

18  Q.  And then how long did you continue to get packages for

19  Isaias?

20  A.  Until like February of 2010.

21  Q.  And I think you said you were getting roughly a package a

22  week?

23  A.  Yes.

24  Q.  Were there any times either between Noe and Isaias that you

25  recalled getting more than one package a week?

1   A.  No.

2   Q.  Now, after February of '10, did you continue to get any

3   packages?

4   A.  No.

5   Q.  Do you know what happened?

6   A.  No, they just stopped coming.

7   Q.  Did you and Isaias ever talk about that?

8   A.  No.

9   Q.  Why not?  Why wouldn't you?  I mean, wouldn't you have been

10  curious and said, "Well, what's happened?"

11  A.  I was, but I guess I just never asked.

12  Q.  Okay.  Now, from the packages you were getting from Isaias,

13  did you ever see any of the methamphetamine?

14  A.  In January.

15  Q.  And during this time frame -- well, let me go back.  Either

16  with Noe or Isaias were you using methamphetamine?

17  A.  No, not until probably end of September, beginning of

18  October.

19  Q.  And that would have been October, September of '09?

20  A.  Yes.

21  Q.  So when you started getting packages for Isaias?

22  A.  Yes.

23  Q.  How is it, then, that you were getting your methamphetamine

24  in September and October?

25  A.  I would ask -- call Isaiah and tell him it was for a

1    friend, and so I would get like a gram or half a gram or

2    whatever.

3    Q.   Why was it that you would be telling Isaias it was for a

4    friend and not yourself?

5    A.   I don't know.  I guess I just -- I don't know.

6    Q.   At this point in time did Isaias know that you were using

7    methamphetamine?

8    A.   Yeah.

9    Q.   Did you pay Isaias for that gram or half a gram?

10   A.   Yes.

11   Q.   How much were you paying for a gram?

12   A.   200.

13   Q.   And how much were you paying for half a gram?

14   A.   A hundred.

15   Q.   Did you sell any of that methamphetamine that you were

16   getting from Isaias?

17   A.   Yeah.

18   Q.   How much of it would you sell?

19   A.   Probably like a gram.

20   Q.   And why were you selling it?

21   A.   Support my habit.

22   Q.   Now, when you were buying the methamphetamine from Isaias,

23   would you pay him at the time you got the methamphetamine or --

24   A.   Yes.

25   Q.   Now, the packages that you were getting from Isaias, were

1   they the same size as the packages you were getting for Noe?

2   A.   Yes.

3   Q.   How about weightwise?  Could you tell weightwise?

4   A.   No, it was about the same.

5   Q.   Now, you mentioned that you saw a package opened on January

6   10th -- I'm sorry -- January of 2010?

7   A.   Yeah.

8   Q.   Tell us about that.  How did that come about?

9   A.   We were -- I was on my lunch hour, and Isaiah had met me at

10  my house, and he opened it on my kitchen table and pulled it

11  out, so that's when I saw it.

12  Q.   Okay.  Let's walk through it.  So it is at your house?

13  A.   Yes.

14  Q.   And who is there?

15  A.   Just me and Isaiah.

16  Q.   And is this one of those packages that had been sent from

17  Fresno, California?

18  A.   Yes.

19  Q.   How do you know that?

20  A.   Because I saw the return address.

21  Q.   So you get the package and I assume you go home.

22  A.   Yes.

23  Q.   And you've contacted Isaias?

24  A.   Uh-huh.

25  Q.   Who opens the package?

1   A.   Isaiah.

2   Q.   Okay.  How does he open it?

3   A.   Like the package or the candle?

4   Q.   The package itself.

5   A.   With a knife.

6   Q.   Okay.  What's inside the package?

7   A.   A candle.

8   Q.   How big of a candle?

9   A.   Like a five-wick (indicating).

10  Q.   Who removes the candle from the package?

11  A.   Isaiah.

12  Q.   And when he removes the candle, what does he do with the

13  candle?

14  A.   Then he started just opening the -- opening the candle like

15  with a knife, you know, take like the top off or the bottom off

16  or whatever.

17  Q.   Okay.  So the top or the bottom is taken off.  And then

18  what happens?

19  A.   And then he pulled out a bag (indicating), and then he -- I

20  don't know.  Then he started just cleaning up the candle from

21  all the wax that was on the floor.  And then that was it.

22  Q.   Okay.  Let's talk about the bag.  What size of bag?  Well,

23  what did the bag look like?

24  A.   It was a clear plastic bag, like a baggie.

25  Q.   Okay.  What size?

1   A.  Gosh, I don't know, like that (indicating).  I mean, it was

2   just like a normal -- I don't know how to describe it.

3   Q.  Was it like a half gallon, gallon, pint, sandwich bag?

4   A.  Probably -- I don't know, probably a gallon.

5   Q.  Okay.  Of this gallon-size bag, how much of it was full of

6   a substance?

7   A.  It was full.

8   Q.  Okay.  Could you tell based upon a full gallon-sized bag

9   how much methamphetamine was there?

10  A.  No.

11  Q.  Had you seen that much methamphetamine before?

12  A.  Yeah, but I couldn't tell you exactly how much it was.  I

13  mean, it was probably, I don't know, 2 ounces.

14  Q.  Do you recall anytime seeing more than 2 ounces?

15  A.  No.

16  Q.  What -- could you tell what the substance looked like?

17  Could you describe what the meth looked like in the bag?

18  A.  Like -- like clear like that or (indicating).

19  Q.  What did the meth look like?  Had you seen meth before?

20  A.  Yeah.

21  Q.  Had you seen different types of methamphetamine?

22  A.  It was clear, like crystal clear.

23  Q.  Does that type of methamphetamine have a name to it?

24  A.  I don't --

25  Q.  Are you familiar with crank?

1   A.   Oh, crank, yeah.

2   Q.   Are you familiar with crystal?

3   A.   Yes.

4   Q.   Or shards?

5   A.   Yes.

6   Q.   Does this particular meth have a name that it was commonly

7   called?

8   A.   Crystal meth.

9   Q.   So Isaias takes this bag out of the candle.  What does he

10  do with this bag?

11  A.   He -- I don't know, actually.  He probably put it in his

12  coat, I think.

13  Q.   Did you ever use any of this methamphetamine?

14  A.   Yes, I did.

15  Q.   Tell us how that came about.

16  A.   He asked if I wanted some in my pipe, and I said yes.  So

17  he gave me a little bit.

18  Q.   Was this -- was this after he got the package from the

19  candle?

20  A.   Yes.

21  Q.   So where did the methamphetamine come from?

22  A.   Like in the package?

23  Q.   Yes.

24  A.   From Fresno.

25  Q.   No, I'm sorry.  Where did Isaias get the methamphetamine

1   that he put in your pipe?  Where did that methamphetamine come

2   from?

3   A.  From the candle.

4   Q.  From the --

5   A.  From the methamphetamine that was in the candle.

6   Q.  From the bigger quantity?

7   A.  Yes.

8   Q.  How much did he put in your pipe, do you know?

9   A.  No.  Probably a quarter gram.

10  Q.  Now, your pipe, tell us, what kind of pipe is it?  What did

11  it look like?

12  A.  It was just like a glass tube with little ball at the end

13  with a hole on top.

14  Q.  Is this the type of pipe that you commonly used to use

15  methamphetamine?

16  A.  Yes.

17  Q.  And how did you use it?

18  A.  Smoked it.

19  Q.  Did you smoke that quarter gram?

20  A.  Not all of it.  I took a couple hits because I had to go

21  back to work.

22  Q.  When you used it, was Isaias with you?

23  A.  Yes.

24  Q.  Did he use any?

25  A.  Yes -- not the pipe, no.

1    Q.  When you took a couple hits off it, how did it make you

2    feel?

3    A.  Felt good.

4    Q.  Could you tell it was methamphetamine?

5    A.  Yes.

6    Q.  In the past had you used what you thought was

7    methamphetamine but was either not methamphetamine or a poor

8    grade?

9    A.  I've used -- yeah.

10   Q.  In this case could you tell if it was good methamphetamine?

11   A.  It was good.

12   Q.  Were there any set days, either with Noe or Isaias, that

13   these packages would arrive at Shipton's?

14   A.  No.

15   Q.  Like it wasn't on always a Wednesday morning?

16   A.  No, just whenever.

17   Q.  So the only way you would know is if someone told you a

18   package was coming?

19   A.  Yes.

20   Q.  Let's talk about Shipton's for a minute and particularly

21   about candles.  Do you know if Shipton's gets candles?

22   A.  Yes, we do.

23   Q.  As part of their normal store stock?

24   A.  Yes.

25   Q.  And what kind of candles do Shipton's supply or stock?

1   A.  It is called their Montana Silversmiths, and they come --

2   either the distributor brings them or they come from the

3   Billings store.

4           THE COURT:  Ms. Perkins, could I ask you to bring the

5   microphone a little closer to you?  Thank you.

6   Q.  (BY MR. FUN)  You mentioned Shipton's gets candles from

7   Montana Silversmiths?

8   A.  Yes.

9   Q.  And where do they come from?

10  A.  There's a company up in Montana that sells them, and

11  usually either the distributor brings them down personally to

12  stock the shelves or we have -- there's a -- the main store is

13  up in Billings, and so when they would bring their trucks down,

14  it would come on the truck as stock instead of it -- it would

15  never get mailed in.

16  Q.  Okay.  Are these -- these Silversmiths candles, what do

17  they look like?

18  A.  They're -- it depends, but they usually come like in a tin

19  can with like a brown wrapping on it.

20  Q.  And how -- what are the size of these candles?

21  A.  It varies.  Usually like little -- a votive candle to a big

22  12-ounce candle.

23  Q.  Were these the -- did Montana Silversmiths ever provide any

24  large five-wick candles that you've previously talked about?

25  A.  No.

1   Q.  Do you know if Shipton's received any candles at all from

2   Fresno, California?

3   A.  No.

4   Q.  How about wax figurines?

5   A.  No.

6   Q.  Do you know if Shipton's -- while you were there working

7   receiving, other than the packages that you were getting that

8   had the drugs, were any packages coming to Shipton's to be

9   stocked normally from Fresno?

10  A.  Not that I was aware of.

11  Q.  Did you receive any packages other than the drugs from

12  Fresno, California for Shipton's?

13  A.  No.

14  Q.  We have previously talked about Noe and Isaiah.  You

15  previously mentioned you knew Robert Velasquez?

16  A.  Yes.

17  Q.  Do you know if he had a nickname?

18  A.  Grouch.

19  Q.  Now, you mentioned that from September of '09, September,

20  October '09 forward you were getting methamphetamine from

21  Isaias to use?

22  A.  Yes.

23  Q.  How long did that last?  In other words -- well, let me

24  rephrase that question.

25          How long did you continue to get methamphetamine from

1  Isaias to use?

2  A.  Probably until about May.

3  Q.  May of what year, ma'am?

4  A.  '09 -- or '10.  Sorry.

5  Q.  Now, you mentioned that some of this methamphetamine you

6  would sell?

7  A.  Yes.

8  Q.  How much would you sell it for?

9  A.  200 a gram.

10  Q.  Okay.  You mentioned that you only were getting sometimes a

11  gram to a quarter gram from Isaias, so how would you get -- how

12  would you be able to sell it and use some?

13  A.  As my use progressed I would get larger, bigger quantity

14  from Isaiah to where I could sell some of it to pay for what I

15  was using.

16  Q.  So during this time that you were getting methamphetamine

17  from Isaias -- you got larger quantities?

18  A.  Yes.

19  Q.  How much more?

20  A.  First it started off with getting an eight ball and couple

21  times got like 2 eight balls.

22  Q.  And how much methamphetamine -- how much methamphetamine is

23  in an eight ball?

24  A.  3 and a half grams.

25  Q.  So two eight balls would be 7 grams?

1   A.   Correct.

2   Q.   How much were you paying for an eight ball of

3   methamphetamine -- how much were you paying for an eight ball

4   of methamphetamine?

5   A.   350, I think.

6   Q.   Were you having the methamphetamine fronted to you from

7   Isaias or were you paying for it?

8   A.   It was fronted.

9   Q.   So you get this eight ball.  What is it that you do with

10  this eight ball?  How much of it do you use?  How much of it do

11  you sell?

12  A.   I usually would sell an eight ball, and then I would do an

13  eight ball.

14  Q.   Did you -- would you sell the whole eight ball or would you

15  break it down?

16  A.   Break it down.

17  Q.   When you break it down, tell us how you would do that.

18  A.   Usually either by the gram, half gram or quarter gram, just

19  depending on what the person wanted.

20  Q.   Okay.  So when you got your eight balls from Isaias, were

21  they already broken down or were they whole as an eight ball?

22  A.   It was whole as an eight ball.

23  Q.   Did you ever add any cutting agents to your

24  methamphetamine?

25  A.   No.

1  Q.  So you sold it as you got it from Isaias?

2  A.  Yes.

3  Q.  Do you know if Noe or Isaias ever added cutting agents to

4  their methamphetamine?

5  A.  No.

6  Q.  How often were you getting eight ball quantities of

7  methamphetamine from Isaias?

8  A.  Once a week.

9  Q.  Okay.  Now, you mentioned that you would have these eight

10  balls fronted to you from Isaias, and you would use one and

11  then sell one?

12  A.  Yes.

13  Q.  When did it go from the eight ball to two eight balls?

14  A.  Gosh, I don't know.  Maybe March.

15  Q.  March of 2010?

16  A.  Yes.

17  Q.  I think you previously indicated that continued until about

18  May of 2010?

19  A.  Yes.

20  Q.  How long would it take you to sell an eight ball to pay the

21  money back to Isaias?

22  A.  It just varied.  I mean, couple days, a week.

23  Q.  And why would it vary?

24  A.  Just depends on, I don't know -- it depended on if anyone

25  wanted anything if I sold any.

1   Q.   Did you ever learn how to cut methamphetamine?

2   A.   No.

3   Q.   Had you ever seen cut?

4   A.   No.

5   Q.   Do you recall any occasions where Isaias left something at

6   your house?

7   A.   Yes.

8   Q.   What would it -- tell us about that.

9   A.   There was a bag that he had left like in a gun case that

10   had what looked like methamphetamine.

11   Q.   Okay.  Describe what you saw in this gun case.

12   A.   There was two plastic baggies that had like a clear white

13   substance that looked like methamphetamine (indicating).

14   Q.   Do you know why -- why was it left at your house?

15   A.   I don't know.  I can't remember.

16   Q.   When you found it, did you do anything with those two bags?

17   A.   No.

18   Q.   Did Isaias ever come back and get that from you?

19   A.   The gun case, yeah.

20   Q.   Were the two bags still in there?

21   A.   As far as I knew.

22   Q.   Well, had you removed them?

23   A.   Had I removed them?

24   Q.   Yes.

25   A.   No.

1   Q.  Did you take them out of the case?

2   A.  No.

3   Q.  Do you recall any occasions when you did find something

4   that you took from what Isaias left at your house?

5   A.  That I took?

6   Q.  Yes, that you kept.  Any drugs?

7   A.  No.

8   Q.  Okay.  Ma'am, I want to turn to a different topic now and

9   talk about vehicles for a moment.  How many vehicles did you

10  have that you owned?

11  A.  Two -- how many did I have?

12  Q.  Yes.

13  A.  Two.

14  Q.  And what vehicles were that?

15  A.  I had a Dodge Durango, and then I had a Ford Expedition

16  that was registered to me.

17  Q.  And when you say the Ford Expedition was registered to you,

18  what do you mean?

19  A.  I wasn't the primary driver.

20  Q.  Who was the primary driver?

21  A.  Isaiah.

22  Q.  If you saw that vehicle, would you recognize it?

23  A.  Yes.

24  Q.  I will show you what's marked as Exhibit 517.  Can you see

25  that?

1    A.  Yes.

2    Q.  Do you recognize that?

3    A.  Yes.

4    Q.  What is it?

5    A.  The Ford Expedition.

6    Q.  Is that -- is that the one that Isaias drove?

7    A.  Yes.

8    Q.  Now, you mentioned that you also had a Dodge Durango?

9    A.  Yes.

10   Q.  And that vehicle was registered to you as well?

11   A.  Yes.

12   Q.  Who drove that vehicle?

13   A.  I did.

14   Q.  So why was -- why was a Ford Expedition registered in your

15   name?

16   A.  Because back in December of '08 Isaiah needed a car, and so

17   we just registered it under my name.

18   Q.  Okay.  Ma'am, I want to show you some registration

19   documents as well.  And I'm going to display for you

20   Government's Exhibit 310, which is a vehicle registration

21   inside an envelope.

22        Let me move that screen up for you.  Ma'am, can you

23   see that?

24   A.  Yes.

25   Q.  Is that the registration for the Dodge Durango?

1   A.   Yes.

2   Q.   Now I'm going to show you Government Exhibit 321, and is

3   that the registration for the Ford Expedition?

4   A.   Yes.

5   Q.   And I will show you Exhibit 322.  Is that the insurance

6   identification for the Ford Expedition?

7   A.   Yes.

8   Q.   And I've got a second copy as well.  And this is page 3 of

9   Exhibit 319.  That's just another copy?

10  A.   Yes.

11  Q.   Now, ma'am, do you know who had the registration and

12  insurance for this Ford Expedition, meaning who possessed -- I

13  mean, it was obviously in your name?

14  A.   Uh-huh.

15  Q.   But do you know where it was kept?

16  A.   In the Expedition.

17  Q.   Do you know who made the payments on that vehicle?

18  A.   Isaiah.

19  Q.   How is it that you know that?

20  A.   He would write a check, and then I would take it down to

21  the car dealership.

22  Q.   Okay, ma'am.  I'm going to show you -- I'm going to show

23  you Government's Exhibit 323, which is a Bottom Auto statement.

24  Do you see that, ma'am?  And that's in your name?

25  A.   Yes.

1   Q.   Did you make those payments?

2   A.   No.

3   Q.   And then finally, ma'am, I will show you what's contained

4   in Government Exhibit 313, which is a Ron's Towing Road and

5   Service receipt.  Can you see that, ma'am?

6   A.   Yes.

7   Q.   It looks like at the top part it has your name and address?

8   A.   Yes.

9   Q.   Okay.  Were you in California on that day?

10  A.   No.

11  Q.   Do you know who was?

12  A.   Isaiah.

13  Q.   How is it that you know that?

14  A.   He had called me.

15  Q.   Is this when he called you about a package?

16  A.   No, this is when he called me about this, about the car

17  getting towed.

18  Q.   So it was a different date?

19  A.   Yes.

20  Q.   And I remember now that you told us that it was September

21  of '09 when he called you about the first package?

22  A.   Yes.

23  Q.   Ma'am, did you know if Isaias had a job?

24  A.   Yes.

25  Q.   Where was he working at?

1   A.   He did construction.

2   Q.   Did he ever say where he was doing construction at?

3   A.   Yes.

4   Q.   Where?

5   A.   At his boss' house, and he was doing repairs on the

6   apartments that he used to live in.

7   Q.   How about Noe?  Did you know Noe to have a job?

8   A.   Yeah.  He did concrete.

9   Q.   Do you know where?

10  A.   No.

11  Q.   Did Noe or Isaias -- well, let me just start with Noe.  Did

12  Noe ever talk about where he was from?

13  A.   Just Fresno.

14  Q.   Did he ever talk about whether or not he was affiliated

15  with any street gangs?

16  A.   Yes.

17  Q.   Tell us about that.

18  A.   That they were -- that he was a member of the Bulldogs from

19  Fresno.

20  Q.   How did that come up?

21  A.   Gosh, I can't remember how.  It just -- I don't know, just

22  talked about the gang life, I guess.

23  Q.   Did you ever talk to him about his tattoos?

24  A.   Huh?

25  Q.   Did you ever talk to him about his tattoos?

1    A.    No.

2    Q.    Did you ever see any tattoos on him?

3    A.    Yes.

4    Q.    Did you see any tattoos that referenced Fresno or Bulldogs?

5    A.    Yes.

6    Q.    Where?

7    A.    On the top of his head.

8    Q.    What tattoo did you see on the top of his head?

9    A.    Of a bulldog.

10   Q.    How about Isaias?

11   A.    Did I see tattoos?

12   Q.    Did he ever talk about his affiliation -- where he came

13   from?

14   A.    Yeah.

15   Q.    And where?

16   A.    Fresno, California.

17   Q.    Similarly, did he talk about whether or not he was

18   affiliated with any street gang?

19   A.    The Bulldogs.

20   Q.    And in what context?  How did that come up?

21   A.    Just casual conversation.

22   Q.    Did you ever see Isaias with any tattoos?

23   A.    Yes.

24   Q.    Any tattoos that referenced Fresno or Bulldogs?

25   A.    No.

1    Q.  Ma'am, there's one other topic that we need to discuss, and

2    that's firearms.  Had you ever seen Isaias with any firearms?

3    A.  Yes.

4    Q.  Where -- well, let me first ask, where did you see the

5    firearms?

6    A.  At his house and my apartment.

7    Q.  Which house is that?

8    A.  On Burkett.

9    Q.  And that was the blue house?

10   A.  Yes.

11   Q.  And then you said your apartment?

12   A.  Yes.

13   Q.  Let's start with the house first.  What guns did you see at

14   the blue house on Burkett?

15   A.  It was a pearl-handled pistol, I guess, or revolver.  I

16   don't know what kind it was.

17   Q.  If you saw it, would you recognize it?

18   A.  Yes.

19   Q.  I am going to show you Exhibit 207 and see if you recognize

20   it.

21   A.  Yes, yes.

22   Q.  Okay.  How is it that you came to see that pearl-handled

23   gun?

24   A.  Isaiah shown it to me.

25   Q.  When he was showing it to you, was there anything happening

1   at the same time?

2   A.   What do you -- as far as --

3   Q.   Were there any drugs involved?  Did you see any drugs, have

4   any drugs?

5   A.   Huh-uh, no.

6   Q.   Were there any times when you brought a package over?

7   A.   No, I never -- I don't think I ever took packages to his

8   house.

9   Q.   What other guns had you seen at his house -- at Isaias's

10  house?

11  A.   Where?

12  Q.   What other guns?

13  A.   I don't know what it was, just there was a black one

14  sitting by his computer, a tall one.

15  Q.   Do you remember, what is it, a rifle, a pistol?

16  A.   A rifle.

17  Q.   Do you remember if it had any type of telescopic sight on

18  it or not?

19  A.   I don't remember.

20  Q.   Do you remember what it roughly looked -- what color was

21  it?

22  A.   Black.

23  Q.   If you saw it, would you recognize it?

24  A.   Yeah.

25  Q.   I'm going to show you Exhibit 210 and ask you if this is

1   the gun you saw?

2   A.  Yes.

3   Q.  And do you recall seeing this gun with interchangeable

4   barrels as well?

5   A.  Yes.

6   Q.  Other than those two guns, had you seen any other guns?

7   A.  No.

8   Q.  Do you recall going into his bedroom at all?

9   A.  Couple times.

10  Q.  And did you recall seeing any firearms in his bedroom?

11  A.  No.

12  Q.  Do you recall if you ever saw a hunting type of rifle with

13  a telescopic sight on it?

14  A.  No.

15  Q.  How about a gun that looked like a machine gun type of

16  thing?

17  A.  No.

18          MR. FUN:  Just a moment, please.

19  Q.  (BY MR. FUN)  Ms. Perkins, there was one issue I forgot to

20  ask you in the very beginning when we talked about your drug

21  use and your criminal history.  Were you ever a confidential

22  informant?

23  A.  Yes.

24  Q.  How did that come about?

25  A.  In September of last year I was approached by DCI.

1   Q.   Do you remember who from DCI approached you?

2   A.   Travis Harnish, and I can't remember the other one.

3   Q.   And did you agree to become a confidential informant?

4   A.   Correct.

5   Q.   Were you paid anything as a confidential informant?

6   A.   No.

7   Q.   Were you made any promises as a confidential informant?

8   A.   No.

9   Q.   What was your role -- well, why did you become a

10  confidential informant?  What was the purpose of it?

11  A.   My -- my intention was to find out what information they

12  had on us, and Travis Harnish had wanted me to wear a wire on

13  Isaiah and do a controlled buy.

14  Q.   Did you wear a wire?

15  A.   No.

16  Q.   Now, you say your intent was to find out what they knew?

17  A.   Yes.

18  Q.   What who knew?

19  A.   DCI.

20  Q.   So you were trying to essentially trick DCI?

21  A.   Yeah.

22  Q.   Did you learn anything from DCI?

23  A.   That they knew everything that happened, everything that

24  was going on, like who was involved.

25  Q.   Whose idea was it to try to do that?  In other words, whose

1    idea was it for you to become a CI to find out more about what

2    the police knew?

3    A.   It was mine.

4    Q.   Had you talked to Isaiah or Noe about that?

5    A.   The night before when they came and talked to me at my

6    house, that night I called Isaiah and told him that they had

7    came and talked to me and wanted me to wear a wire.  And then

8    the next day is when I -- I don't know, I guess, signed up to

9    be a CI.

10   Q.   Okay.  Now, you refer to they a lot.  Who came to your

11   house and talked to you?

12   A.   DCI.

13   Q.   Afterwards you said you called.  Who did you call?

14   A.   Isaiah.

15   Q.   And you told him about what -- DCI had come to your house?

16   A.   Yes.

17   Q.   And then the day after you signed an agreement with DCI?

18   A.   Yes.

19   Q.   Do you remember anything about -- about that agreement?

20   A.   As far as?

21   Q.   Just a moment.

22        Ma'am, I'm going to show you what I've marked for

23   identification as Government's Exhibit 611.  Do you recognize

24   that?

25   A.   Yes.

1   Q.  And is that the CI agreement that you signed?

2   A.  Yes.

3   Q.  Let me retrieve that back from you.

4           Ma'am, did you sign this agreement on September 10th

5   of 2010?

6   A.  Yes.

7   Q.  Okay.  Now, ma'am, at this point in time when you signed

8   this agreement, was it your intent -- did you plan on carrying

9   through to be a confidential informant for DCI?

10  A.  No.

11  Q.  Okay.  So even though you placed your signature on this

12  agreement, you didn't intend on carrying it out?

13  A.  No.

14  Q.  Did you continue to be involved with using methamphetamine

15  after you signed this agreement?

16  A.  Yes.

17  Q.  And did you continue to -- one of the things it talks about

18  is that you're not allowed to break the laws.  Did you continue

19  to break the laws after you signed this agreement?

20  A.  Yes.

21  Q.  Now, did you tell anyone that you had signed this agreement

22  after you signed it?

23  A.  No.

24  Q.  Why is it that you didn't carry through with this

25  agreement?

1   A.  I just -- because I didn't want to.  I didn't even want to

2   do it in the first place, and I just -- they wanted me to wear

3   a wire on Isaiah, and I just -- I couldn't do it.

4   Q.  Did you consider Isaias a friend?

5   A.  Yes.

6           MR. FUN:  Okay.  Thank you, ma'am.  I don't have any

7   further questions -- questions for you at this time.

8           THE COURT:  Thank you, Mr. Fun.

9           Questions from the defense?

10          MR. FLEENER:  Your Honor, could we have our

11  mid-morning break?

12          THE COURT:  That's a good idea.  Thank you for calling

13  that to my attention.  We will take our break now, our

14  mid-morning break.  Please remember to not discuss the case

15  with anyone and to keep an open mind until all the evidence is

16  in.  I would like the jury ready to return at 10:30.

17      (Recess taken 10:11 a.m. until 10:35 a.m.)

18      (Following in the presence of the defendants and jury.)

19          THE COURT:  We are back from our mid-morning break in

20  Docket No. 10-CR-329.  The Court notes the presence of the jury

21  with roll call waived.

22          Ms. Perkins, I would remind you again that you remain

23  under oath.

24          Mr. Fleener --

25          MR. FLEENER:  Thank you, Your Honor.

```
 1           THE COURT:  -- this witness is yours for

 2   cross-examination.

 3           MR. FLEENER:  Thank you, Your Honor.

 4           THE COURT:  And before you start, I would like to ask

 5   Ms. Perkins, we have had -- it is just not you.  We've had a

 6   series of witnesses who have been very hard to hear, and I

 7   would ask that you speak up.  You can assume that court

 8   security officer in the back is hard of hearing and if he can't

 9   hear you, no one can hear you.

10           Go ahead, Mr. Fleener.

11           MR. FLEENER:  Thank you.  And he probably is hard of

12   hearing.  No disrespect.

13                       CROSS-EXAMINATION

14   Q.  (BY MR. FLEENER)  Ms. Perkins, my name is Tom Fleener.  I'm

15   an attorney in Laramie.  I represent Daniel Renteria.  How are

16   you, ma'am?

17   A.  Okay.  How are you?

18   Q.  I'm fine.  Thank you.  IN your testimony with Mr. Fun, you

19   testified that between March of '09 and roughly February of

20   2010, you were receiving candles?

21   A.  Correct.

22   Q.  And that you were getting $250 a candle?

23   A.  Per package, correct.

24   Q.  That comes to roughly $12,000, give or take, does that

25   sound right to you?
```

 1   A.   Yeah.   I've never done the math.

 2   Q.   But you have an Associate's degree in business?

 3   A.   Correct.

 4   Q.   And you were getting packages once a week for roughly a

 5   year?

 6   A.   Correct.

 7   Q.   And once a week would be roughly four to five times a

 8   week -- or four to five times a month?  I apologize.

 9   A.   Correct.

10   Q.   If it was four times a month at $250 a month, that's -- or

11   four times -- four times a month at $250 per, that would be a

12   thousand a month, correct?

13   A.   Correct.

14   Q.   And a thousand a month times the 12 months in the year,

15   that would be roughly $12,000?

16   A.   Correct.

17   Q.   And I know that this is all -- this is all estimating

18   proceeds, right?

19   A.   Correct.

20   Q.   I mean, this isn't something you know for sure off the top

21   of your head?

22   A.   Correct.

23   Q.   And the $12,000 I will assume -- I will go ahead and assume

24   that you didn't report this as income to the IRS.

25   A.   No.

1  Q.   Why?

2  A.   Because it wasn't taxable income.

3  Q.   Okay.  Put that aside.  I know that you -- from your

4  testimony you had -- you've had a heavy -- a long history of

5  drug addiction?

6  A.   Correct.

7  Q.   And this goes back to when you were much younger?

8  A.   Correct.

9  Q.   And I couldn't help but tell or noticing when you were

10 being examined by Mr. Fun that you took pride in your periods

11 of sobriety?

12 A.   Yes, I did.

13 Q.   And as a matter of fact, I mean, you pled -- you pled

14 guilty and you actually pled guilty on September 20th.  Does

15 that sound about right, before this Court?

16 A.   Of this year, correct.

17 Q.   And during that hearing you actually told the Judge that

18 you had been sober for about four to five years before you got

19 involved in this, right?

20 A.   Correct.

21 Q.   And that's true?

22 A.   Correct.

23 Q.   And during your -- you had your conviction in Converse

24 County?

25 A.   Yes.

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 60 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

60

1    Q.  And that conviction in Converse County was in 2006,

2    correct?

3    A.  Yes.

4    Q.  And as a result of that conviction, you sobered up?

5    A.  Yes, I did.

6    Q.  And you did a suspended -- or some sort of split sentence

7    with some sort of jail -- some sort of jail sentence, right?

8    A.  Yes.

9    Q.  And you had an overlying or a -- you had a prison sentence

10   that was hanging over your head?

11   A.  Yes.

12   Q.  And did you go to inpatient drug rehabilitation as well?

13   A.  Yes, I did.

14   Q.  At WYStar?

15   A.  In WYStar.

16   Q.  And you were clean at WYStar -- excuse me -- you were clean

17   at WYStar?

18   A.  Yes.

19   Q.  And you were clean -- you were clean while you were on

20   probation?

21   A.  Yes.

22   Q.  And you got off probation in September -- excuse me --

23   August 2009?

24   A.  Yes.

25   Q.  And it wasn't until, I believe your testimony was,

1   September 2009 that you first began using because you found a

2   package of methamphetamine left at your house?

3   A.   Correct.

4   Q.   And that's all true?

5   A.   Yes.

6   Q.   Do you recall being interviewed by Agent Harnish --

7   A.   Yes.

8   Q.   -- on September 9th of 2010?

9   A.   Yes.

10  Q.   Do you recall telling Agent Harnish that you began getting

11  methamphetamine from Isaias around January of 2009 and that you

12  used small amounts, grams for once or twice a week, and then

13  you began using more frequently throughout 2009, up to eight

14  balls, getting quarters, things of that nature?

15  A.   Yes.

16  Q.   Now, you just testified that you had not used

17  methamphetamine and told this jury that you were clean until

18  September of 2009?

19  A.   Uh-huh.

20  Q.   And you are now admitting that you told Agent Harnish that

21  you were using in January of 2009?

22  A.   Correct.

23  Q.   Okay.  Which one is it?

24  A.   September of 2009.

25  Q.   Okay.  So you were lying to Agent Harnish?

1   A.   Yeah, I had testified that I was trying to deceive them.

2   Q.   So when Agent Harnish interviewed you in September, you

3   actually weren't -- in September of 2010, you testified -- or

4   you told him that you were using methamphetamine in 2009 even

5   when you weren't?

6   A.   That I told him that I was?

7   Q.   Let me rephrase.  You told Agent Harnish -- let's back up

8   again.  You testified a couple different times that the first

9   time you used methamphetamine after you were clean was in

10  September of 2009 after you were on probation because you say

11  that my client left methamphetamine in your closet, I believe,

12  right?

13  A.   Correct.

14  Q.   And you told Agent Harnish that you had been getting

15  methamphetamine since January of 2009 and you had been using in

16  gram and quarter-gram and half-gram increments beginning in

17  January 2009, right?

18  A.   I don't remember saying that.  My dates were messed up back

19  then.  I was under the influence when I was -- when I

20  interviewed with him.

21  Q.   So if you told Agent Harnish that you had been using

22  methamphetamine basically throughout 2009 while you were on

23  probation, you were mistaken?

24  A.   I don't remember telling him I used methamphetamine when I

25  was on probation, no.

Case 1:10-cr-00329-NDF  Document 494  Filed 01/10/12  Page 63 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                           VOL XII

63

1    Q.  Well, if you were not using methamphetamine, why were you

2    hanging around with these guys?

3    A.  Because they were -- they were my friends.

4    Q.  How did you meet them?

5    A.  I met Robert through his brothers, and then I met Isaiah

6    and Noe through Robert.  And we just all hung out.

7    Q.  Played softball?

8    A.  Went to the gym, ate dinner, cooked lunch.

9    Q.  No methamphetamine, though?

10   A.  No.

11   Q.  And this was all while you were on probation, no

12   methamphetamine?

13   A.  Correct.

14   Q.  But they approached you in -- February or March of 2009,

15   you testified that my client approached you and asked you to

16   start receiving candles, right?

17   A.  Correct.

18   Q.  Now, is it your testimony that you're receiving candles --

19   you knew the candles had drugs in them?

20   A.  Correct.

21   Q.  But you weren't using any of the drugs?

22   A.  No.

23   Q.  I want to explore the relationship between you and Noe

24   again, then.  You said you met him at the gym?

25   A.  No, I met him at the apartment.

1   Q.  And what made you decide to hang out with Noe since it had

2   nothing to do with drugs?

3   A.  I don't know.  We just got along and so just all started

4   hanging out.

5   Q.  And same with Isaias?

6   A.  Correct.

7   Q.  And again, this had nothing to do with drugs?

8   A.  No.

9   Q.  Why would he -- why you?  Why did he have you do the

10  receive shipping, then?

11  A.  I don't know.  I couldn't answer that.

12  Q.  Maybe it is because you weren't using drugs?

13  A.  Possibly.

14  Q.  So you weren't using drugs throughout the spring of 2009,

15  but Mr. Renteria decided to involve you in this drug

16  conspiracy?

17  A.  Correct.

18  Q.  And you weren't -- while you weren't using drugs during

19  that time frame, you were receiving one candle a week from

20  the -- from somewhere?

21  A.  Correct.

22  Q.  And you don't really know where you were getting these

23  candles; you don't really know who was sending candles; you

24  just knew candles were coming from California?

25  A.  Correct.

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 65 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

65

1   Q.  And while you weren't using drugs, Mr. Renteria was

2   apparently getting ounces of drugs out of these candles?

3   A.  I never saw any drugs with Noe.

4   Q.  Because you weren't using any drugs during this time frame?

5   A.  Correct.

6   Q.  And during this time frame -- why did you start -- you knew

7   that there was access to drugs.  I mean, you had access to

8   drugs, right?

9   A.  Yes.

10  Q.  And you knew it while you were on probation you had access

11  to drugs?

12  A.  Yes.

13  Q.  And you're testifying you never used any of those drugs?

14  A.  No.

15  Q.  And you don't recall saying anything about that to Agent

16  Harnish --

17  A.  No, I don't.

18  Q.  -- about using drugs throughout 2009?

19        And you obviously liked drugs because you had used

20  drugs in the past.

21  A.  Correct.

22  Q.  And you were addicted to -- what drugs had you used in the

23  past, ma'am?

24  A.  Methamphetamine, marijuana, cocaine.

25  Q.  And you had used all these drugs in the past?

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 66 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

66

1    A.   Correct.

2    Q.   You liked drugs?

3    A.   Yes.

4    Q.   You had access to drugs because your testimony is that he

5    was getting drugs from candles?

6    A.   Correct.

7    Q.   And you were getting the candles?

8    A.   Yes.

9    Q.   But you never used any of the drugs?

10   A.   No.

11   Q.   Until you got off probation in August 2009?

12   A.   Correct.

13   Q.   And then decided -- well, then you used drugs almost

14   immediately, right?

15   A.   Couple months later.

16   Q.   September 2009?

17   A.   September, a month later.

18   Q.   Was it the fact that you weren't on probation that caused

19   you not to -- was it the fact that you were on probation that

20   caused you not to use drugs?

21   A.   Yes.

22   Q.   And I want to make sure I understand.  Is it -- is it your

23   testimony that you didn't, to the best of your understanding

24   now, that you didn't tell Agent Harnish that you were using or

25   that you didn't -- or you don't recall telling him that you had

1   used throughout that time frame?

2           MR. FUN:  I'm going to object, Your Honor.  This has

3   already been asked and answered several times, and the witness

4   has already said she didn't remember saying that, plus she was

5   trying to deceive DCI at the time.

6           MR. FLEENER:  Well, that's --

7           THE COURT:  I will overrule the objection.

8           If you understand the question and remember it, you

9   may answer.

10  Q.  (BY MR. FLEENER)  And I will ask it -- I will ask it to you

11  again.  Because you have mentioned that you were trying to

12  deceive DCI, right?

13  A.  Correct.

14  Q.  And during this interview, right?

15  A.  Yes.

16  Q.  I mean, the September 2000 -- September 9th, 2010

17  interview, that's when you -- well, the very next day you

18  signed the confidential informant agreement?

19  A.  Correct.

20  Q.  And this is during -- so this is the same time frame you

21  were trying to deceive DCI?

22  A.  Correct.

23  Q.  And -- all right.  But you -- is it that you don't recall

24  making that -- making -- that you don't recall talking to

25  Travis Harnish about drug use in January of 2009 or that -- or

1   that you actually did say it because you were trying to deceive

2   him, or something else?

3   A.  I'm not sure I understand.  I -- when I was interviewed,

4   like I said, I was under the influence, and my dates were mixed

5   up.  And the year -- I mean, 20 -- 2009 and 2008 were just all

6   ran together.

7   Q.  Well, you were clean in 2008, though.  You just testified

8   the first time you used was in 2009.  So why would 2009 and

9   2008 be -- why would it matter?  You were clean for both 2008

10  and 2009, right?

11  A.  Because I was interviewed in 2010, and I was under the

12  influence, and I was at a point in my life where everything

13  just ran together.  When you're under the influence of drugs,

14  time doesn't matter, you know, time just runs together.  So

15  2008 could be actually 2005 when you are under the influence.

16          So when I was interviewed, the years were wrong, the

17  dates were wrong, I will admit that, but it wasn't that I was

18  using in '09, and I deceived that because I was clean.

19  Q.  So you were under the influence of drugs when Travis

20  Harnish interviewed you in 2009?

21  A.  Correct.

22  Q.  So the interview took place on September 9th.  Do you have

23  a problem with that date as being the correct date?

24  A.  No.

25  Q.  And you signed the confidential informant agreement on

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 69 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

69

1   September 10th of 2010.  Do you have a problem with that date?

2   A.   No.

3   Q.   So there were two different interactions with you and DCI?

4   A.   Correct.

5   Q.   And you testified that you called him to say, "DCI wants me

6   to wear a wire," or, "DCI wants me to be an informant," right?

7   A.   Correct.

8   Q.   And I will assume that you made that phone call the night

9   of September 9th before you went back in to see them on

10  September 10th.

11  A.   Correct.

12  Q.   Well, you clearly stopped using methamphetamine -- what

13  time did you get interviewed on September -- on September 9th,

14  do you remember?

15  A.   No, I'm not -- I don't know.

16  Q.   Would you quibble with 3:30 in the afternoon?

17  A.   No.

18  Q.   Had you actually used that day?

19  A.   Yes, I did.

20  Q.   When?

21  A.   Probably in the morning or right before I went.

22  Q.   If dates and times are confusing when you're on drugs, how

23  do you know you used drugs that day?

24  A.   Because I was using every day up until I got arrested.

25  Q.   And you continued to use after you got arrested?

1   A.  After I got arrested?

2   Q.  Uh-huh.

3   A.  No, because I was incarcerated.

4   Q.  When did you get -- so you were -- have you been in

5   constant custody since September 9th, 2009?

6   A.  No, I was arrested December 27th, 2009.

7   Q.  Okay.  But you had used -- you were continuing to use after

8   September 2009, correct?

9   A.  Correct.

10  Q.  I mean, because you -- and this is after you were

11  interviewed with DCI?

12  A.  Correct.

13  Q.  Because you were arrested and convicted in Texas in

14  December of 2010?

15  A.  Correct.

16  Q.  All right.  So when you interviewed with DCI, I want to

17  make sure the dates are correct because I think I misspoke.

18  You interviewed with DCI September 9th, 2010 the first time?

19  A.  Correct.

20  Q.  You were under the influence of a controlled substance?

21  A.  Correct.

22  Q.  Did you tell that to Agent Harnish?

23  A.  No, I did not.

24  Q.  Why not?

25  A.  Because I'm not going to admit that I was high.

1   Q.  Well, you admitted all sorts of things on September 9th,

2   2010, didn't you?

3   A.  Yes, but I didn't want to admit that I was high.

4   Q.  Why?  You admitted to -- you don't recall talking to him

5   about your drug use throughout 2009, right?

6   A.  Because I had no drug use throughout 2009.

7   Q.  Okay.  But you told him that you were receiving

8   methamphetamine in candles, right?

9   A.  Correct.

10  Q.  And you went into great detail about that, right?

11  A.  Correct.

12  Q.  And you talked about receiving -- the first package you

13  received was at your residence via U.S. Mail, right?

14  A.  Yes.

15  Q.  And you talked about how it looked like the box had been

16  opened and everything else, right?

17  A.  Yes.

18  Q.  And then you talked about working at Big R's and made

19  statements about receiving candles?

20  A.  Correct.

21  Q.  And you talked about how there was a falling-out between

22  Mr. Renteria and Mr. Ordaz?

23  A.  Correct.

24  Q.  I mean, you were implicating yourself in a fairly heavy

25  drug conspiracy?

1    A.   Right.

2    Q.   And you knew that?

3    A.   Yes.

4    Q.   I mean, you had been convicted in 2006 of a drug -- of a

5    drug crime, correct?

6    A.   Correct.

7    Q.   Of a drug conspiracy?

8    A.   Yes.

9    Q.   And actually gone to -- gone to jail for it and done the

10   rehab and all that, right?

11   A.   Correct.

12   Q.   In fact, you were on probation for that -- your probation

13   had ended just a month earlier?

14   A.   Right.

15   Q.   So you knew that the stuff that you were telling this agent

16   was problematic for you?

17   A.   Correct.

18   Q.   Right?

19   A.   Correct.

20   Q.   But why wouldn't you admit to being high if you're

21   admitting to moving ounces and ounces of methamphetamine

22   through -- throughout a long period of time?

23   A.   I guess it just never crossed my mind to tell him I was

24   high.

25   Q.   Did you talk to him at all about your drug use?

1   A.  Yes, I did.

2   Q.  What do you remember telling him?

3   A.  That I was an addict and that I liked my drugs and I was

4   using drugs.

5   Q.  During what time frame?

6   A.  During what time frame what?

7   Q.  Were you using the drugs.  What time frame do you believe

8   you told him you were using the drugs?  Since early 2009, you

9   don't agree with that?

10  A.  Well, according to the statement, it says I told him

11  January 2009.

12  Q.  Right.

13  A.  Is that what you're asking?

14  Q.  Yeah, but you say that's not true.

15  A.  Correct.

16  Q.  Because you weren't using then?

17  A.  Correct.  And like I said, the dates at the time were -- I

18  was getting the dates mixed up.

19  Q.  Well, you -- but -- let's put the dates aside, then, and

20  not worry about the dates.

21      Do you recall telling him that you began getting

22  methamphetamine from an Hispanic male subject known to the CI

23  as Isaias?

24  A.  Yes.

25  Q.  Well, that's completely different than what you just

1   testified to yesterday and today, that the first time you got

2   drugs you got them because he left some sort of drug supply on

3   your closet shelf and that that's the first time you used

4   drugs.  And that's what you testified to yesterday and today,

5   right?

6   A.  Correct, correct.

7   Q.  And you told Agent Harnish and you just admitted you told

8   Agent Harnish that you began getting methamphetamine from an

9   Hispanic male subject known as Isaias around January 2009.  You

10  dispute that because of the dates.  I understand that.  But you

11  just said that you told Agent Harnish that you began getting

12  methamphetamine from Isaias.  Which one is it?

13  A.  Technically I didn't get it from Noe back in September,

14  because I took it from him, but I got it from Isaias as in

15  purchasing it from him, yes.

16  Q.  So the one time you took methamphetamine from Noe in

17  September of 2009.  You never used it again, ever, until you

18  met Isaias in January of 2010?

19  A.  No, I met Isaiah back in '08.

20  Q.  Right.  But you didn't begin -- when did you first begin

21  using methamphetamine this time around -- or let me not ask you

22  when.  Let me withdraw that question.

23          With whom did you get the methamphetamine the first

24  time you used it in this particular transaction?  Was it

25  Mr. Renteria, like you testified to yesterday and today, or was

 1  it Mr. Ordaz that you told Agent Harnish in 2010?

 2          MR. FUN:  I'm going to object, Your Honor.  One,

 3  compound question, but also that's not what she testified to.

 4  It has been asked and answered.  And "this particular

 5  transaction" is really ambiguous.  Mr. Fleener keeps jumping

 6  from date to date and really not clarifying what dates he's

 7  talking about.

 8          THE COURT:  It is a bit of a long question.  I would

 9  ask you to at least break it up so the witness --

10          MR. FLEENER:  Yes, ma'am.

11          THE COURT:  -- is focused.

12          MR. FLEENER:  Yes, ma'am.

13  Q.  (BY MR. FLEENER)  You admit -- I understand.  You admit and

14  you've testified to a couple different times now that --

15          MR. FUN:  Objection.  That's not what she's testified

16  to, Your Honor.  He's making statements now and not asking

17  questions.

18          THE COURT:  Overruled.

19          Please proceed.

20          MR. FLEENER:  Thank you, Your Honor.

21  Q.  (BY MR. FLEENER)  You testified to yesterday and you

22  testified to today that the first time you used methamphetamine

23  during this most recent spell of methamphetamine use was when

24  Mr. Renteria left a package in your closet and you snuck up and

25  took a gram, right?

1   A.  Correct.

2   Q.  Okay.  And you recall that testimony?

3   A.  Yes, I do.

4   Q.  And you told Agent Harnish that when you were interviewed

5   in September of 2010 that you began getting methamphetamine

6   from an Hispanic male known as Isaias, right?

7   A.  Correct.

8   Q.  Are both of those correct or is one of those correct?

9   Explain -- explain the inconsistency, please, ma'am.

10  A.  Well, I guess I assumed that since I took the

11  methamphetamine from my closet that Noe had left, that that's

12  not -- that I didn't get the drugs from him because I took it.

13  Whereas getting a drug most likely pertains to buying the drug

14  from somebody.  So there's a huge difference as to taking it

15  and buying it.

16  Q.  Okay.  You're a methamphetamine addict?

17  A.  Correct.

18  Q.  And you've been that for a while?

19  A.  Correct.

20  Q.  You were that prior to entering this drug conspiracy,

21  correct?

22  A.  Yes.

23  Q.  And you consider yourself a methamphetamine addict now --

24  methamphetamine addict now?

25  A.  Yes.

Case 1:10-cr-00329-NDF  Document 494  Filed 01/10/12  Page 77 of 263
USA VS VELASQUEZ, ET AL  PERKINS - CROSS- FLEENER                    VOL XII

77

1  Q.  When is the first time you began using methamphetamine?  I

2  think you said you were 15?  Or maybe that was somebody else.

3  A.  Yeah, about 15, 16.

4  Q.  The drug that you were convicted of in Converse County, was

5  that methamphetamine?

6  A.  Yes.

7  Q.  And you had gone to rehab for methamphetamine abuse?

8  A.  Correct.

9  Q.  And you had been on probation for being supervised as a

10  methamphetamine addict?

11  A.  Correct.

12  Q.  And you weren't using until Mr. Renteria left an ounce in

13  your house?

14  A.  Correct.

15  Q.  And you took a gram of methamphetamine sometime maybe

16  September of 2010 -- 2009?

17  A.  '9.

18  Q.  Right?

19  A.  Correct.

20  Q.  Then you didn't use any more methamphetamine ever until you

21  hit Isaiah up in 2010 in January?

22  A.  No, I used --

23         MR. FUN:  Objection, that's not -- objection, Your

24  Honor.  That's not what she said.  She's already said the

25  January date is not what she recalled.

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 78 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

78

1              MR. FLEENER:  He can clarify this on redirect, Judge.

2      This is cross-examination.

3              MR. FUN:  He's misstating the witness's testimony.

4              MR. FLEENER:  He can clarify it if he'd like.

5              THE COURT:  Overruled.

6              If you have the question in mind, you may answer.

7              THE WITNESS:  No, sir.

8      Q.  (BY MR. FLEENER)  Ma'am, I want you to be clear.  I want us

9      not to quibble over dates and events and things like this.  If

10     you don't understand any of my questions, tell me you don't

11     understand, ask me to rephrase, and I will be happy to rephrase

12     and restate it a hundred times over to make sure you understand

13     it.  All right?

14     A.  Okay.

15     Q.  Between September of 2009, which is when you say you first

16     grabbed a gram from Mr. Renteria --

17     A.  Correct.

18     Q.  -- to January of -- well, when did you start getting

19     methamphetamine from Isaiah?

20     A.  Probably October of '09, right after September.

21     Q.  Okay.  When you spoke with Agent Harnish -- and I am going

22     to ask you to clarify this a little bit because you've given a

23     couple different -- I don't want to call them inconsistent --

24     answers as to why dates may be different.

25              If you told him different dates, would that be because

1   you were high, would it be because you were attempting to

2   mislead him, would it be because -- or would it be for some

3   other reason?

4   A.   I would say that I was trying to deceive him.

5   Q.   Okay.  So you being high had nothing to do with it?

6   A.   I'm sure it did.  I would say both.

7   Q.   Okay.  So when you -- when you were being interviewed by

8   Agent Harnish in 2009, the -- if there are inconsistencies

9   between what he would say that you told him and what you're

10  testifying to today, it would be because you were high and

11  dates run together and that you were trying to deceive him,

12  some combination of the two?

13  A.   Correct.

14  Q.   Have you had your PSI interview yet in this case?

15  A.   Yes, I have.

16  Q.   Now, when you were interviewed for the PSI, you weren't

17  high?

18  A.   No.

19  Q.   Do you recall what you told the PSI writer regarding your

20  drug use?

21  A.   No, I don't.

22  Q.   Let's, I guess, talk about the -- the work as a CI.  I

23  mean, you never really did any work as a confidential

24  informant, correct?

25  A.   Correct.

Case 1:10-cr-00329-NDF  Document 494  Filed 01/10/12  Page 80 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER          VOL XII

80

1   Q.  I mean, because your whole goal was to deceive Agent

2   Harnish and gather information?

3   A.  Correct.

4          MR. FLEENER:  May I approach the witness, Your Honor?

5          THE COURT:  Yes.

6   Q.  (BY MR. FLEENER)  Ms. Perkins, this is Government's

7   Exhibit 611, which purports to be the agreement that you have

8   with DCI regarding what you can and can't do as a confidential

9   informant.  Do you recall that?  I mean, is that the correct

10  document?

11  A.  Yes.

12  Q.  And take a look at that and make sure that that's your

13  signature on the second page.  It is, right?

14  A.  Yes, it is.

15  Q.  And it is dated on September 10th of 2010 --

16  A.  '10.

17  Q.  -- right?

18  A.  Correct.

19  Q.  And look on the front page, if you don't mind.  There are a

20  bunch of answers to questions yes, no, yes, no, that go through

21  a series of what you're permitted to do and what you're not

22  permitted to do.  That's all your handwriting, correct?

23  A.  Correct.

24  Q.  And so you read that document and answered those questions,

25  correct?

1    A.  Correct.

2    Q.  Now, were you -- I'm going to retrieve that document from

3    you, ma'am.

4            Actually, I'm going to hand it back.  Is there -- does

5    this document look like your -- look like your complete

6    agreement with DCI?  Does it appear to be altered in any way,

7    ma'am?

8    A.  No.

9    Q.  Thank you.  I'm going to retrieve it again.

10           MR. FLEENER:  Your Honor, I can either offer a

11   Government's exhibit, which I don't think I can do, or I can

12   mark it as a defense exhibit, or Mr. Fun can offer it now,

13   however the Court would like to handle this.

14           MR. FUN:  If Mr. Fleener wants to offer a Government

15   exhibit, I have no objection.  The exhibit is already marked.

16           THE COURT:  It is Government's Exhibit 611?

17           MR. FLEENER:  611, ma'am.

18           THE COURT:  Any objection from any of the rest of the

19   defendants?

20           MR. HORN:  No objection.

21           MR. TIMBERS:  No objection.

22           THE COURT:  Hearing no objections, Government's

23   Exhibit 611 is admitted.

24      (Government's Exhibit 611 received.)

25           MR. FLEENER:  May I have permission, Your Honor, to

1  publish to the jury and examine the witness with it?

2       THE COURT:  Yes.

3  Q.  (BY MR. FLEENER)  First, Ms. Perkins, you can see the

4  yellow sticker at the bottom being Government's Exhibit 611,

5  correct?

6  A.  Correct.

7  Q.  You can see, Ms. Perkins, this is your name and identifying

8  information on the front of this form, correct?

9  A.  Correct.

10  Q.  And when we were talking about all the yeses and noes, just

11  looking at page 1, you can see the first page of this two-page

12  document, you can see the various yeses, correct?

13  A.  Correct.

14  Q.  And I'm going to show page 2.  It is the same thing,

15  questions that are being asked and answered by you, correct?

16  A.  Correct.

17  Q.  And, for instance, we're going to start with number 2.  Let

18  me ask you, which -- which DCI agent went over this with you?

19  Was it Agent Hall, Agent Harnish, Agent --

20  A.  Harnish.

21  Q.  Okay.  We're going to start with agent 2 -- excuse me --

22  question 2.  And question 2 is, "Do you understand you're not

23  allowed to break any laws during the course of your

24  association?"  And you said yes, you understand that.  You just

25  flat out violated that provision, right?

 1  A.  Correct.

 2  Q.  Because you were breaking laws -- you were continuing to

 3  use methamphetamine, for instance, right?

 4  A.  Correct.

 5  Q.  Were you continuing to sell methamphetamine or were you

 6  just using it?

 7  A.  Just using.

 8  Q.  And, ma'am, you were convicted in Texas on December 27th,

 9  2010 of felony possession of marijuana -- of methamphetamine,

10  right?

11  A.  Correct.

12  Q.  Which is just a few months after -- two months after you

13  signed this?

14  A.  Correct.

15  Q.  When were you arrested for this, for the December

16  conviction?

17  A.  When?

18  Q.  Yes, ma'am.

19  A.  December 27th.

20  Q.  All right.  So you were arrested and convicted on the same

21  day?

22  A.  Correct.

23  Q.  Which is roughly two and a half months after you signed

24  your agreement?

25  A.  Yes.

1    Q.   So when you go to number 4 where it says, "You understand

2    you are not to handle any contraband or illegal substances at

3    any time unless specifically authorized to do so," you flat out

4    violated that as well?

5    A.   Correct.

6    Q.   And number 5, "You're not to disclose your association with

7    the agency to anyone," you violated that, too, right, because

8    you said you called Isaiah --

9    A.   Correct.

10   Q.   -- and told him that you were doing this?

11   A.   Yes.

12   Q.   Number 8 says that you weren't to purchase any drugs or

13   contraband from any person whom you cannot fully identify.  Do

14   you believe you complied with that provision?

15   A.   No.

16   Q.   And likewise with number 9, that "You are not to purchase

17   any drugs from the same person twice unless instructed to do

18   so," you violated that as well?

19   A.   Correct.

20   Q.   Now, you weren't carrying any weapons, correct?

21   A.   No, I was not.

22   Q.   Number 14 talks about entrapment.  You were continuing to

23   buy methamphetamine in violation of this agreement, correct?

24   A.   Correct.

25   Q.   And -- but you weren't entrapping anybody; you were just

1   buying methamphetamine?

2   A.   Correct.

3   Q.   And in number 16 it talks about that you're going to be

4   reporting on a regular and continuing basis.  You didn't do any

5   of that, correct?  In fact, you ran away, you ran to Texas to

6   avoid being charged?

7   A.   Correct.

8   Q.   And when you were down in Texas, that's when you picked up

9   the methamphetamine charge?

10  A.   Correct.

11  Q.   So you would agree you weren't complying with that

12  provision regarding reporting and keeping the State aware of

13  your whereabouts?

14  A.   Correct.

15  Q.   Now, number 18 you're complying with because that's saying

16  you're agreeing to testify, correct?

17  A.   Correct.

18  Q.   Now, 20, I want you to read 20 to yourself and follow along

19  with me.  It says, "You understand that during your association

20  with this agency you're required to provide truthful responses

21  to any and all questions posed by the agents or officers of

22  this agency and that providing any materially false statements

23  to the agents or officers of this agency may be grounds for

24  termination of this agreement and/or criminal prosecution."

25  And you indicated yes, correct?

1   A.  Yes.

2   Q.  Now, were you truthful with these agents, or did you

3   violate that provision?

4   A.  I violated.

5   Q.  It's safe to say, is it not -- and I'm retrieving 611 and

6   taking it off the screen -- that you violated this agreement

7   with the agents over and over and over again?

8   A.  Correct.

9   Q.  And you would agree that the agents -- the agents put trust

10  in you when you -- when they signed you up to be a CI?

11  A.  Yes.

12  Q.  And that they chose you, they asked you to wear a wire,

13  they chose you because they believed that you could help out

14  the State or the United States?

15  A.  Correct.

16  Q.  And you violated that trust in them?

17  A.  Correct.

18  Q.  And you violated that trust in them because you were trying

19  to trick them?

20  A.  Correct.

21  Q.  But if you're trying to trick them, why did you move to

22  Texas?  That doesn't sound like that you're trying to deceive

23  anybody.

24  A.  Because I knew I was going to get arrested, so I wanted to

25  prolong it, I guess.

1  Q.  Well, why did you know you were going to be arrested if you

2  were agreeing to be a confidential informant?

3  A.  Because they told me that I was going to get arrested

4  anyways.

5  Q.  But when you moved down to Texas and were in possession of

6  methamphetamine down there, I mean, that wasn't trying to

7  deceive them in any way, was it?

8  A.  No.

9  Q.  That's just because you wanted methamphetamine?

10  A.  Correct.

11          MR. FLEENER:  Can I have just a second, ma'am?

12          THE COURT:  Yes.

13  Q.  (BY MR. FLEENER)  I want to talk about your -- your

14  criminal record and some of the benefits that you're receiving

15  by testifying against my client.  Is that all right?

16  A.  Okay.

17  Q.  We already talked about the first felony drug conviction

18  that you had in March of 2006, right?

19  A.  Yes.

20  Q.  And that's -- that was where you got a split sentence with

21  48 months hanging over your head, right?

22  A.  Correct.

23  Q.  And then you had to do a short jail sentence, I assume?

24  A.  I spent nine months in jail.

25  Q.  And then you spent some time in rehab?

1    A.   Correct.

2    Q.   And that's -- to your understanding, that's a felony drug

3    conviction?

4    A.   Yes.

5    Q.   Were you distributing methamphetamine then, ma'am?

6    A.   No.

7    Q.   That was simply a use or possession?

8    A.   Yes.

9    Q.   Now, your second drug felony took place in December of

10   2010, right?

11   A.   Correct.

12   Q.   That was the one down in Texas for the felony drug charge?

13   A.   Yes.

14   Q.   And that's your second felony drug charge; you would agree

15   with that?

16   A.   Yes.

17   Q.   And you've been now -- you pled guilty to being involved in

18   a drug conspiracy in federal court, correct?

19   A.   Correct.

20   Q.   And that's your third drug conviction, felony?

21   A.   Correct.

22   Q.   Now, you are getting some pretty significant benefits,

23   though, from your plea agreement, are you not?

24   A.   Yeah.

25   Q.   Well, you know that -- you've heard the term "an 851,"

1   haven't you?

2   A.  No, I have not.

3   Q.  Are you aware -- well, you're certainly aware that with two

4   prior drug felonies that you would receive a sentence of life

5   in prison without parole unless you agreed to -- unless you did

6   something that would keep the United States from seeking that

7   sentence?  You're aware of that?

8   A.  Correct.

9   Q.  All right.  So -- and you're -- you're aware certainly of

10  the fact that your felony in Texas and your felony in Wyoming

11  are the two prior felonies, right?

12  A.  Yes.

13  Q.  And with those convictions being on your record -- with

14  those convictions being on your record, it is just a mandatory

15  life sentence?

16  A.  Correct.

17  Q.  Now, by testifying for the United States, one of the

18  main -- one of the main provisions in your plea agreement is

19  that the United States agrees not to file an Information for

20  sentencing enhancement pursuant to 21 USC Sections 841(a)(1),

21  (b)(1)(A) and 851?  You're familiar with that provision?

22  A.  Yes.

23  Q.  And that's the provision which basically gives you your

24  life sentence?

25  A.  Correct.

1    Q.   And by testifying for the United States, pursuant to this

2    plea agreement, they're not going to file the necessary

3    documents which forces you to get a life sentence?

4    A.   Correct.

5    Q.   That's a good deal?

6    A.   Yes.

7    Q.   What kind of sentence do you think you're going to get?

8    A.   That's up to the Judge.

9    Q.   Well --

10   A.   I don't know.

11   Q.   I'm going to --

12        MR. FLEENER:  May I approach the witness with an

13   exhibit, Your Honor?

14   Q.   (BY MR. FLEENER)  I'm going to hand you what the

15   Government's marked as Exhibit 602, which is your plea

16   agreement.  Can you take a look at that document, ma'am, and

17   make sure that that's the plea agreement that you entered --

18   the agreement that you entered into with the United States.

19   A.   Yes, it is.

20   Q.   And on the last page, page 8 or 9 or 10 -- 9, that's your

21   signature, correct?

22   A.   Yes, it is.

23   Q.   And you signed that document, and you read it before you

24   signed it?

25   A.   Yes, I did.

1   Q.  And you went over it thoroughly with your attorney?

2   A.  Yes, I did.

3   Q.  And you received the benefit of his -- his advice?

4   A.  Yes, I did.

5   Q.  And that's your complete and full agreement with the United

6   States regarding what -- what you have to do for them and what

7   they are going to give you in return, correct?

8   A.  Well, what they offered me, yes.

9   Q.  Right.  Well, what do you mean by that?

10  A.  Well, they offer it.  That doesn't mean the Judge has to go

11  by it.

12  Q.  I'm going to retrieve the document.  Does this document

13  appear to be altered in any way, shape or form?

14  A.  No.

15  Q.  Thank you.  It appears to be a good copy of an original

16  document?

17  A.  Yes, it does.

18          MR. FLEENER:  May we have a sidebar, Your Honor?

19          THE COURT:  Yes.

20      (At sidebar.)

21          MR. FLEENER:  Judge, I intend to offer this document

22  into evidence and impeach the witness for bias with this

23  document.  My concern is paragraph 7 where it discusses

24  relevant conduct of 1.5 to 5 kilograms.  One of the issues

25  that's going to be decided in this trial, that has to be

1    decided by this jury is whether they reach certain thresholds

2    as far as drug quantities, statutory thresholds, 50 grams, 500

3    grams.  The fact that this witness has stipulated to an amount

4    certain prejudices my client and probably the rest of the

5    defendants as well, and we're going to be arguing that if there

6    was a conspiracy that they didn't reach the 500-gram threshold.

7            I would seek to have paragraph 7 redacted out of this

8    document.  It is also not relevant for the jury to know what

9    her relevant conduct is, quite frankly.  I would seek to have

10   paragraph 7 redacted and then offer the document into evidence.

11           MR. FUN:  Judge, one, as a practical matter,

12   Mr. Fleener doesn't need to admit the document to cross-examine

13   the witness.  But if he wants to offer it, I have no objections

14   to it.  I think that the jury can just be instructed that -- I

15   think the jury needs to be instructed and given the Davis

16   instruction concerning this defendant's conviction and anything

17   in the plea agreement -- that might be in the plea agreement

18   should not affect their independent judgment of the evidence as

19   they heard it.

20           I think my concern is that it would lead them to

21   speculate about that.

22           MR. FLEENER:  I have a suggestion, an alternative.  I

23   won't offer it, but I will just -- I don't need that -- I'd

24   use -- I am going to go through a couple different provisions

25   with her.  I just wouldn't be going through that provision with

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 93 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

93

1    her, and I won't actually offer the document.  We can just do

2    it basically as a demonstrative aid, and we won't admit the

3    document into evidence.

4              THE COURT:  Fine.  Thank you.

5              MR. FUN:  I think the problem with a demonstrative aid

6    is he can't show it to the jury or display it to the jury

7    because that would be problematic.

8              THE COURT:  I don't know what you mean by a

9    demonstrative, but you can certainly use it with the witness to

10   impeach or refresh her recollection.

11             MR. FLEENER:  I misspoke when I said demonstrative

12   aid.  I would use it to impeach the witness and go through -- I

13   just wouldn't offer the document substantively.  I just want to

14   be able to show her the specific provisions that I want to be

15   able to talk to her about.

16             MR. HORN:  Can I ask a question?  Mr. Fun, are you

17   going to go ahead and offer this document for the jury?

18             MR. FUN:  I didn't plan on it.

19             MR. FLEENER:  The only reason I was going to offer it

20   was to be able to talk to her about it and show it to her.

21   Otherwise, I don't have any desire for it to go back to the

22   jury.

23             THE COURT:  That seems to resolve it unless the

24   defendants request something additional in terms of a curative

25   instruction.

1          MR. HORN:  I think that would be prejudicial to the

2   defendants, Judge, if that were admitted and any similar plea

3   agreement.

4          THE COURT:  Yes.

5          MR. FLEENER:  I agree.  I would simply use it -- I

6   will impeach the witness with the document.  I won't offer it.

7          THE COURT:  All right.  Thank you.

8      (Following in the hearing of the defendants and jury.)

9   Q.  (BY MR. FLEENER)  I'm going to show you, ma'am, what's been

10  marked --

11         MR. FUN:  To be clear -- I don't know if they can

12  restrict it to being seen by the witness.  You're going to show

13  it to her if it is clean?

14         MR. FLEENER:  I already have.

15         MR. FUN:  No, if you put it up, it is going to put it

16  on the overhead for everyone.

17         THE COURT:  Mr. Fun, do you intend to have this on the

18  record?

19         MR. FUN:  Yes, I'm going to object.  Tom, Mr. Fleener

20  wishes to put it on the overhead.  I'm not sure the system is

21  capable of displaying it to just him and the witness, and so my

22  concern is if he puts it on the overhead, it is going to show

23  up, due to the Court's prior ruling, on everyone's screen.

24         MR. FLEENER:  I actually intended everyone to see this

25  thing.

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 95 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER            VOL XII

95

1          THE COURT:  Not the jury.  It is not -- it has not

2   been admitted, so it cannot be displayed to the jury.  I

3   believe the court deputy can control what is displayed, if you

4   would like to use it for purposes of discussing matters with

5   this witness.

6          MR. FLEENER:  Thank you, Your Honor.

7          THE COURT:  So the jury knows, this document has not

8   been moved and has not been admitted, and so it is not evidence

9   in the case.  Documents, though, can be used with witnesses for

10  various purposes without having it come in as evidence.  And so

11  to the extent that Mr. Fleener uses the overhead and discusses

12  this document with this defendant and it is not displayed to

13  you, I just want to make sure that you understand what is

14  happening and how this document is being used with the witness

15  and you're not concerned about why you're not seeing the

16  document.

17          It is not in evidence, and so her testimony about the

18  document or her responses to Mr. Fleener will be evidence for

19  your consideration, but the document itself in terms of

20  something that you can separately read during deliberations

21  will not be in evidence.

22  Q.  (BY MR. FLEENER)  I'm showing you Government's Exhibit 602.

23  Ms. Perkins, you recall looking at that document a few minutes

24  ago.  That appears to be your plea agreement, correct?

25  A.  Correct.

Case 1:10-cr-00329-NDF  Document 494  Filed 01/10/12  Page 96 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

96

1   Q.  And this plea agreement is a document -- a form that

2   you've -- excuse me -- an agreement with the United States, and

3   in return for you doing something for them, you hope to receive

4   some benefit from them?

5   A.  Correct.

6   Q.  The -- I'm showing page 4 of the document.  On paragraph

7   5 -- well, read paragraph 5 to yourself, please.  And you're

8   looking at me, which means you've read it, correct?

9   A.  Correct.

10  Q.  In paragraph 5 essentially what you're agreeing to is that

11  you're informed in this case, that you've read the Indictment,

12  that you know the maximum penalties and minimum penalties and

13  the nature of the charges and elements of the crimes, things of

14  that nature, right?

15  A.  Correct.

16  Q.  And that paragraph indicates -- and by you agreeing -- and

17  you did read that paragraph, correct?

18  A.  Yes, I did.

19  Q.  And you read it before you signed it?

20  A.  Correct.

21  Q.  And what that would indicate is that there weren't any --

22  you were making informed decisions as far as what you were

23  pleading to and what benefit you were hoping to receive and

24  whatnot?

25  A.  Yes.

1   Q.  Now, you said that one of the benefits --

2          MR. FLEENER:  And I'm showing the witness page 7, just

3   for the record, of the plea agreement.

4   Q.  (BY MR. FLEENER)  One of the benefits that you talked about

5   receiving was the benefit of a sentence reduction.

6   A.  Correct.

7   Q.  And a sentence reduction, you've heard it referred to as a

8   5K?

9   A.  Yes.

10  Q.  And 5K is -- and I know your attorney, Mr. Barrett, is a

11  good attorney.  I know that he showed you the federal

12  sentencing guidelines, right?

13  A.  Yes, he did.

14  Q.  And a 5K is a sentence reduction motion, correct?

15  A.  Correct.

16  Q.  And it is a motion that's filed by the United States, and

17  then it is the Court's discretion to reduce your sentence,

18  correct?

19  A.  Correct.

20  Q.  So when you -- when you testified a few minutes ago, you

21  said that you're hoping for a sentence reduction and that the

22  Court decides it, correct?

23  A.  Correct.

24  Q.  But it's true, is it not, though -- and take a look at

25  page -- excuse me -- paragraph 12c.  12c reads that "If the

1    United States determines, in its sole discretion, that the

2    defendant has fully, completely and truthfully cooperated with

3    the United States, the United States agrees to recommend at the

4    time of sentencing, or within one year of sentencing, a

5    downward departure pursuant" --

6              MR. FUN:  I object, Your Honor.  Mr. Fleener is

7    misreading, and he skipped critical words in that plea

8    agreement, which specifically says "agrees to recommend to the

9    Court," and Mr. Fleener skipped that.  And so if he's going to

10   ask a question concerning this document, I ask that he do so

11   fully.

12             MR. FLEENER:  Where is he getting "to the Court"?  I

13   apologize.  I'm reading the document verbatim, paragraph 12c,

14   the Court's name isn't mentioned in there.  I don't know what

15   Mr. Fun is talking about.  I will reread it, Your Honor, but I

16   wasn't misreading that.

17             THE COURT:  I will overrule that objection and permit

18   you to either continue or start again.

19   Q.  (BY MR. FLEENER)  And I don't want to misread this document

20   because it is an important document to you.  Correct?

21   A.  Correct.

22   Q.  This is the document that you hope to receive a sentence

23   reduction?

24   A.  Correct.

25   Q.  And in addition to not getting a life sentence, which you

1    know you would get based on your priors, right?

2    A.   Correct.

3    Q.   You hope to get a reduced sentence from whatever the Court

4    sentenced you to the first time, right?

5    A.   Correct.

6    Q.   Because the Court is going to sentence you to whatever the

7    Court decides to sentence you to whenever your sentencing is,

8    right?

9    A.   Correct.

10   Q.   That hasn't been set yet -- I just looked -- right?

11   A.   Correct.

12   Q.   And if the Court sentences you to ten years in prison, you

13   know that with a sentence reduction that the Court can come

14   back -- or the United States can come back within a year's time

15   and, based on your substantial assistance, ask the Court to

16   basically resentence you, to reduce your sentence, right?

17   A.   Correct.

18   Q.   And that's how -- I mean, you've been in custody now, in

19   federal custody, for how many months, ma'am?

20   A.   Since January.

21   Q.   All right.  So nine months, ten months?

22   A.   Uh-huh.

23   Q.   And this is something that you've thought about, talked

24   about, talked to others about; you understand how this system

25   works?

1  A.  Yes.

2  Q.  And I want you to correct me if I misstate something

3  that -- as far as how you understand it.  Usually what happens

4  and what you're hoping for is that either you get sentenced one

5  time, that the Government files a motion to reduce your

6  sentence, and the Judge is able to reduce your sentence to

7  whatever she feels is the appropriate sentence based on your

8  testimony and whatnot and that will be your final sentence; or,

9  that you get sentenced twice, and you get sentenced the first

10  time to whatever the Judge decides to sentence you to, and then

11  the United States files its motion to reduce your sentence, and

12  then you have another hearing or something later on down the

13  road, within six months or a year, and if the Judge gave you

14  ten years, maybe she will reduce to it five years, who knows.

15  Those are the ways you're sentenced, correct?

16  A.  Correct.

17  Q.  And you don't know which of those methods will be followed

18  because you don't have a sentencing date set, right?

19  A.  I do have a sentencing date set.

20  Q.  You do have a date set?

21  A.  Yes.

22  Q.  When is it?

23  A.  November 29th.

24  Q.  Okay.  There's a lot of filings.  I didn't see that.

25  That's fine.  That's neither here nor there.

1          So on November 29th it is your understanding, is it

2   not, that the sentence that you are -- that you're either going

3   to receive a reduced sentence based on your cooperation and

4   everything and then go off into the Bureau of Prisons, right?

5   A.   Correct.

6   Q.   Or you're going to get a higher sentence and that by your

7   cooperation you hope that Mr. Fun on behalf of the United

8   States files a motion with the Judge saying, "Give her a lower

9   sentence," and then you get resentenced, right?

10  A.   Correct.

11  Q.   Do you know which one of those is going to happen in your

12  case?

13  A.   No, I don't.

14  Q.   You said that you have a -- you received your PSI, correct?

15  You had the interview?

16  A.   I had the interview.

17  Q.   Have you received it yet?

18  A.   No, I have not.

19  Q.   Do you know what sentence the federal sentencing guidelines

20  is calling for you to receive?

21  A.   No, I don't.

22  Q.   Okay.  You have heard discussions in jail and you're -- and

23  your understanding of plea agreements and federal sentencing

24  involves points?  You've heard the points?

25  A.   Yes.

1    Q.  And you've heard that you have -- you get points based on

2    your offense level, right?

3    A.  Correct.

4    Q.  And maybe some aggravating factors, if guns are involved or

5    minors are involved, things of that nature, right?

6    A.  Yes.

7    Q.  And then you get other points based on your criminal

8    history, right?

9    A.  Correct.

10   Q.  And then you -- there's a chart, and you look at the chart

11   and you see how many points you have and what your criminal

12   history looks like, right?

13   A.  Yes.

14   Q.  And then you look at the other -- the points at your

15   offense level that go down the left side, right?

16   A.  Yes.

17   Q.  And then you match the two of them up, and it gives you a

18   term of months?

19   A.  Correct.

20   Q.  Have you looked at the federal sentencing guidelines to try

21   to determine what you believe your sentence is going to be

22   without any cooperation?

23   A.  Yes.

24   Q.  And what do you believe your sentence is going to be

25   without any cooperation?

1  A.  I believe it was up to 30 years.

2  Q.  How many?

3  A.  30.

4  Q.  Because you're a career offender?

5  A.  Correct.

6  Q.  And that's another guideline provision under Section 4 of

7  the guidelines, correct?

8  A.  Yes.

9  Q.  And as a career offender, the problem with being a career

10 offender is because you have your prior drug felonies, it

11 really ratchets you up both on the offense level points, right?

12 A.  Yes.

13 Q.  And your criminal history points?

14 A.  Correct.

15 Q.  And it makes it so if you're computed to be a career

16 offender and you ultimately receive a sentence, it is a heck of

17 a long sentence?

18 A.  Yes, it is.

19 Q.  You said up to 30 years, for instance, right?

20 A.  Correct.

21 Q.  But that's all without testifying in court.

22 A.  Correct.

23 Q.  And you would certainly admit to the jury and everyone else

24 here that one of the -- one of the main goals in testifying in

25 this trial is to get a reduced sentence?

1   A.  Correct.

2   Q.  And you don't want to get a -- you didn't want to get a

3   life sentence, which they could have given you, right?

4   A.  Correct.

5   Q.  And they could have given you that life sentence because

6   you had those two priors?

7   A.  Yes.

8   Q.  But by signing this plea agreement and testifying against

9   my client and others, you are able to avoid that, right?

10  A.  The life sentence, yes.

11  Q.  But you're still talking about up to a 30-year sentence,

12  which is a long time?

13  A.  Yes, it is.

14  Q.  But by testifying against Mr. Renteria and the rest of the

15  defendants here at the table, you're hoping to avoid that long

16  sentence, too?

17  A.  Yes.

18  Q.  And you're hoping to -- have you had any discussions about

19  what you're hoping to get?

20  A.  No.

21  Q.  Certainly significantly less than 30?

22  A.  Correct.

23  Q.  15?

24  A.  I don't know.

25  Q.  10?

1   A.  I don't know.

2   Q.  And I will -- and I'm not going to badger you on that

3   because you do admit to everybody in here that -- and you've

4   already admitted -- that one of your main goals is getting a

5   reduced sentence?

6   A.  Correct.

7   Q.  And the only way you get the reduced sentence -- first of

8   all, the only way you avoided the life sentence was by signing

9   this plea agreement, right, the 851s being filed?

10  A.  Yeah.

11  Q.  I mean, that was the only way you avoided a life sentence.

12  If you were to go to trial and be convicted or plead guilty but

13  not testify, Mr. Fun could file that charging document and give

14  you a life sentence, right?

15  A.  Correct.

16  Q.  And it is by testifying today that that's not going to

17  happen?

18  A.  Correct.

19  Q.  And that's got to be a significant burden off of your mind.

20  A.  Yes.

21  Q.  How old are you, ma'am?

22  A.  36.

23  Q.  And a life sentence in federal court means life, right?

24  You have been told that?

25  A.  Yes.

1   Q.  Life means life; we don't have parole?

2   A.  Yes.

3   Q.  Okay.  Now, going back to this sentence reduction, you

4   testified, and make sure I understand, you believe that the

5   Judge ultimately decides what your sentence is going to be?

6   A.  Yes.

7   Q.  And she ultimately decides, the Court ultimately decides

8   what your sentence is going to be, whether you get sentenced

9   once and your reduction is taken into consideration or whether

10  you get sentenced twice and your reduction comes after the

11  first time you're sentenced, right?

12  A.  Right.

13  Q.  It is all up to the Judge, the ultimate sentencing?

14  A.  Yes.

15  Q.  But look at paragraph 12c, and I'm going to read 12c to

16  you, and if I misread something, you will certainly -- somebody

17  will let me know.  "If the United States determines, in its

18  sole discretion, that the defendant has fully, completely and

19  truthfully cooperated with the United States, the United States

20  agrees to recommend at the time of sentencing, or within one

21  year of sentencing, a downward departure pursuant to USSG" --

22  which is United States Sentencing Guidelines, the section

23  symbol -- "5K1.1" -- which we've talked about being a 5K,

24  right?

25  A.  Right.

1    Q.  -- "or 18 USC" -- which is United States Code -- "Section

2    3553(e), or Rule 35(b) Federal Rules of Criminal Procedure, to

3    reflect the defendant's substantial assistance to the United

4    States."  I will complete that.  "In this regard, the defendant

5    understand" -- I suppose that's a sic, a typo -- "the defendant

6    understand that her rights under this plea agreement" -- you

7    can't see that, can you?

8    A.  No.

9    Q.  I apologize.

10            THE CLERK:  Will you pull -- there you go.

11   Q.  (BY MR. FLEENER)  "In this regard, the defendant understand

12   that her rights under this plea agreement, including any

13   recommendation proposed to be made or behalf" -- "made on her

14   behalf by the United States will in no way be dependent on or

15   affected by the outcome of any case in which she may testify."

16            I read that correctly, did I not?

17   A.  Yes.

18   Q.  And what that actually tells you, that while the Judge

19   ultimately decides what your sentence is going to be -- we all

20   understand that, right?

21   A.  Yes.

22   Q.  In order to get your sentence reduced, he's got to file the

23   motion to reduce your sentence; otherwise, she can't reduce

24   your sentence?  That's correct, isn't it?

25   A.  Correct.

1   Q.  So without the United States' assistance in this, without

2   Mr. Fun or his representatives actually asking the Judge to

3   reduce your sentence, you're stuck possibly with that 30-year

4   sentence?

5   A.  Correct.

6   Q.  And you're hopeful that by -- you are hopeful that Mr. Fun

7   files the motion, I assume.

8   A.  Yes.

9   Q.  You're hopeful that when Mr. Fun files the motion, he makes

10  a strong recommendation to Judge Freudenthal that you should

11  have a lower sentence, right?

12  A.  Correct.

13  Q.  And you're hopeful that the Judge gives you the lowest

14  possible sentence you could possibly get, right?

15  A.  Right.

16  Q.  So when you -- when you said that the Judge is ultimately

17  responsible for your sentencing, it is actually two folks that

18  are responsible:  He has to file and then she has to reduce,

19  correct?

20  A.  Right.

21  Q.  And -- okay.  I want you to look at section -- excuse me --

22  paragraph e, ma'am, where my finger is.  It says, "The United

23  States agrees to recommend a sentence at the low end of the

24  applicable sentencing guideline range," right?

25  A.  Yep.

1   Q.  And what that means is that these guideline ranges,

2   depending on where you are on the big chart, can be one year,

3   two years, three years, four years, five years, ten years, from

4   the low end to the high end of that particular guideline range,

5   right?

6   A.  Correct.

7   Q.  And one of the -- one of the agreements that you were able

8   to secure with the United States was that not only would they

9   not file the enhancements that gave you a life sentence --

10  right?

11  A.  Yes.

12  Q.  And that you would -- they would on their sole discretion

13  file a motion with the Court to reduce your sentence based on

14  substantial assistance on a 5K, right?

15  A.  Right.

16  Q.  That they would also -- whatever particular guideline you

17  happened to be in, if your guideline sentence is 97 to 121

18  months, for instance, your understanding is Mr. Fun is going to

19  stand up and tell the Judge, "Please sentence her to 97 months,

20  not 121 months," the low end of whatever guideline it is?

21  A.  Right.

22  Q.  And that's a significant benefit to you?

23  A.  Yes.

24  Q.  In paragraph g it says, "The United States agrees not to

25  file an Information for sentencing enhancement pursuant to 21

1    United States Code Sections 841(a)(1), (b)(1)(A) and 851."

2    That's what we've talked about a few different times now, the

3    life sentence hanging over your head?

4    A.   Right.

5    Q.   And they've agreed they're not going to do that by you

6    entering this plea agreement?

7    A.   Correct.

8    Q.   And the paragraph h, it says, "The United States agrees to

9    dismiss the remaining count against the defendant and Count Two

10   (conspiracy to launder money)."  That's what it says, correct?

11   A.   Correct.

12   Q.   Because the truth is, you were charged with a couple

13   different crimes?

14   A.   Yes.

15   Q.   And by your plea agreement -- I'm going to turn to page 2

16   of the plea agreement.  I've seen enough of these.  I know

17   where this is, paragraph 2 of your plea agreement.  You're

18   pleading just to one count, conspiracy to possess with the

19   intent to distribute and to distribute methamphetamine, right?

20   A.   Correct.

21   Q.   So the truth is they're also going to dismiss a charge or

22   two against you?

23   A.   Right.

24   Q.   And I don't have the Indictment in front of me.  Do you

25   know how many charges they're actually dismissing?  Is it only

Case 1:10-cr-00329-NDF  Document 494  Filed 01/10/12  Page 111 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

111

1  | one, the money laundering?

2  | A.  Just one, yes.

3  | Q.  And that's a significant concession to you.

4  | A.  Correct.

5  | Q.  And one of the aspects of that concession is that -- I

6  | mean, were you aware that if you're convicted of money

7  | laundering and a drug charge that you actually get an increased

8  | sentence under the guidelines?  Were you aware of that?

9  | A.  No, I was not.

10 | Q.  Mr. Barrett, you guys didn't talk about that?

11 | A.  No.

12 | Q.  But regardless of whether -- I mean, if that's true, that

13 | would be a significant concession?  That would save you some

14 | points?

15 | A.  Right.

16 | Q.  And even if it wasn't true and I just made it up, the fact

17 | is that you're not having to plead to two charges, that they're

18 | willing to get rid of one, that's still a significant

19 | concession to you, right?

20 | A.  Right.

21 | Q.  Oh, paragraph f is significant.  Read paragraph f to

22 | yourself.  RDATP, that's a significant concession.  That's

23 | something you want?

24 | A.  Right.

25 | Q.  RDATP stands for basically what you understand to believe

1    is a drug treatment program offered by the BOP?

2    A.   Correct.

3    Q.   And RDATP, without getting into all the specifics of RDATP,

4    it is your understanding, isn't it, that RDATP is a way to get

5    out of jail early?  Get --

6    A.   And get credit for it, yes.

7    Q.   I apologize.  I didn't mean to interrupt you.  Go ahead.

8    A.   Get credit for it, yes.

9    Q.   Right.  And once you're eligible to get into residential

10   drug treatment, towards the end of your sentence you're able to

11   transition early into residential drug treatment and transition

12   early into a halfway house so that you're actually able to get

13   some amount of time off your sentence?

14   A.   Correct.

15   Q.   Not to mention being able to stay clean, and that's

16   something you want as well?

17   A.   Yes.

18   Q.   But certainly, it is not a stretch for me to say that one

19   of the significant benefits to a defendant as they're sitting

20   there in that chair to residential drug treatment is that

21   you're able to get out of prison a little bit early and get an

22   extended halfway house placement?

23   A.   Correct.

24   Q.   And that's something that the Bureau -- that the defendant

25   and the United States -- the United States agreed -- "The

1    defendant and United States agree to jointly recommend that the

2    defendant be recommended for the 500-hour drug treatment

3    program offered by the Bureau of Prisons."  So that's something

4    Mr. Fun is also doing, correct?

5            MR. FUN:  I'll object.  It does say "...recommend to

6    the Court that the defendant be recommended...."  It does say

7    "to the Court."

8            MR. FLEENER:  I will rephrase.

9    Q.  (BY MR. FLEENER)  Your agreement -- this particular

10   provision of your agreement says that Mr. Fun is going to

11   recommend to the Judge that, along with your attorney, that you

12   get -- that she recommend to the Bureau of Prisons that you are

13   eligible for RDATP, for drug treatment?

14   A.  Correct.

15   Q.  And again, not only does it help make you clean, correct --

16   A.  Yes.

17   Q.  -- but it also gets a limited time off your sentence?

18   A.  Yes.

19   Q.  So you would agree with me that there's some significant

20   benefits in here to your testifying today?

21   A.  Yes.

22   Q.  And that these benefits that are in here could go anywhere

23   from a 30-year sentence for being a career offender all the way

24   up to getting a life-without-parole sentence, right?

25   A.  Right.

1   Q.  And that by you testifying against these folks today, that

2   if Mr. Fun is satisfied with your testimony, he will file a

3   motion -- or he may file a motion, and that the Court may give

4   you a sentence that is significantly less than 30 years?

5   A.  Correct.

6   Q.  I'm going to shift gears now, ma'am, and talk a little bit

7   about your --

8           THE COURT:  Mr. Fleener, if you're shifting positions,

9   it is five to noon.  Do you think this might be a good time for

10  a lunch break?

11          MR. FLEENER:  I should shift to lunch, yes, ma'am.

12          THE COURT:  We will take a break for our lunch.  I

13  would like the jury to be back ready to reassemble at 1:15

14  today, and I again admonish the jury about not discussing the

15  case with anyone and keeping an open mind until all the

16  evidence is in.

17          We will stand in recess for lunch.

18      (Trial proceedings recessed 11:55 a.m.

19      and reconvened 1:30 p.m. , October 25, 2011.)

20      (Following in the presence of the defendants and jury.)

21          THE COURT:  We are here following our lunch break in

22  Docket 10-CR-329.  The Court notes the presence of the jury

23  with roll call waived.

24          Ms. Perkins, you remain under oath.  Thank you.

25          Mr. Fleener, I believe we're still on cross with this

 1   witness.

 2              MR. FLEENER:  Thank you, Your Honor.  I apologize.

 3              THE COURT:  I just said I believe you're still on

 4   cross with this witness.

 5              MR. FLEENER:  I'm all thrown off.  Yes, ma'am.  Thank

 6   you.

 7   Q.  (BY MR. FLEENER)  Ms. Perkins, you recall at least in some

 8   form or fashion the interview that you had with Special Agent

 9   Harnish when you were -- were you actually arrested on

10   September 9th, 2010, or was it noncustodial?

11   A.  It was noncustodial.

12   Q.  They just asked you to come in and talk to them?

13   A.  Correct.

14   Q.  And you recall that interview to some extent, correct?

15   A.  Yes.

16   Q.  And you testified, I believe, that at the time you were

17   high?

18   A.  Yes.

19   Q.  And attempted to deceive Agent Harnish?

20   A.  Correct.

21   Q.  The -- and then you went and saw them the next day and

22   signed the agreement?

23   A.  Correct.

24   Q.  How many times did you meet with Agent Harnish?

25   A.  Twice.

1    Q.  The 9th and the 10th of September?

2    A.  I believe so.

3    Q.  You have -- you have prepared for your testimony by meeting

4    with Mr. Fun, I assume?

5    A.  Yes.

6    Q.  And talked to him about what was being -- going to be asked

7    of you and what your testimony was going to be?

8    A.  Yeah.

9    Q.  Are you familiar with the term "proffer"?

10   A.  Yes.

11   Q.  Did you have a proffer in this case?

12   A.  Yes, I did.

13   Q.  You did?

14   A.  Yes, I did.

15   Q.  When did you do that, ma'am?

16   A.  I believe it was in July when I signed the plea agreement.

17   Q.  You actually sat down with -- did you do it on the second

18   floor of this courtroom or some other place in this courtroom?

19   A.  I did it in Casper.

20   Q.  And you sat down with Mr. Fun and Agent Hall and other

21   people?

22   A.  Yes.

23   Q.  Did you sign a letter?

24   A.  I signed a plea agreement.

25            MR. FLEENER:  Can you please tell me what Renteria's

1   exhibit -- last exhibit is, ma'am?

2            THE CLERK:  Yes.  C.  Oh, you would be on D.

3            MR. FLEENER:  Thank you.

4            Yeah, we didn't get one on her.  She never signed a

5   proffer letter?

6            MR. FUN:  Your Honor, for the Court's information,

7   what Mr. Fleener is asking about, her proffer.  For the record,

8   Ms. Perkins did not sign a proffer letter.  She's confused.

9   She was not proffered.  We interviewed her twice, once prior to

10  trial and the second time when trial got moved the second time.

11  Other than that, there was no proffer, and I think she's

12  misunderstanding, and Mr. Fleener has confused the two issues.

13           THE COURT:  Thank you for clarifying the record.

14           Mr. Fleener, if you would like to proceed.

15           MR. FLEENER:  May I approach the witness, Your Honor?

16           THE COURT:  Yes.

17  Q.  (BY MR. FLEENER)  I'm going to hand you what's been marked

18  as Defendant's Exhibit D for identification.  Did you ever see

19  a document that looks like that, not with -- not with John

20  Morgan's name on it, but with your name on it?

21  A.  No.

22  Q.  You never saw a proffer letter?

23  A.  No.

24  Q.  Okay.  When you sat down with agents, did they record your

25  statement?

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 118 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                    VOL XII

118

1  A.  As far as I know, they didn't.

2  Q.  Do you have any idea why we don't have any notes of your

3  statement?  You don't have any idea, do you?

4  A.  No.

5          MR. FLEENER:  Can we have a sidebar?

6      (At sidebar.)

7          MR. FLEENER:  They proffered up the witness, Judge.

8  Whether they called it a proffer or they didn't call it a

9  proffer, the fact is Agent Hall took extensive notes of a

10  proffer with that witness.  We've never received any of the

11  notes.  For the last three weeks we've asked about proffers on

12  Kim Perkins, proffers on Kim Perkins and been told, no, no,

13  they didn't proffer her.  Well, they did.

14          There was a proffer letter that was drafted by -- I

15  don't know whether she signed it, but I know a proffer letter

16  was drafted, so either the United States is trying to avoid

17  giving us Brady material by not actually having a witness sign

18  a proffer letter -- she believes she was proffered.  And if

19  Agent Hall has notes involving an interview that took place

20  with her, that took place in Casper that she thought was a

21  proffer, we don't have any of it.

22          And, I mean, I don't know because she's not my client,

23  but it would appear to me that there's a statement made by a

24  witness that's discoverable and that wasn't disclosed by the

25  United States, that she was given a proffer, though she didn't

1   have to sign the little letter because they didn't want to

2   disclose it to defense counsel -- or I don't know what other

3   reason it could be.

4              THE COURT:  Are there interview notes?

5              MR. FUN:  There are not, Your Honor.  What it was, we

6   interviewed her twice.  When I say we, myself, my paralegal

7   Lisa Wait and Agent -- Officer Hall was there and her attorney.

8   The first time we did it was when she was in a holding cell and

9   the first time we had trial scheduled.  It was literally the

10  day before trial was to begin because we had -- at that point

11  Mr. Barrett had -- I can't remember if he had just had her sign

12  the plea agreement or -- and then there was not time to really

13  proffer her in that sense.  So we went down to talk to her

14  about her potential testimony that was upcoming.  Then, of

15  course, that never happened because Ramundo Correa was arrested

16  and trial was continued.

17             We brought her back again roughly July for pretrial

18  preparation in our office, again with myself, Sean Barrett,

19  Lisa Wait going over again basically asking her what she would

20  potentially testify to.  There was no proffer letter signed.

21  At that point she had already signed a plea agreement.  She

22  already pled guilty, so there was really nothing to proffer.

23             Proffers happen prior to plea agreements and prior to

24  pleading guilty.  This was post -- post-plea agreement, post

25  her plea.  So it was pretrial preparation with a witness.  The

1    only notes I have are the ones that I took.  There were no

2    recordings made, and the agent didn't take any notes.  I'm the

3    only one that took notes in the preparation for the case.

4            MR. FLEENER:  They prepared a proffer letter.

5            MR. FUN:  The fact that I prepared one, gave it to

6    Sean Barrett, he never had his client sign it.  Sean Barrett

7    never signed it and returned it, so we never got a signed

8    proffer letter back.

9            MR. FLEENER:  Judge, when they prepare proffer

10   letters -- if the United States is allowed to do this in this

11   matter, they can -- to allow the United States to act like this

12   means that the United States can prepare proffer letters and

13   give them to me; I review them with my client; we don't sign

14   them because we don't have to make it be a formal proffer.

15   Then they sit down, and rather than an agent take notes, which

16   they do at every single proffer, Mr. Fun takes the notes.  That

17   way he can somehow under the guise of work product try to --

18           MR. FUN:  I would be happy to give a copy of my notes

19   to Mr. Fleener if he wants.  There's no big secrets in it.  I'm

20   telling the Court in this particular case, in terms of timing,

21   I did provide Mr. Barrett a proffer letter.  He never signed

22   it.  He never had his client sign it.  He never returned it.

23   And at that point we were on the eve of the first trial date,

24   and I don't know if we even had a plea agreement by then

25   signed.  Nonetheless, by the time we brought Ms. Perkins and

1    Sean Barrett back, she had already pled guilty.

2         All the other proffer letters that we've had, we

3    provided.  We're not -- I mean, if we need to, we can take a

4    break.  We can call Sean Barrett, have Agent Hall testify to

5    all of this.  I'm -- whatever Mr. Fleener is alleging, he can

6    allege, but we can show that we've acted in good faith, and

7    we've done nothing in terms of trying to obviously intimidate

8    or shade the witness' testimony to any effect.

9         MR. FLEENER:  Judge, they hid -- they hid proffers.

10   They took proffers and called them something other than

11   proffers.  When you sit down with a person -- with the

12   attorney -- we've all done many of these proffers.  This isn't

13   something that's -- what he did was proffer the person.

14        MR. FUN:  She's entitled to counsel, Judge, and we

15   could not interview her without her counsel being present.  I

16   mean, it was not a proffer.  A proffer is on the eve of prior

17   to plea agreements, and it is an expectation of a plea

18   agreement.

19        MS. HIGHAM:  I take exception to that.  I've had

20   proffers happen along the continuum of the judicial process

21   after a plea has been entered.  In fact, with a 5K in the mix

22   they sometimes happen after sentencing.

23        MR. FUN:  That's all set towards the plea agreement,

24   Your Honor.  The proffer is nothing.  It is not the plea

25   agreement.  It is mentioned in the plea agreement about her

1   cooperation, her truthful cooperation, and that there would be

2   a motion if she truthfully cooperates.  That's all part of the

3   plea agreement.

4           MR. FLEENER:  She thinks she was proffered.  There's a

5   reason for that, Judge.

6           THE COURT:  What the defendant thinks I don't believe

7   is determinative.  The Government -- this individual did not

8   participate in a proffer based upon the discussions of the --

9   from the United States.  I will ask the United States to

10  provide Mr. Fun's notes to the defendant.  I don't think that's

11  Brady material.  It has been offered as a resolution to this.

12  I believe that's the best resolution.  That is the only

13  documents that exist concerning her interview with the

14  Government.

15          MR. FLEENER:  With all due respect to the Court, I'm

16  not convinced that Agent Hall didn't take notes.  He would be

17  the first -- he would be the first agent who didn't take notes

18  in these kinds of interviews in the history of the federal

19  court system.  And so I'm not convinced just because Mr. Fun

20  says that he managed to take the notes and keep it from Agent

21  Hall that Agent Hall didn't take notes.

22          MR. FUN:  We can ask Officer Hall.  Have him come to

23  sidebar and ask him.

24          THE COURT:  All right.

25     (Agent Hall present at sidebar.)

1            MR. FUN:  Officer Mike Hall is now at sidebar.

2            THE COURT:  Officer, I'd remind you that you've been

3    called various times to testify, and you still remain under

4    oath as an officer of the court and as a testifying witness.

5            AGENT HALL:  Okay.

6            THE COURT:  Mr. Fun.

7            MR. FUN:  Officer Hall, when -- do you recall meeting

8    with Kim Perkins?

9            AGENT HALL:  Yes.

10           THE COURT:  You need to speak into the microphone.

11           AGENT HALL:  Sorry.  Yes, I do.

12           MR. FUN:  The first time you met with her, who was all

13   present?

14           AGENT HALL:  Let's see.  It was you, me, Kim and her

15   attorney.

16           MR. FUN:  Who was her attorney?

17           AGENT HALL:  Sean Barrett.

18           MR. FUN:  At that point in time did we have a signed

19   proffer letter in hand?

20           AGENT HALL:  No.

21           MR. FUN:  And was that shortly before the first trial

22   setting?

23           AGENT HALL:  Yeah.  If I'm not mistaken, it was the

24   day of the first James hearing.

25           MR. FUN:  Where did that occur?

Case 1:10-cr-00329-NDF   Document 494   Filed 01/10/12   Page 124 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER                VOL XII

124

1              AGENT HALL:  In a holding cell back here.

2              MR. FUN:  Did we ever complete -- the complete

3    interview at the time?

4              AGENT HALL:  No.

5              MR. FUN:  Why?

6              AGENT HALL:  Because we had the hearing.

7              MR. FUN:  Did -- was there a second time when you and

8    others met with Kim Perkins?

9              AGENT HALL:  Yes.

10             MR. FUN:  Where was that at?

11             AGENT HALL:  That was up in Casper.

12             MR. FUN:  Who was present?

13             AGENT HALL:  Myself, Kim, you.  I can't remember if

14   Lisa was there or not.  I think you were there.  I can't

15   remember for sure if Sean was there or not.

16             MR. FUN:  Okay.  Again, what was the purpose of that

17   particular meeting?

18             AGENT HALL:  To finish the first court prep, if you

19   will, that we started down here.

20             MR. FUN:  At that point in time was there -- did Kim

21   Perkins have a proffer letter?

22             AGENT HALL:  Not that I'm aware of.

23             MR. FUN:  Did you take any notes during either one of

24   those sessions?

25             AGENT HALL:  I think I took a few.

1          MR. FUN:  Do you still have those notes?

2          AGENT HALL:  I don't know.  I could look through my

3  book.

4          MR. FUN:  Who primarily took notes during those --

5  both of those sessions?

6          AGENT HALL:  I think it was you taking those notes.

7          MR. FLEENER:  She used the word "proffer."  Was the

8  word "proffer" ever mentioned during any of those interviews?

9          AGENT HALL:  You used the word "proffer."

10         MR. FLEENER:  Right.  I said, "Were you proffered?"

11  She says, "Yes, I was."

12         Did the word "proffer" ever come up in either of those

13  interviews.

14         AGENT HALL:  No.

15         MR. FLEENER:  Not ever?

16         AGENT HALL:  No, there was no reason to.

17         THE COURT:  She was what?

18         AGENT HALL:  There was no reason to.  It was my

19  understanding it was court prep.

20         MR. TIMBERS:  I actually -- Your Honor, Peter Timbers.

21  I actually think perhaps we need to get Mr. Barrett here

22  because just because there isn't an official letter that says

23  "proffer" doesn't change the substance and materiality of what

24  happened and the fact that it was an extensive interview.  And

25  I guess what -- whether it walks like a duck, quacks like a

1   duck but you call it a goose doesn't change the fact it is a

2   duck.  And I guess if we're going to argue semantics, but what

3   it was was an interview where they're getting information that

4   we should entitled to, and that's my problem with what the USA

5   is doing in this circumstance.  Does that make sense?

6          THE COURT:  Well, the United States has the

7   discretion, I believe it would be uncontested among the

8   defendants, as to whether or not they sit down and decide to

9   proffer an individual that is considering whether to plead

10  guilty or to -- or after the plea.

11         As I understand it from the Government, there was no

12  proffer.  The Government has no signed proffer letter in their

13  possession.  There are, at least on Mr. Fun's behalf, notes

14  capturing that meeting.  I've already indicated the Government

15  will turn those notes over.  If Mr. Hall has notes in his

16  possession, he can look for those and turn those over.

17         I don't really see the value of bringing Mr. Barrett

18  in when we have no signed proffer, and what we have is court

19  preparation.  We have one meeting that didn't conclude, and we

20  have another meeting post-change of plea that was in

21  anticipation of her testimony today.

22         MR. FLEENER:  I believe if Your Honor asked

23  Mr. Barrett did his client proffer, he would testify under oath

24  yes.

25         AGENT HALL:  Why would he say that if there is no

1    proffer?

2            MR. FLEENER:  Because I asked him, and he said he did.

3            THE COURT:  Well, I don't really -- I fail to

4    understand either the characterization of that interview by

5    Mr. Barrett or by Ms. Perkins as significant.  We have what we

6    have.  We have -- Mr. Barrett could have had his client sign or

7    he could have signed that proffer letter and returned it.  That

8    did not happen.  We have notes which will be provided to

9    counsel.  Whether or not they characterize that interview one

10   way or another, I don't see the significance of that.

11           MR. FLEENER:  It is Brady material, Judge.  The fact

12   that she's receiving benefit for her testimony and for her

13   cooperation, the letter talks about the benefit that she gets

14   to receive.  She gets limited immunity on things that she tells

15   these particular agents.

16           THE COURT:  Do the defendants have a proffer letter in

17   their possession?

18           MR. FLEENER:  Yes, we do in all the other -- all the

19   other --

20           THE COURT:  Do you have one as to Ms. Perkins?

21           MR. FLEENER:  No, but I have one as to John Morgan.

22           THE COURT:  Well, we're talking about Ms. Perkins.  It

23   doesn't matter about John Morgan.

24           MR. TIMBERS:  John Morgan proffered.  We can flat out

25   say he proffered.

1         THE COURT:  The Government says they don't have a

2    signed proffer letter in their possession.

3         MR. FUN:  The purpose of the proffer letter is because

4    prior to the change of plea they want to be protected from

5    statements they say before they plead guilty.

6         THE COURT:  So she received no benefit under a proffer

7    letter.  If her attorney never had her sign, if he never

8    signed, then the Government -- we don't have an agreement under

9    which she could claim to receive that benefit.

10        MR. FLEENER:  I understand that, Your Honor, but the

11   record needs to also reflect that she pled guilty on September

12   20th.  So this -- her pretrial interview was exactly the same

13   time frame as you do a formal proffer.  It was before she

14   entered a plea of guilty.  This thing was done in June and

15   July, and she pled guilty in September, which is consistent

16   with every single case that a criminal defendant has.

17        The fact is the United States has chosen for this

18   particular witness, for whatever reason, to give her the

19   benefits of a proffer without giving our clients the ability to

20   cross-examine her on the benefits of the proffer.

21        MR. FUN:  I think he can.  He can ask her, were you

22   given any testimonial immunity, were you promised anything at

23   the time you were interviewed.  He doesn't need a letter to do

24   that.  He can ask.

25        MR. FLEENER:  If Mr. Barrett sat down with her and

1    said, "This is what is happening.  You're going to receive" --

2    I don't have the proffer letter in front of me -- "You get

3    testimonial immunity.  Everything you say -- you get one chance

4    to tell the truth.  Everything you say -- nothing can be used

5    against you.  If you have crimes of violence, you need to talk

6    to your lawyer."

7         If he went over the letter with her, and then they

8    just decided not to sign it, then all they're doing -- by

9    signing it they know it becomes discoverable, and we're able to

10   cross-examine her in this process.

11        THE COURT:  I don't see how the Government could have

12   set that in motion.  Mr. Barrett may or may not have committed

13   malpractice making those representations to her, but without

14   signing that and returning that letter, we have nothing that

15   assures her that those benefits would be available.  We have a

16   signed plea agreement that provides her assurance that certain

17   benefits may be available to her upon motion from the

18   Government.  That's what we have in this case.  Whether

19   Mr. Barrett did or didn't have those discussions, I think is

20   irrelevant.

21        She doesn't have those protections because the

22   Government never received that proffer letter.  She went

23   forward on -- in that first interview and provided testimony

24   without those benefits, and she did it.  I don't -- I don't

25   see -- I don't see the issue of Mr. Barrett in this equation at

1    all.

2          I will ask the Government to provide the materials to

3    counsel.  You can ask questions and pursue what her

4    understanding was in the context of those pre- plea agreement

5    discussions because post-plea she has other advantages.

6          MR. FUN:  Yeah, the plea agreement provides the

7    benefit to her.  That's the benefit.

8          THE COURT:  So let's continue.

9      (Following in the hearing of the defendants and jury.)

10   Q.  (BY MR. FLEENER)  The -- you had an interview with Mr. Fun

11   and Agent Hall the first time in this courthouse, correct, back

12   in June?

13   A.  Correct.

14   Q.  And your attorney was there?

15   A.  Yes, he was.

16   Q.  And when I asked you if you had -- if you had proffered,

17   you said you had, right?

18   A.  Yes.

19   Q.  You believed that to be a proffer?

20   A.  Correct.

21   Q.  And what do you understand a proffer to be?

22   A.  When you cooperate with the Government, when you give

23   details to the case.

24   Q.  Did you believe that when you -- when you had sat down with

25   the United States that this proffer -- did you discuss -- did

1   you discuss with your attorney what a proffer was all about?

2   A.   No.

3   Q.   Did you understand that when you sat down with the United

4   States that there were -- that you were receiving protection

5   based on what you were able to tell them, that you wouldn't be

6   prosecuted based on what you were telling them?

7   A.   I don't think so.

8            THE COURT:  Ms. Perkins, if -- we're now having

9   knocking sounds, so if you could speak up.  Thank you.

10  Q.   (BY MR. FLEENER)  And you said you didn't think so?

11  A.   Yeah.

12  Q.   Do you recall -- and then you met with the United States

13  again in July up in Casper?

14  A.   Correct.

15  Q.   And that was a lengthy -- a lengthy meeting, correct?

16  A.   Yes, it was.

17  Q.   How many hours, roughly?

18  A.   I think it was like four or five.

19  Q.   And during that interview you were present, right, because

20  you were being interviewed?

21  A.   Correct.

22  Q.   And Mr. Fun was president -- president -- was present?

23  A.   Yes.

24  Q.   Mr. -- excuse me -- Agent Hall was present, correct?

25  A.   Correct.

Case 1:10-cr-00329-NDF Document 494 Filed 01/10/12 Page 132 of 263
USA VS VELASQUEZ, ET AL   PERKINS - CROSS- FLEENER         VOL XII

132

1  Q.  Was your lawyer present at that one, or no?

2  A.  Yes, he was.

3  Q.  He was present there, too?

4  A.  Yes.

5  Q.  You said that you believed that people were taking notes.

6  Why do you believe that?

7  A.  Because I saw them writing.

8  Q.  And you saw them.  Who did you see writing?

9  A.  My attorney.

10  Q.  Agent Hall -- I'm sorry.  Go ahead.

11  A.  My attorney, Darrell Fun and his assistant.

12  Q.  And Agent Hall wasn't writing?

13  A.  Not that I can recall.

14  Q.  Are you aware that if Agent Hall was writing, they would

15  have to give us those notes in discovery?

16  A.  No.

17  Q.  Were you -- well, how many other interviews did you have

18  with the United States?

19  A.  Just those two.  Well, and then they came up on -- was it

20  President's Day just for -- in a -- to prep me for testimony.

21  Q.  Well, did you feel like they were prepping you for

22  testimony before, or did you feel like it was a proffer?  In

23  your earlier interviews did you think you were being prepped?

24  A.  They prepped me a little bit.

25  Q.  It is true, though, that you felt that you were simply

1   being interviewed to gather information at that point?

2   A.   Yeah.

3   Q.   I mean, there's a difference between the interview -- the

4   prep interview that you had with Mr. Fun the last time and your

5   interview that you had up here with Mr. Fun and the agent and

6   your lawyer and the interview that you had up in Casper with

7   Mr. Fun and your agent and your lawyer?

8   A.   Correct.

9   Q.   The interview -- and you felt this way, the interview down

10  here was to prepare you for trial?

11  A.   Correct.

12  Q.   And you went over what topics were going to come up and

13  what was going to happen in the courtroom?

14  A.   Correct.

15  Q.   And during your interviews with the agent and Mr. Fun and

16  your lawyer and agent -- excuse me -- and whoever else happened

17  to be there up here, you didn't feel like you were being

18  prepped for trial; you felt like you were proffering, giving

19  them information?

20  A.   Right, and --

21  Q.   And the same -- I apologize.  Go ahead.

22  A.   It was a little bit of prepping as well, too, because that

23  was when the trial was supposed to start in June.

24  Q.   The first time?

25  A.   The first time.  So it was kind of prep at the beginning as

1    to like what to expect.  And then --

2    Q.  It transitioned into a proffer?

3    A.  Correct.

4    Q.  Right.  And then in July when you interviewed -- you

5    interviewed in July up in Casper, right?

6    A.  Correct.

7    Q.  And that was -- that felt to you as it wasn't trial prep;

8    that was an interview with law enforcement to gather

9    information?

10   A.  Correct.

11   Q.  You're in a striped outfit.  You're currently incarcerated

12   in Torrington.  Is that Goshen County?

13   A.  Yes, it is.

14   Q.  And you've been in Goshen County for how long?  Awhile?

15   A.  Maybe a month.

16   Q.  Where were you before that, ma'am?

17   A.  Wheatland.

18   Q.  When you were in Goshen County this last month, you were in

19   the woman's pod, I assume, correct?

20   A.  Correct.

21   Q.  Candice Kysar was also in your pod?

22   A.  Yes, she was.

23   Q.  And you knew Candice?

24   A.  Yes, I do.

25   Q.  You guys talk about the case at all?

1   A.   A little bit.

2   Q.   What did you guys talk about?

3   A.   We just talked about her being subpoenaed, and we were just

4   talking about how we felt about it, how we felt about

5   testifying.

6   Q.   So you talked to Candice a little bit about the case?

7   A.   A little bit.  Not the facts, though, more about our

8   feelings about having to do this more than the facts.

9   Q.   Sure.  The -- going back to your interview with -- with

10  Agent Harnish, some of what you told him was true, right, back

11  in September of 2010?

12  A.   The only things that were incorrect were my dates, my time

13  frame.

14  Q.   And -- well, we've already talked about -- about why it was

15  incorrect.  But you would agree that you were -- you were

16  certainly dishonest with DCI and with Agent Harnish?

17  A.   As far as the dates go, yes.

18  Q.   Well, and as far as signing your agreement to be a

19  confidential informant, right?

20  A.   Right.

21  Q.   I mean, that was dishonest?

22  A.   Correct.

23  Q.   All the different provisions we went through that you

24  violated, you would agree that that was dishonest for you to do

25  so?

1   A.  Yes, it was.

2   Q.  And the -- your district court judge in Converse County

3   that you had your first trial before, your first sentencing

4   before, what judge was that?  Was that Judge Park?

5   A.  Brooks.

6   Q.  Brooks?  I apologize.  Judge Brooks.  And Judge Brooks is

7   the one who put you on probation in 2006?

8   A.  Correct.

9   Q.  And certainly one of the terms of your probation was not to

10  commit any violation of state or federal law?

11  A.  Correct.

12  Q.  And you were on vacation -- vacation -- you were on

13  probation in 2009 through August, right?

14  A.  Correct.

15  Q.  And your testimony is, again, that you weren't using any

16  drugs in early 2009?

17  A.  Correct.

18  Q.  But that you were receiving drugs in 2009?

19  A.  Correct.

20  Q.  And you would agree that you were violating your terms of

21  probation in 2009?

22  A.  Yes, I was.

23  Q.  I'm sorry?

24  A.  Yes, I was.

25  Q.  And you would agree that that is -- that's dishonest?

1   A.  Yes, it is.

2   Q.  And that way you're being dishonest to Judge Brooks?

3   A.  Yes, it is.

4   Q.  And you had a probation officer in 2007, '8, '9 time frame,

5   too, right?

6   A.  Yes, I did.

7   Q.  And during that time when you were on probation you had to

8   have -- you had to have regular meetings with your probation

9   officer, I assume?

10  A.  Yes, I did.

11  Q.  And during these regular meetings there, I assume your

12  probation officer is asking you how you're doing; you're not

13  getting in trouble, things of that nature, right?

14  A.  Correct.

15  Q.  And during this time, if your testimony is the same as it

16  was earlier, you were getting candles full of methamphetamine?

17  A.  Correct.

18  Q.  Who was your probation officer, ma'am?

19  A.  Gosh, I can't remember his name.  Chris -- I can't remember

20  his last name offhand.

21  Q.  Was he a probation officer in Douglas or was he in Casper?

22  A.  No, Sheridan County.

23  Q.  I apologize.  It was Chris somebody up in Sheridan County?

24  A.  Yes, Chris Yaeger.

25  Q.  And with Chris Yaeger you were being dishonest with him as

1   well?

2   A.   Correct.

3   Q.   Because you were out doing other things when you weren't

4   supposed to be committing crimes?

5   A.   Yes.

6   Q.   And when you went down -- why didn't you stop using

7   methamphetamine or getting into trouble after you were

8   interviewed by DCI?  Why did you continue on down in Texas?

9   A.   Why did I go to Texas?

10  Q.   Why did you go Texas?

11  A.   To avoid getting arrested.

12  Q.   That was dishonest, correct?

13  A.   Correct.

14  Q.   And why were you -- why did you use -- why did you violate

15  the laws down there?

16  A.   Because I'm a -- I am -- I was a using addict so I got -- I

17  had drugs on me.

18  Q.   You testified, Ms. Perkins -- you remember we went around

19  and around about whether you told the agent that you were using

20  drugs in early 2009?  You remember that?

21  A.   Yes, I do.

22  Q.   And that if you did tell him, you were mistaken on your

23  dates or you were confused with being high, correct?

24  A.   Correct.

25  Q.   Why is your memory so good on everything else but just so

1  bad about the dates when you used drugs in 2009?

2  A.  My memory isn't bad.  I mean, I don't understand your

3  question.

4  Q.  Well, you testified that when you used drugs that all the

5  dates and years run together.  It could be 2008 and that would

6  be the same as 2005.  Why doesn't everything else run together,

7  too?  How are we so sure of what you're testifying, that you're

8  testifying truthfully when you've already testified that when

9  things occur and dates and things of that nature all run

10  together?

11  A.  I don't know.  I don't know how to answer that.

12        MR. FLEENER:  I don't have any further questions.

13  Thank you.

14        THE COURT:  Thank you, Mr. Fleener.

15                     CROSS-EXAMINATION

16  Q.  (BY MR. HORN)  Ms. Perkins, I'm Vincent Horn.  I represent

17  Robert Velasquez.  I believe you testified, I think it was

18  yesterday, that you first met Robert Velasquez near the end of

19  2007.  Is that --

20  A.  I believe that's correct.

21  Q.  I'm sorry?

22  A.  Yes, I did.

23  Q.  Okay.  And was that in Sheridan, Wyoming, that you met?

24  A.  Yes, it was.

25  Q.  And did you have any other connections with him or meetings

1   with him?  Let me withdraw that.

2            Did you both attend AA and NA meetings at the same

3   time?

4   A.  Yes, we did.

5   Q.  Do you remember what time frame that was?

6   A.  That was right when I first met him.  In fact, when he got

7   into town, him and I went to an AA meeting.

8   Q.  Just one meeting?

9   A.  I think we went to a couple.

10  Q.  Were the NA meetings, Narcotics Anonymous, separate from

11  the Alcoholics Anonymous, AA?  Are they two different meetings,

12  in other words?

13  A.  Yes, they are, but we only went to AA.

14  Q.  I'm sorry?

15  A.  We only went to AA class.

16  Q.  You only went to AA.  And you think it was about two

17  meetings in December of '07?

18  A.  Yeah, two or three.  It wasn't -- it wasn't a lot.

19  Q.  Did you have any other contact with Mr. Velasquez after he

20  moved to Basin?

21  A.  No, I did not.

22  Q.  Do you remember when the last time was you actually met him

23  before this trial?

24  A.  We went up to Red Lodge one year for New Year's Eve, and he

25  had driven up, and we went bowling, went out to eat and that

1   was it, a whole bunch of us.

2   Q.  Did you go with him?  In other words, did you drive up to

3   Red Lodge with Mr. Velasquez?

4   A.  No.  I drove up with Isaiah and Noe, and then he drove up,

5   and then that was the last I seen him.

6   Q.  Did you ever have any drug dealings with Mr. Velasquez?

7   A.  No, I did not.

8   Q.  By dealings, I mean did you share or did either of you sell

9   to each other, is my question?

10  A.  No, we hadn't.  No.

11          MR. HORN:  Can I have a moment, Your Honor?

12          THE COURT:  Yes.

13          MR. HORN:  Nothing -- no additional questions, Your

14  Honor.  Thank you.

15          THE COURT:  Thank you, Mr. Horn.

16                      CROSS-EXAMINATION

17  Q.  (BY MR. TIMBERS)  Hi, Ms. Perkins.  I'm Peter Timbers.  I

18  represent Isaiah.

19          You testified under direct that a candle was opened in

20  front of you in January of 2010?

21  A.  Yes.

22  Q.  Were you aware that during January of 2010, Noe and Isaiah

23  went to California?

24  A.  Yes.  They didn't spend the whole month there, though, I

25  don't think.

1   Q.  Do you know when in late January they got back?

2   A.  No, I don't.

3   Q.  You have alleged that that candle was opened in front of

4   you in your kitchen?

5   A.  Yes.

6   Q.  What I'm wondering is why, after so many alleged shipments

7   to you, this one candle is all of a sudden opened up in front

8   of you.  Do you have any reason why Isaiah would do that in

9   front of you at that time?

10  A.  We were at my house, and I guess he wanted to open it.  Any

11  other time I dropped off the package.  We met for lunch, and I

12  would -- we hardly ever met at my house for the package.

13  Q.  Why would he reveal the contents when he previously had not

14  revealed the contents?  Why on that one time would he do that?

15  A.  Because we were in the privacy of my house --

16  Q.  And you guys --

17  A.  -- instead of in his car in the parking lot at Hardee's or

18  wherever.  It doesn't make sense to open the package in the

19  parking at a restaurant, whereas if we're in my house, in the

20  privacy of my house to open it.

21  Q.  So that's the one time you guys were in a private

22  situation, and he -- and he -- in your estimation, he took

23  advantage of that to open up the candle and reveal what had

24  previously not been revealed to you?

25  A.  Correct.

1   Q.  Because you would admit that, according to your story, both

2   Noe and Isaiah had taken great cares not to open anything in

3   front of you prior to that, correct?

4   A.  Correct.

5          MR. TIMBERS:  No further questions.  Thank you.

6                    CROSS-EXAMINATION

7   Q.  (BY MS. HIGHAM)  Good afternoon, Ms. Perkins.  My name is

8   Jill Higham.  I represent Mr. Alex Garcia.  You testified

9   earlier, I believe when Mr. Fleener was doing his

10  cross-examination, that you have a sincere interest in getting

11  a lower sentence?

12  A.  Correct.

13  Q.  Lower than a life sentence?

14  A.  Correct.

15  Q.  Lower than a 30-year sentence, which is still pretty

16  extraordinary?

17  A.  Right.

18  Q.  And could you just walk me through, help me understand,

19  what some of your reasons might be for -- obviously, other than

20  prison is just a terrible place no one wants to be -- what

21  would be some of your other reasons for wanting to get a

22  significant sentence reduction?

23  A.  I don't want to spend time in prison.  I don't want -- I

24  don't want to die in prison.  I mean, that's pretty much it.

25  Q.  What are you missing out on if you're in prison?

1   A.  My children's life.

2   Q.  And you testified -- and I don't want you to give names,

3   but you did testify that you have two children?

4   A.  Yes, I do.

5   Q.  And I'm sorry, but were they 11 and 14?

6   A.  9 and 14.

7   Q.  9 and 14.  Are you divorced from their father?

8   A.  I'm divorced from my youngest child's father.

9   Q.  Okay.

10  A.  My oldest daughter's dad died.

11  Q.  I'm sorry?

12  A.  My oldest daughter, my daughter, her dad died.

13  Q.  I'm sorry to hear that.  Do you have custody?

14  A.  No, I don't.

15  Q.  You don't have custody of your daughter?

16  A.  No.

17  Q.  Who does she live with?

18  A.  My brother.

19  Q.  And you don't have custody of your other child either?

20  A.  No, I don't.

21  Q.  And when was the last time you saw your daughter?

22  A.  I saw her two years ago.

23  Q.  Okay.  When was the last time you saw your son?

24  A.  I would say six years ago.

25  Q.  Six years ago?

1   A.   Correct.

2   Q.   You haven't been incarcerated those six years?

3   A.   No, I haven't.

4   Q.   And you weren't incarcerated the full two years since you

5   saw your other child?

6   A.   No, I have not.

7   Q.   Why haven't you seen your kids?

8   A.   Because they don't live in the same state as I do and

9   because my ex-husband won't allow me to see my son.

10  Q.   They don't live in the same state.  Where do they live?

11  A.   In other states --

12  Q.   Okay.

13  A.   -- besides Wyoming.

14  Q.   But you're able to travel to Texas, true?

15  A.   Correct.

16  Q.   You've traveled to other states?

17  A.   Yes.

18  Q.   And you haven't traveled to see your children?

19  A.   I did travel to see my daughter two years ago.

20  Q.   Okay.  And is there -- was there some sort of visitation

21  term that -- did the Court ever inquire into your drug

22  addiction in the family law --

23  A.   No --

24  Q.   -- case?

25  A.   With my son, yes.

Case 1:10-cr-00329-NDF  Document 494  Filed 01/10/12  Page 146 of 263
USA VS VELASQUEZ, ET AL  PERKINS - CROSS - HIGHAM                VOL XII

146

1   Q.  Was there some sort of agreement or condition by the Court

2   that you would get some sort of intervention or drug treatment

3   as a condition of your visitation?

4   A.  No, there was not.

5   Q.  There was never any sort of condition like that?

6   A.  No.

7   Q.  Did the Court offer any guidance into your addiction and

8   trying to look out for the best interest of your children?

9   A.  No, they did not.

10  Q.  So for the past six years you've essentially chosen not to

11  visit your daughter?

12  A.  My son.

13  Q.  Your son?  I'm sorry.  The son was six years, the daughter

14  was two --

15  A.  Correct.

16  Q.  -- since you've seen them?

17  A.  Correct.

18  Q.  So in the past six years you haven't made any real

19  meaningful effort to see your son?

20  A.  Correct.

21          MS. HIGHAM:  Thank you.

22          THE COURT:  Any redirect from the Government?

23          MR. FUN:  Yes, Your Honor.

24                    REDIRECT EXAMINATION

25  Q.  (BY MR. FUN)  Ms. Perkins, let me just pick up where

1  Ms. Higham left off.  You hadn't seen your daughter in two

2  years.  Two years ago from up to today where have you been?

3  A.  I've been incarcerated the last year and before that in

4  Sheridan.

5  Q.  And you were on probation in Sheridan?

6  A.  Correct.

7  Q.  And, ma'am, six years ago up to today where have you been

8  with your life?

9  A.  Sorry.

10  Q.  I know that this is difficult.  Do you need a break?

11          MR. FUN:  Your Honor, could we please take a short

12  recess?

13          THE COURT:  Yes.  We will recess until 2:25.  Will

14  that be sufficient time?

15          MR. FUN:  Yes, Your Honor, I believe so.  I just

16  need -- I think the witness needs --

17          THE COURT:  Thank you.  Let's stand for the jury.

18      (Recess taken 2:15 until 2:29 p.m.)

19      (Following in the presence of the defendants and jury.)

20          THE COURT:  After a short break in Docket 10-CR-329

21  we're back on the record.  The Court notes the presence of the

22  jury with roll call waived.

23          Ms. Perkins, you remain under oath.

24          Mr. Fun, redirect.

25  Q.  (BY MR. FUN)  Ms. Perkins, where we left off was

1    Ms. Higham's line of questioning about your children, and I

2    think where we last left off was your son.  When were you

3    convicted in Douglas?

4    A.  In 2006.  I was arrested in 2005.

5    Q.  And after you were convicted in Douglas, then you were on a

6    period of probation?

7    A.  Correct.

8    Q.  And inpatient treatment with WYStar?

9    A.  Correct.  Yes.

10   Q.  So in the last six years when you haven't seen your son,

11   what's been going on in your life?

12   A.  Well, a year I was in jail.  For nine months I was in

13   treatment, and then after I completed treatment I was on drug

14   court for a year and then supervised probation for a year, and

15   then I was off probation for a year and -- well, a year and a

16   half, and then I got arrested again.  So I really haven't

17   had -- there really hasn't been an opportunity to see him.

18   Q.  And when you went to Texas in -- it was December of what

19   year?

20   A.  2010.

21   Q.  Your goal there was obviously to flee?

22   A.  Correct.

23   Q.  Were you still using drugs then?

24   A.  Yes, I was.

25   Q.  And you got caught in Texas with drugs?

1   A.  Yes, I did.

2   Q.  How much drugs?

3   A.  Less than half a gram.

4   Q.  And that ended up in Texas as being a felony?

5   A.  Yes, it did.

6   Q.  Mr. Timbers asked you questions about January of 2010.  Do

7   you remember that?

8   A.  Yes, I do.

9   Q.  About the package being opened?

10  A.  Yes.

11  Q.  And you indicated that you were aware that Isaias and Noe

12  went to California in January?

13  A.  Correct.

14  Q.  Do you know, did they go to January before or after the

15  package was opened in your kitchen?

16  A.  I would have to say after.

17  Q.  When Isaias was in California, did he call you about any

18  additional packages?

19  A.  No, he did not.

20  Q.  Now, ma'am, let's turn to the questions from Mr. Fleener.

21  I just have a few areas I just wanted to discuss with you.

22       He asked you questions about Chris Yaeger, your

23  probation officer, while you were on probation, court

24  conditions, drug court.  Do you remember that line of

25  questioning?

1   A.  Yes, I do.

2   Q.  Were you going to tell your probation officer that you were

3   getting drugs shipped to you in candles?

4   A.  No.

5   Q.  Were you going to tell your probation officer that you were

6   still using drugs?

7   A.  No.

8   Q.  Now, let's just briefly turn to your interview with Agent

9   Harnish.  Do you recall that interview taking place on

10  September 9th of 2010?

11  A.  Yes, I do.

12  Q.  Were you under oath at the time?

13  A.  No, I was not.

14  Q.  Was a -- was there a court reporter taking down everything

15  that you were saying at that interview?

16  A.  No, there wasn't.

17  Q.  Now, you mentioned that at the time you think you were

18  under the influence of methamphetamine?

19  A.  Yes.

20  Q.  And that time periods sometimes run together?

21  A.  Correct.

22  Q.  You know time periods run together.  How about events?

23  A.  No, just time.

24  Q.  I think Mr. Fleener seemed to suggest that you were able to

25  remember events pretty clearly.

1   A.  Correct.

2   Q.  But time periods didn't make sense, why there would be a

3   difference between the two?

4   A.  Right.

5   Q.  Could you remember what you were wearing that day you were

6   interviewed by Travis Harnish on September 9th of 2010?

7   A.  No, I don't.

8   Q.  But do you remember the events of what happened that you

9   were involved with?

10  A.  Correct.

11  Q.  Such as getting packages?

12  A.  Right.

13  Q.  And discussions you had with Noe?

14  A.  Yes.

15  Q.  Discussions you had with Isaias?

16  A.  Yes.

17  Q.  Did Travis Harnish ever ask you if you were, in fact, high

18  that day or had used that day?

19  A.  I don't believe he did.

20  Q.  Mr. Fleener also asked you questions about that why you

21  were just getting packages in the beginning for just Noe when

22  you weren't using any methamphetamine.  Do you remember that,

23  those kind of questions?

24  A.  Yes, I do.

25  Q.  Was Noe -- had you and Noe had any discussions about your

1   past?

2   A.   We talked about it.  I mean, it wasn't -- I mean, it was

3   knowledgeable.  They knew.  I had discussed it before.

4   Q.   Did you ever discuss the fact that you had been convicted?

5   A.   Yes.

6   Q.   And convicted of methamphetamine cases?

7   A.   Yes.

8   Q.   And did you discuss with Noe that you were on probation?

9   A.   Yes.

10  Q.   And did you discuss with him that you would get tested

11  periodically?

12  A.   Yes.

13  Q.   Now, did those discussions take place before or after you

14  had discussions with him about getting packages?

15  A.   Probably both.

16  Q.   So is it fair to say that by the time Noe asked you to get

17  packages, he was aware of your drug history?

18  A.   Correct.

19  Q.   Finally, let's talk a little bit about your plea agreement.

20  I know Mr. Fleener spent a lot of time on it.  I just have a

21  few questions about that.  I just want to show you what's been

22  previously marked for identification as 602.

23          Well, I guess Abby is not there, so let me provide you

24  a copy of that?

25          Mr. Fleener indicated that you would get

1   significant -- you got significant concessions as part of this

2   plea agreement.  You remember those kinds of questions?

3   A.  Yes, I do.

4   Q.  Let's take a moment.  I have a copy here as well, so just

5   look at your copy, and I want to take a look at page 7 and

6   paragraph 12c, and that's what Mr. Fleener talked to you about

7   concerning the 5K and the motion -- that the Government has to

8   make the motion, and then the Judge has to make a decision on

9   that motion before anything can happen.  Do you remember that?

10  A.  Yes, I do.

11  Q.  Now, with regards to the motion, what has to happen before

12  any motion can be made?

13  A.  I have to fully, completely and truthfully cooperate with

14  the United States.

15  Q.  Do you have to cooperate in any type of way with the United

16  States?

17  A.  Probably like testifying?

18  Q.  Do you have to testify in a certain way?

19  A.  Honestly or truthfully.

20  Q.  And that says that here?

21  A.  Yes, it does.

22  Q.  And even after that, is it your understanding that it is

23  the Court that ultimately decides whether or not you get a

24  sentence reduction?

25  A.  Yes, it does.

1    Q.   And the Government can only make the recommendation?

2    A.   Correct.

3    Q.   Now, you also indicated that it is your expectation that as

4    you sit there now you're looking at a 30-year sentence?

5    A.   Yes.

6    Q.   And do you know how low the Court will go on your sentence?

7    A.   I don't know.

8    Q.   Do you have any expectation that you get to walk out free

9    and clear?

10   A.   No.

11   Q.   Do you have any expectation that you will get probation?

12   A.   No.

13   Q.   Do you have any expectation that you will get time served?

14   A.   No.

15   Q.   Do you have any expectation that you're going to have to

16   serve a prison sentence?

17   A.   Yes.

18   Q.   Now, have any promises been made to you that because you

19   testify truthfully that you will get to walk free?

20   A.   No.

21   Q.   Now, you mentioned that there's a possibility of 30 years.

22   How old are you now?

23   A.   36.

24   Q.   Finally, while you're on page 7, I want you to look at

25   paragraph 12b.  Do you see that paragraph?

1   A.  Yes, I do.

2   Q.  That essentially says that "The United States reserves the

3   right to comment on the evidence and circumstances of the

4   case..." --

5   A.  Yes.

6   Q.  -- "...and to bring to the Court and the United States

7   Probation Office's attention all aggravating and mitigating

8   facts in its possession relevant to sentencing."  Do you see

9   that?

10  A.  Yes, I do.

11  Q.  So what -- what's your understanding of what aggravating

12  facts -- what does that mean?

13  A.  Things -- stuff that can have an impact on my sentencing as

14  far as like my felonies or not being truthful, I guess, things

15  like that.

16  Q.  How about mitigating, mitigating facts?

17  A.  I don't -- I don't know what that word is.  Sorry.

18  Q.  Based on this provision, do you understand that the United

19  States has to tell the Court and probation office everything,

20  good and bad?

21  A.  Correct.

22  Q.  Okay.  Finally, if you turn to page 8 and just continue on

23  with that particular paragraph that Mr. Fleener had mentioned

24  to you, that being 12c, 12c continues.  There's a final

25  sentence at the end.  I want you to take a look at that.  It

1   starts with, "In this regard...."

2   A.  Okay.

3   Q.  Okay.  And it essentially says that it doesn't matter what

4   the outcome of any case is that you testify in.

5   A.  Correct.

6   Q.  So is it your understanding that irrespective of whether

7   you testify -- your testimony would help the Government or hurt

8   the Government, your obligation is to testify truthfully?

9   A.  Correct.

10  Q.  And that is, you can't falsely implicate someone?

11  A.  Right.

12  Q.  And you can't lie?

13  A.  Correct.

14  Q.  Would you falsely implicate someone to avoid a life

15  sentence?

16  A.  No, I would not.

17  Q.  Would you lie?

18  A.  No.

19  Q.  How about to avoid a 30-year sentence?

20  A.  No.

21  Q.  And then finally, let's talk about this drug court program,

22  and that's at page 8, subparagraph f.  And Mr. Fleener asked

23  you about that and the 500-hour program.  Do you remember that?

24  A.  Yes, I do.

25  Q.  Do you know whether or not you have to volunteer for that

1   program?

2   A.  As far as I understand, you do.  It is recommended, but you

3   don't have to actually do it.

4   Q.  Do you have to successfully complete that program to get

5   any sentence reduction?

6   A.  Yes, you do.

7   Q.  And who gives you the sentence reduction if you complete

8   that program?

9   A.  The Judge, I guess.

10  Q.  And that program is essentially drug treatment for your

11  addictions.

12  A.  I'm sorry?

13  Q.  Let me rephrase that question.  What's your understanding

14  as to what that program is for, that RDATP program?

15  A.  That it is a drug treatment program to help me stay clean

16  and to, when I get into society, to live a drug-free life,

17  instead of going back into the drug use.

18  Q.  Do you want that?

19  A.  Yes, I do.

20  Q.  Let me go ahead and retrieve that document back from you,

21  ma'am.

22          And then finally, Mr. Fleener asked you questions

23  about meeting with me.  Do you remember those questions?

24  A.  Yes, I do.

25  Q.  And do you remember meeting with myself, Officer Hall and

1    my paralegal, Lisa Wait?

2    A.   Yes.

3    Q.   And was your attorney also present?

4    A.   Yes, he was.

5    Q.   Do you recall meeting on June 10th of 2010?

6    A.   Yes, I do.

7    Q.   Was that the first time we met?

8    A.   Yes, it was.

9    Q.   And was that shortly before this case -- well, let me

10   rephrase that question.

11          When we met on June 10th, where did we meet at?

12   A.   Up here in the courthouse.

13   Q.   Where were you at?

14   A.   Where was I incarcerated?

15   Q.   Yes.

16   A.   I think I was in Scottsbluff.

17   Q.   I'm sorry.  Were you in a holding cell?

18   A.   Oh, yes.

19   Q.   Was that pretrial preparation with you completed on June

20   10th?

21   A.   No, it was not.

22   Q.   How far did we get?

23   A.   Not very far.  Probably -- I think we were in there for

24   like an hour and a half maybe.

25   Q.   And then we subsequently met again on July 25th of 2010?

1   A.  Yes.

2   Q.  And the same people?

3   A.  Correct.

4   Q.  And that was in Casper?

5   A.  Yes.

6   Q.  At the U.S. Attorney's Office?

7   A.  Yes, it was.

8   Q.  Were you still in custody?

9   A.  Yes, I was.

10  Q.  Were you brought there in shackles and handcuffs?

11  A.  Yes, I was.

12  Q.  Now, during those meetings was there a court reporter

13  there?

14  A.  No, there was not.

15  Q.  Were you sworn under oath?

16  A.  No.

17  Q.  And you saw me take notes?

18  A.  Yes, I did.

19  Q.  During both of those sessions?

20  A.  Yes.

21  Q.  During any of those sessions did I tell you what the most

22  important thing was?

23  A.  Yes, you did.

24  Q.  What is it that I told you?

25  A.  To be truthful in my testimony.

1   Q.  Did I ever tell you what to say?

2   A.  No.

3   Q.  Were words ever put in your mouth?

4   A.  No.

5   Q.  Did we -- did anyone ever tell you that you had to convict

6   anyone?

7   A.  No.

8   Q.  How is it, then, that you were prepared for trial during

9   these sessions?

10  A.  On that I think just by asking or telling me, like, to be

11  truthful, to look at the jury, things like that, but not -- I

12  don't think -- nothing was discussed as far as like what was

13  going to be asked until we met in Torrington a couple weeks

14  ago.

15  Q.  And when we met in Torrington a couple weeks ago, what did

16  we discuss?

17  A.  Just the topics of what we were going to go through, like

18  my history and my drug use and how I got involved with the

19  conspiracy, things like that.

20  Q.  Okay.  Again, was words put in your mouth?

21  A.  No.

22  Q.  Were you told what to say?

23  A.  No.

24  Q.  Were you told how to say it?

25  A.  No.

1  Q.  And, again, was there anything that was reiterated to you

2  that was important on that third session?

3  A.  Just to be truthful.

4            MR. FUN:  And, Your Honor, for the record, I've made

5  copies of my notes, which consist of eight pages, including the

6  June 8th and June 25th sessions with Ms. Perkins.  I have made

7  four copies.  I will provide that to defense counsel.

8            THE COURT:  Thank you.

9            MR. FUN:  And I have nothing further, ma'am.

10            THE COURT:  Thank you, Ms. Perkins.

11            I would ask the Marshal, given the disclosure of these

12  notes and the lack of an opportunity by defense to review

13  them -- I would ask the Marshal to keep Ms. Perkins here

14  subject to recall, and that will give you an opportunity to

15  review them.

16            We will make the decision after our mid-afternoon

17  break as to whether Ms. Perkins should be recalled for recross.

18  Is that acceptable to the defense?

19            MR. TIMBERS:  Absolutely, Your Honor.  Thank you.

20            THE COURT:  All right.  We will -- we will excuse you

21  for now, Ms. Perkins, but you will remain here in the building

22  subject to recall.  Thank you very much for your testimony

23  today.

24            THE WITNESS:  Thank you.

25            THE COURT:  While we're -- I think we have some

1   additional time, Mr. Fun, if you would like to call your next

2   witness.

3           MR. FUN:  Like to call Amber Bear.

4           Stand in front of the box and be sworn.

5       (Witness sworn.)

6           THE CLERK:  State and spell your name for the record.

7           THE WITNESS:  Amber Bear, A-m-b-e-r B-e-a-r.

8                         AMBER BEAR,

9   called for examination by the Plaintiff, being first duly

10  sworn, on her oath testified as follows:

11                    DIRECT EXAMINATION

12  Q.  (BY MR. FUN)  Ms. Bear, where did you grow up?

13  A.  I grew up in Worland, Wyoming.

14  Q.  Are you married?

15  A.  No, sir.

16  Q.  Do you have kids?

17  A.  Yes, I have two sons.

18  Q.  What ages?

19  A.  7 and 5.

20  Q.  Are they in your custody?

21  A.  They live with my parents right now.

22  Q.  Now, ma'am, you were arrested in connection with this case?

23  A.  Yes, sir, I was.

24  Q.  And that was as a material witness?

25  A.  Yes, sir.

1    Q.   And it was your understanding that you -- an arrest warrant

2    was put out for you because you could not be located?

3    A.   That's correct.

4    Q.   Did you have a hearing before this Judge concerning that

5    material witness warrant?

6    A.   Yes, I did.

7    Q.   Were you charged in connection with that material witness

8    warrant that was issued for you?

9    A.   No.

10   Q.   Conditions were placed on you concerning being released on

11   a material witness warrant, do you remember that?

12   A.   That's correct.

13   Q.   And one of those were that you maintain contact with your

14   attorney?

15   A.   Yes.

16   Q.   And that you maintain contact with our office?

17   A.   Yes.

18   Q.   And that you not change your telephone number?

19   A.   Yes.

20   Q.   Okay, ma'am.  Let's just turn now to your drug use.  Have

21   you used drugs in the past?

22   A.   Yes, I have.

23   Q.   What type of drugs have you used?

24   A.   I used to smoke pot, meth and cocaine.

25   Q.   And, ma'am, how old are you?

1  A.  I'm 28.

2  Q.  And what was the first drug that you used in your life?

3  A.  Alcohol or weed, but it was when I was 13 years old.

4  Q.  When did you first use cocaine?

5  A.  I tried it once when I was like in my 20s, but I didn't

6  really care for it.

7  Q.  After you tried it that one time, did you ever try it

8  again?

9  A.  No, it wasn't my drug of choice.

10 Q.  And then when was the first time you remember using

11 methamphetamine?

12 A.  I believe I was 17 years old.

13 Q.  What was your drug of choice?

14 A.  Methamphetamine.

15 Q.  When was the last time you used methamphetamine?

16 A.  Two years, four months ago.

17 Q.  Two years and --

18 A.  Four months.

19 Q.  When was the last time you used marijuana?

20 A.  Geez, I can't even recall.  Quite a few years ago.

21 Q.  Longer than the two years --

22 A.  Yes.

23 Q.  -- and four months?

24 A.  Oh, yeah.

25 Q.  How would you use your methamphetamine?

1   A.  When I first started using it, I smoked it.

2   Q.  Did you use it any other way than smoking it?

3   A.  As I progressed in my addiction, I did shoot up, used a

4   needle for a little while or I would snort it.

5   Q.  Was there a method that you preferred to use?

6   A.  For a short period of time I preferred to shoot up, and

7   then I -- when I cleaned myself up and relapsed, I would just

8   smoke it.

9   Q.  Why is it that you prefer to use IV?

10  A.  It was a cleaner -- it was cleaner that way, I guess you

11  could say, took out the cut.

12  Q.  So you were familiar with different quality of

13  methamphetamine?

14  A.  Yes, sir.

15  Q.  That being good methamphetamine or bad methamphetamine?

16  A.  Yes, sir.

17  Q.  Do you consider yourself an addict?

18  A.  Yes, sir, I'm an addict in recovery.

19  Q.  Do you think you will always be an addict?

20  A.  Oh, yeah.

21  Q.  Why?

22  A.  I have a switch broken in my brain.  It is an addictive

23  personality.  If I ever use again, I don't think I will be able

24  to stop.

25  Q.  Now, you have been clean and sober for two years and four

1  months?

2  A.  Yes, sir.

3  Q.  Did you receive any treatment at all during your time?

4  A.  I did go to treatment at Cedar Mountain Center in Cody.  I

5  completed a program successfully and graduated.  I had a small

6  relapse after that, but I haven't gone back since then to use.

7  Q.  Is Cedar Mountain inpatient or outpatient?

8  A.  It is an inpatient treatment facility.

9  Q.  How long were you there?

10  A.  It was a 30-day program.

11  Q.  When did you complete Cedar Mountain?

12  A.  It was in the beginning of 2009, January 9th, I believe, I

13  graduated.

14  Q.  Other than that, have you attended any other treatment?

15  A.  I did go to WYStar in 2007, 2008, the end of '07, beginning

16  of '08.  I was there for approximately four months.  However, I

17  didn't complete the program.

18  Q.  Why not?

19  A.  I guess it was a misunderstanding of some letters that were

20  written as far as whether -- what my sexuality was.  They

21  thought it was unsafe for the other girls in the facility.

22  Q.  Were you terminated from WYStar?

23  A.  Yes, I was.

24  Q.  Now, did you voluntarily enter Cedar Mountain?

25  A.  Yes, I did, and WYStar.

1    Q.   Was either one of those court ordered?

2    A.   No.

3    Q.   Okay, ma'am.  Let's talk about your criminal history a

4    little bit.  Have you been convicted of any felony crimes?

5    A.   Yes, sir, I have.

6    Q.   How many felony -- how many felonies?

7    A.   I have four felonies total.

8    Q.   What were -- what was the first felony conviction for?

9    A.   First felony was for possession of stolen property.

10   Q.   How old were you at the time?

11   A.   18.

12   Q.   And do you know where that conviction occurred at?

13   A.   Actually right here in Cheyenne.

14   Q.   Did you serve your sentence on that?

15   A.   Yes, I did.

16   Q.   How about the other three felonies?

17   A.   One is for child endangerment, one is for delivery of

18   methamphetamines, and the other one is for delivery of cocaine.

19   Q.   Was the child endangerment drug related?

20   A.   There was no drugs around my children.  It was due to the

21   conspiring of making a delivery with my children in the

22   background during a wiretap, so...

23   Q.   Was it -- was the child endangerment charge related to the

24   delivery of methamphetamine or the delivery of cocaine

25   conviction?

1    A.   It was, I believe, at a different point in time.  I don't

2    know if the delivery actually occurred, but there was still the

3    grounds for it.

4    Q.   And when were you convicted of those three felonies?

5    A.   In 2007.

6    Q.   All three of them?

7    A.   Yes, sir.

8    Q.   Now, the delivery of methamphetamine and the delivery of

9    cocaine -- well, let me start first, with the methamphetamine,

10   that particular conviction.  Where did you get the

11   methamphetamine from?

12   A.   At that point in time Robert Velasquez was supplying me.

13   Q.   So that conviction was from methamphetamine you obtained

14   from Robert Velasquez?

15   A.   Yes.

16   Q.   How about the cocaine conviction?

17   A.   Also from Robert Velasquez.

18   Q.   Now, when you were -- when you were convicted of those

19   three felonies, did you have any sort of plea agreement with

20   the State?

21   A.   No, sir, not really.

22   Q.   At the time that you pled guilty and were sentenced --

23   well, were you sentenced on those three convictions?

24   A.   Yes, sir, I was.

25   Q.   Have you served your sentence?

1   A.  Yes, sir, I have.

2   Q.  When did you first learn about your involvement -- let me

3   rephrase that question.

4           When did you first learn that you would be called as a

5   witness in this case?

6   A.  I found out the potential of it in 2010.

7   Q.  At the time that you were convicted in 2007, did you know

8   that you would likely be a witness?

9   A.  No.

10  Q.  Had there been any mention of it?

11  A.  No.

12  Q.  Did you know back in 2007 that Robert Velasquez or others

13  were under investigation?

14  A.  No, I did not, not at that time.

15  Q.  At this point in time are you completely finished with

16  those three convictions conditions?

17  A.  Yes, sir.  Yes, sir.

18  Q.  Do you have any plea agreement with the United States to

19  cooperate?

20  A.  No, sir.

21  Q.  Have you ever been convicted of any crime, whether

22  misdemeanor or felony, involving perjury?

23  A.  No, sir.

24  Q.  How about false statements?

25  A.  No, sir.

1   Q.   How about fraud?

2   A.   No, sir.

3   Q.   Have you been a confidential informant for law enforcement?

4   A.   Yes, I was, in 2007, but not to do with this case.

5   Q.   Okay.  Was it -- was it in connection with Robert

6   Velasquez?

7   A.   No, sir.

8   Q.   Do you know if that case is resolved?

9   A.   Yes, sir.

10  Q.   Let me just now focus your attention to 2007.  When did you

11  first meet Robert Velasquez?

12  A.   It was in the beginning of '07, I believe towards the end

13  of January, beginning of February.

14  Q.   How is it that you came to meet Robert Velasquez?

15  A.   Through a mutual acquaintance.

16  Q.   And who was that?

17  A.   Charlene Sackett.

18  Q.   What were the circumstances that you met Robert Velasquez?

19  A.   I was in active addiction at the time, and I went over to

20  Ms. Sackett's house to get high, and that's where I met him.

21  Q.   Ma'am, and I guess I did forget something previously, and

22  I'm sorry.  Before we go on and we discuss your involvement --

23  I'm going to show you two documents.  I've marked them as

24  Government's Exhibits 606 and 606-A.  Have you seen those

25  documents before?

1   A.  Yes, I have.

2   Q.  606 has whose signature on the back second page?

3   A.  That would be my signature.

4   Q.  And 606-A has whose signature on the back page?

5   A.  My signature and my attorney's signature.

6   Q.  Had you had a chance to look over those documents?

7   A.  Yes, I have previously.

8   Q.  And do you know what those documents are?

9   A.  Yes, sir.

10  Q.  What are they?

11  A.  I believe that they are a letter of immunity.

12  Q.  And what's your understanding as to what that means?

13  A.  As far as what my testimony states that I won't be

14  convict -- charged with me saying that I've done drugs and

15  dealt drugs before.

16  Q.  And do you understand, though, that despite that, that you

17  have to testify truthfully?

18  A.  Yes, sir.

19  Q.  And you can't commit perjury?

20  A.  Yes, sir.

21          MR. FUN:  Let me retrieve those documents back, and I

22  move to admit 606 and 606-A.

23          MR. FLEENER:  No objections.

24          THE COURT:  Hearing no objections, Government's

25  Exhibits 606 and 606-A are admitted.

1        (Government's Exhibits 606 and 606-A   received.)

2   Q.  (BY MR. FUN)  Let's continue now with your meeting with

3   Robert Velasquez.  You've gone to Charlene Sackett's house to

4   use some methamphetamine?

5   A.  Yes, sir.

6   Q.  And when you show up there, who else is there?

7   A.  At first I didn't see anybody, but after a short period of

8   time Mr. Velasquez came out.

9   Q.  And how was he introduced to you?

10  A.  He was introduced to me as Rob, Robert, and it was just

11  kind of a casual thing.

12  Q.  And then what happened after that?

13  A.  Charlene, Ms. Sackett had explained to me that Robert was

14  needing -- Mr. Velasquez was needing a place to live or stay

15  for a while until he could get back home.  She knew I had a

16  two-bedroom apartment, and she wanted to know if he could stay

17  with me for a while, and I told her that he could.

18  Q.  At that time where were you living?

19  A.  At that time I was living in Worland off 4th Street, I

20  think, or something.

21  Q.  And you mentioned that Robert Velasquez couldn't get back

22  home.  Do you know where he was supposed to go back to?

23  A.  No, at that point I didn't.  I didn't really understand a

24  whole lot of anything.  I'm just, I guess -- I didn't realize

25  where he was going or wasn't told where he was going to.  I

1   just knew that he just needed a couch to crash on for a couple

2   days.

3   Q.  Did you later learn where he was supposed to go back to?

4   A.  I believe it was Greybull.

5   Q.  Did you then -- well, what did you decide to do?

6   A.  I decided that I would go ahead and let him stay.  He

7   didn't seem to be that intimidating, I guess, at the time.

8   Q.  Why would you do that?  I mean, you just met this guy.

9   A.  I have a big heart sometimes.  I know that when I'm in hard

10  places, between a rock and a hard place, I would like someone

11  to help me sometimes.

12  Q.  When you were at Charlene Sackett's with Robert Velasquez,

13  did you use any methamphetamine?

14  A.  Yes, we were.

15  Q.  Did this conversation about Robert Velasquez staying at

16  your house come up before or after you used the

17  methamphetamine?

18  A.  During, through the process of smoking.

19  Q.  Do you know where that methamphetamine came from?

20  A.  At that point in time I didn't.  I kind of figured it out

21  later on when he stayed at my house and still had some.

22  Q.  He being Robert Velasquez?

23  A.  Yes, sir.  Sorry.

24  Q.  Okay.  So Robert Velasquez comes to your house.  What

25  happens?

1    A.  In a very short period of time I lost all control of my

2    life.

3    Q.  Well, what do you mean by that?  Did someone else take

4    control?

5    A.  Mr. Velasquez became very aggressive when it came to me

6    doing things.  He would have my car all the time, my phone 98

7    percent of the time.  He would tell me when I could and could

8    not go and get my kids and things like that.

9    Q.  Were your kids with you at that time?

10   A.  They were living with me, yes.

11   Q.  Again, why would you invite a stranger to your house when

12   you've got kids?

13   A.  I had to keep my habit up.

14   Q.  Now, you mentioned that you later learned that the

15   methamphetamine that you had used at Charlene's likely came

16   from Robert Velasquez?

17   A.  Most likely, yes.

18   Q.  Why is it that you came to that conclusion?

19   A.  I know that I didn't take any there, and I know that

20   Charlene didn't have a supplier at the time.

21   Q.  Now, did something happen at your house?

22   A.  Robert, Mr. Velasquez approached me as far as pushing dope

23   for him, dealing dope for him, methamphetamine.

24   Q.  Were you -- sorry.  What do you mean, he approached you

25   about --

1   A.  Pretty much told me that I was going to sell dope for him.

2   Q.  Did you agree to?

3   A.  Not at first.

4   Q.  What do you mean, not at first?

5   A.  Not at first due to the fact that I had my kids there.  I

6   was in active addiction, so it was really a tossup, but we had

7   a few physical altercations where he beat me pretty bad and

8   involved my kids in that and threatened me.

9   Q.  And so did you then -- did you at some point in time agree

10  to distribute drugs?

11  A.  Yes, sir, I did.

12  Q.  Why didn't you just call the police?

13  A.  Worland is a small town.  He would have known I called the

14  cops before I ever even made the phone call.

15  Q.  Now, tell us about the first time that you sold drugs for

16  Robert.

17  A.  I don't believe I can recall exactly what time it was.  I

18  know that I sold it.  I had gotten, I believe it was, a half

19  gram to a gram from Robert to sell to a couple individuals that

20  I worked with.

21  Q.  Tell us how that came about.  I mean, did -- how was the

22  methamphetamine packaged?

23  A.  It was packaged in individual packages like the jewelry

24  bags, little Ziploc baggies.

25  Q.  And who provided you that -- that quantity of

1   methamphetamine to sell?

2   A.   Mr. Velasquez.

3   Q.   And how did he go about doing it?

4   A.   I told him what I needed, and he handed me the bag.

5   Q.   How did you know what you would need?

6   A.   The other individuals asked me for a half gram or a gram,

7   I'm not sure which one, and I told him, and he gave it to me.

8   Q.   How did you know these other individuals would want

9   methamphetamine?

10  A.   I approached them and asked them, told them that I could

11  get if they wanted.

12  Q.   Now, how -- how much time had passed between the time that

13  he showed up at your house that you began selling

14  methamphetamine?

15  A.   A week to two weeks, if that.

16  Q.   The first time?

17  A.   Within a week.

18  Q.   And how long did you continue selling methamphetamine for

19  Robert Velasquez?

20  A.   Approximately two to three months.

21  Q.   And during this whole time was he staying at your house?

22  A.   For the most part, yes.

23  Q.   How often after that first time were you then selling

24  methamphetamine for Robert?

25  A.   Almost on a daily basis.

1    Q.  And in what quantities?

2    A.  They were packaged in half-gram, gram quantities.  I don't

3    think there was ever quite a time where anybody wanted an eight

4    ball.

5    Q.  Okay.  When you say "daily," were you only selling a gram a

6    day, or were you selling more than that?

7    A.  Approximately a gram to 3 grams a day.

8    Q.  3 grams a day at the most?

9    A.  Yes, sir.

10   Q.  And that was almost every day?

11   A.  Just about.

12   Q.  Now, when you were selling this methamphetamine, did you

13   sell it on the front, or did you ask for the money at the time?

14   A.  Asked for the money at the time.

15   Q.  And once you got the money, what is it that you did with

16   it?

17   A.  I gave it to Mr. Velasquez.

18   Q.  Did you give all of it to him?

19   A.  Oh, yeah.

20   Q.  How much were you supposed to sell the methamphetamine for?

21   A.  I think at that point in time grams were going for $180.

22   Q.  And is that what you sold it for?

23   A.  Yes, sir.

24   Q.  Did you ever add anything to it or cut it?

25   A.  I didn't, no, sir.

1  Q.  Do you know if Robert did?

2  A.  No, sir.  I know there was talk about it, but I never

3  actually saw it.

4  Q.  Who talked about it?

5  A.  Everybody, when the product started to go downhill.

6  Q.  Now, during this time were you getting any methamphetamine

7  from Robert to use yourself?

8  A.  I never got a personal stash, no.

9  Q.  So what was your -- I mean, what were you getting out of

10  this for selling methamphetamine for Robert, then?

11  A.  Most times I would get high with the people that I was

12  selling to.  On occasions he would get me high, but it was more

13  like a tease.

14  Q.  What do you mean like a tease?

15  A.  Me being an addict, he would kind of tease me like I was a

16  dog wanting a biscuit treat; you know, I got it, but you can't

17  have it.

18  Q.  You said that you would get high with other people?

19  A.  Yes, sir.

20  Q.  Were those the customers you were selling the

21  methamphetamine to?

22  A.  Yes, sir.

23  Q.  And that was the methamphetamine that was from Robert?

24  A.  Yes, sir.

25  Q.  How much of the methamphetamine -- well, tell me how that

1  happened.  When you sell the methamphetamine to your customers,

2  how is it that you get high with them?

3  A.  Usually I would take a hit or two off of their pipes, and

4  then I would run out the door to go deliver the money to

5  Mr. Velasquez.

6  Q.  Now, when you smoked methamphetamine, in your experience,

7  how much would you put in a pipe?

8  A.  Sometimes be like .2 grams, which is less than a quarter

9  gram of dope.

10  Q.  And how many hits could you take off of that quantity in a

11  pipe?

12  A.  It would last you awhile.  You could probably smoke off one

13  bowl of meth for probably an hour, depending on if it is just

14  you or more people.

15  Q.  Okay.  So taking two hits, did that consume all of the

16  methamphetamine?

17  A.  No.

18  Q.  Other than methamphetamine, did you sell any other drugs

19  for Robert?

20  A.  Just the cocaine the one time.

21  Q.  Tell us about that.

22  A.  He handed, me I believe it was, a half gram of cocaine one

23  night along with the half gram of meth that I was supposed to

24  be taking to deliver already and told me to try to get rid of

25  that also, so I did.

1   Q.   And how much was that cocaine selling for?

2   A.   I want to say it was only 50 bucks for a half gram, and it

3   was like a hundred for a gram.

4   Q.   Did you ever use any of that cocaine?

5   A.   No, sir.

6   Q.   Now, when you were using the methamphetamine with your

7   customers, could you tell it was methamphetamine?

8   A.   Oh, yeah.

9   Q.   Did the quality of the methamphetamine change over that --

10  A.   Yes, it did.  It reduced in quality, I guess you could say.

11  Q.   How could you tell?

12  A.   It didn't smoke quite as well.  It didn't burn in the pipe

13  quite as well, and you didn't get the high that you got to

14  begin with.

15  Q.   Could you still get high?

16  A.   Sort of, yeah.  You would get high.  It wasn't like the

17  highs from when I first started pushing it.

18  Q.   Okay.  So when you were selling methamphetamine for the

19  three months for Robert, at what point in time did you notice

20  the quality of the methamphetamine changing?

21  A.   Probably halfway through.

22  Q.   So roughly a month and a half --

23  A.   Month and a half to two months through I noticed it started

24  to get real -- I guess what you would call bunk.  People

25  started to complain.

1   Q.  Meaning your customers would complain?

2   A.  Yes, sir.

3   Q.  Your customers were able to tell as well?

4   A.  Yes, sir.

5   Q.  Now, do you remember making any trips with Robert anywhere?

6   A.  I've only made one trip with Robert.

7   Q.  Where did you go?

8   A.  To Utah, Ogden.

9   Q.  Do you know when that occurred?

10  A.  In March, I believe, sometime March or beginning of April.

11  Q.  Of what year?

12  A.  '07.

13  Q.  And at this point how long had you been selling

14  methamphetamine for Robert?

15  A.  For just about two months, if that.

16  Q.  When you went to Ogden, whose car did you go in?

17  A.  My car.

18  Q.  Who drove?

19  A.  Robert.

20  Q.  Why -- do you know why you went to Ogden?

21  A.  As far as I was -- I was under the understanding that we

22  were going to go pick up a friend that was going to come to

23  town and do some tattoos.

24  Q.  Did you later learn why?  Was that the real reason?

25  A.  I later learned as we pulled into town that my car was used

1  to transport illegal drugs.

2  Q.  What do you mean pull into town, into Ogden?

3  A.  Pulled in town into Worland, Wyoming, and I had my car

4  sitting in the alley, and when I came around the corner they

5  were digging something out of my trunk.

6  Q.  So was that -- I might be confused here.  Was that on the

7  trip to Ogden or on the return trip to --

8  A.  On the return trip home.

9  Q.  Let's break that down a little bit.  So you go to Ogden

10 with Robert, and he's driving?

11 A.  Yes, sir.

12 Q.  Your car?

13 A.  Yes, sir.

14 Q.  And your understanding at that point was you were supposed

15 to go pick someone up?

16 A.  Yes, sir.

17 Q.  When you went to Ogden, did you meet anyone?

18 A.  Not really.  I remember going to a house, and there was

19 some folks that lived there.  I was pretty kept in the dark

20 about things.  And the individuals that were coming from

21 California hadn't arrived yet, so we had to wait longer.

22 Q.  So the people you were supposed to meet were coming from

23 California?

24 A.  Yes, sir.

25 Q.  Do you know where in California?

1  A.  I believe Fresno.

2  Q.  Did those individuals eventually show up?

3  A.  Yes, sir.

4  Q.  How many?

5  A.  There was two individuals.

6  Q.  Were you introduced -- when they showed up, were you

7  introduced to them?

8  A.  I don't know if I was introduced right at that point in

9  time, but I had later learned who they were and ran around with

10 them, yes.

11 Q.  How is it that you later learned who they were?

12 A.  I was introduced to them, and I guess the association or

13 acquaintanceship kept growing.

14 Q.  And so you're still out in Utah.  You meet these two

15 individuals.  Did you -- you later learned who they were?

16 A.  Yes.

17 Q.  Who were they?

18 A.  Tito and Ray-Ray.

19 Q.  Now, after you meet Tito and Ray-Ray, what happens?

20 A.  In Ogden or --

21 Q.  In Ogden.  Sorry.

22 A.  They decided they were both going to come to Worland, that

23 we didn't need to drive the one individual back to Worland, so

24 we took two vehicles back to Worland.

25 Q.  Now, when you got back to Worland, what happened?

1          THE COURT:  Mr. Fleener, did you have --

2          MR. FLEENER:  Your Honor, could we have a short

3     conference at the bench?

4          THE COURT:  Yes.

5       (At sidebar.)

6          MR. FLEENER:  I don't know -- this is Tom Fleener.  I

7     don't know how to say this, but she's exhibiting every sign of

8     being on methamphetamine right now.  I spend hours and days

9     with individuals that are on drugs.  She's tweaking right now.

10    She's popping and doing everything that a methamphetamine

11    addict does when they're using methamphetamine.  I think she's

12    on a controlled substance.

13         MR. FUN:  I don't see that, Your Honor.  I think she's

14    just nervous.

15         MR. FLEENER:  For what it is worth, everyone -- we've

16    all noticed it, and I spend all day with these people.

17    She's -- I suppose I could be wrong, but -- and I don't think

18    it is right to bring it up in front of the jury, certainly, but

19    I would request the Court inquire as to whether she's using a

20    controlled substance.  We believe we have a good-faith basis

21    for asking that, Judge.

22         MR. FUN:  Your Honor, if I could just complete my line

23    of questioning, and then maybe we can take our afternoon break

24    at 3:30 and sort this out then.

25         THE COURT:  All right.

1              MR. FLEENER:  No objection, Judge.

2              MR. HORN:  She's crying, Your Honor.

3              THE COURT:  I'm sorry?

4              MR. HORN:  She's crying.

5              THE COURT:  You can ask if she wants to take a break

6    now or if she's all right to continue.

7              MR. FUN:  All right, Judge.

8              THE COURT:  Thank you.

9         (Following in the hearing of the defendants and jury.)

10             MR. FUN:  Ms. Bear, would you like to take a break

11   now?

12             THE WITNESS:  I'm okay.

13   Q.  (BY MR. FUN)  Has this been one of the most difficult

14   things you've had to do?

15   A.  Yes, sir.

16   Q.  Is this the first time you've had to publicly talk about

17   the details of what's happened?

18   A.  Yes, sir.

19   Q.  And you mentioned that you eventually left Ogden and came

20   back to Worland?

21   A.  Yes, sir.

22   Q.  Were you still in your vehicle?

23   A.  On the trip home, yes.

24   Q.  And who was with you?

25   A.  Robert and my youngest son.

1   Q.  How did Ray-Ray and Tito get to Worland?

2   A.  They were driving a car from California.

3   Q.  What kind of car?

4   A.  A really nice car.

5   Q.  Can you remember the color of it?

6   A.  It was like a creamish white.

7   Q.  Do you remember the make or model?

8   A.  It looked like it might have been a Mercedes SS or Mercedes

9   500.  I'm not sure.  It was a nice car.

10  Q.  Now, you arrive in Worland.  And what happens when you

11  arrive in Worland?

12  A.  I had to deal with my mom and my oldest son, getting him

13  rounded up.  We pulled into the alleyway next to my apartment,

14  and I ran around to the front of my apartment to deal with my

15  mom.  And when I went back around, I seen, I believe it was,

16  Robert in the trunk with Ray-Ray getting something out of it,

17  and there was no reason to be in there.

18  Q.  Of your car?

19  A.  Yes, sir.

20  Q.  I don't understand.  If you went to Ogden, were you with

21  your car at all times?

22  A.  Yes -- well, no, not at all times, no, sir.

23  Q.  Okay.

24  A.  We had gotten a motel room part of the time that we were

25  there, and there was a point in time when Robert left me at the

 1  motel room.

 2  Q.  All right.  So when you were in Ogden, how long were you in

 3  Ogden for?

 4  A.  I believe we were there for a day and a half.  It was only

 5  supposed to be a day trip.

 6  Q.  And you mentioned your son was with you at that time?

 7  A.  My youngest son, yes.

 8  Q.  And why would you take your youngest son with you?

 9  A.  It was just supposed to be a quick road trip to go pick

10  somebody up.

11  Q.  And at this time you were still using methamphetamine?

12  A.  At that time I was not high, no, but I was still in active

13  addiction, yes.

14  Q.  And when you come back to Worland, do you know if Ray-Ray

15  and Tito in the Mercedes followed?

16  A.  Oh, yeah, they followed.  We kind of played cat and mouse

17  on the highway.

18  Q.  Now, after you get back to Ogden, did you get any

19  methamphetamine from Robert?

20  A.  In Ogden?

21  Q.  No, I'm sorry.  After you get back from Ogden.

22  A.  The usual customer supply, yeah, I did.

23  Q.  Now, prior to going to Ogden, did you have to deliver any

24  methamphetamine for Robert?

25  A.  I had been delivering it.  I hadn't -- I mean, it wasn't a

1  stop-and-go thing.

2  Q.  So when you came back to Worland and you delivered,

3  could -- did you use with any of your customers then?

4  A.  There was a difference in the quality of the dope.

5  Q.  What was the difference?

6  A.  It was pure.  It wasn't cut as bad.  It was a stronger

7  high, I guess you could say.

8  Q.  Okay.  So this was after the trip --

9  A.  To Ogden.

10  Q.  -- to Ogden you noticed a difference?

11  A.  Yes, sir.

12  Q.  So prior to that was the quality different?

13  A.  It was lower grade.

14  Q.  How long did you continue to assist Robert Velasquez with

15  selling methamphetamine?

16  A.  Shortly after we got back from Ogden, he was incarcerated

17  on a warrant, and that's when it stopped.

18  Q.  And what happened after that?

19  A.  As far as my dealings?

20  Q.  Yes.

21  A.  I stopped for a short period of time but then was

22  approached and asked to continue selling.

23  Q.  And who approached you?

24  A.  Ray-Ray.

25          MR. FUN:  Your Honor, before we start this new topic

 1   with Ray-Ray, it might be appropriate to break for our

 2   afternoon.

 3          THE COURT:  All right.  We will take our afternoon

 4   break.  At this time I would ask the jury to be ready to

 5   reassemble at a quarter to 4:00.  Please remember the

 6   admonition against discussing the case and please keep an open

 7   mind until all of the evidence is in.

 8      (Following out of the presence of the jury.)

 9          MR. FUN:  Your Honor, I don't know how you wish to

10   proceed on this issue.  I think one of my biggest concerns is

11   potential witness harassment if it ends up not being what --

12          THE COURT:  I will -- Ms. Bear, we met the other day

13   when you were here on the material witness --

14          THE WITNESS:  Yes, ma'am.

15          THE COURT:  -- warrant and the discussion about the

16   terms and conditions of your release, correct?

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  And you understand today we're not here to

19   use your testimony against you, correct?

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  And that's the understanding you have with

22   the Government --

23          THE WITNESS:  Yes, ma'am.

24          THE COURT:  -- correct?

25          As you sit here today, are you under the influence of

1  any drug?

2          THE WITNESS:  No, ma'am.  I'm not.

3          THE COURT:  Have you drank any alcohol?

4          THE WITNESS:  No, ma'am.

5          THE COURT:  And when I say "drug," either prescribed

6  or nonprescribed drugs?

7          THE WITNESS:  No, ma'am.

8          THE COURT:  And I bring this up just because I've

9  noticed that you seem very nervous.  And people are nervous,

10  this is not a forum that is comfortable for anyone, and so I

11  just -- I wanted to inquire about your nervous tendencies.

12          THE WITNESS:  I'm very scared right now, Your Honor.

13          THE COURT:  And why is that?

14          THE WITNESS:  Because he scares me.  I've never had to

15  be in a situation like this.  And he has threatened me before

16  with my life, so why wouldn't he now?

17          THE COURT:  Is there anything that -- we need to

18  finish your testimony, and you will be -- Mr. Fun has some

19  questions, and then the attorneys for the defense will ask

20  whatever questions that they have.  Is there anything that the

21  Court can do to put you more at ease?

22          THE WITNESS:  (Witness shakes head.)

23          THE COURT:  Mr. Fun, is there any follow-up questions?

24          MR. FUN:  No, Your Honor.  But just for the record,

25  when we met with Amber Bear when she was in custody on the

1    material witness warrant, she also displayed these emotions

2    because it is extremely emotional for her, particularly some of

3    the details of the events that happened which didn't come out

4    during my direct.  And briefly before she testified today she

5    also expressed to me grave concern over her family's safety,

6    and this is -- and she did shed tears at that time as well.

7              THE COURT:  Thank you.

8              Anything from the defense on this -- the question --

9    the issue that we're here to address?

10             MR. HORN:  Your Honor, outside the presence of the

11   jury I would ask a question, if I could.

12             Are you using any illegal -- excuse me -- are you

13   using any prescription drugs that have not been given to you --

14             THE WITNESS:  I do not take any drugs whatsoever.  I

15   do not even take over-the-counter Advil anymore.

16             MR. HORN:  So you're saying that your bouncing your

17   head and bouncing your body, that's all --

18             THE WITNESS:  I'm shaking my leg right now, that's

19   nerves, yes, sir.

20             MR. HORN:  So you're saying under oath that you have

21   not used any prescription drugs or any other kind of drugs --

22             THE WITNESS:  No, sir, I have not.

23             MR. HORN:  Let me finish my question, please, ma'am.

24             -- that are either prescribed by a doctor or bought or

25   borrowed from somebody else?  That's what you are saying.

```
 1            THE WITNESS:  Yes, sir, that's what I'm saying.

 2            MR. HORN:  Thank you, Your Honor.

 3            THE COURT:  Why don't we take -- allow this witness to

 4   take a break, and I know the defendants are warranted a --

 5   warrant a break as well.

 6            Again, if there's anything that the Court can do to

 7   place you more at ease through this, I would ask you to speak

 8   up when we reconvene.  All right?

 9            THE WITNESS:  Yes, ma'am.

10            THE COURT:  Thank you.  We stand in recess.

11       (Recess taken 3:28 p.m. until 3:50 p.m.)

12       (Following in the presence of the defendants and jury.)

13            THE COURT:  Following our afternoon break in Docket

14   10-CR-329, the Court notes the presence of the jury with roll

15   call waived.  We're still on direct examination by Mr. Fun.

16            I would remind the witness that you remain under oath.

17            THE WITNESS:  Yes, ma'am.

18            THE COURT:  Thank you.  Please proceed.

19            MR. FUN:  With the Court's permission, is it okay if

20   the witness wears a jacket since she is cold?  And it is

21   snowing outside now.

22            THE COURT:  It can be cold in here.  I have several

23   layers on.

24            THE WITNESS:  Thank you.

25            MR. FUN:  I know it is not normal court attire.
```

1           THE COURT:  That's fine.

2    Q.  (BY MR. FUN)  Okay.  Ms. Bear, where we left off, we were

3    going to start talking about Ray-Ray, and you mentioned that

4    Robert Velasquez had gone to jail.

5    A.  Yes, sir.

6    Q.  Did there come a point -- after he went to jail, did you

7    see Robert Velasquez again?

8    A.  I seen him one more time after that point in time.

9    Q.  When you saw him after that, did you get any drugs from

10   him?

11   A.  No, sir.

12   Q.  After that point in time did you have any more contact with

13   Robert Velasquez?

14   A.  After that last incident, no.

15   Q.  Why?  Do you know why?

16   A.  Because I had started dealing with Ray-Ray, and from my

17   understanding, he had upset them pretty bad, upset Ray-Ray

18   pretty bad, and then Robert had beat -- beat me up pretty bad

19   the last time that I seen him, so...

20   Q.  Can you remember when the last time was, what date it was?

21   A.  I don't remember exactly what date it was.  I did make an

22   anonymous phone call, but I didn't want to give my name up, and

23   they wouldn't -- the police wouldn't come help me without that.

24   Q.  You made a call to the police the last time you saw Robert?

25   A.  Yes, sir.

1   Q.  And they didn't come?

2   A.  No, sir.

3   Q.  And that was because you didn't want to provide your name?

4   A.  Yes, sir.

5   Q.  And why is it that you didn't want to provide your name?

6   A.  I didn't want him to know that I was the one who called the

7   cops.

8   Q.  Him being who?

9   A.  Robert Velasquez.

10  Q.  You mentioned it was your understanding that they were

11  upset with Rob.  Who was upset?

12  A.  From my understanding, Ray-Ray and Tito were upset with

13  him.

14  Q.  What gave you that understanding?

15  A.  Ray-Ray and I had a conversation that pretty much stated

16  that he was in debt to them, to Ray-Ray, for drugs and that

17  they had been getting complaints about him cutting his -- his

18  supply.

19  Q.  Why would Ray-Ray tell you that?  I guess you probably

20  don't know what Ray was thinking.  Let me ask you a different

21  question.

22          Did Ray-Ray tell you that in the context of other

23  conversations you were having with Ray-Ray?

24  A.  Yeah.  We had -- we had actually become somewhat of

25  friends, associates, whatever.  He had a key to my apartment,

1   so we were on pretty close terms.

2   Q.   Okay.  What do you mean, he had a key to your apartment?

3   A.   I had given him a key to my apartment.  That way if he

4   needed a place to do tattoos at, he could go ahead and go in my

5   apartment and do that.

6   Q.   How did you know Ray-Ray did tattoos?

7   A.   He completed a tattoo on my lower back.

8   Q.   And do know where Ray-Ray was from?

9   A.   From my understanding, he was from Fresno, California.

10  Q.   Do you know if he had a tattoo shop in Fresno, California?

11  A.   I don't know if that came up.  I do know that he did a lot

12  of tattoos.  He had a lot of professional equipment, and he did

13  a pretty all right job, so.  He had also done another tattoo on

14  an individual that we sold -- that I was selling to at the

15  time.

16  Q.   Now, again, going back, how is it that it came up that

17  Robert owed Ray-Ray drug debt?

18  A.   We were conversating at one point, and he asked me, you

19  know, if I would continue to deal or push dope for him, for

20  Ray-Ray because of the fact that I did a better job, I guess

21  you could say.  I didn't cut the dope, and I didn't short

22  people, so they were moving more quantity through me than they

23  were through Robert.

24  Q.   Had you told Ray-Ray that you were selling drugs for Robert

25  Velasquez?

1   A.   I never came out and said it.  He just knew.

2   Q.   Okay.  So who approached who first?

3   A.   Ray-Ray approached me.

4   Q.   And he's the one that brought that up with you?

5   A.   Yes, sir.

6   Q.   At that point in time did you tell Ray-Ray about what was

7   happening with you and Robert?

8   A.   Yes, sir, I did.

9   Q.   And what was Ray-Ray's response to that?

10  A.   Ray-Ray told me that he would take care of it.

11  Q.   From that point forward did you have any more contact with

12  Robert Velasquez?

13  A.   After that last incident, no.

14  Q.   Now let's talk about Ray-Ray.  If you saw a picture of him,

15  would you be able to recognize him?

16  A.   Yes, sir.

17  Q.   How often did you see him -- well, when you started dealing

18  with Ray-Ray, do you remember how long it was you dealt with

19  Ray-Ray?

20  A.   It was for a very short period of time.  It was maybe a

21  month or so that I had dealt with Ray-Ray.  He had gone back to

22  California.

23  Q.   Did you know Ray-Ray's real name?

24  A.   No.

25  Q.   If you saw a picture, would you be able to recognize him?

1   A.  I'm pretty sure, yes.

2   Q.  I will show you what I've marked as Government's

3   Exhibit 3000.  Have you take a look at that.  Do you recognize

4   that photograph?

5   A.  Yes, sir.

6   Q.  And who do you recognize it as?

7   A.  That is Ray-Ray.

8   Q.  Let me retrieve that back from you, please.

9          MR. FUN:  Move to admit Exhibit 3000, Your Honor.

10          MR. FLEENER:  No objection.

11          THE COURT:  Government Exhibit 3000 is admitted.

12      (Government's Exhibit 3000 received.)

13   Q.  (BY MR. FUN)  I am going to display Government Exhibit 3000

14   for you.  And that was the individual you knew as Ray-Ray?

15   A.  Yes, sir.

16   Q.  Does he look the same in this picture as when you saw him

17   back in 2007?

18   A.  He's put on some weight since then, but that's definitely

19   him.

20   Q.  Okay.  So Ray-Ray approaches you, and he tells you that he

21   wants to do business with you.  He likes the way you do

22   business?

23   A.  Yes, sir.

24   Q.  Did you agree to do it?

25   A.  Yes, sir.

1   Q.   What is it that you agreed to do?

2   A.   I agreed to continue to push dope -- methamphetamine for

3   him.

4   Q.   So tell us about the first time that you got

5   methamphetamine for -- from Ray-Ray.

6   A.   The first time I received methamphetamine from him, he

7   fronted me two eight balls of methamphetamine.

8   Q.   What's an eight ball?

9   A.   An eight ball is 3.5 grams.

10  Q.   And so two eight balls would be 7 grams?

11  A.   Yes, sir.

12  Q.   Or a quarter of an ounce?

13  A.   Yes, sir.

14  Q.   And what did you do with those two eight balls?

15  A.   I proceeded to package them up individually and to deliver

16  them to customers and sold them.

17  Q.   Okay.  So when Ray-Ray provided you the eight balls, were

18  they two eight balls together or were they packaged separately?

19  A.   The eight balls were separate, but they weren't broken down

20  any smaller than that.

21  Q.   Do you know why -- why is it that you had to break it down?

22  A.   Probably easier transportation.  I'm not sure.

23  Q.   That was different from the arrangement with Robert because

24  Robert was giving you only --

25  A.   What was needed at the time was all I received from Robert.

1    Q.  Had you had any discussion with Ray-Ray prior to getting

2    the two eight balls about how much you thought you might need

3    to sell?

4    A.  We agreed that it would be $600 for the two eight balls.

5    Q.  And what were you going to get out of selling the two eight

6    balls?

7    A.  Being in active addiction, I got to continue in my

8    addiction.

9    Q.  And from where were you getting that methamphetamine?

10   A.  With having that large a quantity, I had a personal stash

11   out of it at that point.

12   Q.  And how much of those two eight balls would you sell?

13   A.  I sold about 3 grams.

14   Q.  What did you do with the rest of it, which would be 4

15   grams?

16   A.  Well, 3 grams out of each eight ball went towards selling,

17   and I got about a gram for myself.

18   Q.  Now, you said you would break it down.  In what quantities

19   would you break it down?

20   A.  Quarter grams, half grams and grams.

21   Q.  How did you know to break it down into those quantities?

22   A.  I've been an addict since I was 17.  That's the common --

23   common breakdown.

24   Q.  After you got the money -- when you were selling the

25   methamphetamine that was obtained from Ray-Ray, was it again on

1   a front, or were you getting paid at the time?

2   A.  I got it on a front, and then I would have to pay him the

3   money.

4   Q.  And when Ray-Ray provided you the eight balls, was that on

5   the front?

6   A.  Yes.

7   Q.  How about for your customers?

8   A.  No.

9   Q.  So you got the money from your customers?

10  A.  Yes, sir.

11  Q.  How long would it take you to sell these two eight balls?

12  A.  Three to four days.

13  Q.  After you got the money, what is it that you did with the

14  money?

15  A.  I would get ahold of Ray-Ray and give it to him or at

16  different points in times they had me getting ahold of another

17  individual over in Greybull to give -- to hold on to the money

18  for them.

19  Q.  And who was that?

20  A.  Carlos Garay.

21  Q.  During that month time frame, how many eight balls do you

22  think you sold for Ray-Ray?

23  A.  I would say I probably sold four to six eight balls for

24  him.

25  Q.  How come you didn't continue to sell eight balls for

1  Ray-Ray after that?

2  A.  I got caught and thrown in jail.

3  Q.  When you say you got caught, you got caught selling?

4  A.  Individuals had worn wires on me, and there was warrants

5  issued for my arrest for delivery.

6  Q.  So was that from the deliveries from when you were dealing

7  with Robert or was it from the deliveries --

8  A.  Both, I believe.

9  Q.  Did you -- did there come a point in time when Ray-Ray

10  left?

11  A.  He left probably, I want to say, towards the end of March,

12  maybe a week into April he had left to go back to Casper --

13  Fresno.  Excuse me.  He stated he would be back, but I never

14  saw him after that point in time.

15  Q.  Why is it you never saw him?

16  A.  He didn't come back before I went to jail, and then I did

17  quite a little bit of time on my drug charges.

18  Q.  Had you told Ray-Ray that you had gone to jail?

19  A.  I hadn't told him that I had gone to jail.  At that

20  point -- at one point in time I had made a phone call to him

21  shortly after my residence got raided, and I was out on bond,

22  and I let him know that I had been raided.

23  Q.  When you say you got raided, what do you mean by that?

24  A.  The police and drug task force in Worland came into my

25  house and searched it for drug or drug paraphernalia and my car

1   and person.

2   Q.  And shortly after that you were arrested?

3   A.  Yes.

4   Q.  Ma'am, let's talk about guns for a moment.  Did you ever

5   see Ray-Ray with a gun?

6   A.  No.

7   Q.  Did he ever talk about guns?

8   A.  There was talk.  I didn't really pay attention.  I don't

9   care much for guns.

10  Q.  How about Robert?  Did you ever see him with a gun?

11  A.  Once.

12  Q.  When did you see him with a gun?

13  A.  It was shortly after I met him when he was trying to get me

14  to push dope for him, asking me to, one of the times when we

15  had a physical altercation.

16  Q.  So this was after you met him at Charlene Sackett's and he

17  had come over to your house to stay?

18  A.  Yes, sir.

19  Q.  How far into the stay at your house did you see the gun?

20  A.  Within a week, week and a half.

21  Q.  And in what context did you see the gun?  Tell me what

22  happened.

23  A.  In a threatening manner.

24  Q.  Why -- what was the threats about?

25  A.  Robert and I had gotten into an altercation about the

1    pushing of dope and him having control of my life.  My kids

2    were at home, and he -- he beat me up pretty good, and as I

3    laid there he backhanded my oldest son across the room, and

4    then he went over and applied pressure with his foot to my

5    youngest son's head on the ground.

6    Q.  Let me ask about the gun specifically here.  At what point

7    did you see the gun?

8    A.  When I went to step up to get him off my son.

9    Q.  Okay.  And what was -- was he -- at this point in time were

10   you agreeing to sell methamphetamine for Robert?

11   A.  Uhm.

12   Q.  I mean, before all this happened?

13   A.  This was about the time that I agreed to.  This was around

14   the same night that I told him that I would do whatever, I

15   didn't care anymore.

16   Q.  Okay.  Tell me -- could you describe the gun that you saw?

17   A.  It was black.  It was a handgun.  I don't know.

18   Q.  Do you know the difference between a revolver and a

19   semiautomatic gun?

20   A.  It wasn't a revolver.

21   Q.  And when you saw the gun, in what way did you see it?

22   A.  I was looking down the barrel of it.

23   Q.  So Robert was pointing it at you?

24   A.  Yes, sir.

25         THE COURT:  Counsel, can I see counsel at sidebar for

1   a minute?

2        (At sidebar.)

3            THE COURT:  They want to transport Ms. Perkins to

4   Scottsbluff with the weather turning bad, and I forgot to ask

5   whether anyone had any questions relating to the information,

6   the documents that you received.

7            MR. TIMBERS:  This is Peter Timbers.  I have no

8   further questions for Ms. Perkins.

9            THE COURT:  Thank you.

10           MR. FLEENER:  This is Tom Fleener.  Quite frankly, I'm

11  not sure.  I'm about halfway through the stuff.

12           MR. FUN:  It is good stuff, Tom.

13           MR. FLEENER:  I figured if it was really good, you

14  would have given it to me.  So I would ask that she not, at the

15  very least not be released from her subpoena and --

16           MR. FUN:  She's not under subpoena.  She's in federal

17  custody.  She can be brought here.

18           MR. FLEENER:  Then I don't have a problem with her

19  going back to Scottsbluff.  If I decide to examine her, I will

20  coordinate with the Marshal Service.

21           THE COURT:  Is that acceptable to everyone?

22           MS. HIGHAM:  Yes, Your Honor.

23           MR. HORN:  Yes, Your Honor.

24           THE COURT:  All right.  Thank you.

25       (Following in the hearing of the defendants and jury.)

1          THE COURT:  Excuse the interruption.

2          MR. FUN:  Could I please have the reporter read back

3    the last question and answer.

4       (Previous question and answer read as follows:

5    "Question: And when you saw the gun, in what way did you see

6    it?

7    Answer: I was looking down the barrel of it.

8    Question:  So Robert was pointing it at you?

9    Answer:  Yes, sir.")

10   Q.  (BY MR. FUN)  As Robert was pointing at it you, was he

11   saying anything?

12   A.  I don't remember.

13   Q.  Was it your understanding at that point that you were

14   essentially being asked to distribute methamphetamine for

15   Robert?

16   A.  There was no question.  I was being told.

17   Q.  We have been talking about Robert Velasquez.  We have

18   already talked about Ray-Ray.  If you saw Robert Velasquez,

19   would you be able to recognize him?

20   A.  Yes, sir.

21   Q.  If he's in this courtroom today, can you please indicate

22   where he's at and what he's wearing?

23   A.  He's sitting second over on the far side of that table over

24   there, got tattoos above his eyebrow.

25          MR. FUN:  Let the record reflect the witness has

1    correctly identified the defendant, Robert Velasquez.

2              THE COURT:  The record will so reflect.

3              MR. FUN:  I have no further questions and would like

4    to go ahead and publish Exhibits 606, 606-A and 3000 to the

5    jury.

6              THE COURT:  As admitted exhibits, you may publish.

7    Thank you.

8              Cross for the defense.

9              MR. HORN:  Yes, Your Honor.

10             THE COURT:  Thank you, Mr. Horn.

11                          CROSS-EXAMINATION

12   Q.  (BY MR. HORN)  I'm Vincent Horn.  I represent

13   Mr. Velasquez.  When you visited with the agents in Casper on

14   January 11th, 2010, was the -- was that interview taped, do you

15   recall?

16   A.  Not that I recall, no.

17   Q.  Okay.  Let me represent to you that it was taped, okay?

18   A.  Okay.

19   Q.  Is there a recording of it?

20   A.  If there is, I don't know.

21   Q.  Did you -- did Mr. Fun give you a copy of the summary of

22   the interview that you had --

23   A.  I believe --

24   Q.  Let me finish the question, please.  On January 11, 2010,

25   did he allow you to look at it and see to help you refresh your

1   memory?

2   A.  I believe I looked over it, but it wasn't more for

3   refreshing.  It was me remembering that day.

4   Q.  Is remembering and refreshing kind of the same thing?

5   A.  I already had stated everything that I had talked about.

6   Q.  Stated everything you talked about when?

7   A.  On that paperwork.

8   Q.  On January 11th of 2010?

9   A.  Yeah.

10  Q.  So are you saying as you sit there that you have -- today

11  have a very clear record or remembrance of what happened on

12  January 10th, 2010?  Is that what you're saying?

13  A.  I have an okay remembrance of it.

14  Q.  An okay remembrance?

15  A.  Yes, sir.

16  Q.  What does that mean?

17  A.  I have bad short-term memory loss due to blunt force trauma

18  to the head, so --

19  Q.  Have you gone to see a doctor about the blunt force to your

20  head?

21  A.  No, sir, I haven't.  It is hard for me to recall things

22  from so long ago, though.

23  Q.  Okay.  As I read the synopsis of your interview with the

24  agents, Agent Hall and Agent Steward on January 11th, 2010, you

25  made a statement that on the trip that you and Mr. Velasquez

1    made to Ogden, Utah, that he threw you down the stairs.  Is

2    that correct?  Where were those stairs located in Ogden?

3    A.   That would have been in the motel room that we got.

4    Q.   And were you on the second floor or the first floor?

5    A.   Second floor.

6    Q.   So if I were to obtain a subpoena for the motel records,

7    they would back you up and say that you were, in fact, on the

8    second floor; is that what you're saying?

9    A.   I would hope so.  That's how I recollect it.

10   Q.   And your testimony is today under oath that he threw you

11   down the stairs?

12   A.   We got into an argument and, yes, there was an altercation,

13   and I went down the stairs.  I'm not saying he picked me up and

14   threw me, but I did go down the stairs.

15   Q.   Did you seek medical help for that --

16   A.   No, I was --

17   Q.   -- event?

18   A.   -- pretty much unable to seek.  He took my car and left.

19   Q.   Did he come back and pick you up?

20   A.   Not for a long time.

21   Q.   What's a long time?

22   A.   I believe it was the next morning when I finally seen him

23   again with my car.

24   Q.   The summary that the agents gave to me about your January

25   11th, 2010 interview, that you told them that you never pulled

1  a gun on him -- Mr. Velasquez never pulled a gun on you, but he

2  did show it to you and threatened to shoot you or your children

3  when he got mad.  Now, what does that mean?

4  A.  I'm sorry.  When I got back?

5  Q.  Let me just break it down.  Did he ever pull a gun on you?

6  A.  In this instance, not in Ogden, but at my home in Worland,

7  yes.

8  Q.  And was that before or after June 11th, 2010 (sic)?

9  A.  That would have been before that he pulled the gun on me.

10  Q.  And why would you tell the agents that he never pulled a

11  gun on you on January 11th, 2010?

12  A.  I was scared at that point in time.

13  Q.  So you lied?

14  A.  You could say that, yes.  I didn't tell --

15  Q.  Did you lie or did you not lie?

16  A.  As far as I know the fact, paperwork wasn't supposed to be

17  done under oath.  I met in a parking lot with them, and it was

18  a quick interview.  I don't recall.

19  Q.  Which gun -- what was the color of the gun that he

20  supposedly pulled on you?

21  A.  It was black.

22  Q.  And any other colors other than black?

23  A.  Had a black grip on it.

24  Q.  Black grip?

25  A.  All I know.

1  Q.  You didn't see any of the rest of the gun, the revolver?

2  A.  I was looking down the barrel.  I was scared.  I had just

3  gotten beat up.

4  Q.  Where were you when you were looking down the barrel?

5  A.  In the living room of my apartment with my two children

6  laying right there.

7  Q.  Did you tell anybody else other than the agents that he

8  pulled a gun on you?

9  A.  I've spoken with close friends about it.

10  Q.  And who are they?

11  A.  Individuals that aren't here.

12  Q.  I understand that.  Who are they?  Can you name them?

13  A.  I've talked to -- I don't know.  Talked to my grandparents

14  about it.

15  Q.  Let's stop there.  Did you tell your grandparents that

16  Mr. Velasquez pulled a gun on you?

17  A.  Yes, sir.

18  Q.  And when did you tell them that?

19  A.  I don't remember when.

20  Q.  Well, when did he pull a gun on you in your house?

21  A.  In '07.

22  Q.  In '07?

23  A.  In 2007.

24  Q.  Any month?

25  A.  Within the beginning of that year.

1   Q.  So --

2   A.  Probably, I would say best guess February of '07.

3   Q.  Could you tell whether or not the gun was loaded when you

4   supposedly -- when he supposedly pointed it at you?

5   A.  No, sir, I didn't know.

6   Q.  Do you remember asking the agents during the January 11th,

7   2010 interview -- do you remember asking them, quote, unquote,

8   "Are you going to nail him?" referring to Mr. Velasquez?

9   A.  I don't remember saying that.

10  Q.  Don't remember saying that?  Okay.

11          Do you remember saying in that interview the same day

12  that, quote, unquote, "I'm going to look Robert in his eyes and

13  tell him what I think.  I don't give a fuck about him"?  Did

14  you say that?

15  A.  I possibly could have.

16  Q.  Well, did you or did you not?

17  A.  I don't remember for sure.

18  Q.  That wouldn't be something that would stick in your mind

19  that you would want to see him get what you think he ought to

20  get?

21  A.  I believe that he needs to get what he deserves coming to

22  him if he's found guilty.

23  Q.  And did you ever make the comment on that same day, same

24  interview, that "I want" -- "I want Robert to go to prison, and

25  I'm hiring a big guy to rape him.  Nothing in the world will

1    make me happier"?

2    A.  I don't recall saying that.

3    Q.  Did you -- is it likely that you said it?

4    A.  I don't know.  I know that I'm very angry with him.

5    Q.  Angry enough to hire somebody, right?

6    A.  No.

7    Q.  So you're saying you didn't say it; is that what you're

8    saying?

9    A.  I'm saying I don't recall saying that.

10   Q.  Is it more likely than not that you said it or not, do you

11   know?

12   A.  I don't know.

13   Q.  Is it convenient for you to say these things that you don't

14   remember?

15   A.  Convenient, no.  Actually, it is not convenient at all.

16   Q.  But you're saying it is because you don't remember, right?

17          How many times did you -- you claim that you saw a gun

18   that Mr. Velasquez threatened you with.  Do you know how long

19   he had it?

20   A.  No, sir.

21   Q.  It was just the one time that he showed it to you and

22   pointed it at you?

23   A.  The one time that I saw it there had been talk that it was

24   constantly there.  I don't know.

25   Q.  It was possibly there; is that what you said?

1    A.   There was talk that it was constantly on his person or

2    close to him, but I never saw it besides that one time.

3    Q.   You also told the agents on January 11th, 2010, that

4    Mr. Velasquez carried a pistol with him that was tucked into

5    the front of his pants.  Did you ever see the gun tucked under

6    his pants?

7    A.   That's where he pulled it from when he aimed it at me.

8    Q.   So that's the only time you saw it then, that's your

9    testimony?

10   A.   I believe so, yes.

11   Q.   So the phrase "always carried a gun" was one time or more

12   than one?

13   A.   I assumed he always carried it.

14   Q.   You assumed, but you only saw it once, correct?

15   A.   Yes.

16   Q.   Yes or no?

17   A.   I said yes.

18   Q.   I'm sorry.  I didn't hear you.

19            MR. HORN:  May I have a moment, Your Honor?

20            THE COURT:  Yes.

21            MR. HORN:  No further questions, Your Honor.

22            THE COURT:  Thank you, Mr. Horn.

23                         CROSS-EXAMINATION

24   Q.   (BY MR. FLEENER)  Ms. Bear, good afternoon.  My name is Tom

25   Fleener.  I'm an attorney in Laramie.  I represent Daniel

1   Renteria.

2          I guess first things first.  You testified, I believe,

3   under direct examination that you felt forced, basically, to

4   sell drugs for Robert Velasquez?

5   A.  Yes, sir.

6   Q.  And that these things were being -- you were having to do

7   this against your will?

8   A.  To an extent, yes, sir.

9   Q.  I'm sorry?

10  A.  To an extent, yes, sir.  I still made my choices.

11  Q.  All right.  And this is throughout 2007?

12  A.  Through the beginning of 2007, yes, sir.

13  Q.  And it was -- was it after you were selling -- well, how

14  did he force you?

15  A.  He was very aggressive.  There was physical altercation.

16  Q.  And these physical altercations you allege happened, you

17  never told the police about them?

18  A.  No, sir.

19  Q.  Why?

20  A.  Fear of further repercussions.

21  Q.  These altercations that were happening, we have throwing

22  down the stairs, correct?

23  A.  Yes, sir.

24  Q.  We have just the general fear and threats that were being

25  forced on you to sell methamphetamine?

1   A.  Yes, sir.

2   Q.  We have this terrible altercation that you discussed about

3   involving your children and Mr. Velasquez?

4   A.  Yes, sir.

5   Q.  And you never bothered to tell anybody?

6   A.  Not at the present time.

7   Q.  Well, not at any time?

8   A.  I did after the fact.

9   Q.  But you had access to the police.  You didn't -- throughout

10  2007, didn't you?

11  A.  One of the last altercations that I had with him --

12  Q.  That wasn't the question I asked.  I said you had access to

13  the police throughout 2007?

14  A.  I did not have access, no.

15  Q.  Well, I'm going to show you what I've marked as Renteria's

16  Exhibit E.

17          MR. FLEENER:  May I approach?

18  Q.  (BY MR. FLEENER)  I'm going to hand you what's marked as

19  Defendant's -- Defendant Renteria Exhibit E.  You were working

20  as a confidential informant in 2007, weren't you?

21  A.  Yes, I was, in the middle.

22  Q.  Well, that's in 2007 in May, right?

23  A.  Yes, sir.

24  Q.  And, well, I know you're going to be truthful with law

25  enforcement, so I assume you told them about your altercation

1   that took place with Robert, right?

2   A.   Yes, I did.

3   Q.   Okay.  Good.  Who is it?

4   A.   Excuse me?

5   Q.   Who is the cop that you told in 2007 that Robert Velasquez

6   assaulted you?  Give me his name.

7   A.   I believe that I had talked to Val Martin and Rich

8   Fernandez about it.

9   Q.   Where are Val Martin and Rich Fernandez from, do you know?

10  A.   Washakie County.

11  Q.   And you told them that during -- did you tell -- so you did

12  tell them during this interview while you were acting as a

13  confidential informant?

14  A.   I don't know when I told them.  I can't say it was during

15  an interview.  I don't know.

16  Q.   But you told them?

17  A.   Yes.  There was conversation about it.

18  Q.   Well, I assume law enforcement took a -- took action, I

19  mean, if children are being threatened, right?

20  A.   Children are already out of the home.  They were living

21  with --

22  Q.   So law enforcement did nothing?

23  A.   (Witness nods head.)  That's correct, Your Honor.

24  Q.   And you were actually serving -- I'm going to show you

25  page -- I apologize.  Defendant's Renteria Exhibit E that I

1   showed you, you recognize that document as the agreement you

2   have with DCI in 2007, correct, ma'am?

3   A.  Yes, sir.

4   Q.  It doesn't appear to be altered in any way, shape or form?

5   A.  No, sir.

6   Q.  The signature at the bottom of 2000 -- or that document

7   appears to be your signature, right?

8   A.  Yes, sir.

9   Q.  And it's dated May 1st, 2007, 11:25?

10  A.  Yes, sir.

11  Q.  I show you --

12          MR. FLEENER:  I offer Renteria Exhibit E into

13  evidence.

14          THE COURT:  Hearing no objections, Renteria Exhibit E

15  is admitted.

16      (Defendant Renteria Exhibit E received.)

17  Q.  (BY MR. FLEENER)  I'm showing you page 2 of that document.

18  Now, ma'am, that document is dated May 1, 2007, correct?

19  A.  Yes, sir.

20  Q.  And during this time you were selling all sorts of

21  methamphetamine?

22  A.  No, sir.

23  Q.  You weren't?

24  A.  No, sir.  I did at one time.

25  Q.  You sold methamphetamine one time?

1    A.   During this particular point in time, yes.

2    Q.   Okay.

3    A.   As a CI.

4    Q.   Right.  I'm not talking about your CI sales.  I'm talking

5    about all the other sales, okay?

6    A.   Okay.

7    Q.   All right.  So you sold as a CI once, right?

8    A.   Yes, sir.

9    Q.   And you sold as a drug dealer how many times?

10   A.   Between 20 and 50 times during a four-month period.

11   Q.   And this is while you were a CI?

12   A.   No.

13   Q.   When was that?

14   A.   That was before May.

15   Q.   Oh, okay.  So after May you were clean, and you didn't do

16   any other bad things?

17   A.   Oh, I can't say that.  I'm not -- I'm not perfect.

18   Q.   I know that.

19            MR. FUN:  Objection.  Move to strike, Your Honor.

20            MR. FLEENER:  Withdrawn.

21   Q.   (BY MR. FLEENER)  In May in -- what were you doing after

22   May 2007, ma'am?

23   A.   I do believe I was sitting and doing time for my drug

24   charges after May of 2007.

25   Q.   Well, you were convicted of that -- I mean, you were

1  actually convicted of -- well, June 15th you were convicted of

2  interference with a police officer, 2007?

3  A.  Yes, sir.

4  Q.  June 15th, that's just 45 days after you signed your

5  agreement, correct?

6  A.  Yes, sir.

7  Q.  And did the incident take place -- well, what was the

8  interference with a police officer?  What did you do?

9  A.  I don't recall that, actually.

10  Q.  Okay.

11  A.  They said that I got a DUI and that I had interference.  I

12  asked them to test my blood because I wasn't drinking that

13  night, and I served five days in jail in Campbell County for

14  that.  And I was returned to Washakie County and spent my time

15  for my drug charges over there.

16  Q.  You're saying you don't recall -- well, did you interfere

17  with a police officer or not?

18  A.  That happened in Campbell County.  I don't recall that

19  situation.  I recall going to court.  I recall waking up in

20  jail.  I don't recall anything prior to that.

21  Q.  So you don't recall -- did you plead guilty?

22  A.  Yes, I did.

23  Q.  How could you plead guilty if you don't recall anything?

24  A.  Because I didn't want to fight it.

25  Q.  Fight what?

1    A.  I had enough going on.

2    Q.  I'm sorry?

3    A.  I had enough going on in my life.  I didn't want to fight

4    it.

5    Q.  Oh, you didn't want to fight it.  What did you have going

6    on in your life that you didn't want to fight it in June of

7    2007?  I thought that you were clean.  You said just a few

8    minutes ago that after May you were -- you had --

9    A.  I did not say that.

10   Q.  Okay.  Well, then what did you have going on after May but

11   before June?

12   A.  I became a raging alcoholic because I didn't have my kids,

13   and I went on the run, I guess you could say.

14   Q.  Were you using methamphetamine as well?

15   A.  No.  My supply was gone.

16   Q.  And you were -- you were a raging alcoholic.  What does

17   that mean?

18   A.  Another form of addiction.

19   Q.  You started using drugs when, ma'am?

20   A.  The first time I ever tried them or the first time I

21   actually started using them recreationally?

22   Q.  Well, start with the first time you ever tried them.

23   A.  When I was 13 years old.

24   Q.  And what drugs were they?

25   A.  I attempted to smoke pot, and I drank alcohol.

 1   Q.   And when did you start using them on a more regular basis?

 2   A.   Alcohol didn't take place till after I was 18.  And weed

 3   still really hasn't taken place as far as recreational.  I had

 4   an allergic reaction at age 13 and didn't smoke it again.

 5   Q.   If -- in 2007 you testified that you felt threatened and

 6   forced to sell methamphetamine for Robert Velasquez?

 7   A.   I never testified to that in 2007.

 8   Q.   Okay.  When did you feel threatened to sell methamphetamine

 9   for Robert Velasquez?

10   A.   All the time.

11   Q.   I'm sorry?

12   A.   I was always feeling threatened by him.

13   Q.   But why were you selling methamphetamine for Ray-Ray and

14   Tito voluntarily if you felt threatened to sell for Velasquez?

15   A.   Ray-Ray and Tito didn't put their hands on me.

16   Q.   Okay.  So it wasn't the selling of the methamphetamine you

17   had a problem with; it was how -- it is your testimony it was

18   how Mr. Velasquez treated you?

19   A.   I was not a good person.

20   Q.   I'm sorry?

21   A.   I was not a good person then, and I wanted, I needed my

22   fix, my methamphetamine fix.

23   Q.   And I don't -- I didn't ask that question.  I don't want to

24   judge you.  But I do want to know why it was a threat for you

25   to sell methamphetamine for Robert Velasquez but you apparently

1   had no problem selling methamphetamine for anybody else that

2   decided to ask you to sell methamphetamine?

3   A.   I was told that they would help take care of me and that

4   they would make sure that Robert didn't hurt me again.

5   Q.   Okay.   So, again, it wasn't the methamphetamine that you

6   had a problem selling.   It was Mr. Velasquez that you had a

7   problem with?

8   A.   To begin with I did have a problem with methamphetamine.   I

9   had been clean up until that point in time when I met Robert at

10  Ms. Sackett's house, so I did have a problem with it.   But once

11  I got back into my addiction, it was full blown.   I didn't care

12  anymore.

13  Q.   When were you clean?

14  A.   I had been clean for four years, since the time that my

15  oldest son was born until the time shortly -- what, six months

16  after my youngest son was born is when I started using again.

17  Q.   And you were using and selling methamphetamine around your

18  children?

19  A.   No, sir, it wasn't going on around my children.   There were

20  times when I would have my parents take them and baby-sit them.

21  Q.   While you were out slanging?

22  A.   Yes.

23  Q.   I thought you testified that -- it may have been somebody

24  else -- weren't you convicted of child endangerment?   Yeah,

25  sure you were.

1   A.  Yes, sir.

2   Q.  And that was part of that 2007 stuff?

3   A.  Yes, sir.

4   Q.  And the child endangerment was because you were doing

5   something around your children with methamphetamine?

6   A.  There was a conversation that took place that happened on

7   wiretap where I was talking to my supplier on the phone with

8   intentions to commit a delivery.

9   Q.  And your kids were in the background?

10  A.  Yes, sir.

11  Q.  So you were conspiring to sell methamphetamine with your

12  young children in the background at your house?

13  A.  I was conspiring to go pick it up, yes, sir.

14  Q.  And you love your children, I assume.

15  A.  I do.

16  Q.  They live with your parents?

17  A.  Yes, they do.

18  Q.  If you love your children, why -- why would you let them be

19  assaulted by Mr. Velasquez?

20  A.  I didn't allow it.

21  Q.  If that's true -- I'm sorry?

22  A.  I didn't allow it.

23  Q.  Well, if what you testified to is to be believed, ma'am,

24  you allowed a man to stick a gun in your mouth --

25          MR. FUN:  Objection, that's not what she said, Your

1  Honor.

2          THE COURT:  Sustained.

3          MR. FUN:  And it is badgering the witness.  I mean,

4  he's asking the same questions over and over again, Your Honor.

5  She's already testified --

6          MR. FLEENER:  Just because he doesn't like the

7  answer --

8          MR. FUN:  Objection, Your Honor.  It is not whether I

9  like the answer or not.  We're wasting time asking the same

10  things over and over again.

11          THE COURT:  Sustained.

12  Q.  (BY MR. FLEENER)  You let a man step on your child's head

13  according to your testimony?

14  A.  I was laying on the ground beaten.  I didn't let him.

15  Q.  And when exactly was this?

16  A.  I don't recall exactly.  It was in the beginning of 2007,

17  approximately February was the month.

18  Q.  How old were your children?

19  A.  My oldest was approximately 15 months old, and my youngest

20  was 6 months old.

21  Q.  Did they have a baby-sitter at all?

22  A.  Occasionally.  Most of the time it was just my mom.

23  Q.  And it is your testimony you talked to Val Martin and Rich

24  Fernandez and told them about this?  You're under oath, ma'am.

25  A.  It had come up in conversation because I was angry with

Case 1:10-cr-00329-NDF Document 494 Filed 01/10/12 Page 225 of 263
USA VS VELASQUEZ, ET AL    BEAR - CROSS - FLEENER    VOL XII

225

1  them that they were watching me or I was on their -- how they

2  put it -- on their radar for selling drugs, and they didn't do

3  anything knowing that I had gotten beat up.

4  Q.  Now, you're how old again, ma'am?  I'm sorry if you've

5  answered this.  I apologize.

6  A.  28 years old.

7  Q.  And you picked up your first felony in 2001, correct?

8  A.  Yes, sir.

9  Q.  And that was here in Laramie County?

10  A.  Yes, sir.

11  Q.  And that was for buying or receiving stolen property?

12  A.  Possession of stolen property.  I was driving a vehicle my

13  boyfriend had stolen.

14  Q.  Did you know he had stolen it?

15  A.  No, sir.

16  Q.  Why did you plead guilty to it, then?

17  A.  I was dumb and young and naive and thought they would go

18  easy on me since I was pregnant with my first kid.

19  Q.  And then you picked up your interference charge in Campbell

20  County in 2007, correct?

21  A.  Yes, sir.

22  Q.  And that interference charge, you don't remember much about

23  it at all?

24  A.  No, sir.

25  Q.  You just pled guilty to it because you had other things

1    going in our life that were stressful and terrible?

2    A.  Yes, sir.

3    Q.  And then along about the same time frame -- well, in

4    October of 2007, that's where you were convicted of the intent

5    to distribute -- possession with intent to distribute the

6    methamphetamine and the child endangerment, correct?

7    A.  There was no possession.  There was delivery of meth,

8    delivery of cocaine and child endangerment.  There was no

9    possession.

10   Q.  You were convicted of the delivery of possession --

11   delivery of cocaine, delivery of methamphetamine and the child

12   endangerment, correct?

13   A.  Yes, sir.

14   Q.  And that was in October of 2007?

15   A.  Yes, sir.

16   Q.  Did you have another conviction, or is that it?

17   A.  That was it.

18   Q.  You said you had blunt force trauma to your head?

19   A.  I've gotten it quite a few times in my life, yeah.

20   Q.  I'm sorry?

21   A.  I've had it happen to me quite a few times in my life, yes,

22   sir.

23   Q.  Then how can you recall what took place in 2007?

24   A.  Something that I will never forget.

25   Q.  But don't you forget -- you would agree that things that

1   happen closer in time generally are easier to remember than

2   things that happened a long, long time ago?

3   A.  No, sir, not for me.

4   Q.  You remember what happened a long, long time ago better

5   than you do something that happened yesterday?

6   A.  Yes, sir, I get lost in my conversations quite frequently.

7   Q.  You recall, though, being interviewed by Agent Hall and

8   Agent Steward when they talked to you on the corner of Poplar

9   Street and Collins Street in Casper?

10  A.  Yes, sir.

11  Q.  You said that it wasn't under oath, that was your

12  understanding?

13  A.  No, sir, it wasn't being taped.  I didn't -- I don't

14  remember a whole lot from that.  I remember meeting up with

15  them.  I don't remember exactly word for word what I said, no.

16  Q.  But you remember you just testified with Mr. Horn that you

17  admitted you lied to them?

18  A.  Yes, sir.

19  Q.  And -- but then you said something about it not being under

20  oath or not being recorded.  Does that matter to you whether it

21  is under oath or not under oath whether you can lie or not lie?

22  A.  It's wrong either way.

23  Q.  But why did you lie to them in 2010?

24  A.  I was still scared.

25  Q.  Scared of what?

1    A.  Scared for my kids.

2    Q.  Were your kids living with you or were they with your

3    parents?

4    A.  Temporarily they live with my parents.

5    Q.  Okay.  But you've used your kids as an excuse to be scared,

6    and I appreciate that.  Why didn't you --

7    A.  I'm not --

8    Q.  -- tell anybody, ma'am, that you're afraid for your kids

9    if --

10   A.  I have and I did, and nothing happened, so why should I

11   tell anybody anymore?  Everybody in Worland knows everything

12   you do before you ever do it.  If I want to walk down and try

13   to call the cops like I did at one point in time and he beat

14   the crap out of me for it, why would I do that again?

15   Q.  Now, you said this is the anonymous phone call, right?

16   A.  Actually, this is the phone call to Ray-Ray, I had with

17   Ray-Ray, and he thought I was on the phone with the cops, and

18   he beat me up in my bathtub and hit me over the head with a

19   beer bottle and didn't stop, and when he did stop he told me to

20   go to bed.

21   Q.  Was this phone conversation -- was that different than

22   the -- you testified on direct examination that there was some

23   sort of anonymous phone call?

24   A.  There was an anonymous phone call, yes, there was.

25   Q.  So that was different than this?

1    A.   Yes.

2    Q.   The anonymous phone call, was that before or after you

3    allege that Mr. Velasquez assaulted your children in February

4    of 2007?

5    A.   It was after he assaulted us originally, and I believe I

6    talked to the chief of the police department at that point in

7    time about anonymously reporting the assault.

8    Q.   If everybody in Worland knew what everybody was doing, then

9    why would you be a confidential informant if you're afraid for

10   your kids' lives?  I mean, you said in Worland everyone knows

11   what you're doing.  That's the reason you didn't want to call

12   the police, right?

13   A.   My kids were safe.

14   Q.   When?

15   A.   When I was a confidential informant.

16   Q.   Where were they then?

17   A.   With my parents, and I felt -- I felt very secure with

18   that.

19   Q.   But you didn't feel secure two and a half years later when

20   you're talking to Mike Hall in Casper and lied to him?

21        It is true, is it not, you're a heavy user of

22   methamphetamine?

23   A.   Was.

24   Q.   Some of the signs of methamphetamine use are being twitchy?

25   A.   Yes, sir.

1   Q.  Being fidgety?

2   A.  Yes, sir.

3   Q.  Anxiety?

4   A.  Yes, sir.

5   Q.  Nervousness?

6   A.  Sure.

7   Q.  Shaking?

8   A.  Yes, sir.

9   Q.  Paranoia?

10  A.  Sometimes.

11  Q.  Aggressive behavior?

12  A.  Sure.

13  Q.  Shaking, rocking?

14  A.  I guess, for some people.  Not all.

15  Q.  You were arrested on a material witness warrant --

16  A.  October 2nd, 2011.

17  Q.  I'm sorry?

18  A.  October 2nd of 2011.

19  Q.  Now, what's your understanding of why you were arrested?  I

20  mean, you think --

21  A.  They couldn't --

22  Q.  I apologize, and I'm going to withdraw that question and

23  rephrase it.  Certainly witnesses don't get arrested every day,

24  witnesses in cases?

25  A.  Okay.

1   Q.  I mean, do you agree?

2   A.  Sure, yeah, I agree with you.

3   Q.  But you were arrested?

4   A.  Yes, sir.

5   Q.  What's your understanding as to why you were arrested?

6   A.  Because they could not locate me.

7   Q.  Where were you?

8   A.  I was in Fontenelle, Wyoming.

9   Q.  Why?

10  A.  I had moved out of Casper trying to better my life, getting

11  away from old people, places and things.  I actually went over

12  there to apply for a contract -- a construction job on the

13  road.

14  Q.  Where were you living in Fontenelle?

15  A.  The only place you can live.  It's population of three

16  people.

17  Q.  I've never been there.  Where would that be, then, the only

18  place?

19  A.  Across over South Pass.  It is about four miles away from

20  Casper -- excuse me -- four hours away from Casper.

21  Q.  How would you expect to find a job in a town of three

22  people?

23  A.  There's Big Piney.  There's LaBarge.  There's a lot of

24  oilfield workers out there, a lot of man camps, and this road

25  construction was out there with Anderson Signs from Casper.

1   Q.  Did you get hired?

2   A.  No, sir.

3   Q.  Did you apply?

4   A.  Yes, sir.

5   Q.  Did you have to subject yourself to drug screens to get one

6   of those jobs?

7   A.  No, sir.  I was more than willing to, though.

8   Q.  The -- so you were in Fontenelle?

9   A.  Yes, sir.

10  Q.  Were you hiding?

11  A.  No.

12  Q.  Then why did you need to be arrested if you weren't hiding?

13  A.  They couldn't locate me.  I didn't know they were looking

14  for me.

15  Q.  I thought you knew you were going to be subpoenaed for

16  this.

17  A.  No, I didn't.  I had no clue that I was being subpoenaed

18  for this.

19  Q.  Well, then why weren't you just handed a subpoena and told

20  to come to court?

21  A.  They couldn't find me.

22         MR. FUN:  Objection, asked and answered.  She already

23  said she couldn't be found, and that's why she was arrested.

24         THE COURT:  Sustained.

25  Q.  (BY MR. FLEENER)  So a warrant for your arrest was served

1   upon you, and you were taken into custody?

2   A.  Yes, sir.

3   Q.  Why wouldn't they just give you a subpoena instead of

4   arresting you?

5          MR. FUN:  Objection, speculation.

6          THE COURT:  Sustained.

7          MR. FUN:  Your Honor, we've been over this over and

8   over again.  I don't know what point this really has.

9   Q.  (BY MR. FLEENER)  While you were in jail -- how many days

10  did you spend in jail on a material witness warrant, six?

11  A.  I think it was ten days I was on the material witness hold.

12  Q.  And you were in Torrington as well?

13  A.  Yes, sir.

14  Q.  With Kim Perkins?

15  A.  Yes, sir.

16  Q.  With Candice Kysar?

17  A.  Yes, sir.

18  Q.  Same pod?

19  A.  Yes, sir.

20  Q.  Then you were brought into court, and Mr. Fun argued and

21  asked the Court to let you go?

22  A.  Yes, sir, under bond stipulations and the -- make sure we

23  didn't have no more warrants.

24  Q.  Did you have any more warrants?

25  A.  Yes, sir, I did.

Case 1:10-cr-00329-NDF  Document 494  Filed 01/10/12  Page 234 of 263
USA VS VELASQUEZ, ET AL    BEAR - CROSS - FLEENER              VOL XII

234

1   Q.  What was that for?

2   A.  Unpaid fines out of Washakie County.

3   Q.  That's something else that we haven't talked about?  Is

4   that something else unrelated to --

5   A.  Unrelated completely.

6           MR. FUN:  Your Honor, we probably need a sidebar.

7       (At sidebar.)

8           MR. FUN:  Your Honor, I'm going to object to this line

9   of questioning.  Mr. Fleener, knowing this witness, numerous

10  witnesses, gets them to talk about their misdemeanor

11  convictions, which is not proper 609 impeachment, which then

12  requires me to go back and clean it up and have them explain

13  what these warrants and misdemeanor convictions are for.  It is

14  really inappropriate and outside the rules of impeachment.

15          MR. FLEENER:  I had no idea that she had a warrant,

16  and had she not told me she had a warrant, I wouldn't have

17  known she had a warrant, and I wouldn't have asked if she had a

18  warrant.

19          MR. FUN:  That just means Mr. Fleener is on a fishing

20  expedition and --

21          MR. FLEENER:  I didn't ask -- the warrant came up --

22          MR. FUN:  -- as he has been with all witnesses, just

23  asking general questions.

24          MR. FLEENER:  I apologize for speaking over Mr. Fun.

25  Your Honor, if the warrant came up on -- I didn't bring up the

 1   warrant.  She brought up the warrant.  I don't care whether she

 2   has a warrant.

 3            MR. FUN:  In response to questions by Mr. Fleener.

 4            MR. FLEENER:  No.  I asked her if she was arrested on

 5   conditions, and she brought up the fact that the conditions

 6   that existed as long as she didn't have a warrant.  I never

 7   mentioned the word "warrant."

 8            MR. FUN:  Mr. Fleener said she was released on

 9   recommendation of the Government, and that's how that came up.

10            MR. FLEENER:  Right.  How do I know that she has a

11   warrant?  I'm not on a fishing expedition.  They bring these

12   witnesses up here, Judge, that have all sorts of checkered

13   past, and the jury has every right to know about them.  The

14   fact that she has a warrant, I didn't bring it up.  How am I

15   supposed to know that she has a warrant?  If she wouldn't have

16   told me, I would have never asked.

17            THE COURT:  I will sustain the Government's objection.

18   You did ask if she had any warrants, and that was what -- her

19   response.  She indicated she was released on conditions

20   including not having any outstanding warrants, and I believe

21   you asked her whether she had any outstanding warrants, and

22   that was her response.

23            MR. FLEENER:  I apologize.

24            THE COURT:  I don't think we need to pursue a warrant

25   for outstanding fines.  I wouldn't have expected you to.

1          MR. FLEENER:  I wasn't -- I -- Roger.

2          THE COURT:  Thank you.

3          MR. FLEENER:  Yes, ma'am.

4      (Following in the hearing of the defendants and jury.)

5   Q.  (BY MR. FLEENER)  Ultimately you appeared before this

6   Court, correct?

7   A.  Yes, sir.

8   Q.  And you were assigned an attorney?

9   A.  Yes, sir.

10  Q.  Ms. Domonkos?

11  A.  Yes, sir.

12  Q.  And Mr. Fun argued and asked the Court that you be released

13  on various conditions, correct?

14  A.  Yes, sir.

15  Q.  And you're thankful for that?

16  A.  Oh, yes, sir.

17  Q.  Because you didn't want to have to be in jail?

18  A.  No, sir.

19  Q.  And in addition to requesting that you be released, Mr. Fun

20  also gave you an immunity letter, correct?

21  A.  The immunity letter happened prior to the court hearing.

22  Q.  Okay.  Same day?  Different day?

23  A.  I don't remember exactly what day it was.  It is on the

24  signatures.

25  Q.  This is only two weeks ago, right?  I thought your

1    short-term memory is good.

2    A.  When you spend time in jail, you kind of lose track of what

3    day it is.

4    Q.  Okay.  Well, was this -- was it on the same day or was it

5    on a different day that you got this immunity letter when you

6    appeared in court?

7    A.  There were two different immunity letters.  There was one I

8    signed in court when I came in front of Your Honor that added

9    my attorney's name to it, and then there was one that I had

10   signed previously that were the exact same, just my attorney's

11   name was added to the second one I signed.

12   Q.  And in that immunity letter, I mean, the United States

13   agreed to essentially not use your testimony or any other

14   information you provide in any way against you, correct?

15   A.  Yes, sir.

16   Q.  And that benefits you, correct?

17   A.  No, sir -- it does, but -- I don't know.

18   Q.  Well, you --

19   A.  I'm confused right now.

20   Q.  I will try and clear things up.

21          You were -- you said someone wore a wire on you,

22   correct?

23   A.  Yes, sir.

24   Q.  And that's how you got one of your convictions in --

25   A.  All of them.

 1   Q.  All of them in 2007?

 2   A.  Yes.

 3   Q.  Well, if your testimony is to be believed, you were selling

 4   all sorts of drugs for Mr. Velasquez, correct?

 5   A.  Yes.

 6   Q.  And you weren't charged with any of those crimes?

 7   A.  I was charged with all of those crimes that they --

 8   Q.  With Mr. Velasquez' crimes?

 9   A.  Of the crimes of me selling the drugs for him, yes.

10   Q.  You were charged with those?

11   A.  I was charged and convicted for the drugs that I sold for

12   Mr. Velasquez.

13   Q.  What precisely were you convicted of?  You said that

14   someone wore a wire on you.

15   A.  Yes, sir.

16   Q.  Who was it who wore the wire on you, do you know?

17   A.  A confidential informant.

18   Q.  When was the wire worn?

19   A.  Between the months of February of '07 and April of '07.

20   Q.  But during those months you certainly had more than one --

21   one drug transaction, right?

22   A.  They were mostly to the same two people.

23   Q.  Okay.  But you sold it to -- you sold it more than one

24   time.  And the immunity that Mr. Fun has provided you allows

25   you not to get prosecuted for any of these other drug

1   transactions that you weren't convicted of in 2007, right?

2   A.   I did my time.

3   Q.   Is that yes or is that no?

4   A.   I was originally charged with ten felony charges.  I had

5   ten charges against me.

6   Q.   Okay.  Well, you're aware that Mr. Velasquez is on trial in

7   federal court for distributing methamphetamine involved in a

8   drug conspiracy, right?

9   A.   Yes, sir.

10  Q.   And if your testimony is to believed, you were smack dab

11  involved in this drug conspiracy, right?

12  A.   Yes, sir.

13  Q.   And so but for your agreement with Mr. Fun, I mean, you

14  could be sitting at the table with Mr. Velasquez facing federal

15  drug charges?

16  A.   In all honesty, I probably should be.

17  Q.   Do you know why you aren't?  Is it because of the agreement

18  with Mr. Fun or is it something else that you've --

19  A.   I've already done my time.  They already caught me and

20  convicted me.

21  Q.   But you would agree that -- well, you only -- that

22  conviction in 2007, though, you just got a little split

23  sentence?

24  A.   A little split sentence?

25  Q.   Well, you had a two to five, right, that's two years to

1   five years, and it was -- the sentence was split where you

2   spent time in jail?

3   A.  Six months county time.

4   Q.  So you spent six months in county in 2007, right?

5   A.  I would rather do prison time, sir.

6   Q.  I'm sorry?

7   A.  I would rather have done prison.  County is pretty harsh.

8   Q.  You would rather go to prison?

9   A.  I would rather have done prison.

10  Q.  Well, put that aside.  In 2007 you did six months in county

11  jail?

12  A.  Yes, sir.

13  Q.  And then you were released to rehab or some sort?

14  A.  I wasn't released to rehab.  I got out after my six-month

15  stint, and I voluntarily admitted myself into WYStar treatment

16  facility.

17  Q.  Okay.  And you were -- and when were you in WYStar?

18  A.  The end of '07 and part of '08.

19  Q.  And since 2007 -- well, let me -- do you in your mind

20  equate that sentence to what these gentlemen face sitting here

21  at the table?

22          MR. FUN:  Objection, Your Honor.  Invades the province

23  of the Court.

24          THE COURT:  Sustained.

25          MR. FUN:  Move to strike Mr. Fleener's last question.

1          THE COURT:  It can remain on the record.  As the jury

2   knows and will be instructed again later, all questions from

3   counsel are not evidence in the case.

4   Q.  (BY MR. FLEENER)  And since 2007, 2008 you've been clean?

5   A.  I had a relapse.

6   Q.  When was your relapse?

7   A.  It would have been July of '09, I believe.

8   Q.  And since July of '09, you've tried to live a law-abiding

9   life?

10  A.  I'm trying to get my things ironed out.  I still have a few

11  things that need to be taken care of, but I'm working on it.

12  Q.  If you're -- if you've been clean all that time, why did

13  you run off to whatever that little town was four hours away?

14  A.  I wasn't running off.  I was trying to better my

15  opportunities somewhere else.  I had somebody there that wanted

16  me to be there.

17  Q.  Are you still there?

18  A.  No, sir.

19  Q.  Why?

20  A.  Couldn't find a job.  Economy is kind of bad right now,

21  plus my felonies don't help.

22  Q.  So you moved there -- well, strike that.  I apologize.

23          This report you made to Val Martin and Rich Fernandez

24  in Washakie County, do you know where the report went?

25  A.  There was never a report done up.  There was never an

1  actual report.  There was never no affidavit.  There was

2  nothing.  It was in conversation.  I don't know what they ever

3  did about it or with it, if anything.  I did not proceed with

4  charges.

5  Q.  And if I asked this, I do apologize because I truly don't

6  remember.  That was before -- telling Val Martin and Rich

7  Fernandez this was before or after you purportedly made this

8  anonymous call about Mr. Velasquez?

9  A.  I don't recall which one was first.

10 Q.  Was it roughly around the same time frame?

11 A.  Could have been.

12 Q.  I'm sorry?

13 A.  It could have been.

14 Q.  Well, you didn't -- by making an anonymous phone call, it

15 didn't appear you were too afraid of Mr. Velasquez if you were

16 willing to call law enforcement.

17        MR. FUN:  Objection, Your Honor.  Again, all of these

18 questions have been asked and answered, and if Mr. Fleener

19 can't remember what questions were asked or what the responses

20 were, I'm sorry, but we've spent a lot of time on these issues.

21        THE COURT:  Overruled.

22        If you remember the question, you can may answer.

23        THE WITNESS:  What was the question?

24 Q.  (BY MR. FLEENER)  The question was that if the anonymous

25 phone call was purportedly around the same time as this

1   conversation that you had with Val Martin and Rich Fernandez,

2   right?

3   A.  I believe that's who it was.

4   Q.  I'm sorry?

5   A.  I'm pretty sure that's who it was, the conversation that I

6   had with them.

7   Q.  It may not have been Val Martin and Rich Fernandez?

8   A.  I believe that it was Rich Fernandez, not Val Martin.  I'm

9   trying to figure out if that was in the interrogation room with

10  both of them or if it was a different time where it was just

11  Rich -- excuse me -- Deputy Fernandez.  The anonymous phone

12  call was made prior to me talking to them because that was

13  during my incarceration period when I talked to them about what

14  had gone on in my house.

15  Q.  You were in the interrogation room, then, when you told

16  them about this --

17  A.  No.

18  Q.  Okay.  Clarify that for me.  Where were you when you talked

19  to Rich Fernandez -- Val Martin wasn't there now, right?

20  A.  I don't recall if she was in the room or not.

21  Q.  You testified 15 or 20 minutes ago that Val Martin was

22  there.  Is that -- I mean, do you want to --

23  A.  I believe she was there.  I don't remember quite for sure.

24  I don't have a picture-perfect memory of it.  I apologize.

25  Q.  Well, you gave all sorts of testimony about 2007 --

1          MR. FUN:  Objection, Your Honor, badgering.  And

2    again, we've been over this again.  Mr. Fleener just keeps

3    going around in circles and circles.  I object, Your Honor,

4    asked and answered and relevancy.

5          MR. FLEENER:  The relevance, Judge, is that she --

6          MR. FUN:  Objection, Your Honor.  I don't think we

7    need a speaking response.

8          MR. FLEENER:  I get to respond to an objection, Judge.

9    May I respond to the objection, Judge?

10          THE COURT:  Yes.

11          MR. FLEENER:  Thank you.  It is relevant because she

12    just testified that she doesn't -- and I'm putting -- I don't

13    have her exact quote, but she doesn't recall.  She doesn't have

14    a picture-perfect memory, which is during the exact time frame

15    when she just testified about all these terrible things

16    happening involving Mr. Velasquez and others, so that's why it

17    would be relevant.  Involving who was actually in the room she

18    was actually fairly adamant about Rich Martinez (sic) and Val

19    Martin, and I remember asking, "Are you sure Val Martin," and

20    yes, and I wrote the names down, and now she's hedging on that

21    a bit.

22          THE WITNESS:  May I answer?

23          THE COURT:  Overruled.

24          MR. FUN:  I believe the witness said she would like to

25    answer the question.

1            THE WITNESS:  May I answer?

2  A.   The reason why I'm hedging on it is because Val Martin and

3  Rich Fernandez are the heads of the drug task force in Worland,

4  so where one was, normally the other one was.  That's why I'm

5  fairly certain both of them were there, yes.

6  Q.   (BY MR. FLEENER)  Where was this conversation that you told

7  Val Martin and Rich Fernandez that Robert Velasquez held a gun

8  to you and put his foot on your child's head?  Where was that

9  conversation, ma'am?

10           MR. FUN:  Objection.  That's not what she previously

11  testified to.  She didn't say she told Val Martin and Rich

12  Fernandez those specific issues.  It mischaracterizes the

13  testimony of the witness.

14           THE COURT:  Overruled.

15  Q.   (BY MR. FLEENER)  Where were you when this conversation

16  took place?  Or if you don't know, tell me you don't know.

17  A.   Honestly, I don't know if it was in the interrogation room

18  or if it was upstairs in the library at the jail when I was

19  incarcerated.

20  Q.   It would have been in one of those two places, though?

21  A.   Yes.

22  Q.   Well, if it is in the interrogation room at the jail, that

23  doesn't sound like something that's just a statement that would

24  be made in passing.  It sounds like something that law

25  enforcement would act on.  You're being interrogated.  That's

1   what the interrogation room is for, right?

2   A.  Yes, that's what the interrogation room is for.

3   Q.  I'm sorry?

4   A.  Yes, that's correct.  That's what the interrogation room is

5   for, yes.

6   Q.  And during the interrogation room sometimes they actually

7   have cameras that are watching you, right?

8   A.  I would assume so, yes.

9   Q.  And police officers come in, sometimes there are

10  recordings, or they take tape recorders in there?

11  A.  Yes, sir.

12  Q.  Or pads of paper and they certainly take notes?

13  A.  Sometimes.

14  Q.  And that sounds like it would be a fairly formal setting

15  for you to tell these officers about this event that --

16  A.  Worland is a very small town.  I grew up with those people

17  being idols to me.  A lot of times we would see the deputies

18  upstairs where the jail is and ask to talk to them, and they

19  would come talk to us.  And it wasn't in a formal setting, and

20  it wasn't that I stated that Robert stuck a gun in my face or

21  anything like that.  It was just about the abuse, about him

22  beating me up.  There was never any specifics talked about.

23  Q.  So you never did specifically tell them about this incident

24  that you're testifying that --

25  A.  Correct.

1   Q.   Okay.  And you never told Agent Hall about it either when

2   he interviewed you in 2011?

3   A.   No.

4   Q.   Did you ever tell Mr. Fun about it?

5   A.   When I was being questioned, yes.

6   Q.   Why didn't you tell Agent Hall about that incident?

7   A.   I've tried to block a lot of my stuff out.  That's one of

8   the incidents where I don't like to remember.

9   Q.   Your testimony is that you didn't tell him because you

10  blocked out the incident because you --

11  A.   I don't like to remember it.

12  Q.   -- don't like to remember it?  Is that your testimony,

13  ma'am?

14  A.   I purposely blocked it out, yes, sir.

15  Q.   When were you incarcerated in Washakie County?

16  A.   For my drug charges?

17  Q.   When you would have had this conversation with --

18  A.   In '07.

19  Q.   I'm sorry?

20  A.   In 2007.

21  Q.   When in 2007?

22  A.   I don't know exactly.

23  Q.   Well --

24  A.   I know I was incarcerated from, I believe, June to

25  December.

1   Q.   And you were a CI in May, right?

2   A.   According to the paperwork, yes.

3   Q.   Well, I mean, is the paperwork not true?

4   A.   Yes, it's true.  I signed it.

5   Q.   Okay.  You were in custody after you were in -- you were in

6   custody after you were a CI?

7   A.   Yes, sir.

8   Q.   How far after you were a CI when you were in custody were

9   you --

10  A.   30 days, maybe.

11  Q.   Okay.

12  A.   Maybe just over 30 days.

13  Q.   Okay.  So sometime during fall of 2007 you would have at

14  least had some sort of discussion with one or two of these

15  officers about the abusive relationship with Mr. Velasquez,

16  right?

17  A.   Yes.

18  Q.   If you were willing to talk to them about the abusive

19  relationship you were having with Mr. Velasquez in general

20  terms, why in God's name wouldn't you tell them about the

21  specific incident that you testified to today?  I mean, you

22  obviously felt comfortable talking to them.

23  A.   He was still out of jail at the time.  I was afraid.

24  Q.   But you already told -- you just testified that you told

25  these officers that you had -- that he was abusive to you and

1   doing things to you, right?

2   A.   It is the level of degree of how much trouble I could have

3   got him into, and I didn't want to have him come after me.

4   Q.   Rather than protect yourself and your children?

5   A.   My children were protected.

6           MR. FLEENER:   May I have one moment, please, Judge?

7           THE COURT:   Yes.

8   Q.   (BY MR. FLEENER)   You agree that you're testifying here

9   under a grant of immunity, though, right?

10          MR. FUN:   Objection, Your Honor, asked and answered.

11  We've already been over this.

12          THE COURT:   Sustained.

13          MR. FUN:   If Mr. Fleener is marking that, I believe

14  we've already moved to admit that as a Government exhibit, the

15  immunity letter, so it is already an exhibit.

16          MR. FLEENER:   What is it?   I'm sorry.   I didn't see

17  that it was.

18          THE COURT:   606 or 606-A.   It may be behind you.

19          MR. FLEENER:   Thank you, ma'am.

20          MR. FUN:   Let the record reflect the jury has provided

21  Mr. Fleener with Government's exhibits.

22          MR. FLEENER:   I didn't realize that it actually had

23  been offered.

24          I have no further questions at this time.

25          THE COURT:   We will take --

1            MR. TIMBERS:  I have no questions, Your Honor.

2            Thank you, Ms. Bear.

3            THE WITNESS:  Thank you.

4            THE COURT:  No questions?  So we know where we are

5    with this witness, Ms. Higham, do you have questions?

6            MS. HIGHAM:  No questions for Mr. Garcia, Your Honor.

7            THE COURT:  Thank you.

8            Any redirect?

9            MR. FUN:  I do.  I think it can be very brief.  I know

10   the weather is getting bad.  I don't suspect that -- my

11   redirect to take more than 15 minutes.

12           THE COURT:  I would like to finish with this witness

13   so we can release her.

14           MR. FUN:  After my redirect I don't think there's

15   anything that we need to discuss.

16           THE COURT:  Thank you for your patience.  I know it's

17   been a long afternoon.  We'll try to finish with this witness

18   to release her.

19           MR. FUN:  I prefer to finish the witness.  Given the

20   weather, I don't want to have to keep her another night and

21   have to travel to different locations.

22           THE COURT:  Thank you.

23           Are you doing all right?

24           THE WITNESS:  I'm fine.  Thank you.

25

1                          REDIRECT EXAMINATION

2    Q.  (BY MR. FUN)  Ms. Bear, do you think you can handle a few

3    more questions?

4    A.  Yes, sir.

5    Q.  Ma'am, has this been one of the hardest things you've had

6    to do?

7              MR. FLEENER:  Objection, that was asked and answered

8    in Mr. Fun's direct examination.

9              MR. FUN:  I can ask another question, Your Honor.

10   Q.  (BY MR. FUN)  Ma'am, Mr. Fleener asked you a lot of

11   questions about your testimony and the specifics of your

12   testimony of what happened during the events that you testified

13   to.  Do you remember all of those questions?  I mean, there

14   were a lot of them.

15   A.  Specifically, no.

16   Q.  You remember the general tone of them?

17   A.  Yes, sir.

18   Q.  All right.  Now, we met, correct, you and me?  It was also

19   with Officer Hall, my paralegal, Lisa Wait, and my unfortunate

20   colleague who is now missing, Bob Murray?

21   A.  Yes, sir.

22   Q.  And that was after you had been arrested on your material

23   witness warrant?

24   A.  Yes, sir.

25   Q.  And you were being held in the Torrington jail?

1   A.  Yes, sir.

2   Q.  And when we talked to you, we asked you details about what

3   happened?

4   A.  Yes, sir.

5   Q.  And was that the first time you've had to talk about that?

6   A.  In such specific detail, yes.

7   Q.  And at that time when we talked about it in detail, did you

8   cry?

9   A.  I bawled hysterically.

10  Q.  And we had to take a break?

11  A.  Yes, sir.

12  Q.  And this is now the second time you've had to recall those

13  events in detail?

14  A.  Yes, sir.

15  Q.  Is it fair to say it is extremely painful for you?

16  A.  Yes, sir.

17  Q.  Now, ma'am, you were in the Torrington jail with Kim

18  Perkins?

19  A.  Yes, sir.

20  Q.  Did you talk to her about this case?

21  A.  No, sir.

22  Q.  You didn't talk about any of the facts at all?

23  A.  Not the facts, no, just that we knew the individuals.

24  Q.  Did you guys talk about trying to set them up in any way?

25  A.  No.

1  Q.  How about, were you also there with Candice Kysar who is

2  also a material witness?

3  A.  For a short period, yes.

4  Q.  Similar question:  Did you talk to her?

5  A.  I talked to her, yes, but not to do with this case until

6  after we were already here in this courtroom.

7  Q.  Again, did you talk to her about trying to set anyone up?

8  A.  No, sir.

9  Q.  Did you guys compare notes about your testimony?

10  A.  No.  Mine is hard enough alone.

11  Q.  In fact, when we met in Torrington, you were specifically

12  instructed about your conduct with other witnesses?

13  A.  Yes, sir.

14  Q.  What were you instructed?

15  A.  They were all under the assumption that I was there on a

16  conspiracy hold, not for a witness hold.

17  Q.  Now, ma'am, I'm going to just display for you on the

18  overhead but not for the jury -- Mr. Horn asked you some

19  questions about the -- seeing the gun.  Do you remember that?

20  A.  Yes, sir.

21  Q.  And he talked to you about your statement you had given to

22  Agent Hall on January 11th of 2010?

23  A.  Yes, sir.

24  Q.  Do you remember that?  And you've had a chance to look at

25  this statement when Mr. Horn showed it to you, correct?

1    A.  Yes, sir.

2    Q.  And so I will display for you what's been marked as

3    Government's Exhibit for identification 3001 and page 49 of

4    that document, the last paragraph.  Now, looking at that, we

5    talked about that already, that you had already indicated that

6    Robert Velasquez carried a pistol with him that was tucked in

7    the front of his pants, and the way you know that is because

8    you actually saw him pull it from that location?

9    A.  Yes, sir.

10   Q.  And it goes on, and you actually describe the pistol at

11   that point in time which was as being a silver and black gun?

12   A.  Yes, sir.

13   Q.  And that it was a semiautomatic instead of a revolver?

14        MR. HORN:  I'm going to object, Your Honor.  I think

15   the witness said under my cross-examination that all she could

16   recall was that it was black.  Mr. Fun is now suggesting a

17   different recollection.

18        MR. FUN:  I'm just asking -- I'm asking if that was in

19   her statement, Your Honor, that she gave to Agent Harnish --

20   excuse me -- Officer Hall.

21        THE COURT:  Overruled.

22   Q.  (BY MR. FUN)  And that's what you told Officer Hall back

23   then?

24   A.  Yes.

25   Q.  But you know -- you still remember today that it was a

1    semiautomatic firearm?

2    A.  Yeah, it wasn't a revolver.

3    Q.  Now, looking down to the almost second-to-last sentence

4    there, Mr. Horn asked you about that, that you had said that

5    you never -- you had told officers that Robert Velasquez never

6    pulled the gun on him or her, but that he, being Robert, did

7    show it to you.  That was accurate, correct?

8    A.  Yes.

9    Q.  Okay.  And it goes on, threatened to shoot you and your

10   children when he got mad?

11   A.  Yes.

12   Q.  Okay.  Now, there's also a statement there about having

13   nightmares.  Do you still currently have nightmares about all

14   of this?

15   A.  Yes, sir.

16   Q.  So you did, in fact, tell Officer Hall back then generally

17   what happened?

18   A.  Yes, sir.

19   Q.  Now, I'll refer you back to the first page, which is page

20   48, and again, the last paragraph of that document, and again,

21   Mr. Fleener asked you numerous questions about reporting to the

22   police.

23   A.  Yes, sir.

24   Q.  Now, if you look at that last paragraph, does -- do you

25   recall telling Officer Hall that you tried to report it

1   anonymously to the police?

2   A.  Yes, sir.

3   Q.  And that's in there, correct?

4   A.  Yes, sir.

5   Q.  And you indicate why you didn't want -- or at least why you

6   were afraid.  And Mr. Fleener kept on asking you why would you

7   do it, why wouldn't you, and you told Officer --

8              MR. FLEENER:  I object, Your Honor.  This is improper

9   impeachment.  She has agent's notes in front of her --

10             MR. FUN:  It is not impeachment.  It is redirect based

11  on Mr. Fleener's repetitive questions about why she didn't do

12  something, why she wasn't reporting it, why she was scared, why

13  she didn't report this to Officer Hall.  This is rehabilitation

14  to show she did, in fact, report it to Officer Hall.

15             MR. FLEENER:  Your Honor, he can rehabilitate as much

16  as he wants, but not with the agent's notes of an interview in

17  front of the witness.  The format is improper.  He can

18  certainly ask her questions about what she may have told

19  Officer Hall, but to sit here with Officer Hall's notes, which

20  she's never seen before, or if she's seen them, it is because

21  he gave them to her.  This isn't her document.  This isn't the

22  way you should impeach this witness.

23             MR. FUN:  It is not impeachment, Your Honor.

24             MR. FLEENER:  Well, whatever he's doing, it is not

25  proper.  You can't just have a witness sit there and read a

1   document.  I don't know what this is.

2            MR. FUN:  I'm not having her read the document.  I'm

3   asking if that was -- if she, in fact, remembers reporting it

4   now based upon this document, which both Mr. Fleener and

5   Mr. Horn used in their cross-examination, and I think it is

6   fair for this witness to look back.

7            MR. FLEENER:  Respectfully, Judge, we used the

8   document to impeach the witness and cross-examine her.  We

9   didn't just take the document and give it to her and let her

10  whatever he's doing with this document.  I believe -- I agree

11  that Mr. Fun can do what he wants to this witness, but --

12           MR. FUN:  My point, Your Honor, is that there was no

13  impeachment.  If it was reported --

14           THE COURT:  Sustained.

15  Q.  (BY MR. FUN)  Okay, Ms. Bear, let me ask you a different

16  question.  Please look at that and read that to yourself and

17  see if that refreshes your memory as to what you told Officer

18  Hall.

19           MR. FLEENER:  She needs to first acknowledge she

20  doesn't remember the event before it is proper to have the

21  recollection refreshed, Judge.

22           THE COURT:  Sustained.

23  Q.  (BY MR. FUN)  Ms. Bear, do you remember the questions

24  Mr. Fleener asked you about not reporting this to the officers?

25  A.  Yes, sir.

1   Q.  Did you report it to officers?

2   A.  Yes, sir.

3   Q.  Did you report it to Officer Hall when he interviewed you

4   back in January of 2010?

5   A.  Yes, sir.

6   Q.  And did you tell Officer Hall why it is that you were

7   afraid to report it back then in 2007 --

8   A.  Yes.

9   Q.  -- what your fears were?

10  A.  Yes, sir.

11  Q.  And you provided -- do you recall informing Officer Hall

12  what your fears were about?

13  A.  It wasn't necessarily Robert coming after me.  It was

14  somebody else that he knew.

15  Q.  And do you recall saying that it was -- you were afraid of

16  retaliation?

17  A.  Yeah.

18  Q.  Now, Mr. Horn also asked you questions about this stairs

19  incident.  Do you remember that?

20  A.  Yes, sir.

21  Q.  Do you recall telling Officer Hall in January of 2010 about

22  that incident?

23  A.  Yes, sir.

24  Q.  Ma'am, I just have a few more questions.  Just so I have

25  the timeline correct a little bit here, let's talk about you

 1  becoming a confidential informant.  You signed the confidential

 2  informant agreement in May of 2007?

 3  A.  Yes, sir.

 4  Q.  Now, prior to May is when all of this stuff with Robert and

 5  Ray-Ray happened?

 6  A.  Yes, sir.

 7  Q.  And that began in January of '07?

 8  A.  Yes, sir, approximately.

 9  Q.  And continued on to April of '07?

10  A.  Yes, sir.

11  Q.  And in May of '07 you signed this confidential informant

12  agreement?

13  A.  Yes, sir.

14  Q.  And then you get arrested shortly after that in October of

15  '07?

16  A.  I was arrested in June, June 15th -- 14th, I believe.

17  Q.  And then you subsequently get convicted in October of '07

18  for the three felonies?

19  A.  Yes, sir.

20  Q.  And then obviously in January of 2010 is when Officer Hall

21  interviewed you about this case?

22  A.  Yes, sir.

23  Q.  Now, ma'am, let's now just turn to the immunity agreement

24  real quickly.  You understand that the immunity agreement is

25  that you get testimonial immunity?  Is that your understanding?

 1   A.  Yes, sir.

 2   Q.  That is, that what you testify to under oath you're immune?

 3   A.  Right.

 4   Q.  Do you know if you get transactional immunity, meaning that

 5   whatever you've done in your life you are immune from?

 6   A.  No, sir.  I believe that if they have evidence, then I

 7   would be caught, I mean.

 8   Q.  And despite having immunity, you understand that you have

 9   to testify truthfully?

10   A.  Oh, yes.

11   Q.  You are subject to the pains and penalties of perjury?

12   A.  Yes, sir.

13   Q.  Despite having immunity, would you testify falsely against

14   someone?

15   A.  To what -- I'm sorry?  To do what?

16   Q.  Excuse me.  Even though you had testimonial immunity, would

17   you testify falsely against someone?

18   A.  No.

19   Q.  Would you falsely accuse someone?

20   A.  No.

21   Q.  Even though you -- are you still angry at Robert Velasquez

22   today?

23   A.  No.

24   Q.  Even though you were angry at him back in 2007, as you sit

25   there today, would you testify falsely against him?

1    A.  No.

2            MR. FUN:  Thank you.  I have nothing further.

3            THE COURT:  Thank you, Ms. Bear.  The Court

4    appreciates your time and attendance today.

5            THE WITNESS:  Thank you.

6            THE COURT:  You're released from your subpoena.

7            THE WITNESS:  Thank you.

8            THE COURT:  We will take our evening break today.

9    Again, I apologize we're breaking late.  I thank you for your

10   attention through a long afternoon.  I would like the jury

11   reassembled at 8:30 tomorrow morning, and we will start as soon

12   as everyone arrives in the courtroom to receive you.

13           Please remember the admonition to not research

14   anything about this case or anyone involved in the case, not

15   discuss the case with anyone and to keep an open mind until all

16   the evidence is in.

17           Please stand to excuse the jury.

18       (Following out of the presence of the jury.)

19           MR. HORN:  Judge, are we going to convene at 8:45 or

20   so?  You told the jury 8:30.

21           MR. FLEENER:  I have a scheduling conference.

22           THE COURT:  Yes, I know Mr. Fleener has a scheduling

23   conflict, so I'd ask counsel to be here in the courtroom no

24   later than 8:45.  And, of course, Mr. Fleener, if he's delayed,

25   then we will -- we won't call the jury back in until after he's

1    here.

2            MR. FLEENER:  I will make sure if for some reason

3    there is a problem with roads and whatnot with Judge Johnson

4    getting here for the conference, I will let everyone know.

5    Thank you.

6            THE COURT:  Thank you very much.

7            Anything else before we adjourn for the day?

8            MR. FUN:  Nothing from the United States, Your Honor.

9            THE COURT:  Thank you.  We will stand in recess until

10   call.

11       (Trial proceedings recessed

12       5:25 p.m., October 25, 2011.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4

5          I, JANET DAVIS, Federal Official Court Reporter for

6    the United States District Court for the District of Wyoming, a

7    Registered Merit Reporter and Federal Certified Realtime

8    Reporter, do hereby certify that I reported by machine

9    shorthand the foregoing proceedings contained herein on the

10   aforementioned subject on the date herein set forth, and that

11   the foregoing pages constitute a full, true and correct

12   transcript.

13

14          Dated this 10th day of January, 2012.

15

16

17

18

19                    _____
                               /s/ JANET DAVIS

20                            JANET DAVIS
                        Federal Official Court Reporter
21                        Registered Merit Reporter
                     Federal Certified Realtime Reporter
22

23

24

25

JANET DAVIS, RMR, FCRR                                    307.635.3884